# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2013AP296-OA & 2014AP417-W through 2014AP421-W & 2013AP2504-W through 2013AP2508-W |
| COMPLETE TITLE: | State of Wisconsin ex rel. Two Unnamed Petitioners, Petitioner, <br><br> v. <br><br> The Honorable Gregory A. Peterson, John Doe Judge and Francis D. Schmitz, Special Prosecutor, Respondents. <br><br> ---------------------------------------------------- <br><br> State of Wisconsin ex rel. Francis D. Schmitz, Petitioner, <br><br> v. <br><br> Honorable Gregory A. Peterson, John Doe Judge, Respondent, <br> Eight Unnamed Movants, Interested Party. <br><br> ---------------------------------------------------- <br><br> In the Matter of John Doe Proceeding <br><br> State of Wisconsin ex rel. Three Unnamed Petitioners, Petitioner, <br><br> v. <br><br> the Honorable Gregory A. Peterson, John Doe judge, the Honorable Gregory Potter, Chief Judge and Francis D. Schmitz, as Special Prosecutor, Respondents. |

ORIGINAL ACTION

----------------------------------------------------------

PETITION FOR SUPERVISORY WRIT BEFORE THE SUPREME COURT, APPEAL AND BYPASS TO THE SUPREME COURT FROM CIRCUIT COURT ORDER

----------------------------------------------------------

PETITION FOR REVIEW BEFORE THE SUPREME COURT

| | |
|---|---|
| OPINION FILED: | July 16, 2015 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Milwaukee, Iowa, Dodge, Dane and Columbia |

JUDGE:          Gregory A. Peterson (Reserve)

---

JUSTICES:
  CONCURRED:     PROSSER, J., ROGGENSACK, C.J. (joining Sections IV and V), ZIEGLER, J. (joining Section IV) and GABLEMAN, J. (joining Section IV) concur (Opinion filed). ZIEGLER, J. concurs (Opinion filed).
  CONCUR/DISSENT: ABRAHAMSON, J. concurs and dissents (Opinion filed). CROOKS, J. concurs and dissents (Opinion filed).
  DISSENTED:
  NOT
  PARTICIPATING: BRADLEY, J., did not participate.

---

ATTORNEYS:

For the Petitioners (case nos. 2013AP2504-W through 2013AP2508-W and 2014AP296-OA) and Interested Parties (case nos. 2014AP417-W through 2014AP421-W) there were briefs by *Attorney Dean A. Strang, StrangBradley, LLC*, Madison; *Attorney Steven M. Biskupic* and *Attorney Michelle L. Jacobs, Biskupic & Jacobs, S.C.*, Mequon; *Attorney Dennis P. Coffey, Mawicke & Goisman, SC*, Milwaukee; *Attorney Matthew W. O'Neill, Fox O'Neill Shannon, S.C.*, Milwaukee; *Attorney James B. Barton, Hansen Reynolds Dickinson Crueger LLC*, Milwaukee; *Attorney Eric J. Wilson, Godfrey & Kahn, S.C.*, Madison; and *Attorney Jeffrey James Morgan, LeBell, Dobrowski & Morgan, LLP,* Milwaukee.

For the Respondents (case nos. 2013AP2504-W through 2013AP2508-W, 2014AP417-W through 2014AP421-W and 2014AP296-OA) there were briefs by *Assistant Attorney General David C. Rice*, with whom on the briefs was *Attorney General J. B. Van Hollen* (term of office ending December 31, 2014) and *Attorney General Brad Schimel* (term of office commencing January 1, 2015) and *Special Prosecutor Francis D. Schmitz* (Petitioner in case nos. 2014AP417-W through 2014AP421-W), Milwaukee.

Amici Curiae briefs were filed by *Attorney Benjamin T. Barr (pro hac vice)*, Cheyenne, WY and *Attorney Stephen R. Klein (pro hac vice)*, Cheyenne, WY on behalf of the *Wyoming Liberty Group*

with whom on the brief was *Attorney Matthew M. Fernholz* and *Cramer, Multhauf & Hammes, LLP*, Waukesha; *Attorney James Bopp, Jr.*, Terre Haute, IN, on behalf of the *James Madison Center for Free Speech* and on behalf of *Wisconsin Right to Life, Inc.* with whom on the briefs was *Attorney Michael D. Dean* and *Michael D. Dean, LLC*, Brookfield; *Attorney James R. Troupis* and *Troupis Law Office, LLC*, Cross Plains, on behalf of the *Ethics and Public Policy Center*; *Attorney Adam J. White (pro hac vice)*, Washington, D.C. and *Boyden Gray & Associates*, Washington, D.C., on behalf of *Former Members of the Federal Election Commission Lee Ann Elliot, David Mason, Hans von Spakovsky and Darryl Wold* with whom on the brief were *Attorney James R. Troupis* and *Attorney Paul M. Ferguson*, Cross Plains; *Attorney Jonathan Becker, Attorney Nathan W. Judnic* and *Attorney Kevin J. Kennedy* on behalf of the *Wisconsin Government Accountability Board*, Madison; *Attorney Richard M. Esenberg, Attorney Brian W. McGrath* and the *Wisconsin Institute for Law & Liberty*, Milwaukee, on behalf of *The Hon. Bradley A. Smith, Center for Competitive Politics*, and *Wisconsin Family Action*; *Attorney J. Gerald Hebert (pro hac vice), Attorney Tara Malloy (pro hac vice), Attorney Paul S. Ryan (pro hac vice), Attorney Megan P. McAllen (pro hac vice)* and *The Campaign Legal Center*, Washington D.C., *Attorney Fred Wertheimer (pro hac vice)* and *Democracy 21*, Washington, D.C. and *Attorney Donald J. Simon (pro hac vice)* and *Sonosky, Chambers, Sachse, Endreson & Perry, LLP*, Washington, D.C. on behalf of *Campaign Legal Center, Democracy 21, Common Cause in Wisconsin and League of Women Voters of Wisconsin* with whom on the brief was *Attorney Susan M. Crawford* and *Cullen Weston Pines & Bach LLP*, Madison; *Attorney David B. Rivkin, Jr. (pro hac vice), Attorney Lee A. Casey (pro hac vice), Attorney Mark W. Delaquil (pro hac vice), Attorney Andrew M. Grossman (pro hac vice), Attorney Richard B. Raile (pro hac vice)* and *Baker & Hostetler LLP*, Washington, D.C. on behalf of *Citizens for Responsible Government Advocates, Inc.* with whom on the brief

3

was *Attorney Christopher M. Meuler* and *Friebert Finerty & St. John, S.C.*, Milwaukee; *Attorney Matthew Menendez (pro hac vice)*, *Attorney Daniel I. Weiner (pro hac vice)*, *Attorney Alicia L. Bannon (pro hac vice)* and *Brennan Center for Justice at NYU School of Law* on behalf of *Professors of Legal Ethics*, with whom on the brief was *Attorney Thomas R. Cannon*, Milwaukee.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2014AP296-OA & 2014AP417-W through 2014AP421-W & 2013AP2504-W through 2013AP2508-W
(L.C. No. 2013JD11 & 2013JD9 & 2013JD6 & 2013JD1 & 2012JD23)

STATE OF WISCONSIN : IN SUPREME COURT

**State of Wisconsin ex rel. Two Unnamed Petitioners,**

       Petitioner,

   v.

**The Honorable Gregory A. Peterson, John Doe Judge and**

**Francis D. Schmitz, Special Prosecutor,**

       Respondents.

**FILED**

**JUL 16, 2015**

Diane M. Fremgen
Clerk of Supreme Court

**State of Wisconsin ex rel. Francis D. Schmitz,**

       Petitioner,

   v.

**Honorable Gregory A. Peterson, John Doe Judge,**

       Respondent,

**Eight Unnamed Movants,**

       Interested Party.

**In the Matter of John Doe Proceeding**

**State of Wisconsin ex rel. Three Unnamed Petitioners,**

       **Petitioner,**

  **v.**

**the Honorable Gregory A. Peterson, John Doe judge,**

**the Honorable Gregory Potter, Chief Judge and**

**Francis D. Schmitz, as Special Prosecutor,**

       **Respondents.**

---

ORIGINAL ACTION for declaratory judgment. *Declaration of rights; relief granted; John Doe investigation ordered closed.*

PETITION for supervisory writ and appeal from an order of a John Doe Judge for Milwaukee County, Iowa County, Dodge County, Dane County, and Columbia County, Gregory A. Peterson, Reserve Judge. *Petition for supervisory writ denied and order affirmed.*

PETITION for supervisory writ and review of a decision of the Court of Appeals. *Petition for supervisory writ denied and decision affirmed.*

¶1 MICHAEL J. GABLEMAN, J. These cases arise from a John Doe proceeding originally initiated in Milwaukee County, and subsequently expanded to four additional counties, Iowa

2

County, Dodge County, Dane County, and Columbia County.  Though not consolidated, these proceedings have been overseen by a single John Doe judge and organized by a single special prosecutor (Francis Schmitz).  For the sake of clarity, we will refer to all five proceedings as a single "John Doe investigation."  The investigation has been ongoing for several years and has been the subject of much litigation.[1]

¶2   According to the special prosecutor, the purpose of the John Doe investigation is to root out allegedly illegal campaign coordination between certain issue advocacy groups and a candidate for elective office.  To further the investigation, the special prosecutor sought, and received, wide-ranging subpoenas and search warrants for 29 organizations and individuals, seeking millions of documents that had been created over a period of several years.  Various targets (collectively "the Unnamed Movants") moved the John Doe judge to quash the subpoenas and search warrants and to return any property seized by the special prosecutor.  The John Doe judge, the Hon. Gregory A. Peterson, presiding, granted the motions to quash and ordered the return of all property seized.  Reserve Judge Peterson

---

[1] We have granted the amicus briefs on the merits filed by: Wisconsin Right to Life; Citizens for Responsible Government Advocates, Inc.; The Wisconsin Government Accountability Board; The Honorable Bradley A. Smith, Center for Competitive Politics, and Wisconsin Family Action; Campaign Legal Center, Democracy 21, Common Cause in Wisconsin, and League of Women Voters of Wisconsin; Former Federal Election Commission Members Lee Ann Elliott, David Mason, Hans von Spakovsky, and Darryl Wold; and Wyoming Liberty Group.

stayed the order, however, and also halted the John Doe investigation pending our resolution of the cases before us.

¶3   The first case we address is an original action brought by Unnamed Movants Nos. 6 and 7, State ex rel. Two Unnamed Petitioners v. Peterson ("Two Unnamed Petitioners"). Unnamed Movants Nos. 6 and 7 seek a declaration of rights that the special prosecutor's theory of the case is invalid under Wisconsin law.  Specifically, they ask that we declare that coordinated issue advocacy of the kind alleged by the special prosecutor is not regulated under Wis. Stat. Ch. 11 (2011-12),[2] Wisconsin's campaign finance law.

¶4   The second case we review is a petition brought by the special prosecutor for a supervisory writ and an appeal of Reserve Judge Peterson's decision and order quashing the subpoenas and search warrants, State ex rel. Schmitz v. Peterson ("Schmitz v. Peterson").  The special prosecutor argues that Reserve Judge Peterson improperly quashed the subpoenas and search warrants because the records in the John Doe investigation establish a reasonable belief that the Unnamed Movants violated Wisconsin's campaign finance law.  This case is before us on the Unnamed Movants' petitions to bypass the court of appeals pursuant to Wis. Stat. § 809.60 (2013-14).

¶5   The third case we address is a petition for a supervisory writ and a review of a decision of the court of

---

[2] All subsequent references to the Wisconsin Statutes are to the 2011-12 version unless otherwise indicated.

appeals, <u>State ex rel. Three Unnamed Petitioners v. Peterson</u> ("<u>Three Unnamed Petitioners</u>").   This petition for supervisory writ was brought by Unnamed Movants Nos. 2, 6, and 7, and broadly challenges whether the John Doe investigation can be initiated in five separate counties under a single John Doe judge, and whether the special prosecutor was properly appointed.   The court of appeals denied the supervisory writ and Unnamed Movants Nos. 2, 6, and 7 appealed that decision to this court.

¶6   Our order granting and consolidating[3] each of these cases identified 14 issues presented by the complex nature of the cases.   These issues related to the procedural nature of the John Doe investigation, as well as whether the conduct alleged by the special prosecutor is actually a violation of Ch. 11. Subsequent briefing by the parties has revealed that the cases can be resolved on much narrower grounds than those that were originally submitted, and we have written this opinion accordingly.

¶7   We can resolve the original action, <u>Two Unnamed Petitioners</u>, by first examining whether the statutory definitions of "committee," "contributions," "disbursements," and "political purposes" in Wis. Stat. §§ 11.01(4), (6), (7),

---

[3] In our December 16, 2014, grant order we consolidated the cases for the purpose of briefing and oral argument.   We subsequently consolidated these three cases into one opinion because each case arises out of the same facts.

and (16) are limited to express advocacy[4] or whether they encompass the conduct of coordination between a candidate or a campaign committee and an independent organization that engages in issue advocacy.  Second, if the definitions extend to issue advocacy coordination, what then constitutes prohibited "coordination?"[5]

¶8    Next, we can resolve the supervisory writ petition in Schmitz v. Peterson by answering whether the evidence gathered in the John Doe proceedings provides a reasonable belief that Wisconsin law was violated by a campaign committee's coordination with independent advocacy organizations that engaged in express advocacy.[6]

¶9    Finally, we can resolve the supervisory writ petition in Three Unnamed Petitioners by examining: (1) Whether the Director of State Courts ("Director") violated a plain legal duty in appointing reserve judge, Barbara A. Kluka, as the John Doe judge to preside over a multi-county John Doe proceeding; (2) Whether the Chief Judge of the First Judicial District violated a plain legal duty in appointing reserve judge, Gregory A. Peterson, as the John Doe judge to preside over a multi-

---

[4] Express advocacy is a communication that expressly advocates for the election or defeat of a clearly identified candidate.

[5] This is issue seven from our December 16, 2014, grant order.

[6] This is issue ten from our December 16, 2014, grant order.

county John Doe proceeding; (3) Whether a John Doe judge violated a plain legal duty by convening a John Doe proceeding over multiple counties, which is then coordinated by the district attorney of one of the counties; (4) Whether a John Doe judge violated a plain legal duty by appointing a special prosecutor to perform the functions of a district attorney in multiple counties in a John Doe proceeding when (a) the district attorney in each county requests the appointment; (b) but none of the nine grounds for appointing a special prosecutor under Wis. Stat. § 978.045(1r) apply; (c) no charges have yet been issued; (d) the district attorney in each county has not refused to continue the investigation or prosecution of any potential charge; and (e) no certification that no other prosecutorial unit was able to do the work for which the special prosecutor was sought was made to the Department of Administration; and (5) If, arguendo, there was a defect in the appointment of the special prosecutor in the John Doe proceedings at issue in these matters, what effect, if any, would such a defect have on the competency of the special prosecutor to conduct the investigation; or the competency of the John Doe judge to conduct these proceedings?[7]

I. HOLDINGS

A.

---

[7] These are issues one through five from our December 16, 2014, grant order.

¶10 In Two Unnamed Petitioners, we hold that the definition of "political purposes" in Wis. Stat. § 11.01(16) is unconstitutionally overbroad and vague under the First Amendment to the United States Constitution and Article 1, Section 3 of the Wisconsin Constitution[8] because its language "'is so sweeping that its sanctions may be applied to constitutionally protected conduct which the state is not permitted to regulate.'" State v. Janssen, 219 Wis. 2d 362, 374, 580 N.W.2d 260 (1998) (quoting Bachowski v. Salamone, 139 Wis. 2d 397, 411, 407 N.W.2d 533 (1987)).   However, a readily available limiting construction exists that we will apply and that will prevent the chilling of otherwise protected speech; namely, "political purposes" is limited to express advocacy and its functional equivalent[9] as those terms are defined in Buckley v. Valeo, 424 U.S. 1 (1976), and Fed. Election Comm'n v. Wis. Right to Life, Inc., 551 U.S. 449 (2007) (WRTL II).   With this limiting construction in place, Chapter 11 does not proscribe any of the alleged conduct of any of the Unnamed Movants.   The special prosecutor has not alleged

---

[8] See Madison Teachers, Inc. v. Walker, 2014 WI 99, ¶23 n.9, 358 Wis. 2d 1, 851 N.W.2d 337, reconsideration denied, 2015 WI 1, 360 Wis. 2d 178, 857 N.W.2d 620  (concluding that the freedom of speech rights protected under the Wisconsin and United States Constitutions are coextensive.)  See also Kenosha Co. v. C&S Management, Inc., 223 Wis. 2d 373, 389, 588 N.W.2d 236 (1999).

[9] The functional equivalent of express advocacy occurs when the "'ad is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate.'" Wis. Right to Life, Inc. v. Barland, 751 F.3d 804, 820 (7th Cir. 2014) (Barland II) (citing Fed. Election Comm'n v. Wis. Right to Life, Inc., 551 U.S. 449, 469-70 (2007) (WRTL II)).

any express advocacy, and issue advocacy, whether coordinated or not, is "beyond the reach of [Ch. 11]." Wis. Right to Life, Inc. v. Barland, 751 F.3d 804, 815 (7th Cir. 2014) (Barland II). Accordingly, we invalidate the special prosecutor's theory of the case, and we grant the relief requested by the Unnamed Movants.

¶11 To be clear, this conclusion ends the John Doe investigation because the special prosecutor's legal theory is unsupported in either reason or law. Consequently, the investigation is closed. Consistent with our decision and the order entered by Reserve Judge Peterson, we order that the special prosecutor and the district attorneys involved in this investigation must cease all activities related to the investigation, return all property seized in the investigation from any individual or organization, and permanently destroy all copies of information and other materials obtained through the investigation. All Unnamed Movants are relieved of any duty to cooperate further with the investigation.

B.

¶12 In Schmitz v. Peterson, we hold that the special prosecutor has failed to prove that Reserve Judge Peterson violated a plain legal duty when he quashed the subpoenas and search warrants and ordered the return of all property seized by the special prosecutor. In quashing the subpoenas and search warrants, Reserve Judge Peterson exercised his discretion under the John Doe statute, Wis. Stat. § 968.26, to determine the

extent of the investigation.  Because the purpose of a supervisory writ does not include review of a judge's discretionary acts, State ex rel. Kalal v. Circuit Court for Dane Cnty., 2004 WI 58, ¶24, 271 Wis. 2d 633, 681 N.W.2d 110, the supervisory writ sought by the special prosecutor is denied, and Reserve Judge Peterson's order is affirmed.

C.

¶13 Finally, in Three Unnamed Petitioners, we hold that the Unnamed Movants have failed to prove that either Reserve Judge Kluka or Reserve Judge Peterson violated a plain legal duty by: (1) accepting an appointment as a reserve judge; (2) convening a multi-county John Doe proceeding; or (3) appointing a special prosecutor.  Although the circumstances surrounding the formation of the John Doe investigation raise serious concerns, and although the appointment of the special prosecutor may well have been improper, such concerns do not satisfy the stringent preconditions for a supervisory writ.[10]  Put another way, were we to grant the supervisory writ in this case, we would risk "transform[ing] the writ into an all-purpose alternative to the appellate review process," which we cannot do.  Id.  Accordingly, we deny the supervisory writ and affirm the decision of the court of appeals.

---

[10] See infra Section V.

10

II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY[11] [12]

¶14   In the spring of 2010, a John Doe proceeding (John Doe I) was commenced for the purpose of investigating the alleged misuse of public resources in the Milwaukee County Executive's Office.  This investigation resulted in criminal charges being filed against four individuals——Tim Russell, Kevin Kavanaugh, Kelly Rindfleisch, and Darlene Wink——in January 2012.[13]

¶15   John Doe I also triggered a second John Doe proceeding (John Doe II), the investigation at issue here.  On August 10, 2012, Milwaukee County Assistant District Attorney David Robles filed a petition for the commencement of John Doe II in the

_____

[11] In setting forth the facts, we respect the terms of the secrecy order issued by Reserve Judge Kluka and thus our majority opinion will set forth only the facts necessary for our resolution of this case.  See State ex rel. Niedziejko v. Coffey, 22 Wis. 2d 392, 398, 126 N.W.2d 96 (1964).  However, we can interpret the secrecy order and modify it to the extent necessary for the public to understand our decision herein.  If a fact is necessary to include in order to render explicable a justice's analysis of an issue presented, it is not precluded by the secrecy order.  We do not discuss the identity of the Unnamed Movants or the specific allegations against them.  We do, however, discuss the actions of the prosecutors and the judges involved.

[12] We recognize that in the ordinary case our procedural background would not be given with such exacting precision.  Conversely, we recognize that in the ordinary case without a secrecy order, our factual background would be more precise, in that we would, among other things, identify the parties.  Be that as it may, in the interest of as much transparency as possible we set forth as many of the facts as we can.

[13] Records from John Doe I have been released to the public by the original John Doe judge and are no longer subject to any secrecy order.

Milwaukee County circuit court.  This petition sought leave to investigate alleged campaign finance violations under Wis. Stat. Ch. 11, and requested a secrecy order to cover the investigation in anticipation that documents would be sought from the targeted individuals.  In support of his request, Robles' petition referred to an affidavit by Investigator Robert Stelter.

¶16 Stelter's affidavit indicates that emails obtained in response to a search warrant in John Doe I suggested that there may have been coordination of fundraising between campaign committees and other related, independent groups.  Reserve Judge Neal Nettesheim, the John Doe I judge, authorized the use of the information obtained in John Doe I for the purpose of requesting the commencement of John Doe II.

¶17 On August 23, 2012, the Chief Judge of the First Judicial District, Jeffrey Kremers, assigned and forwarded the John Doe petition to Reserve Judge Kluka.  On September 5, 2012, using a form titled "Application and Order for Specific Judicial Assignment," Director of State Courts John Voelker (with then-Chief Justice Shirley Abrahamson's name directly above)[14] assigned Reserve Judge Kluka to preside over the John Doe proceeding in Milwaukee County.  That same day, Reserve Judge Kluka authorized the commencement of the John Doe proceeding and also granted the requested secrecy order.

_____

[14] The actual text of the assignment orders read: "Shirley Abrahamson Chief Justice By: Electronically signed by [sic] A. John Voelker, Director of State Courts."

12

¶18  On September 6, 2012, Investigator Stelter filed an affidavit in support of a request for search warrants and subpoenas.  The request covered a wide swath of desired information, including emails, conference call records, and bank records, dating from 2009 to 2012.  In support of this request, Investigator Stelter provided details of numerous emails between a candidate committee and individuals and/or groups.

¶19  On December 13, 2012, Investigator Stelter filed another affidavit in support of a request for further search warrants and subpoenas.  This affidavit provided additional details about the parties and how they operated in coordination with each other.  The theory of the case, as put forward by the special prosecutor, is two-fold: (1) that the independent groups and the candidate committee worked "hand in glove" such that the independent groups became mere subcommittees of the candidate's committee, thus triggering reporting and disclosure requirements under Wis. Stat. §§ 11.10(4); and (2) that the coordinated issue advocacy amounted to an unlawful in-kind contribution to the candidate committee under Wis. Admin. Code § GAB 1.20.

¶20  On January 18, 2013, Milwaukee County District Attorney John Chisholm met with then-Attorney General J.B. Van Hollen to discuss the ongoing investigation.  District Attorney Chisholm sought to determine whether, given the statewide nature and gravity of the investigation, the Department of Justice ("DOJ") wished to become involved.  On May 31, 2013, Attorney General Van Hollen sent District Attorney Chisholm a letter

13

declining DOJ involvement in the investigation.  Attorney General Van Hollen cited, among other things, potential conflicts of interest and the appearance of impropriety.

¶21  In July 2013, three more petitions to commence John Doe proceedings were filed: District Attorney Jane Kohlwey filed a petition in Columbia County circuit court on July 22, 2013; District Attorney Larry Nelson filed a petition in Iowa County circuit court on July 25, 2013; and District Attorney Kurt Klomberg filed a petition in Dodge County circuit court on July 26, 2013.

¶22  On August 7, 2013, using a form titled "Application and Order for Specific Judicial Assignment," Director Voelker (with then-Chief Justice Shirley Abrahamson's name directly above) assigned Reserve Judge Kluka to preside over the Iowa County John Doe proceeding.  On August 21, 2013, Reserve Judge Kluka entered an order commencing the John Doe proceeding in Iowa County and also entered a secrecy order.

¶23  Also on August 7, 2013, using a form titled "Application and Order for Specific Judicial Assignment," Director Voelker (with then-Chief Justice Shirley Abrahamson's name directly above) assigned Reserve Judge Kluka to preside over the Dodge County John Doe proceeding.  On August 21, 2013, Reserve Judge Kluka entered an order commencing the Dodge County John Doe proceeding and also entered a secrecy order.

¶24  On August 14, 2013, using a form titled "Application and Order for Specific Judicial Assignment," Director Voelker

14

(with then-Chief Justice Shirley Abrahamson's name directly above) assigned Reserve Judge Kluka to preside over the Columbia County John Doe proceeding.  On August 21, 2013, Reserve Judge Kluka entered an order commencing the John Doe proceeding and also entered a secrecy order.

¶25 On August 21, 2013, Dane County District Attorney Ismael Ozanne filed a petition in Dane County circuit court to commence a John Doe proceeding.  On August 21, 2013, using a form titled "Application and Order for Specific Judicial Assignment," Director Voelker (with then-Chief Justice Shirley Abrahamson's name directly above) assigned Reserve Judge Kluka to preside over the Dane County John Doe proceeding.  On August 21, 2013, Reserve Judge Kluka entered an order commencing the Dane County John Doe proceeding and also entered a secrecy order.

¶26 Also on August 21, 2013, the District Attorneys from all five counties sent a joint letter to Reserve Judge Kluka requesting the appointment of a special prosecutor to oversee the entire investigation.  The District Attorneys encouraged Reserve Judge Kluka to appoint a special prosecutor on her own motion and in the exercise of her inherent authority.  Their letter expressed concerns that it would be inefficient for five district attorneys to handle one investigation and that there may be a perception of bias given their partisan affiliations. The letter recommended Francis Schmitz for the position.

¶27 On August 23, 2013, Reserve Judge Kluka entered separate, but identical, orders in all five John Doe proceedings appointing Francis Schmitz as special prosecutor with jurisdiction across the five counties.  Mirroring the District Attorneys' position on the matter, Reserve Judge Kluka cited, as the basis of her appointment, concerns of efficiency and the appearance of impropriety.  Reserve Judge Kluka made the appointment pursuant to her purported "authority" under State v. Carlson, 2002 WI App 44, 250 Wis. 2d 562, 641 N.W.2d 451, as well as her purported "inherent authority" under State v. Cummings, 199 Wis. 2d 721, 736, 546 N.W.2d 406 (1996).  Each order fixed the special prosecutor's rate of pay at $130 per hour and stated that a copy should be sent to the Department of Administration.

¶28  On October 1, 2013, Reserve Judge Kluka authorized 29 subpoenas duces tecum to, among others, Unnamed Movants Nos. 1, 2, 3, 4, 5, and 8, based on an affidavit submitted to her by Investigator Stelter.  These subpoenas compelled production of documents evidencing the conduct of coordination among the subpoenaed parties and a candidate committee, particularly the interaction between Unnamed Movants Nos. 1 and 2.  That same day Reserve Judge Kluka authorized search warrants for the homes and offices of Unnamed Movants Nos. 6 and 7.  The search warrants were executed at approximately 6:00 a.m. on October 3, 2013, in pre-dawn, armed, paramilitary-style raids in which bright floodlights were used to illuminate the targets' homes.

¶29 The breadth of the documents gathered pursuant to subpoenas and seized pursuant to search warrants is amazing. Millions of documents, both in digital and paper copy, were subpoenaed and/or seized. Deputies seized business papers, computer equipment, phones, and other devices, while their targets were restrained under police supervision and denied the ability to contact their attorneys. The special prosecutor obtained virtually every document possessed by the Unnamed Movants relating to every aspect of their lives, both personal and professional, over a five-year span (from 2009 to 2013). Such documents were subpoenaed and/or seized without regard to content or relevance to the alleged violations of Ch. 11. As part of this dragnet, the special prosecutor also had seized wholly irrelevant information, such as retirement income statements, personal financial account information, personal letters, and family photos.

¶30 Motions to quash the subpoenas were filed by Unnamed Movant No. 1 on October 17, 2013, and by Unnamed Movants Nos. 2 and 3 on October 25, 2013. On October 29, 2013, before ruling on the motions, Reserve Judge Kluka recused herself from the Milwaukee County proceeding, citing only an unspecified "conflict." The Milwaukee County proceeding was reassigned by Chief Judge Kremers to Reserve Judge Gregory Peterson on October 29, 2013.

¶31 The next day, on October 30, 2013, Reserve Judge Kluka disqualified herself from the remaining John Doe proceedings.

17

On November 1, 2013, Chief Judge Potter of the Sixth Judicial District assigned Reserve Judge Peterson to preside over the John Doe proceedings in Columbia County and Dodge County. On November 1, 2013, Chief Judge Duvall of the Seventh Judicial District assigned Reserve Judge Peterson to preside over the John Doe proceeding in Iowa County. On November 4, 2013, Chief Judge Daley of the Fifth Judicial District assigned Reserve Judge Peterson to preside over the John Doe proceeding in Dane County. Thereafter, on November 4, 2013, Director Voelker (with then-Chief Justice Shirley Abrahamson's name directly above) assigned Reserve Judge Peterson to preside over the Milwaukee County John Doe proceeding. On November 11, 2013, Director Voelker (with then-Chief Justice Shirley Abrahamson's name directly above) assigned Reserve Judge Peterson to preside over the John Doe proceedings in Iowa County and Dane County. On November 14, 2013, Director Volker (with then-Chief Justice Shirley Abrahamson's name directly above) assigned Reserve Judge Peterson to preside over the John Doe proceedings in Columbia County and Dodge County.

¶32 Also on November 14, 2013, Unnamed Movants Nos. 2, 6, and 7 filed with the court of appeals a petition for supervisory writs of mandamus and prohibition directed at Reserve Judges Kluka and Peterson (Three Unnamed Petitioners). The Unnamed Movants alleged procedural defects involving the appointment of a reserve judge to oversee a multi-county John Doe investigation and the appointment of the special prosecutor. The Unnamed

18

Movants asked the court of appeals to declare the John Doe investigation void ab initio.

¶33 In an order dated November 22, 2013, the court of appeals summarily dismissed what it deemed the Unnamed Movants' "first and sixth claims," namely, that there is no statutory authority to appoint or assign a reserve judge to preside over a John Doe proceeding, and that the John Doe judge circumvented the statutory functions of the clerks of court in five counties by requiring certain documents be sent to a post office box. Three Unnamed Petitioners, Nos. 2013AP2504-W-2508-W, unpublished order 6-7 (Wis. Ct. App. Nov. 22, 2013). Regarding the first claim, the court of appeals reasoned that there is no statute that limits the ability of reserve judges to oversee John Doe investigations. Id. Moreover, the court of appeals noted that the statute authorizing the appointment of reserve judges explicitly states that reserve judges "shall perform the same duties as other judges." Id. (citing Wis. Stat. § 753.075). The court of appeals ordered the respondents to address the remaining claims concerning the legality of a multi-county John Doe proceeding, the legality of a special prosecutor handling a multi-county John Doe proceeding, and the legality of the special prosecutor's appointment under Wis. Stat. § 978.045. Id.

¶34 While that case was pending at the court of appeals, Unnamed Movant No. 6 also filed a petition in Dodge County circuit court on December 4, 2013, for the return of the

19

property taken pursuant to the October 1 search warrant.   On December 20, 2013, Unnamed Movant No. 7 filed a substantially similar petition in Dane County circuit court.   After a response by the special prosecutor, Reserve Judge Peterson granted the motions to quash the subpoenas and the petitions to return property on January 10, 2014.   Reserve Judge Peterson reasoned:

> I conclude the subpoenas do not show probable cause that the moving parties committed any violations of the campaign finance laws.   I am persuaded the statutes only prohibit coordination by candidates and independent organizations for a political purpose, and political purpose, with one minor exception not relevant here . . . requires express advocacy.   There is no evidence of express advocacy.
>
> . . .
>
> Before there is coordination there must be political purposes; without political purposes, coordination is not a crime.
>
> . . .
>
> As relevant here, acts are for political purposes when they are made to influence the recall or retention of a person holding office.   Wis. Stat. § 11.01(16).   If the statute stopped here, the definition of political purposes might well be unconstitutionally vague. Buckley v. Valeo, 424 U.S. 1, 77 (1976).   But the definition continues: acts for political purposes include, but are not limited to, making a communication that expressly advocates the recall or retention of a clearly identified candidate.   Wis. Stat. § 11.01(16)(a).   In GAB 1.28, the GAB attempted to flesh out other acts that would constitute political purposes, but because of constitutional challenges it has stated it will not enforce that regulation.   So the only clearly defined political purpose is one that requires express advocacy.
>
> The state is not claiming that any of the independent organizations expressly advocated.   Therefore, the

20

subpoenas fail to show probable cause that a crime was committed.

¶35  As for the search warrants executed on the homes and offices of Unnamed Movants Nos. 6 and 7, Reserve Judge Peterson reasoned:

> The same legal conclusions should apply to all parties who have raised challenges in this case.  Therefore, for the reasons stated above regarding the limitations in the scope of the campaign finance laws, I conclude that the warrants lack probable cause.

¶36  The special prosecutor requested a stay of the order, which was granted on January 27, 2014.  In his order granting the stay, Reserve Judge Peterson also clarified that he was incorrect in stating that the probable cause standard applied to subpoenas.  Nevertheless, he concluded that a subpoena is not "valid when based on an invalid interpretation of the law."  As a condition of the stay, Reserve Judge Peterson ordered the State not to examine any of the property seized pursuant to search warrants.

¶37  On January 30, 2014, the court of appeals issued an opinion and order in Three Unnamed Petitioners addressing the remaining issues and denying the supervisory writ.  Regarding the legality of a multi-county John Doe proceeding, the court of appeals reasoned that there were five separate proceedings in five separate counties and that it is not unusual for courts to hold joint proceedings or to issue joint orders in non-consolidated cases that share a common factual basis, raise the same legal issue, or involve overlapping parties.  Three Unnamed Petitioners, Nos. 2013AP2504-W-2508-W, unpublished slip op. &

21

order 3-4 (Wis. Ct. App. Jan. 30, 2014). The court of appeals used the same reasoning to justify the legality of a special prosecutor handling multi-county John Doe proceedings. Id. at 4-7. As for the legality of the special prosecutor's appointment under Wis. Stat. § 978.045, the court of appeals determined that the special prosecutor was appointed pursuant to Reserve Judge Kluka's "authority" under Carlson, and "inherent authority" under Cummings, not under Wis. Stat. § 978.045, the special prosecutors statute. Id. On February 19, 2014, the Unnamed Movants filed a petition for review in this court, which we granted on December 16, 2014.

¶38 Meanwhile, on February 7, 2014, Unnamed Movants Nos. 6 and 7 filed a petition for leave to commence an original action in the Wisconsin Supreme Court under Article VII, Section 3(2) of the Wisconsin Constitution[15] (Two Unnamed Petitioners). The original action sought a declaration confirming the ruling of Reserve Judge Peterson in his January 10, 2014, order. The special prosecutor filed a response to this petition on February 25, 2014. We granted the original action on December 16, 2014.

---

[15] "The supreme court has appellate jurisdiction over all courts and may hear original actions and proceedings. The supreme court may issue all writs necessary in aid of its jurisdiction." Wis. Const. art. VII, § 3(2).

"The supreme court limits its exercise of original jurisdiction to exceptional cases in which a judgment by the court significantly affects the community at large." Wis. Prof'l Police Ass'n v. Lightbourn, 2001 WI 59, ¶4, 243 Wis. 2d 512, 627 N.W.2d 807. We exercised original jurisdiction because this case meets that test.

22

¶39  On February 21, 2014, the special prosecutor filed a petition for a supervisory writ and a writ of mandamus in the court of appeals (Schmitz v. Peterson).  The special prosecutor sought the supervisory writ in order to vacate Reserve Judge Peterson's January 10, 2014, order and to direct Reserve Judge Peterson to enforce the subpoenas and search warrants.  Unnamed Movants Nos. 1, 2, 3, 4, 5, 6, 7, and 8 filed responses to the petition on March 31, 2014.  Shortly thereafter, the Unnamed Movants brought a petition to bypass the court of appeals.  We granted bypass on December 16, 2014.

¶40  Finally, on November 3, 2014, Unnamed Movants Nos. 6 and 7 filed a motion with Reserve Judge Peterson requesting an order to show cause as to why the John Doe proceeding should not be ended.  Reserve Judge Peterson denied that motion but concluded that if appellate courts agreed with his interpretation of Ch. 11, the "consequence will no doubt be the end of the John Doe investigation."

### III. TWO UNNAMED PETITIONERS

¶41 We turn first to Two Unnamed Petitioners, the original action filed with the Wisconsin Supreme Court. This case requires us to interpret Wisconsin's campaign finance law, Wis. Stat. Ch. 11. By its very nature, this task involves fundamental questions regarding the scope of the government's ability to regulate political speech. To resolve this case, we must engage in statutory interpretation of the phrase "political purposes," which includes all activities "done for the purpose of influencing [an] election." Wis. Stat. § 11.01(16). We conclude, consistent with the First Amendment of the United States Constitution and Article I, Section 3 of the Wisconsin Constitution, that the plain language of "political purposes" in Wis. Stat. § 11.01(16) is unconstitutionally overbroad and vague if it is not given a limiting construction and applied to only express advocacy and its functional equivalent. This conclusion invalidates the special prosecutor's theory of the case and ends the John Doe investigation. Therefore, we agree with the Unnamed Movants and grant their requested relief.

### A. Standard of Review

¶42 Statutory interpretation is a question of law, which this court reviews de novo. Covenant Healthcare Sys., Inc. v. City of Wauwatosa, 2011 WI 80, ¶21, 336 Wis. 2d 522, 800 N.W.2d 906. In this case, our statutory interpretation implicates the constitutionality of specific provisions in

24

Chapter 11, which is also a question of law which we review de novo.  Janssen, 219 Wis. 2d at 370.

¶43  Statutes are presumed to be constitutional, "and the party seeking to overcome the presumption must prove the statute unconstitutional beyond a reasonable doubt."  Id.  When the statute implicates the exercise of First Amendment rights, however, "[t]he burden shifts to the proponent of the statute." Id. at 370-71.  Here, the proponent is the special prosecutor.

B. The First Amendment and the Doctrines of Vagueness and Overbreadth

i. First Amendment Principles

¶44  In addressing the scope of Wisconsin's campaign finance law we are keenly aware that this task bears directly on the ability of all citizens in our State to engage in the democratic process.  The special prosecutor's theories implicate one of the foundational principles of our nation: the freedom of speech, specifically, political speech.  We therefore begin our analysis with the words of the First Amendment: "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const. amend. I.[16]  Article I, Section 3 of the Wisconsin Constitution guarantees that: "Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right, and no laws shall be passed to restrain or abridge the liberty of speech or of the press."

---

[16] The First Amendment is applicable to the States through the Fourteenth Amendment.

¶45 While the First Amendment protects a broad range of speech and conduct, "there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs. . . . of course includ(ing) discussions of candidates . . . ." Buckley, 424 U.S. at 14 (quoting Mills v. Alabama, 384 U.S. 214, 218 (1966)).  Indeed, "[t]he right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 339 (2010).  "In a republic [such as ours] where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation." Buckley, 424 U.S. at 14-15.  These values reflect our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." N.Y. Times Co. v. Sullivan, 376 U.S. 254, 270 (1964) (emphasis added).

¶46 Our protection of the freedom of political speech reflects our firm belief that "[d]iscussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution." Buckley, 424 U.S. at 14.  "At the founding, speech was open, comprehensive, and vital to society's definition of itself; there were no limits on the sources of

26

speech and knowledge." Citizens United, 558 U.S. at 353. Therefore, "[t]he First Amendment affords the broadest protection to [] political expression in order 'to assure (the) unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" Buckley, 424 U.S. at 14 (quoting Roth v. United States, 354 U.S. 476, 484 (1957)).

¶47 Accordingly, "the First Amendment 'has its fullest and most urgent application precisely to the conduct of campaigns for political office.'" McCutcheon v. Fed. Election Comm'n, 134 S. Ct. 1434, 1441 (2014) (quoting Monitor Patriot Co. v. Roy, 401 U.S. 265, 272 (1971)). There exists "no right more basic in our democracy than the right to participate in electing our political leaders." Id. at 1440-41. Political speech is thus a fundamental right and is afforded the highest level of protection. Indeed, freedom of speech, especially political speech, is the right most fundamental to our democracy. To that end, we must conduct a particularly "[c]lose examination of the specificity of the statutory limitation . . . where, as here, the legislation imposes criminal penalties in an area permeated by First Amendment interests." Buckley, 424 U.S. at 40-41. "The First Amendment does not permit laws that force speakers to retain a campaign finance attorney, conduct demographic marketing research, or seek declaratory rulings before discussing the most salient political issues of our day. Prolix laws chill speech for the same reason that vague laws chill

speech: People 'of common intelligence must necessarily guess at [the law's] meaning and differ as to its application.'" Citizens United, 558 U.S. at 324 (quoting Connally v. Gen. Constr. Co., 269 U.S. 385, 391 (1926)).

¶48 However, there are certain, limited circumstances in which the government may regulate and impose burdens upon the exercise of free speech. In the campaign finance context, these include disclosure and reporting requirements, as well as contribution limits to candidates.[17] The justification for imposing such restrictions is to "prevent[] corruption and the appearance of corruption." WRTL II, 551 U.S. at 478 (quotations omitted). The interest in preventing the corruption of public officials, however, does not justify the regulation of all political speech. Rather, the United States Supreme Court has drawn an important "distinction between discussion of issues and candidates and advocacy of election or defeat of candidates." Buckley, 424 U.S. at 42. The compelling governmental interest that justifies the regulation of express advocacy (the prevention of quid pro quo[18] corruption) "'might not apply to'" the regulation of issue advocacy. WRTL II, 551 U.S. at 471 (quoting McConnell v. Fed. Election Comm'n, 540 U.S. 93, 209 n.88 (2003)). Indeed, "[s]pending large sums of money in

---

[17] See generally Barland II, 751 F.3d 804.

[18] Quid pro quo is a Latin term meaning "what for whom" and is defined as "[a]n action or thing that is exchanged for another action or thing of more or less equal value." Black's Law Dictionary 1367 (9th ed. 2009).

connection with elections, but not in connection with an effort to control the exercise of an officeholder's official duties, does not give rise to such quid pro quo corruption." McCutcheon, 134 S. Ct. at 1450.  "Nor does the possibility that an individual who spends large sums may garner 'influence over or access to' elected officials or political parties."  Id. at 1451 (quoting Citizens United, 558 U.S. at 359).

¶49  A key reason that issue advocacy is afforded greater protection under the First Amendment is that "[f]reedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period."  Thornhill v. Alabama, 310 U.S. 88, 102 (1940).  "Discussion of issues cannot be suppressed simply because the issues may also be pertinent in an election."  WRTL II, 551 U.S. at 474.

¶50  In order to give the fullest protection possible to the right to the exercise of political speech, "the government's authority to regulate in this area extends **only** to money raised and spent for speech that is clearly election related[, that is, express advocacy]; ordinary political speech about issues, policy, and public officials[, that is, issue advocacy,] **must remain unencumbered**."  Barland II, 751 F.3d at 810 (emphasis added).  Thus, in order to avoid a chilling effect on otherwise protected speech, "when the regulatory scheme reaches beyond candidates, their campaign committees, and political

parties. . . . [the] government may regulate . . . only with narrow specificity." Id. at 811 (quotations omitted). "In short, [we] must give the benefit of any doubt to protecting rather than stifling speech." WRTL II, 551 U.S. at 469; see also McCutcheon, 134 S. Ct. at 1451 (quoting WRTL II, 551 U.S. at 457) ("'[T]he First Amendment requires [courts] to err on the side of protecting political speech rather than suppressing it.'").

¶51 To that end, "in the domain of campaign-finance law, the First Amendment requires a heightened degree of regulatory clarity and a close fit between the government's means and its end." Barland II, 751 F.3d at 808. This "close fit" requirement is intended to prevent the dangerous chilling effect an unclear or imprecise law has on protected speech. Id. at 835. To guard against inhibiting protected political speech, courts use the overbreadth and vagueness doctrines. These doctrines "reflect[] the conclusion that the possible harm to society from allowing unprotected speech to go unpunished is outweighed by the possibility that protected speech will be muted." Janssen, 219 Wis. 2d at 372 (citation omitted).

ii. Overbreadth and Vagueness

¶52 "A statute is overbroad when its language, given its normal meaning, is so sweeping that its sanctions may be applied to constitutionally protected conduct which the state is not permitted to regulate." Id. at 374 (citation omitted). The overbreadth doctrine "recognize[s] that broadly written statutes

substantially inhibiting free expression should be open to attack even by a party whose own conduct remains unprotected under the First Amendment."   State v. Stevenson, 2000 WI 71, ¶11, 236 Wis. 2d 86, 613 N.W.2d 90.   "The danger inherent in overbroad statutes is that such statutes provide [the government with] practically unbridled administrative and prosecutorial discretion that may result in select[ive] prosecution based on certain views deemed objectionable by law enforcement."   Id., ¶13.   Thus, "[o]verbroad statutes may undesirably dissuade persons from exercising their rights by 'chilling' their protected speech or expression."   Janssen, 219 Wis. 2d at 372 (citation omitted).   In other words, the threat to free expression created by overbroad statutes is that, by potentially sweeping in constitutionally protected activity, individuals and groups may self-censor out of fear of vindictive or selective prosecution.

¶53 When faced with an overbroad statute, courts have several options.

> First, courts may apply a limiting construction to rehabilitate the statute when such a narrowing and validating construction is readily available.  Second, courts may cure the constitutional defect by severing the unconstitutional provisions of a statute and leaving the remainder of the legislation intact. Finally, courts may determine that the statute is not amenable to judicial limitation or severance and invalidate the entire statute upon a determination that it is unconstitutional on its face.

Stevenson, 236 Wis. 2d 86, ¶15 (internal citations omitted).

31

¶54 Related to the overbreadth doctrine is the vagueness doctrine,[19] which "requires legislatures to set reasonably clear guidelines for law enforcement officials and triers of fact in order to prevent 'arbitrary and discriminatory enforcement.'" State v. Princess Cinema of Milwaukee, Inc., 96 Wis. 2d 646, 657, 292 N.W.2d 807 (1980) (quoting Smith v. Goguen, 415 U.S. 566, 572-73 (1974)).  A vague statute "is one which operates to hinder free speech through the use of language which is so vague as to allow the inclusion of protected speech in the prohibition or to leave the individual with no clear guidance as to the nature of the acts which are subject to punishment."  Id. at 656.   "Where First Amendment rights are involved, an even 'greater degree of specificity' is required."  Buckley, 424 U.S. at 77 (citations omitted).   Thus, when a criminal statute implicates First Amendment rights, the statutory language must have the "utmost clarity and exactitude."   Stevenson, 236 Wis. 2d 86, ¶30.  Thus, the vagueness doctrine concerns the

> imping[ement] upon three first amendment values: (1)
> it does not provide individuals with fair warning of

---

[19] "The problems of vagueness and overbreadth in statutes, although raising separate problems, often arise together." State v. Princess Cinema of Milwaukee, Inc., 96 Wis. 2d 646, 656-57, 292 N.W.2d 807 (1980).   "Where statutes have an overbroad sweep, just as where they are vague, 'the hazard of loss or substantial impairment of those precious [First Amendment] rights may be critical,' since those covered by the statute are bound to limit their behavior to that which is unquestionably safe."  Keyishian v. Bd. of Regents of Univ. of State of N.Y., 385 U.S. 589, 609 (1967) (internal citation omitted).

what is prohibited; (2) lacking precise or articulated standards, it allows for arbitrary or discriminatory enforcement; and (3) it causes citizens to 'forsake activity protected by the First Amendment for fear it may be prohibited.'

State v. Thiel, 183 Wis. 2d 505, 521 n.9, 515 N.W.2d 847 (1994) (quoting M.S. News Co. v. Casado, 721 F.2d 1281, 1290 (10th Cir. 1983)).    In other words, "[b]ecause First Amendment freedoms need breathing space to survive, government may regulate in [this] area only with narrow specificity."  Barland II, 751 F.3d at 811 (quotations omitted).

C. The Definition of "Political Purposes" in Wis. Stat.
§ 11.01(16) is Overbroad and Vague Unless Limited to Express

Advocacy and Its Functional Equivalent.

¶55 The special prosecutor alleges that the Unnamed Movants engaged in illegally coordinated issue advocacy. However, the basis for his theory has evolved over the course of the various legal challenges to his investigation, and he appears unable to decide just how the Unnamed Movants have broken the law.[20]

¶56 Today, the special prosecutor alleges two theories of illegal coordination: (1) that the coordination between the Unnamed Movants is so extensive that the supposedly independent groups became subcommittees for the candidate's campaign under Wis. Stat. § 11.10(4); and (2) that the coordinated issue

---

[20] The original complaint initiating John Doe II alleged only coordinated fundraising between the Unnamed Movants.  Over time, the theory of coordination evolved to include coordinated issue advocacy.

33

advocacy amounts to an in-kind contribution under Wis. Admin. Code § GAB 1.20.  The special prosecutor's theories, if adopted as law, would require an individual to surrender his political rights to the government and retain campaign finance attorneys before discussing salient political issues.  See Citizens United, 558 U.S. at 324.  We find no support for the special prosecutor's theories in Wis. Stat. Ch. 11.  Chapter 11's definition of "political purposes," which underlies Wisconsin's campaign finance law, is both overbroad and vague and thus unconstitutionally chills speech because people "'of common intelligence must necessarily guess at [the law's] meaning and differ as to its application.'"  Id. (quoting Connally, 269 U.S. at 391).

¶57 However, by limiting the definition of "political purposes" to express advocacy and its functional equivalent, we ensure that all issue advocacy will remain unencumbered.  This limiting construction[21] allows us to protect political speech, a vital First Amendment right, and allows us to guard against the theories of the special prosecutor and those who would rely on overbroad and vague statutes to silence those with whom they disagree.

---

[21] Adopting a limiting construction is the only feasible option because the statutory definition of "political purposes" is not severable and because simply declaring the definition unconstitutional without adopting a limiting construction would effectively eliminate all of Wis. Stat. Ch. 11.

i. The Definition and Scope of "Political Purposes" in Wis. Stat. § 11.01(16) Must Be Limited to Only Express Advocacy.

¶58 We begin our analysis by noting that Wisconsin's campaign finance law "is labyrinthian and difficult to decipher without a background in this area of the law." Barland II, 751 F.3d at 808. Indeed, "[t]o a lay reader [Chapter 11] require[s] almost any group that wants to say almost anything about a candidate or election to register as a political committee." Id. at 810 (citing Wis. Right to Life, Inc. v. Paradise, 138 F.3d 1183, 1184 (7th Cir. 1998)). However, in analyzing the statutes, it becomes readily apparent that the entire regulatory scheme depends on but a few key terms: "committee," "contribution," "disbursement," and "political purposes."

¶59 "Committee" is defined in Wis. Stat. § 11.01(4) as "any person other than an individual and any combination of 2 or more persons, permanent or temporary, which makes or accepts contributions or makes disbursements, whether or not engaged in activities which are exclusively political, except that a 'committee' does not include a political 'group' under this chapter." As one can see from the statutory definition, committee status under Wisconsin campaign finance law depends on the definitions of "contributions" and "disbursements."

¶60 "Contribution" has a very lengthy definition, but the relevant portion is contained in Wis. Stat. § 11.01(6)(a)1, which states that "contribution" means

> [a] gift, subscription, loan, advance, or deposit of
> money or anything of value, except a loan of money by

35

a commercial lending institution made by the institution in accordance with applicable laws and regulations in the ordinary course of business, <u>made for political purposes</u>. In this subdivision "anything of value" means a thing of merchantable value.

(emphasis added).  The definition of "disbursement" largely parallels the definition of "contribution," the relevant portion of which states that a "disbursement" is

> [a] purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, except a loan of money by a commercial lending institution made by the institution in accordance with applicable laws and regulations in the ordinary course of business, <u>made for political purposes</u>.  In this subdivision, "anything of value" means a thing of merchantable value.

Wis. Stat. § 11.01(7)(a)1 (emphasis added).  It is apparent from the emphasized language that whether or not something is a contribution or disbursement depends on the definition of "political purposes."

¶61  "Political purposes" is defined, in relevant part, as an act

> done <u>for the purpose of influencing the election</u> or nomination for election of any individual to state or local office, for the purpose of influencing the recall from or retention in office of an individual holding a state or local office, for the purpose of payment of expenses incurred as a result of a recount at an election, or for the purpose of influencing a particular vote at a referendum.  In the case of a candidate, or a committee or group which is organized primarily for the purpose of influencing the election or nomination for election of any individual to state or local office, for the purpose of influencing the recall from or retention in office of an individual holding a state or local office, or for the purpose of influencing a particular vote at a referendum, all administrative and overhead expenses for the

36

maintenance of an office or staff which are used principally for any such purpose are deemed to be for a political purpose.

(a) Acts which are for "political purposes" include but are not limited to:

1. <u>The making of a communication which expressly advocates the election, defeat, recall or retention of a clearly identified candidate or a particular vote at a referendum.</u>

Wis. Stat. § 11.01(16) (emphasis added).

¶62  Thus, the lynchpin of Wisconsin's campaign finance law is whether an act is done for "political purposes."  Chapter 11 regulates "disbursements" and "contributions," and the phrase "political purposes" is used in the definition of each of those words.  <u>See</u> Wis. Stat. §§ 11.01(7) (defining "disbursement"), 11.01(6) (defining "contribution").  If an act is not done for "political purposes," then it is not a disbursement or a contribution, and it therefore is not subject to regulation under Ch. 11.

¶63  The Seventh Circuit in <u>Barland II</u> held that the phrase "political purposes," as defined in Wis. Stat. § 11.01, is both vague and overbroad.  <u>Barland II</u>, 751 F.3d at 833.  The court reasoned that the U.S. Supreme Court in <u>Buckley</u> held that the phrase "influence an election," which also appears in the definition of "political purposes," is vague and overbroad.  <u>Id.</u> at 833 ("The [<u>Buckley</u>] Court held that this kind of broad and imprecise language risks chilling issue advocacy, which may not be regulated; the same reasoning applies here.").  Further, the court concluded the phrase "include but are not limited to"

37

renders the definition of "political purposes" vague and overbroad because "[t]he 'not limited to' language holds the potential for regulatory mischief."  Id.; see also Elections Bd. of State of Wis. v. Wis. Mfrs. & Commerce, 227 Wis. 2d 650, 677, 597 N.W.2d 721 (1999) (WMC) (concluding that the express advocacy standard under Wis. Stat. § 11.01(16)(a)1 must still be consistent with Buckley, lest it become a trap for the innocent and unwary.)

¶64 The special prosecutor has completely disregarded these principles.  The lack of clarity in Ch. 11, which the special prosecutor relies upon, leads us to the unsettling conclusion that it is left to government bureaucrats and/or individual prosecutors to determine how much coordination between campaign committees and independent groups is "too much" coordination.  In essence, under his theory, every candidate, in every campaign in which an issue advocacy group participates, would get their own John Doe proceeding and their own special prosecutor to determine the extent of any coordination.  This is not, and cannot, be the law in a democracy.

¶65 More fundamentally, however, the fact that these questions arise at all is proof that the definition of "political purposes" "holds the potential for regulatory mischief.  Perhaps [the express advocacy language] was included to leave room for regulation of the 'functional equivalent' of express advocacy as that term was later explained in [WRTL II]. Beyond that, however, the language contains persistent vagueness

and overbreadth." Barland II, 751 F.3d at 833. In fact, the Government Accountability Board ("GAB") conceded this point in Barland II and suggested a limiting construction to the Seventh Circuit that would "confine the definitions [of "political purposes"] to express advocacy and its functional equivalent." Id. That is precisely the construction the Seventh Circuit adopted, and we conclude that same limiting construction should apply here as well.

¶66 To be clear, the reason that the definition of "political purposes" in § 11.01(16) is unconstitutional is because the phrase "influencing [an] election" is so broad that it sweeps in protected speech, as well as speech that can be subject to regulation. "Influencing [an] election" obviously includes express advocacy, but without a limiting construction it could just as easily include issue advocacy aired during the closing days of an election cycle. This is precisely the kind of overbroad language that the Supreme Court has repeatedly rejected. "Discussion of issues cannot be suppressed simply because the issues may also be pertinent in an election." WRTL II, 551 U.S. at 474 (emphasis added). We must have clear rules that protect political speech, and we must continue to reject the idea that some protected speech may be chilled or restricted simply because it is "difficult to distinguish from unprotected speech." Id. at 494 (Scalia, J., concurring). "[L]aws targeting political speech are the principal object of the First Amendment guarantee. The fact that the line between electoral

39

advocacy and issue advocacy dissolves in practice is an indictment of the statute, not a justification of it."  Id.

¶67 We therefore hold that the definition of "political purposes" in Wis. Stat. § 11.01(16) is unconstitutionally overbroad and vague.  In order to cure this overbreadth and vagueness, we adopt a construction of § 11.01(16) that limits the definition of "political purposes" to include only express advocacy and its functional equivalent, as those terms are defined in Buckley and WRTL II.  This construction is "readily available" due to the Seventh Circuit's decision in Barland II. See Stevenson, 236 Wis. 2d 86, ¶15; Barland II, 751 F.3d at 834 (explaining that "[t]he [Wisconsin Supreme Court] and [] Attorney General have acknowledged that when Chapter 11 is applied beyond candidates, their committees, and political parties, it must be narrowly construed to comply with Buckley's express-advocacy limitation; the administration of the state's campaign-finance system has generally reflected this understanding for many decades.").[22]  Given that Chapter 11's requirements depend on whether an act is done for "political

_____

[22] Although Barland II did not involve an allegation of coordination, that distinction is meaningless in determining whether the definition of "political purposes" is vague or overbroad.  It may well be that the distinction between issue and express advocacy is little more than "a line in the sand drawn on a windy day."  WRTL II, 551 U.S. at 499 (Scalia, J., concurring) (citation omitted).  However, "'[p]rotected speech does not become unprotected merely because it resembles the latter.  The Constitution requires the reverse.'"  Id. at 475 (majority opinion) (quoting Ashcroft v. Free Speech Coal., 535 U.S. 234, 255 (2002)).

purposes," the effect of this limiting construction places "issue advocacy . . . beyond the reach of [Wisconsin's] regulatory scheme." Barland II, 751 F.3d at 815.

ii. The Special Prosecutor's Theories of Coordination Depend on Coordinated Issue Advocacy, Which Is Not Regulated Under Chapter 11.

¶68 Having reached our conclusion about the scope of conduct regulated by Chapter 11, we now turn to the special prosecutor's theories of coordination and whether the alleged conduct is regulated under Wisconsin law.[23]  The special

---

[23] We note that in Wis. Coal. for Voter Participation, Inc. v. State Elections Bd., 231 Wis. 2d 670, 605 N.W.2d 654 (Ct. App. 1999) (WCVP), the court of appeals concluded that conduct substantially identical to the subject of this investigation, coordinated issue advocacy, is regulated under Wisconsin law. The key language from that case upon which the special prosecutor's theories rest, is that "the term 'political purposes' is not restricted by the cases, the statutes or the code to acts of express advocacy.  It encompasses many acts undertaken to influence a candidate's election . . . ." WCVP, 231 Wis. 2d at 680.

The court of appeals' statement regarding "political purposes" is incorrect.  It was incorrect when WCVP was decided in 1999, and it is incorrect today.  Just four months prior to the WCVP decision, this court stated that

> Buckley stands for the proposition that it is unconstitutional to place reporting or disclosure requirements on communications which do not 'expressly advocate the election or defeat of a clearly identified candidate.'  Any standard of express advocacy must be consistent with this principle in order to avoid invalidation on grounds of vagueness and/or overbreadth.

(continued)

prosecutor has disregarded the vital principle that in our nation and our state political speech is a fundamental right and is afforded the highest level of protection.  The special prosecutor's theories, rather than "assur[ing] [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people," Roth, 354 U.S. at 484, instead would assure that such political speech will be investigated with paramilitary-style home invasions conducted in the pre-dawn hours and then prosecuted and punished.  In short, the special prosecutor completely ignores the command that, when seeking to regulate issue advocacy groups, such regulation must be done with "narrow specificity."  Barland II, 751 F.3d at 811 (quotations omitted).

---

Elections Bd. of State of Wis. v. Wis. Mfrs. & Commerce, 227 Wis. 2d 650, 669, 597 N.W.2d 721 (1999) (WMC) (citations omitted).  This should have been enough to "restrict" the definition of "political purposes" in Chapter 11.  If "it is unconstitutional to place reporting or disclosure requirements on communications which do not 'expressly advocate the election or defeat of a clearly identified candidate,'" then "political purposes" cannot extend as broadly as WCVP and the special prosecutor claim.  At the very least, WCVP ignores WMC and is inconsistent with its explanation of Buckley.

In any event, even assuming that it was good law to begin with, WCVP is no longer a correct interpretation of "political purposes" in Chapter 11.  As discussed above, recent case law has clearly restricted the scope of permissible regulation in campaign finance law to express advocacy and its functional equivalent.  See WRTL II, 551 U.S. 449; Citizens United v. Fed. Election Comm'n, 558 U.S. 310 (2010); Barland II, 751 F.3d 804. Therefore, to the extent that WCVP implies that the definition of "political purposes" in Chapter 11 extends beyond express advocacy and its functional equivalent, WCVP is overruled.

¶69   The limiting construction that we apply makes clear that the special prosecutor's theories are unsupportable in law given that the theories rely on overbroad and vague statutes. By limiting the definition of "political purposes" to express advocacy and its functional equivalent, political speech continues to be protected as a fundamental First Amendment right.

¶70   The special prosecutor's first theory of illegal coordination is that ostensibly independent, advocacy groups operated "hand in glove" with the candidate's committee, which made the independent groups subcommittees under Wis. Stat. § 11.10(4).  The relevant part of this statute states that

> [a]ny committee which is organized or acts with the cooperation of or upon consultation with a candidate or agent or authorized committee of a candidate, or which acts in concert with or at the request or suggestion of a candidate or agent or authorized committee of a candidate is deemed a subcommittee of the candidate's personal campaign committee.

Wis. Stat. § 11.10(4) (emphasis added).  The special prosecutor argues that coordinated issue advocacy is prohibited under this provision because the statute itself only requires cooperation between a candidate's committee and another committee and that the statute does not require that such cooperation be limited to express advocacy.

¶71   The first flaw in the special prosecutor's theory is that it is left to the whim of each regulatory bureaucrat and/or prosecutor to subjectively determine how much coordination is "too much."  Indeed, the special prosecutor, because he relies

43

on vague and overbroad statutes, will be the only one to know how much coordination is "too much."  This cannot be; such an interpretation of § 11.10(4) is unconstitutionally overbroad and vague under the First Amendment.  See Princess Cinema, 96 Wis. 2d at 657 (citations omitted) ("The void for vagueness doctrine '. . . incorporates the notions of fair notice or warning. . . . (i)t requires legislatures to set reasonably clear guidelines for law enforcement officials and triers of fact in order to prevent "arbitrary and discriminatory enforcement."'").

¶72 However, there is another, more obvious flaw in the special prosecutor's theory.  Wisconsin Stat. § 11.10(4) refers to a "committee" that coordinates with a candidate's committee and in order to be a "committee," an entity must "make[] or accept[] contributions or make[] disbursements."  In order to come within the purview of regulated acts both "contributions" and "disbursements" must be "made for political purposes."  Wis. Stat. §§ 11.01(6)(a)1; 11.01(7)(a)1.  Applying the necessary limiting construction to the phrase "for political purposes," we conclude that in order to meet the statutory definition of "committee," a committee must engage in express advocacy and its functional equivalent.  This conclusion is fatal to the special prosecutor's subcommittee theory because he does not allege that the Unnamed Movants engaged in express advocacy.  Put simply, because the Unnamed Movants did not engage in express advocacy,

they could not be considered a "committee" subject to Chapter 11's regulation.

¶73 The special prosecutor's second theory of illegal coordination is that the coordinated issue advocacy should have been reported as "in-kind contributions" by the candidate's committee.  This "in-kind contribution" theory rests on the assumption that any issue advocacy engaged in by the Unnamed Movants was done for the benefit of the candidate and therefore should have been reported.  Once again, the special prosecutor's theory fails.

¶74 An "in-kind contribution" is defined in the GAB's regulations as "a disbursement by a contributor to procure a thing of value or service for the benefit of a registrant who authorized the disbursement."  GAB 1.20(1)(e) (emphasis added). By its plain language, the definition of an in-kind contribution depends on the making of a "disbursement."  As a result of the limiting construction of "political purposes," there can be no "disbursement" under Chapter 11, or the corresponding regulations, without express advocacy or its functional equivalent.  Even assuming that the special prosecutor is correct and the Unnamed Movants engaged in issue advocacy at the specific request of the candidate or the candidate's committee, those actions do not give rise to a reportable "in-kind contribution" because under Ch. 11 issue advocacy cannot be a "disbursement."

¶75 In sum, we hold that, consistent with the First Amendment to the United States Constitution and Article I, Section 3 of the Wisconsin Constitution, the definition of "political purposes" in Wis. Stat. § 11.01(16) is unconstitutionally overbroad and vague because its language "is so sweeping that its sanctions may be applied to constitutionally protected conduct which the state is not permitted to regulate." Janssen, 219 Wis. 2d at 374. However, there is a readily available limiting construction that will prevent the chilling of otherwise protected speech, and we hold that "political purposes" is limited to express advocacy and its functional equivalent as those terms are defined in Buckley and WRTL II. With this limiting construction in place, Chapter 11 does not regulate the alleged conduct of the Unnamed Movants. The special prosecutor has not alleged any express advocacy, and issue advocacy, whether coordinated or not, is "beyond the reach of the regulatory scheme." Barland II, 751 F.3d at 815. Accordingly, we grant the relief requested by the Unnamed Movants.

¶76 To be clear, this conclusion ends the John Doe investigation because the special prosecutor's legal theory is unsupported in either reason or law. Consequently, the investigation is closed. Consistent with our decision and the order entered by Reserve Judge Peterson, we order that the special prosecutor and the district attorneys involved in this investigation must cease all activities related to the

46

investigation, return all property seized in the investigation from any individual or organization, and permanently destroy all copies of information and other materials obtained through the investigation.  All Unnamed Movants are relieved of any duty to cooperate further with the investigation.

IV. SCHMITZ V. PETERSON

¶77 We turn now to the second case presented for our review, Schmitz v. Peterson.  This case is before us on petitions to bypass the court of appeals filed by the Unnamed Movants.  In this case, the special prosecutor seeks a supervisory writ in order to reverse Reserve Judge Peterson's decision to quash the subpoenas and search warrants issued by Reserve Judge Kluka.  The specific issue presented is whether the evidence gathered in the John Doe proceedings provide a reasonable belief that Wisconsin's campaign finance law was violated by a campaign committee's coordination with independent advocacy organizations.

¶78 We hold that the special prosecutor has failed to prove that Reserve Judge Peterson violated a plain legal duty when he quashed the subpoenas and search warrants and ordered the return of all property seized by the special prosecutor.  In quashing the subpoenas and search warrants, Reserve Judge Peterson exercised his discretion under the John Doe statute, Wis. Stat. § 968.26, to determine the extent of the investigation.  Because the purpose of a supervisory writ does not include review of a judge's discretionary acts, Kalal, 271 Wis. 2d 633, ¶24, the supervisory writ sought by the special prosecutor is denied, and Reserve Judge Peterson's order is affirmed.

A. Standard of Review

48

¶79 The decisions of John Doe judges "are not subject to direct appeal" to the court of appeals "because an order issued by a John Doe judge is not an order of a 'circuit court' or a 'court of record.'" In re John Doe Proceeding, 2003 WI 30, ¶¶23, 41, 260 Wis. 2d 653, 660 N.W.2d 260. Nonetheless, a party may seek review of a John Doe judge's actions "pursuant to a petition for supervisory writ." Id., ¶41; see also Wis. Stat. § 809.51(1).

¶80 It is well settled that "[a] writ of supervision is not a substitute for an appeal." Kalal, 271 Wis. 2d 633, ¶17 (quotations omitted). In order to prevail on a supervisory writ, the petitioner must prove the following: "(1) an appeal is an inadequate remedy; (2) grave hardship or irreparable harm will result; (3) the duty of the trial court is plain and it must have acted or intends to act in violation of that duty; and (4) the request for relief is made promptly and speedily." Id. (quoting Burnett v. Alt, 224 Wis. 2d 72, 96-97, 589 N.W.2d 21 (1999)) (emphasis added). "A plain duty 'must be clear and unequivocal and, under the facts, the responsibility to act must be imperative.'" Id., ¶22 (quoting State ex rel. Kurkierewicz v. Cannon, 42 Wis. 2d 368, 377-78, 166 N.W.2d 255 (1969)).

¶81 "A supervisory writ 'is considered an extraordinary and drastic remedy that is to be issued only upon some grievous exigency.'" Id., ¶17 (citation omitted). The obligation of a judge to correctly find facts and apply the law is not the type of plain legal duty contemplated by the supervisory writ

49

procedure, "as it would extend supervisory jurisdiction to a virtually unlimited range of decisions involving the finding of facts and application of law." Id., ¶24.  Instead,

> [t]he obligation of judges to correctly apply the law is general and implicit in the entire structure of our legal system.  The supervisory writ, however, serves a narrow function: to provide for the direct control of lower courts, judges, and other judicial officers who fail to fulfill non-discretionary duties, causing harm that cannot be remedied through the appellate review process.  To adopt [a contrary] interpretation of the plain duty requirement in supervisory writ procedure would transform the writ into an all-purpose alternative to the appellate review process.

Id. (emphasis added) (citations omitted).

### B. Nature of John Doe Proceedings

¶82 Before analyzing Reserve Judge Peterson's decision to quash the subpoenas and search warrants, it is necessary for us to provide background regarding the proper conduct of John Doe proceedings, which have been in use in Wisconsin since its days as a territory.  In re Doe, 317 Wis. 2d 364, ¶13.  This discussion is necessary to educate the public on the nature of this important investigatory tool, and also to provide guidance to the lower courts on the proper conduct of John Doe proceedings.

¶83 Wisconsin's John Doe proceeding, codified in Wis. Stat. § 968.26, serves two important purposes.  State ex rel. Reimann v. Circuit Court for Dane Cnty., 214 Wis. 2d 605, 621, 571 N.W.2d 385 (1997).  "First, and most obvious, a John Doe proceeding is intended as an investigatory tool used to ascertain whether a crime has been committed and if so, by whom.

50

Second, the John Doe proceeding is designed to protect innocent citizens from frivolous and groundless prosecutions." Id. (citations omitted). In order to fulfill the dual purposes of the John Doe statute, a John Doe judge

> serves an essentially judicial function. The judge considers the testimony presented. It is the responsibility of the John Doe judge to utilize his or her training in constitutional and criminal law and in courtroom procedure in determining the need to subpoena witnesses requested by the district attorney, in presiding at the examination of witnesses, and in determining probable cause. It is the judge's responsibility to ensure procedural fairness.

State v. Washington, 83 Wis. 2d 808, 823, 266 N.W.2d 597 (1978) (footnote omitted).

¶84 "Wisconsin Stat. § 968.26 outlines a four-step process for John Doe proceedings." In re Doe, 317 Wis. 2d 364, ¶14. "First, the judge must determine whether a complainant has alleged 'objective, factual assertions sufficient to support a reasonable belief that a crime has been committed.'" Id. (citation omitted). Second, if the complainant meets this burden, "the judge must proceed with a hearing at which 'the judge shall examine the complainant under oath and any witnesses produced by him or her.'" Id., ¶15 (quoting Wis. Stat. § 968.26 (2007-08)). Third, when this hearing is over, "a judge must determine whether probable cause exists as to each essential element of the alleged crime." Id., ¶16. "Finally, if the judge determines that probable cause is present—that is, that a crime probably has been committed—and who the perpetrator of the alleged crime is, the judge may order that a criminal complaint

51

be reduced to writing . . . ." Id., ¶17. This process gives a John Doe judge "broad discretion to decide whether to file a criminal complaint, even upon a finding of probable cause." Id.

¶85 In order to commence a John Doe proceeding, the complainant, whether it be the district attorney or anyone else, must demonstrate to the John Doe judge "that he has reason to believe that a crime has been committed within the jurisdiction." State v. Doe, 78 Wis. 2d 161, 165, 254 N.W.2d 210 (1977). If "the judge finds that the complainant has failed to establish 'reason to believe[]' [that a crime has been committed,] that judge may deny the John Doe petition without conducting an examination." Reimann, 214 Wis. 2d at 625. Thus, the John Doe judge must act as a gate-keeper and screen out "petitions that are spurious, frivolous, or groundless." Id. at 624. "In determining whether the petition is worthy of further treatment, a circuit court judge [presiding over a John Doe proceeding] must act as a neutral and detached magistrate." Id. at 625 (emphasis added).

¶86 Therefore, from the earliest stages of the proceeding, to the conclusion of the investigation, "[t]he proceedings of the John Doe are constantly under the scrutiny of a judge." Doe, 78 Wis. 2d at 165. The John Doe judge does not act as "chief investigator" or as a mere arm of the prosecutor. Washington, 83 Wis. 2d at 823. Rather, the John Doe judge serves as a check on the prosecutor and on the complainant to

ensure that the subject(s) of the investigation receive(s) due process of law. See Doe, 78 Wis. 2d at 164-65.

¶87 In this way, Wisconsin's John Doe proceeding is very different than a grand jury, and when conducted appropriately, provides much greater protections to the target of an investigation. Id. at 165. This is due in no small part to the role played by the John Doe judge, which is to ensure that the investigation stays focused on the conduct alleged in the petition to commence the John Doe proceeding. Washington, 83 Wis. 2d at 841-42. Further,

> [a]nyone familiar with the functions of the grand jury or who has dealt with it knows the hazards of a run-away grand jury, which can go beyond the restraints of the prosecutor, the executive, or of the judiciary. Such hazards do not exist in the Wisconsin John Doe. While John Doe proceedings can be abused, the document produced by a John Doe does not ipso facto force the defendant to trial. The complaint which emanates from it is issued under the aegis of a judge but nevertheless must subsequently stand the scrutiny of an open court inspection in an adversary proceeding at the preliminary examination as a prerequisite to the filing of an information, arraignment, and trial.

Doe, 78 Wis. 2d at 170-71. Thus, "[a] John Doe proceeding . . . serves both as an inquest into the discovery of crime and as a screen to prevent 'reckless and ill-advised' prosecutions." Reimann, 214 Wis. 2d at 621 (citation omitted).

¶88 The text of the John Doe statute gives the John Doe judge broad powers. Within his discretion, the John Doe judge is able to determine the extent of the investigation and whether

the investigation is conducted in secret. Wis. Stat. § 968.26(3).[24] We have long recognized the need for secrecy in John Doe proceedings and have identified several reasons that justify such secrecy. Cummings, 199 Wis. 2d at 736.

> These include: (1) keeping knowledge from an unarrested defendant which could encourage escape; (2) preventing the defendant from collecting perjured testimony for the trial; (3) preventing those interested in thwarting the inquiry from tampering with prosecutive testimony or secreting evidence; (4) rendering witnesses more free in their disclosures; and (5) preventing testimony which may be mistaken or untrue or irrelevant from becoming public.

Id. These reasons illustrate how important a John Doe proceeding can be as an investigative tool. The secrecy orders available to a John Doe proceeding serve to protect the

---

[24] The full text of this subsection is:

> The extent to which the judge may proceed in an examination under sub. (1) or (2) is within the judge's discretion. The examination may be adjourned and may be secret. Any witness examined under this section may have counsel present at the examination but the counsel shall not be allowed to examine his or her client, cross-examine other witnesses, or argue before the judge. Subject to s. 971.23, if the proceeding is secret, the record of the proceeding and the testimony taken shall not be open to inspection by anyone except the district attorney unless it is used by the prosecution at the preliminary hearing or the trial of the accused and then only to the extent that it is so used. A court, on the motion of a district attorney, may compel a person to testify or produce evidence under s. 972.08 (1). The person is immune from prosecution as provided in s. 972.08 (1), subject to the restrictions under s. 972.085.

Wis. Stat. § 968.26(3).

integrity of the investigation.[25]   Such orders help encourage witnesses who may be reluctant or fearful to testify by keeping their testimony secret.   The secrecy of a John Doe investigation also protects innocent targets of the investigation by preventing the disclosure of "testimony which may be mistaken or untrue."  Id.

¶89 Consistent with this broad authority, "[t]he John Doe judge should act with a view toward issuing a complaint or determining that no crime has occurred."  Washington, 83 Wis. 2d at 823.   Accordingly, the scope of any John Doe investigation "is essentially limited to the subject matter of the complaint upon which the John Doe is commenced."  Id. at 822; see also In re Doe, 317 Wis. 2d 364, ¶23.  "The John Doe judge has no authority to ferret out crime wherever he or she thinks it might exist."  Washington, 83 Wis. 2d at 822 (emphasis added).   This final limitation is crucial to the fair administration of a John Doe proceeding.  Without it, John Doe proceedings could easily devolve into judicially sanctioned general warrants.

---

[25] We do not disregard the secrecy order issued in the John Doe proceeding.  See Niedziejko, 22 Wis. 2d at 398.  However, we interpret and modify the secrecy order to the extent necessary for the public to understand our decision herein.  Consequently, if a fact is necessary to include in order to render explicable a justice's analysis of an issue presented, it is not precluded by the secrecy order.

¶90 The purpose of the Fourth Amendment to the United States Constitution[26] and of Article I, Section 11 of the Wisconsin Constitution[27] "was to abolish searches by general warrants, which authorized searches in any place or for any thing." State ex rel. City of Milwaukee v. Newman, 96 Wis. 258, 267, 71 N.W. 438 (1897). Such general warrants, also known as Writs of Assistance, "were used in the American colonies to search wherever government officials chose with nearly absolute and unlimited discretion." State v. Tye, 2001 WI 124, ¶8, 248 Wis. 2d 530, 636 N.W.2d 473. "These early warrants lacked specificity and allowed government officers in the late eighteenth century to enter homes, shops, and other places, and

---

[26] The Fourth Amendment provides that

[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

[27] Article I, Section 11 provides that

[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

Wis. Const. art. I, § 11.

56

in the event the officers encountered resistance, they could break down doors and forcibly search closed trunks and chests." In re John Doe Proceeding, 2004 WI 65, ¶36, 272 Wis. 2d 208, 680 N.W.2d 792.   To combat such unchecked power, the Fourth Amendment requires reasonable searches and mandates that warrants "particularly describ[e] the place to be searched." U.S. Const. amend. IV.

¶91 Reasonableness and particularity are not just requirements of search warrants, however.  Subpoenas issued by courts, and by extension John Doe judges, must also satisfy these requirements of the Fourth Amendment.  In re John Doe Proceeding, 272 Wis. 2d 208, ¶38.  A John Doe proceeding, with its broad investigatory powers, must never be allowed to become a fishing expedition.

¶92 It is difficult, if not impossible, to overstate the importance of the role of the John Doe judge.  If he does not conduct the investigation fairly, as a neutral and detached magistrate, the risk of harm to innocent targets of the investigation-and we remain mindful that all such targets are presumed innocent-is too great.  Through the use of a John Doe proceeding, "law enforcement officers are able to obtain the benefit of powers not otherwise available to them, i.e., the power to subpoena witnesses, to take testimony under oath, and to compel the testimony of a reluctant witness." Washington, 83 Wis. 2d at 822-23.  Such powers, if not wielded with care and skill may serve to transform a John Doe proceeding into an

implement of harassment and persecution by a vengeful or unethical prosecutor.  Thus, John Doe judges must be mindful of this danger and zealously guard the rights of all citizens against over-reach.

¶93 The foregoing discussion emphasizes that John Doe proceedings are a necessary investigative tool "to 'ascertain whether [a] crime has been committed and by whom.'"  Cummings, 199 Wis. 2d at 736 (quoting Wolke v. Fleming, 24 Wis. 2d 606, 613, 129 N.W.2d 841 (1964)).  John Doe proceedings have been utilized in Wisconsin since it was a territory and have no doubt served our state well.  But the simple fact that the John Doe proceeding has a long and near constant use should not blind us to the potential for abuse.  We must be mindful of the purpose of the John Doe proceeding and why it was originally instituted.  This purpose was aptly explained by this court more than 125 years ago:

> When this statute was first enacted the common-law practice was for the magistrate to issue the warrant on a complaint of mere suspicion, and he was protected in doing so.  This was found to be a very unsafe practice.  Many arrests were made on groundless suspicion, when the accused were innocent of the crime and there was no testimony whatever against them.  The law delights as much in the protection of the innocent as in the punishment of the guilty.  This statute was made to protect citizens from arrest and imprisonment on frivolous and groundless suspicion. . . .  'Our statute is framed so as to exclude in a great measure the abuses to which such a practice might lead, and undoubtedly was designed to throw the duty of judging, in this respect, entirely upon the magistrate.  It should not regard mere allegations of suspicion, but the grounds of the suspicion-the facts and circumstances-must be laid before him, and these

should be sufficient to make it appear that a crime has been actually committed, and that there is probable cause for charging the individual complained of therewith.'

State v. Keyes, 75 Wis. 288, 294-95, 44 N.W. 13 (1889) (citations omitted).

¶94 In sum, Wis. Stat. § 968.26 grants John Doe judges broad authority to conduct an investigation into alleged crimes. A John Doe judge is also given "those powers necessary" to carry out this duty. Cummings, 199 Wis. 2d at 736. Nevertheless, "[a]s to all aspects of the conduct of the judicial function, the [John Doe] judge is the governor of the proceedings, and as such is responsible for maintaining the good order, dignity, and insofar as it is compatible with the administration of justice, efficiency of those proceedings." In re Doe, 317 Wis. 2d 364, ¶22. This duty applies with equal force in all John Doe proceedings, regardless of the target's station in life, or the crime alleged, be it drug trafficking in the inner city, malfeasance in the corporate boardroom, or corruption in the halls of government.

C. Reserve Judge Peterson Did Not Violate a Plain Legal Duty When He Quashed the Subpoenas and Search Warrants Issued in This Case.

¶95 As is clear from the above discussion, John Doe judges are given enormous discretion to control the scope and conduct of a John Doe proceeding. With this important point in mind, we now turn to the specific issue before us: whether Reserve Judge Peterson violated a plain legal duty when he quashed the

59

subpoenas and search warrants and ordered the return of all seized property.  He did not.

¶96 "A plain duty 'must be clear and unequivocal and, under the facts, the responsibility to act must be imperative.'" Kalal, 271 Wis. 2d 633, ¶22 (quoting Kurkierewicz, 42 Wis. 2d at 377-78).  Although a supervisory writ is the proper vehicle for the special prosecutor to seek review of Reserve Judge Peterson's decision, the writ procedure serves a very narrow function which is distinct from the normal appellate process. Id., ¶24.  The purpose of a supervisory writ is "to provide for the direct control of lower courts, judges, and other judicial officers who fail to fulfill non-discretionary duties, causing harm that cannot be remedied through the appellate review process."  Id. (emphasis added).

¶97  Here, the special prosecutor argues that Reserve Judge Peterson failed to comply with his duty to correctly apply the law and erroneously concluded that Wisconsin campaign finance law does not regulate the Unnamed Movants' alleged conduct.  The special prosecutor essentially argues that Reserve Judge Peterson misapplied the law and prematurely ended the John Doe investigation.  This argument misses the point of the supervisory writ procedure and asks us to adopt a standard of review that we explicitly rejected in Kalal.  See id., ¶¶23-24 ("In essence, the Kalals argue that the judge . . . has a plain duty to correctly find facts and apply the law.  We cannot accept this proposition, as it would extend supervisory

60

jurisdiction to a virtually unlimited range of decisions involving the finding of facts and application of law.").  As was the case in Kalal, if we were to adopt the special prosecutor's understanding of a plain legal duty, we "would transform the writ into an all-purpose alternative to the appellate review process."  Id., ¶24.  This we will not do.

¶98  A John Doe judge is given the discretion to determine the extent of the investigation.  Wis. Stat. § 968.26(3).  In doing so, he or she "should act with a view toward issuing a complaint or determining that no crime has occurred."  Washington, 83 Wis. 2d at 823.  In his decision to quash the subpoenas and search warrants, Reserve Judge Peterson concluded that the subpoenas and search warrants do not provide a reasonable belief that the Unnamed Movants "committed any violations of the campaign finance laws."  Reserve Judge Peterson further concluded that "[t]he State is not claiming

that any of the independent organizations expressly advocated.[28] Therefore the subpoenas[29] fail to show probable cause that a crime was committed."  In a subsequent order granting a stay of his decision to quash, Reserve Judge Peterson clarified that, although he mistakenly phrased his decision in the context of whether the subpoenas showed probable cause, the subpoenas and search warrants were premised "on an invalid interpretation of

---

[28] The special prosecutor now claims that coordinated express advocacy did in fact occur between Unnamed Movants 1 and 6 and two express advocacy groups, neither of which are parties to the current lawsuits.  The special prosecutor and the Unnamed Movants presented Reserve Judge Peterson with the evidence of coordination regarding the first express advocacy group. Reserve Judge Peterson considered this evidence when deciding whether or not to quash the subpoenas or order the return of seized property.  Reserve Judge Peterson definitively concluded that "[t]here is no evidence of express advocacy."  We will not disturb that decision as, under the John Doe statute, it was Reserve Judge Peterson's to make.  More fundamentally, however, as a member of the first express advocacy group, the candidate at issue in this case and his agents had an absolute constitutional right to interact with a political organization of which he was a member, and improper coordination cannot be presumed by such contacts. Colo. Republican Fed. Campaign Comm. v. Fed. Eletion. Comm'n, 518 U.S. 604, 619 (1996).  Further, the special prosecutor chose not to present evidence pertaining to the second express advocacy group to Reserve Judge Peterson. Arguments not presented to the court in the first instance are deemed waived.  State v. Caban, 210 Wis. 2d 597, 604, 563 N.W.2d 501 (1997).

[29] Although he refers only to the subpoenas issued in the John Doe investigation, Reserve Judge Peterson later clarified that "for the reasons stated above regarding the limitations on the scope of the campaign finance laws, I conclude that the . . . warrants [issued for Unnamed Movants Nos. 6 and 7] lack probable cause."

the law.   That . . . was the underlying problem with the subpoenas."[30]

¶99 Reserve Judge Peterson's decision is consistent with his discretion to determine the extent of the John Doe investigation.   In addition, "[i]t is within the discretion of the trial court to quash a subpoena."   State v. Horn, 126 Wis. 2d 447, 456, 377 N.W.2d 176 (Ct. App.  1985), aff'd, 139 Wis. 2d 473, 407 N.W.2d 854 (1987).   Because supervisory writs are not appropriate vehicles to review a judge's discretionary acts, see Kalal, 271 Wis. 2d 633, ¶24, the special prosecutor has failed to show that Reserve Judge Peterson violated a plain legal duty by quashing the subpoenas and search warrants. Therefore, the supervisory writ sought by the special prosecutor is denied, and Reserve Judge Peterson's order is affirmed.[31]

---

[30] We note that as a result of our interpretation of Chapter 11 in Two Unnamed Petitioners, Reserve Judge Peterson's interpretation is correct as a matter of law.

[31] While we base our conclusion solely on Reserve Judge Peterson's exercise of discretion under the John Doe statute, we note that there are serious flaws with the subpoenas and search warrants, which were originally issued by Reserve Judge Kluka. As we explained above, a John Doe judge does not act as "chief investigator" or as a mere arm of the prosecutor. State v. Washington, 83 Wis. 2d 808, 823, 266 N.W.2d 597 (1978). Rather, a John Doe judge serves as a check on the prosecutor and on the complainant to ensure that the subject(s) of the investigation receive(s) due process of law. See State v. Doe, 78 Wis. 2d 161, 164-65, 254 N.W.2d 210 (1977). This is an important function that cannot be ignored. Judges cannot simply assume that the prosecutor is always well-intentioned. Due to the exceptionally broad nature of the subpoenas and search warrants, it is doubtful that they should have ever been issued in the first instance.

(continued)

## V. THREE UNNAMED PETITIONERS

¶100 Finally, we turn to Three Unnamed Petitioners, in which the Unnamed Movants appeal an opinion and order of the court of appeals denying their petition for a supervisory writ. This case requires us to determine whether either Reserve Judge Kluka or Peterson violated a plain legal duty by: (1) accepting an appointment as a reserve judge; (2) convening a multi-county John Doe proceeding; or (3) appointing a special prosecutor.[32]

¶101 We affirm the decision of the court of appeals and deny the Unnamed Movants' petition for a supervisory writ. We hold that the Unnamed Movants have not met the burden of proof required for a supervisory writ. Specifically, they have not established that either Reserve Judge Kluka or Peterson violated a plain legal duty by: (1) accepting an appointment as a reserve

---

The special prosecutor alleges that the Unnamed Movants engaged in "illegal" coordination of issue advocacy sometime between 2011 and 2012. The subpoenas and search warrants, however, sought records-many of which were personal and had nothing to do with political activity-and information ranging from 2009 through 2013. If the illegal conduct took place during a discrete timeframe in 2011 and 2012, as the special prosecutor alleges, what possible relevance could documents from a full two years prior have to the crime alleged? By authorizing such sweeping subpoenas and search warrants, Reserve Judge Kluka failed in her duty to limit the scope of the investigation to the subject matter of the complaint. See In re Doe, 2009 WI 46, ¶23, 317 Wis. 2d 364, 766 N.W.2d 542. These subpoenas and search warrants also come dangerously close to being general warrants of the kind which, in part, provoked our forefathers to separate from the rule of Empire.

[32] This case presents issues one through five in our December 16, 2014 grant order. See supra ¶9.

judge; (2) convening a multi-county John Doe proceeding; or (3) appointing a special prosecutor.  "The obligation of judges to correctly apply the law is general and implicit in the entire structure of our legal system."  Kalal, 271 Wis. 2d 633, ¶24. The Unnamed Movants' argument does not fit the purpose of a supervisory writ, which requires a "clear and unequivocal" duty to act on the part of the judge.  Id., ¶22.  If we were to adopt the Unnamed Movants' argument, we "would transform the writ into an all-purpose alternative to the appellate review process." Id., ¶24.  Because the Unnamed Movants have not identified a violation of a plain legal duty, their petition for a supervisory writ is denied.

## A. Standard of Review

¶102 "[T]he authority of both judges and prosecutors in a John Doe proceeding[] . . . are questions of statutory interpretation which this court reviews de novo without deference to the circuit court or court of appeals." Cummings, 199 Wis. 2d at 733.   Thus, "[w]hether a John Doe judge has exceeded his or her powers is a question of law that this court determines independently."  State ex rel. Individual Subpoenaed to Appear at Waukesha Cnty. v. Davis, 2005 WI 70, ¶17, 281 Wis. 2d 431, 697 N.W.2d 803 (citing Cummings, 199 Wis. 2d at 733).

¶103 For a supervisory writ to issue, the petitioner for the writ must establish that: "(1) an appeal is an inadequate remedy; (2) grave hardship or irreparable harm will result; (3)

the duty of the trial court is plain and it must have acted or intends to act in violation of that duty; and (4) the request for relief is made promptly and speedily."    Kalal, 271 Wis. 2d 633, ¶17 (emphasis added).

¶104 A "'writ of supervision is not a substitute for an appeal.'"    Id. (citation committed).    "A supervisory writ 'is considered an extraordinary and drastic remedy that is to be issued only upon some grievous exigency.'"    Id. (citation omitted).

¶105  Although a court exercises its discretion in deciding whether or not to issue a writ, "[t]he exercise of that discretion often involves . . . resolving questions of law in order to determine whether the circuit court's duty is plain." State ex rel. Kenneth S. v. Circuit Court for Dane Cnty., 2008 WI App 120, ¶9, 313 Wis. 2d 508, 756 N.W.2d 573.    "A plain duty 'must be clear and unequivocal and, under the facts, the responsibility to act must be imperative.'"    Kalal, 271 Wis. 2d 633, ¶22 (citation omitted).  The obligation of a judge to correctly find facts and apply the law is not the type of plain legal duty contemplated by the supervisory writ procedure, "as it would extend supervisory jurisdiction to a virtually unlimited range of decisions involving the finding of facts and application of law."  Id., ¶24; see also supra ¶80.

¶106 Consequently, for a writ to issue in this case, the Unnamed Movants must demonstrate that the John Doe judges violated a plain legal duty, either in accepting an appointment

66

as a reserve judge, in convening a John Doe proceeding over multiple counties, or in appointing a special prosecutor.

B. The Unnamed Movants Have Failed to Prove the Violation of a Plain Legal Duty.

i. No Violation of a Plain Legal Duty Occurred in the Appointment and Assignment of Reserve Judge Kluka or Reserve Judge Peterson to Preside Over a Multi-County John Doe Proceeding.

¶107 We first discuss whether Reserve Judge Kluka or Reserve Judge Peterson violated a plain legal duty either in accepting an appointment as a reserve judge or in convening a multi-county John Doe proceeding.  We hold that the Unnamed Movants failed to prove that Reserve Judge Kluka or Reserve Judge Peterson violated a plain legal duty by accepting an appointment as a reserve judge or in convening a John Doe proceeding over multiple counties.

1. Reserve Judge Kluka Did Not Violate a Plain Legal Duty in Accepting Her Appointment as a Reserve Judge.

¶108 We begin our discussion of this issue by explaining the distinction between the appointment and assignment of a reserve judge.  A former judge is appointed to be a reserve judge by the Chief Justice.  Once a former judge has been appointed to be a reserve judge then that reserve judge can be assigned to a particular case or to a particular circuit court calendar.

67

¶109 The Director of State Courts has the power to assign reserve judges, but he does not have the power to appoint reserve judges.  See SCR 70.10[33]; SCR 70.23.[34]  The Chief Justice is the sole individual with the power to both appoint and assign reserve judges.  See Wis. Const. art. VII, § 24(3)[35]; Wis. Stat. § 753.075[36]; SCR 70.23(1).[37]

---

[33] "The director of state courts shall have the responsibility and authority regarding the assignment of reserve judges and the interdistrict assignment of active judges at the circuit court level where necessary to the ordered and timely disposition of the business of the court."

[34] "The director of state courts may make interdistrict judicial assignments at the circuit court level."  SCR 70.23(1). "The director of state courts may also make a permanent assignment to a judicial district of a reserve judge who can be assigned by a chief judge in the same manner as an active circuit judge under this section."  SCR 70.23(2).  "[I]f the chief judge deems it necessary the chief judge shall call upon the director of state courts to assign a judge from outside the judicial administrative district or a reserve judge."  SCR 70.23(4).

[35] "A person who has served as a supreme court justice or judge of a court of record may, as provided by law, serve as a judge of any court of record except the supreme court on a temporary basis if assigned by the chief justice of the supreme court."

[36]

(1)Definitions.  In this section:

(a)'Permanent reserve judge' means a judge appointed by the chief justice to serve an assignment for a period of 6 months.  Permanent reserve judges shall perform the same duties as other judges and may be reappointed for subsequent periods.

(continued)

¶110 The relevant orders in the record state that Reserve Judge Kluka was assigned, not appointed, to serve as the John Doe judge in each of the five counties.  Once the Milwaukee County District Attorney's Office filed a petition for the commencement of a John Doe proceeding in Milwaukee County, Chief Judge Kremers "assigned and forwarded" the petition to "Reserve Judge Kluka" on August 23, 2012.  Thereafter, on September 5, 2012, the Director of State Courts, with then-Chief Justice Shirley Abrahamson's name directly above, assigned Reserve Judge Kluka to preside over the matter using a form titled "Application and Order for Specific Judicial Assignment."  The actions taken by Chief Judge Kremers and the Director of State Courts suggest that Kluka possessed reserve judge status at the time her assignments were made.  However, nothing in the record

---

(b)'Temporary reserve judge' means a judge appointed by the chief justice to serve such specified duties on a day-by-day basis as the chief justice may direct.

(2)Eligibility.  The chief justice of the supreme court may appoint any of the following as a reserve judge:

(a)Any person who has served a total of 6 or more years as a supreme court justice, a court of appeals judge or a circuit judge.

(b)Any person who was eligible to serve as a reserve judge before May 1, 1992.

[37] "The chief justice may assign active or reserve judges, other than municipal judges, to serve temporarily in any court or branch of a circuit court for such purposes and period of time as the chief justice determines to be necessary."

definitively establishes that the then-Chief Justice had previously appointed Kluka as a reserve judge.

¶111 The absence of a record on this point is very likely because no one disputes that Kluka was lawfully appointed as a reserve judge.  Indeed, the Unnamed Movants do not challenge Reserve Judge Kluka's authority to preside over the Milwaukee County John Doe proceeding.  Rather, according to the Unnamed Movants, "the problem arose later, when the Director of State Courts extended that [assignment] to four more counties in one functionally-consolidated proceeding or investigation."  In fact, in their reply brief, the Unnamed Movants state "the core issue is not who appointed a reserve judge: it is whether the five-county structure is lawful at all."  Because the Unnamed Movants have failed to show that Reserve Judge Kluka was not lawfully appointed, it follows that they have failed to prove that she violated a plain legal duty in accepting her appointment as a reserve judge.

## 2. Reserve Judge Peterson Did Not Violate a Plain Legal Duty in Accepting His Appointment as a Reserve Judge.

¶112 Similarly, the Unnamed Movants also have failed to meet their burden with respect to Reserve Judge Peterson.  On October 29, 2013, Chief Judge Kremers assigned Reserve Judge Peterson to serve as the John Doe judge in Milwaukee County, after Reserve Judge Kluka withdrew, in an order titled: "REASSIGNMENT AND EXCHANGE."  The document also states: "Reassigned to Reserve Judge Gregory A. Peterson according to

70

the rules." <u>See</u> SCR 70.23 (providing that the chief judge can request the assignment of a reserve judge by the Director of State Courts). As explained above, only the Chief Justice has the authority to <u>appoint</u> reserve judges.

¶113 Similar to the issue with Reserve Judge Kluka, the Unnamed Movants do not question Reserve Judge Peterson's authority to preside over the Milwaukee County John Doe proceeding. Their contention is that it was unlawful for Reserve Judge Peterson to accept assignment to four more counties "in one functionally-consolidated proceeding or investigation." Because the Unnamed Movants have failed to show that Reserve Judge Peterson was not lawfully appointed, they have failed to prove that Reserve Judge Peterson violated a plain legal duty in accepting his appointment as a reserve judge.

3. Reserve Judge Kluka Did Not Violate a Plain Legal Duty in Convening a Multi-County John Doe Proceeding.

¶114 The Unnamed Movants contend that no one may appoint or assign a reserve judge to serve as a John Doe judge simultaneously in five counties. The Unnamed Movants argue that "the question properly is not whether anything in the enabling statute 'prevents' or 'prohibits' what happened here. The right question is whether anything in the statutes permits what happened here." The Unnamed Movants emphatically state that "[t]he answer to that question is no." However, in examining this issue, we look to whether the John Doe statute clearly

prohibits the procedural posture of this John Doe investigation. The answer is no.

¶115 Pursuant to Wis. Stat. § 968.26(1)[38] five separate John Doe proceedings were initiated by the district attorneys of the five counties; however, it was for one investigation conducted by a special prosecutor. The investigation was expanded because the initial investigation in Milwaukee County suggested that persons residing in four additional counties could be involved with potential campaign finance violations and Wis. Stat. § 978.05(1) provides that a district attorney shall:

> [p]rosecute all criminal actions before any court within his or her prosecutorial unit and have sole responsibility for prosecution of all criminal actions arising from violations of chs. 5 to 12 . . . that are alleged to be committed by a resident of his or her prosecutorial unit. . . .

See also Wis. Stat. §§ 971.19(11)-(12) (providing that the venue for a criminal proceeding under campaign finance laws shall be the county of the defendant's residence unless the defendant chooses to be tried in the county where the crime occurred). The Director of State Courts, with then-Chief Justice Shirley Abrahamson's name directly above, then executed five separate orders assigning Reserve Judge Kluka to preside over the five separate proceedings. While these five separate proceedings are

---

[38] "If a district attorney requests a judge to convene a proceeding to determine whether a crime has been committed in the court's jurisdiction, the judge shall convene a proceeding described under sub. (3) and shall subpoena and examine any witnesses the district attorney identifies."

72

a single investigation, they have not been consolidated. Rather, the John Doe proceedings at issue have merely been running parallel to one another.

¶116 Nothing in the John Doe statute prohibits the initiation of five parallel John Doe proceedings. Put another way, nothing in the John Doe statute explicitly told Reserve Judge Kluka that she could not preside over five John Doe proceedings. To initiate a John Doe proceeding, a district attorney must simply make the request, which is exactly what happened here. See Wis. Stat. § 968.26(1). Because nothing in the John Doe statute expressly prohibits the initiation of five parallel John Doe proceedings concerning a single investigation, we cannot conclude that Reserve Judge Kluka violated a plain legal duty in convening the five separate proceedings. As such, a supervisory writ cannot issue.

¶117 The Unnamed Movants argue that they have shown a violation of a plain legal duty. They argue that "[t]he investigation was constituted in direct contravention of Wisconsin statutes and without authority. The John Doe judge . . . had a plain duty to comply with Wisconsin statutes in the conduct of a statutorily-constituted investigation." We rejected an identical argument in Kalal.

¶118 In Kalal, a circuit court judge ordered that a criminal complaint be brought against the Kalals under Wis. Stat. § 968.02(3), which allows a circuit judge to order a criminal complaint be issued if a district attorney "refuses" to

73

issue a complaint.  <u>Kalal</u>, 271 Wis. 2d 633, ¶¶12-13.  The Kalals argued that "the circuit judge has a plain duty to correctly determine the presence of this threshold refusal before authorizing the issuance of a criminal complaint."  <u>Id.</u>, ¶23. We held that this argument failed to establish the violation of a plain legal duty.  "To the extent that a circuit judge's decision to permit the filing of a complaint under Wis. Stat. § 968.02(3) is legally or factually unsupported, the defendant . . . may seek its dismissal in the circuit court after it has been filed, and may pursue standard appellate remedies  thereafter."   <u>Id.</u>,  ¶25.   "But  the  statutory prerequisite that the judge find a refusal to prosecute by the district attorney does not impose upon the circuit judge a plain, clear, non-discretionary, and imperative duty of the sort necessary for a supervisory writ."  <u>Id.</u>

¶119 We explained that, "[i]n essence, the Kalals argue that the judge sitting ex parte in a hearing under Wis. Stat. § 968.02(3) has a plain duty to correctly find facts and apply the law."  <u>Id.</u>, ¶23.  "We cannot accept this proposition, as it would extend supervisory jurisdiction to a virtually unlimited range of decisions involving the finding of facts and application of law."  <u>Id.</u>, ¶24.  "The obligation of judges to correctly apply the law is general and implicit in the entire structure of our legal system."  <u>Id.</u>  "The supervisory writ, however, serves a narrow function: to provide for the direct control of lower courts . . . [that] fail to fulfill non-

74

discretionary duties . . . ."    Id. (citations omitted).    "To adopt the Kalals' interpretation of the plain duty requirement in supervisory writ procedure would transform the writ into an all-purpose alternative to the appellate review process."    Id.

¶120 The Unnamed Movants have not identified a "plain, clear, non-discretionary, and imperative duty of the sort necessary for a supervisory writ."    Id., ¶25.    In this supervisory writ action, the Unnamed Movants must do more than point out the fact that the statutes do not explicitly authorize the commencement of parallel John Doe proceedings in multiple counties.    Further, they must do more than argue that five parallel investigations and proceedings were "implicitly" prohibited by the statute.    They must show that by commencing five parallel John Doe proceedings Reserve Judge Kluka violated a plain, clear, non-discretionary, and imperative duty of the sort necessary for a supervisory writ.    They have not even tried to make such a showing.

¶121 We understand the Unnamed Movants' concerns and agree that the kind of multi-county investigation that occurred here does raise serious questions.    Typically, statewide or multi-county investigations are conducted by the Attorney General or by the GAB.    See Wis. Stat. §§ 165.50(1) (Attorney General), 5.05 (Government Accountability Board).    However, Wis. Stat. § 968.26 is silent as to whether a John Doe judge can preside over a multi-county John Doe.    It is axiomatic that silence on the point does not (and cannot) result in the creation of a

plain legal duty.  Here, Reserve Judge Kluka and the special prosecutor initially ran the investigation and proceeding out of a single post office box in Milwaukee controlled by the special prosecutor.  They also put the case names and numbers of all five proceedings on every search warrant, subpoena, and order. However, the concerns expressed by the Unnamed Movants are more properly addressed to the legislature, not a court in a supervisory writ petition.  Should the legislature wish to prohibit multi-county John Does, it is free to do so.  We, however, cannot "transform the writ into an all-purpose alternative to the appellate review process" or announce new rules for future cases as part of that process.  Kalal, 271 Wis. 2d 633, ¶24.  To do so would be an instance of judicial overreach incompatible with the nature and purpose of a supervisory writ.

¶122 Therefore, we hold that Reserve Judges Kluka and Peterson did not violate a plain legal duty by: (1) accepting an appointment as a reserve judge; or (2) convening a multi-county John Doe proceeding, and thus we deny the Unnamed Movants' petition for a supervisory writ.

ii. Reserve Judge Kluka Did Not Violate a Plain Legal Duty by Appointing Francis Schmitz to be the Special Prosecutor.

¶123 We now turn to whether Reserve Judge Kluka violated a plain legal duty in appointing the special prosecutor, and if so, what effect that would have on the court and special prosecutor's competency.  We conclude that the Unnamed Movants

76

have failed to prove that Reserve Judge Kluka violated a plain legal duty in appointing the special prosecutor.

1. Under Carlson, Reserve Judge Kluka Reasonably Concluded that She Had the Authority to Appoint the Special Prosecutor on Her Own Motion.

¶124 In appointing the special prosecutor Reserve Judge Kluka relied, in part, on Carlson.[39]  Carlson concerned a court's statutory authority to appoint a special prosecutor under Wis. Stat. § 978.045.[40]  In Carlson, the court of appeals explained

_____

[39] To be clear, we do not rely on State v. Carlson, 2002 WI App 44, 250 Wis. 2d 562, 641 N.W.2d 563.  There are certainly distinctions to be made between the facts of Carlson and the facts of the instant case.  We discuss Carlson only as it relates to the larger question of whether Reserve Judge Kluka violated a plain legal duty at the time the appointment was made.

[40] Wisconsin Stat. § 978.045, the "special prosecutors" statute, provides:

(1g)A court on its own motion may appoint a special prosecutor under sub. (1r) or a district attorney may request a court to appoint a special prosecutor under that subsection.  Before a court appoints a special prosecutor on its own motion or at the request of a district attorney for an appointment that exceeds 6 hours per case, the court or district attorney shall request assistance from a district attorney, deputy district attorney or assistant district attorney from other prosecutorial units or an assistant attorney general.  A district attorney requesting the appointment of a special prosecutor, or a court if the court is appointing a special prosecutor on its own motion, shall notify the department of administration, on a form provided by that department, of the district attorney's or the court's inability to obtain assistance from another prosecutorial unit or from an assistant attorney general.

(continued)

77

(1r)Any judge of a court of record, by an order entered in the record stating the cause for it, may appoint an attorney as a special prosecutor to perform, for the time being, or for the trial of the accused person, the duties of the district attorney. An attorney appointed under this subsection shall have all of the powers of the district attorney. The judge may appoint an attorney as a special prosecutor at the request of a district attorney to assist the district attorney in the prosecution of persons charged with a crime, in grand jury proceedings or John Doe proceedings under s. 968.26, in proceedings under ch. 980, or in investigations. The judge may appoint an attorney as a special prosecutor if any of the following conditions exists:

(a)There is no district attorney for the county.

(b)The district attorney is absent from the county.

(c)The district attorney has acted as the attorney for a party accused in relation to the matter of which the accused stands charged and for which the accused is to be tried.

(d)The district attorney is near of kin to the party to be tried on a criminal charge.

(e)The district attorney is physically unable to attend to his or her duties or has a mental incapacity that impairs his or her ability to substantially perform his or her duties.

(f)The district attorney is serving in the U.S. armed forces.

(g)The district attorney stands charged with a crime and the governor has not acted under s. 17.11.

(h)The district attorney determines that a conflict of interest exists regarding the district attorney or the district attorney staff.

(i)A judge determines that a complaint received under s. 968.26 (2) (am) relates to the conduct of the

(continued)

78

that the plain language of the special prosecutors statute "authorizes two distinct ways in which a court may appoint a special prosecutor."  Carlson, 250 Wis. 2d 562, ¶8.  The first is on the court's own motion.  Id.  The second is at the request of a district attorney.  Id.  Where the appointment is on the court's own motion, the court of appeals interpreted Wis. Stat. § 978.045(1r) as giving a court "unfettered authority" to make the appointment, as long as the court entered an order "stating the cause therefor."  Id., ¶¶ 5, 9 (quotation omitted) ("In short, if a court makes a special prosecutor appointment on its own motion, it is constrained only in that it must enter an order in the record stating the cause for the appointment."). "[A]ny restriction, if one exists, is triggered only when the appointment is made at the request of a district attorney, not when the appointment is made by a court on its own motion." Id., ¶8.

¶125 Carlson thus concluded that a court need satisfy only one of the nine conditions listed under Wis. Stat. § 978.045(1r) when the district attorney requests the appointment of a special prosecutor, but when the court makes the appointment on its own motion, it need only enter an order stating the cause therefor. "A plain reading of the statute tells us that when a court makes this appointment on its own motion, all that is required of the court is that it enter an order in the record 'stating the cause

_____

district attorney to whom the judge otherwise would refer the complaint.

79

therefor.'"   Id., ¶9 (quoting Wis. Stat. § 978.045(1r) (1999-2000) which addresses, in part, John Doe proceedings and a John Doe judge's ability to appoint a special prosecutor for such proceedings).

¶126 Reserve Judge Kluka relied on Carlson to appoint, on her own motion, the special prosecutor.  Thus, in order to justify the appointment under Carlson, Reserve Judge Kluka was simply required to enter an order "stating the cause therefor," which is exactly what she did in citing concerns of efficiency and the appearance of impropriety.

¶127 We note that Carlson is problematic to the point of being suspect.  This is so because Carlson disregards the fact that one of the nine conditions enumerated under Wis. Stat. § 978.045(1r) must exist for the appointment of a special prosecutor, regardless of whether the appointment is made on the court's own motion or at the district attorney's request.  The Carlson court's failure to import this language from the governing statute is an inexplicable-and very likely fatal-defect in its holding.  While we agree with the Unnamed Movants' interpretation of Wis. Stat. § 978.045, we do not take the ultimate step of overruling Carlson because to do so would go

further than the supervisory writ allows.[41]  Simply put, despite Carlson's questionable validity we cannot reasonably conclude that Reserve Judge Kluka violated a plain legal duty in making the appointment.

¶128 The issue presented also asks whether Reserve Judge Kluka violated a plain legal duty in making the special prosecutor appointment where no charges have yet been issued; where the district attorney in each county has not refused to continue the investigation or prosecution of any potential charge; and where no certification that no other prosecutorial unit was able to do the work for which the special prosecutor was sought was made to the Department of Administration.  Again, Carlson gave the John Doe judge "unfettered authority" to appoint the special prosecutor, so the absence of these additional circumstances does not demonstrate that Reserve Judge Kluka violated a plain legal duty in making the appointment.

2. Reserve Judge Kluka Also Relied on Her Inherent Authority in Appointing the Special Prosecutor.

¶129 Reserve Judge Kluka also stated that she appointed the special prosecutor pursuant to her "inherent authority" under Cummings.  The relevant issue in Cummings was whether a John Doe

---

[41] The procedural posture of this case prevents us from overruling Carlson.  If this issue were to arise in a non-supervisory writ case we may very well overrule Carlson. However, the supervisory writ is not an "all-purpose alternative to the appellate review process."  State ex rel. Kalal v. Circuit Court for Dane Cnty., 2004 WI 58, ¶24, 271 Wis. 2d 633, 681 N.W.2d 110.

judge has the ability to seal a search warrant.  Id. at 733. There the defendant argued that no statutory authority conferred such power on John Doe judges.  In rejecting the defendant's argument, we reasoned:

> [A] John Doe judge has been granted jurisdiction, the legal right to exercise its authority, pursuant to Wis. Stat. § 968.27.  A grant of jurisdiction by its very nature includes those powers necessary to fulfill the jurisdictional mandate.  The statutory jurisdiction of a John Doe judge has been defined as the authority of the judge to conduct a John Doe investigation [in order to ascertain whether a crime has been committed and by whom]. . . .  The ability to seal a search warrant is exactly that type of power which a John Doe judge needs to fulfill [that] jurisdictional mandate.

Id. at 736-37.  Thus, while Cummings did not specifically address a John Doe judge's inherent authority to appoint a special prosecutor, it provides broad language supporting the idea that a John Doe judge possesses inherent authority where it is necessary to facilitate its jurisdictional mandate.  Stated otherwise, a John Doe judge's inherent authority is limited to what is necessary to enable the judge to properly conduct a John Doe proceeding.  State ex rel. Individual Subpoenaed, 281 Wis. 2d 431, ¶26; see In re John Doe Proceeding, 272 Wis. 2d 208, ¶10.

¶130 The Unnamed Movants argue that the only cases invoking a court's inherent authority to appoint a special prosecutor have arisen after charges have been filed.  See, e.g., State v. Lloyd, 104 Wis. 2d 49, 56-57, 310 N.W.2d 617 (Ct. App. 1981). We agree, but that is because no court has addressed whether a

John Doe judge has inherent authority to appoint a special prosecutor, which necessarily occurs before charging.   That there is an absence of case law addressing whether a John Doe judge has inherent authority to appoint a special prosecutor does not necessarily mean the John Doe judge in this case violated a plain legal duty in doing so.[42]

¶131 Arguably, the broad language in Cummings could be used to support Reserve Judge Kluka's actions in this case.   Because no law expressly prohibits a John Doe judge from exercising his inherent authority to appoint a special prosecutor, the Unnamed Movants cannot prove that Reserve Judge Kluka violated a plain legal duty in exercising that authority to appoint the special prosecutor.

¶132 Due to the existing precedent, Reserve Judge Kluka's legal duty was not plain, clear, and unequivocal with an imperative responsibility to act under the facts.   Because the Unnamed Movants have not established that Reserve Judge Kluka violated a plain legal duty in appointing the special prosecutor, we deny their petition for a supervisory writ and affirm the court of appeals.[43]

---

[42] While we do not endorse Reserve Judge Kluka's interpretation of her inherent authority in this instance, we cannot say her conduct of appointing a special prosecutor was violative of a plain legal duty.

[43] We need not address what effect an unlawful appointment would have had because no violation of a plain legal duty occurred.

## VI. CONCLUSION

¶133 Our lengthy discussion of these three cases can be distilled into a few simple, but important, points.  It is utterly clear that the special prosecutor has employed theories of law that do not exist in order to investigate citizens who were wholly innocent of any wrongdoing.  In other words, the special prosecutor was the instigator of a "perfect storm" of wrongs that was visited upon the innocent Unnamed Movants and those who dared to associate with them.  It is fortunate, indeed, for every other citizen of this great State who is interested in the protection of fundamental liberties that the special prosecutor chose as his targets innocent citizens who had both the will and the means to fight the unlimited resources of an unjust prosecution.  Further, these brave individuals played a crucial role in presenting this court with an opportunity to re-endorse its commitment to upholding the fundamental right of each and every citizen to engage in lawful political activity and to do so free from the fear of the tyrannical retribution of arbitrary or capricious governmental prosecution.  Let one point be clear: our conclusion today ends this unconstitutional John Doe investigation.

### A.

¶134 In Two Unnamed Petitioners, we hold that the definition of "political purposes" in Wis. Stat. § 11.01(16) is unconstitutionally overbroad and vague under the First Amendment to the United States Constitution and Article I, Section 3 of

84

the Wisconsin Constitution because its language "'is so sweeping that its sanctions may be applied to constitutionally protected conduct which the state is not permitted to regulate.'" Janssen, 219 Wis. 2d at 374 (quoting Bachowski, 139 Wis. 2d at 411).  However, a readily available limiting construction exists that we will apply and that will prevent the chilling of otherwise protected speech; namely, that "political purposes" is limited to express advocacy and its functional equivalent as those terms are defined in Buckley and WRTL II.  With this limiting construction in place, Chapter 11 does not proscribe any of the alleged conduct of any of the Unnamed Movants.  The special prosecutor has not alleged any express advocacy, and issue advocacy, whether coordinated or not, is "beyond the reach of [Ch. 11]."  Barland II, 751 F.3d at 815.  Accordingly, we invalidate the special prosecutor's theory of the case, and we grant the relief requested by the Unnamed Movants.

¶135 To be clear, this conclusion ends the John Doe investigation because the special prosecutor's legal theory is unsupported in either reason or law.  Consequently, the investigation is closed.  Consistent with our decision and the order entered by Reserve Judge Peterson, we order that the special prosecutor and the district attorneys involved in this investigation must cease all activities related to the investigation, return all property seized in the investigation from any individual or organization, and permanently destroy all copies of information and other materials obtained through the

investigation.  All Unnamed Movants are relieved of any duty to cooperate further with the investigation.

B.

¶136 In Schmitz v. Peterson, we hold that the special prosecutor has failed to prove that Reserve Judge Peterson violated a plain legal duty when he quashed the subpoenas and search warrants and ordered the return of all property seized by the special prosecutor.  In quashing the subpoenas and search warrants, Reserve Judge Peterson exercised his discretion under the John Doe statute, Wis. Stat. § 968.26, to determine the extent of the investigation.  Because the purpose of a supervisory writ does not include review of a judge's discretionary acts, Kalal, 271 Wis. 2d 633, ¶24, the supervisory writ sought by the special prosecutor is denied, and Reserve Judge Peterson's order is affirmed.

C.

¶137 Finally, in Three Unnamed Petitioners, we hold that the Unnamed Movants have failed to prove that either Reserve Judge Kluka or Reserve Judge Peterson violated a plain legal duty by: (1) accepting an appointment as a reserve judge; (2) convening a multi-county John Doe proceeding; or (3) appointing a special prosecutor.  Although the circumstances surrounding the formation of the John Doe investigation raise serious concerns, and the appointment of the special prosecutor may well have been improper, such concerns do not satisfy the stringent standards of a supervisory writ.  Put another way, if we were to

86

grant the supervisory writ in this case, we would risk "transform[ing] the writ into an all-purpose alternative to the appellate review process," which we cannot do. <u>Id.</u> Accordingly, we deny the supervisory writ and affirm the decision of the court of appeals.

*By the Court.*—Declaration of rights; relief granted; John Doe investigation ordered closed in <u>Two Unnamed Petitioners</u>.

*By the Court.*—Petition for supervisory writ denied and order affirmed in <u>Schmitz v. Peterson</u>.

*By the Court.*—Petition for supervisory writ denied and decision affirmed in <u>Three Unnamed Petitioners</u>.

¶138 ANN WALSH BRADLEY, J., did not participate.

¶139 DAVID T. PROSSER, J. *(concurring)*. The court is confronted with three separate but overlapping cases related to a John Doe investigation involving [————————————————————— ————————————————————————————————], and a substantial number of organizations and individuals who are associates and political allies of [———————————].

¶140 This is the second John Doe investigation initiated by the Milwaukee County District Attorney's Office that has focused on [———————————] and [————] political circle. The present investigation concerns alleged campaign finance violations, but the scope of the investigation is sufficiently broad that it amounts to a fishing expedition into the lives, work, and thoughts of countless citizens.

¶141 For all practical purposes, the court has merged the two writ cases[1] into the original action[2] and invited the parties to submit briefs on all issues, even if an issue was not part of the party's original case.

¶142 The consolidated case presents at least 14 issues. Collectively they are complex and difficult. They also are important to the people of Wisconsin. Many of these issues are addressed in the majority opinion. I write separately to provide my own analysis and perspective on the following issues:

---

[1] State ex rel. Schmitz v. Peterson, 2014AP417-W through 2014AP421-W; State ex rel. Three Unnamed Petitioners v. Peterson, 2013AP2504-W through 2013AP2508-W.

[2] State ex rel. Two Unnamed Petitioners v. Peterson, No. 2014AP296-OA.

(1) Issues 4 and 5 related to the appointment of the special prosecutor.

(2) Issue 14 related to several search warrants. However, the record in this matter requires discussion of search warrants and subpoenas beyond the warrants identified in Issue 14.

(3) Issue 6 related to the application of Wis. Stat. § 11.26(13m) to contributions in recalls.

(4) Issues relating to several different provisions in Chapter 11 of the Wisconsin Statutes.

¶143 This concurring opinion discusses issues arising out of a John Doe investigation that is subject to multiple broad secrecy orders. Full adherence to these secrecy orders in their original breadth is impossible because full adherence would mean that the court could not acknowledge what the John Doe is about or discuss fully the numerous issues bearing on the scope, conduct, and propriety of the investigation.

¶144 "Secrecy of John Doe proceedings and the records thereof is not maintained for its own sake." State v. O'Connor, 77 Wis. 2d 261, 252 N.W.2d 671 (1977). Instead, "[t]he policy underlying secrecy is directed to promoting the effectiveness of the investigation. Therefore, any secrecy order 'should be drawn as narrowly as is reasonably commensurate with its purposes.'" State ex rel. Unnamed Person No. 1 v. State, 2003 WI 30, ¶61, 260 Wis. 2d 653, 660 N.W.2d 260 (quoting O'Connor, 77 Wis. 2d at 286). In making determinations about the scope of a secrecy order, "[a] balance must be struck between the public's right to be informed about the workings of its

2

government and the legitimate need to maintain the secrecy of certain John Doe proceedings." Id., ¶66.

¶145 It is important to protect the targets of a John Doe investigation when it is determined that they have not committed a crime. This protection extends to the identity of individual people as well as the content of their private communications and other records obtained in the course of the investigation. Here, there is no similar interest in protecting the actions of the John Doe judge or the special prosecutor. Because the majority orders the John Doe investigation "closed," it cannot be said that the continued secrecy of certain facts in this matter——the scope and nature of the investigation, search warrants, and subpoenas, for example——is necessary to protect the integrity of this or a future John Doe investigation. Accordingly, I conclude that discussion of these facts is not inconsistent with the secrecy order.

¶146 Thus, this concurring opinion does not name individuals or organizations, except the individuals and organizations who initiated and conducted the John Doe investigation. State and local government officials who initiate sweeping criminal investigations of Wisconsin citizens cannot expect to keep their conduct secret indefinitely, and appellate courts reviewing state and local government conduct do not provide the public with the full reasoning for their decisions if they are unwilling or unable to discuss the facts essential to these decisions. See majority op., ¶14 n.11, ¶88 n.25.

¶147 My interpretation of the secrecy order is essential to the discussion of certain procedural issues and is taken (1) after discussion with the court, (2) with knowledge that much information about the investigation has already been disclosed, and (3) with experience that additional disclosure in the future is likely.

¶148 In my view, all issues of law in this matter are subject to de novo review.

¶149 I join Section III of the majority opinion, and I concur in the result of Section IV. Although I agree with most of the discussion in Section IV, I would reach the result as a matter of law.

I

¶150 Scott Walker was elected governor of Wisconsin on November 2, 2010. He was sworn in as governor on January 3, 2011.

¶151 On February 14, 2011, Governor Walker proposed a Budget Repair Bill that was intended to deal with the state's fiscal situation for the remaining months of the 2009-2011 biennium and for the 2011-2013 biennium beginning on July 1, 2011. Legislation to implement the governor's plan was introduced in both the Senate and Assembly. The proposed legislation included provisions requiring additional public employee contributions for health care and pensions. The two bills also included provisions curtailing collective bargaining rights for most state and local public employees and making appropriations.

4

¶152 The history of this legislation——which became 2011 Wis. Act 10 (Act 10)——is discussed in State ex rel. Ozanne v. Fitzgerald, 2011 WI 43, 334 Wis. 2d 70, 798 N.W.2d 436, and Madison Teachers, Inc. v. Walker, 2014 WI 99, 358 Wis. 2d 1, 851 N.W.2d 337. See also Wis. Educ. Ass'n Council v. Walker, 705 F.3d 640 (7th Cir. 2013).

¶153 Act 10 was highly controversial. Intense opposition in the legislature included more than 60 consecutive hours of debate in the Assembly and the departure of all 14 Democratic senators from the state for nearly a month to deprive the Senate of a sufficient quorum to pass the original bill. Public opposition to Act 10 included massive demonstrations at the Wisconsin State Capitol. The demonstrations were so large that they garnered national and international attention. There were many smaller demonstrations throughout Wisconsin.

¶154 After its passage, the Act 10 legislation was challenged in the Dane County Circuit Court on procedural grounds to prevent its publication as an act. It was later challenged again in both federal and state courts in an effort to invalidate several of its provisions on constitutional grounds. The main challenge to Act 10 was not resolved by this court until mid-2014. Madison Teachers, 358 Wis. 2d 1.

¶155 The introduction and passage of Act 10 also led to efforts (1) to defeat a supreme court justice in April 2011, producing an exceptionally close election and the first statewide candidate recount in Wisconsin history; (2) to recall 16 state senators in July and August 2011, nine of whom were

5

forced to run for reelection; and (3) to recall the governor, lieutenant governor, and five state senators in June 2012.  Four of the five senators had to run for reelection.

¶156 Two Republican state senators were defeated in 2011 and one Republican state senator was defeated in 2012.  The latter election shifted control of the state senate to the Democrats.  This was the second time in recent years that a recall election in Wisconsin shifted control of the state senate to the Democratic party.[3]

¶157 The John Doe investigation under review is ostensibly about alleged criminal activity by [————————————], ——————————————————], and [——————————] during the multiple recall elections described above.  In an affidavit in support of the petition for the John Doe proceeding in August 2012, an investigator in the Milwaukee County District Attorney's office wrote:

> 3.  The purposes and goals of this John Doe investigation would be to:
>
> a.  Determine the nature and extent of an agreement or understanding related to the solicitation by [——————————————————————————], and [————————————————————————————], [——————————————————————————————————————————] in the 2011 and 2012 recall elections, for contributions to organizations regulated by Title 26 U.S.C. 501(c)4 contrary to

---

[3] The first Wisconsin legislator to be successfully recalled was Senator George Petak (R-Racine), who lost a recall election on June 4, 1996.  In 1995 Senator Petak voted for a bill to authorize financing for a new baseball stadium for the Milwaukee Brewers.  Senator Petak's recall shifted control of the Senate to the Democratic Party.

Wisconsin Stats sec. 11.10(4), 11.26, 11.27 and 11.61(1)(b);

      b. Determine whether the circumstances under which the solicitation and use of said campaign contributions were to circumvent the provisions of Wisconsin Stats sec. 11.26 and 11.27(1) by individuals and others identified above, for a criminal purpose in order to avoid the requirements of Wisconsin Stats. Sec. 11.06(1) and 11.27(1).

¶158 In fact, however, the Milwaukee County District Attorney's Office targeted [————————————] circle for investigation before [———————————————], and it has framed the present investigation to include alleged campaign finance violations dating from 2009 through the 2012 recall elections.

¶159 Almost immediately after the introduction of Governor Walker's Budget Repair Bill, talk of his recall began to surface. However, because Walker was elected in 2010 and did not take office until January 3, 2011, he could not be recalled under the constitution until 2012 "after the first year of the term for which the incumbent was elected." Wis. Const. art. XIII, § 12. Consequently, Walker's opponents focused their attention in the short term on a pending race for the supreme court and the recall of eight Republican state senators elected in 2008: Robert Cowles (District 2); Alberta Darling (District 8); Sheila Harsdorf (District 10); Luther Olsen (District 14); Randy Hopper (District 18); Glenn Grothman (District 20); Mary Lazich (District 28); and Dan Kapanke (District 32). Formal recall efforts for these senators began on March 2, 2011.

¶160 Opponents of Governor Walker and the senators who voted for Act 10 succeeded in obtaining the required signatures

to force recall elections for Senators Cowles, Darling, Harsdorf, Olsen, Hopper, and Kapanke.  They failed to obtain sufficient signatures to force recall elections for Senators Grothman and Lazich.

¶161 Supporters of Governor Walker attempted to recall eight Democratic state senators, namely, Lena Taylor (District 4); Spencer Coggs (District 6); James Holperin (District 12); Mark Miller (District 16); Robert Wirch (District 22); Julie Lassa (District 24); Fred Risser (District 26); and Dave Hansen (District 30).  Their formal efforts began as early as February 22 (District 12).  They succeeded in obtaining the required number of signatures to force recall elections for Senators Holperin, Wirch, and Hansen.  They failed to obtain sufficient signatures to force recall elections for Senators Taylor, Coggs, Miller, Lassa, and Risser.

¶162 In the 2011 recall elections, Senators Randy Hopper and Dan Kapanke were defeated.  Senators Cowles, Darling, Harsdorf, Holperin, Olsen, Wirch, and Hansen were reelected.

¶163 Opponents of Governor Walker sought to recall Walker and Lieutenant Governor Rebecca Kleefisch and four Republican state senators, namely, Scott Fitzgerald (District 13); Van Wanggaard (District 21), Terry Moulton (District 23); and Pam Galloway (District 29), in 2012.  Supporters of Governor Walker attempted to recall Senator Robert Jauch (District 25).  Insufficient signatures were submitted to recall Senator Jauch.  However, all the Republican targets faced recall elections in 2012, except Senator Galloway, who resigned on March 16, 2012.

She was replaced by Representative Jerry Petrowski, who ran in the recall general election.

¶164 The timing of the recall elections in 2011 and 2012 was complicated by multiple different filing dates for recall petitions and a substantial number of primary elections.  Recall petitions were filed with the Government Accountability Board (GAB) on April 1, 2011 (Senator Kapanke); April 7, 2011 (Senator Hopper); April 18, 2011 (Senator Olsen); April 19, 2011 (Senator Harsdorf); April 21, 2011 (Senators Darling, Holperin, Wirch, and Hansen); and April 25, 2011 (Senator Cowles).

¶165 Primary elections were held on July 12, 2011, in Senate Districts 2, 8, 10, 14, 18, and 32.  Primary elections were held on July 19, 2011, in Districts 12 and 22.

¶166 In 2011 the recall general elections were held on July 19, 2011 (District 30); August 9, 2011 (Districts 2, 8, 10, 14, 18, and 32); and August 16, 2011 (Districts 12 and 22).

¶167 In 2012 the primary elections for governor, lieutenant governor, and the four senate seats in Districts 13, 21, 23, and 29 were held on May 8.  The recall general elections were held on June 5, 2012.  Senator Van Wanggaard was defeated.  Governor Walker, Lieutenant Governor Kleefisch, and Senators Fitzgerald and Moulton were reelected.  Representative Petrowski was elected as a Republican to succeed Senator Galloway.

¶168 The seemingly insignificant factual details of these multiple elections are important to show the unprecedented, unscheduled electoral activity in Wisconsin during 2011 and

2012, and to relate these multiple elections to Wisconsin campaign finance laws.

## II

¶169 Wisconsin statutory law on recalls is contained primarily in Wis. Stat. § 9.10. This section is intended "to facilitate the operation of article XIII, section 12, of the [Wisconsin] [C]onstitution," Wis. Stat. § 9.10(7), which provides for the recall of "any incumbent elective officer after the first year of the term for which the incumbent was elected." Wis. Const. art. XIII, § 12.

¶170 "[A] petition for recall of an officer shall be signed by electors equal to at least 25% of the vote cast for the office of governor at the last election within the same district or territory as that of the officeholder being recalled." Wis. Stat. § 9.10(1)(b).

¶171 Wisconsin Stat. § 9.10(2) outlines the petition requirements, including the design of recall petition forms. Paragraph (2)(d) provides:

> No petition may be offered for filing for the recall of an officer unless the petitioner first files a registration statement under s. 11.05(1) or (2) with the filing officer with whom the petition is filed. The petitioner shall append to the registration a statement indicating his or her intent to circulate a recall petition, the name of the officer for whom recall is sought and, in the case of a petition for the recall of a city, village, town, town sanitary district, or school district officer, a statement of a reason for the recall which is related to the official responsibilities of the official for whom removal is sought. . . . The last date that a petition for the recall of an officer may be offered for filing is 5 p.m. on the 60th day commencing after

10

registration. . . . No signature may be counted unless the date of the signature is within the period provided in this paragraph.

¶172 Paragraph (2)(d) is significant in several respects. First, a recall effort cannot <u>formally</u> begin until a registration statement is filed under Wis. Stat. § 11.05(1) or (2). However, the organization of a recall campaign may begin much earlier than the date of registration, and the planners and organizers are not required to report any activity or expenditure to launch the campaign except expenditures by already-registered political committees.

¶173 Second, supporters of a recall campaign have 60 days after registration to circulate and file their recall petitions. However, organizers of the Scott Walker recall petition shrewdly selected Tuesday, November 15, 2011, to register their recall efforts. Under Wis. Stat. § 990.001(4)(a), which deals with how time is computed under the Wisconsin Statutes, the first day is excluded in counting the 60 days. Under Wis. Stat. § 990.001(4)(c), if the deadline for filing a document is on a day when the filing office is closed, the filing "may be done on the next succeeding day that is not a Sunday or a legal holiday." The Walker recall petition was due on January 14, 2012. However, January 14 was a Saturday, which meant that the petition did not have to be filed until Tuesday, January 17, because January 16 was a legal holiday (Martin Luther King's birthday). This gave the organizers 64 days to circulate and file the Walker, Kleefisch, Fitzgerald, Wanggaard, Moulton, and Galloway recall petitions.

11

¶174 Third, Wis. Stat. § 9.10(2)(b) makes plain that no stated reason is required to recall a state officer, as opposed to a local official.

¶175 Wisconsin Stat. § 9.10(3)(b) provides that:

> Within 10 days after the petition is offered for filing, the officer against whom the petition is filed may file a written challenge with the official, specifying any alleged insufficiency. If a challenge is filed, the petitioner may file a written rebuttal to the challenge with the official within 5 days after the challenge is filed. If a rebuttal is filed, the officer against whom the petition is filed may file a reply to any new matter raised in the rebuttal within 2 days after the rebuttal is filed. Within 14 days after the expiration of the time allowed for filing a reply to a rebuttal, the official shall file the certificate or an amended certificate.

¶176 Subsection (3)(b) continues:

> Within 31 days after the petition is offered for filing, the official with whom the petition is offered for filing shall determine by careful examination whether the petition on its face is sufficient and so state in a certificate attached to the petition. If the official finds that the amended petition is sufficient, <u>the official shall file the petition and call a recall election</u> to be held on the Tuesday of the 6th week commencing after the date of filing of the petition.

(Emphasis added.)

¶177 Subsection (3)(f) provides that "If a recall primary is required, the date specified under par. (b) shall be the date of the recall primary and the recall election shall be held on the Tuesday of the 4th week commencing after the recall primary or, if that Tuesday is a legal holiday, on the first day after that Tuesday which is not a legal holiday."

12

¶178 Subsection (3), too, is important in this matter. First, the statute builds in certain protections for a public officer against whom a recall petition is filed.  Consequently, no recall primary or recall election may proceed until the official with whom the petition is filed certifies the recall and orders a recall election.  The review process can be very time consuming, especially if all available process is utilized.

¶179 In this case, recall elections were certified by the Government Accountability Board as follows:

2011

| Officer | Recall Certified |
|---|---|
| District 2 (Robert Cowles) | June 3, 2011 |
| District 8 (Alberta Darling) | June 3, 2011 |
| District 10 (Sheila Harsdorf) | June 3, 2011 |
| District 12 (Jim Holperin) | June 10, 2011 |
| District 14 (Luther Olsen) | June 3, 2011 |
| District 18 (Randy Hopper) | June 3, 2011 |
| District 22 (Robert Wirch) | June 10, 2011 |
| District 30 (Dave Hansen) | June 10, 2011 |
| District 32 (Dan Kapanke) | June 3, 2011 |

2012

| Officer | Recall Certified |
|---|---|
| Governor Scott Walker | March 30, 2012 |
| Lt. Governor Rebecca Kleefisch | March 30, 2012 |
| District 13 (Scott Fitzgerald) | March 30, 2012 |
| District 21 (Van Wanggaard) | March 30, 2012 |

13

District 23 (Terry Moulton)          March 30, 2012

District 29 (Pam Galloway)           March 30, 2012

¶180 Second, Wis. Stat. § 11.26 sets limits on contributions, as defined in Wis. Stat. § 11.01(6). However, subsection (13m) of § 11.26 contains two specific exceptions to these contribution limits:

> Contributions utilized for the following purposes are not subject to limitation by this section:
>
> (a) For the purpose of payment of legal fees and other expenses incurred as a result of a recount at an election.
>
> (b) For the purpose of payment of legal fees and other expenses incurred in connection with the circulation, offer to file or filing, or with the response to the circulation, offer to file or filing, of a petition to recall an officer prior to the time a recall primary or election is ordered, or after that time if incurred in contesting or defending the order.

(Emphasis added.)

¶181 The plain language of Wis. Stat. § 11.26(13m) provides that there is no limitation on contributions for payments made for certain purposes from the date a recall campaign is registered until the date a recall election is ordered. There also is no limitation on contributions for payment of legal fees and other expenses incurred as a result of a recount.

¶182 For the nine successful recall petitions in 2011, the periods of exemption were as follows:

District 2           March 2, 2011—June 3, 2011 = 94 days

District 8           March 2, 2011—June 3, 2011 = 94 days

District 10          March 2, 2011—June 3, 2011 = 94 days

District 12          February 22, 2011—June 10, 2011 = 109 days

14

| | |
|---|---|
| District 14 | March 2, 2011—June 3, 2011 = 94 days |
| District 18 | March 2, 2011—June 3, 2011 = 94 days |
| District 22 | February 24, 2011—June 10, 2011 = 107 days |
| District 30 | February 25, 2011—June 10, 2011 = 106 days |
| District 32 | March 2, 2011—June 3, 2011 = 94 days |

¶183 For the six successful recall petitions for 2012, the periods of exemption were as follows:

| | |
|---|---|
| Governor | November 15, 2011—March 30, 2012 = 137 days |
| Lt. Governor | November 15, 2011—March 30, 2012 = 137 days |
| District 13 | November 15, 2011—March 30, 2012 = 137 days |
| District 21 | November 15, 2011—March 30, 2012 = 137 days |
| District 23 | November 15, 2011—March 30, 2012 = 137 days |
| District 29 | November 15, 2011—March 30, 2012 = 137 days |

¶184 There were two recounts during the period under review——the statewide recount of the 2011 supreme court election and the recount in Senate District 21 in 2012.

¶185 During periods of exemption, individuals and organizations that are permitted to make contributions to recall campaigns may make unlimited contributions to support or oppose a recall effort. If these individuals and organizations are permitted to support or oppose recall efforts with unlimited contributions during exempt periods, they are likewise permitted to seek contributions during these periods and to make contributions during these periods that will be lawful in periods that are not exempt under Wis. Stat. § 11.26(13m).

¶186 In 2011 there were 156 exempt days between February 22 and December 31 related to recall elections. In 2012 there were

15

90 exempt days between January 1 through March 30 related to recall elections.

¶187 In sum, irrespective of any First Amendment or due process limitations on the regulation of campaign finance, Wisconsin campaign finance statutes were largely inapplicable during 246 of the days under investigation, by virtue of Wis. Stat. § 11.26(13m). This figure does not include exempt days for fundraising and contributions to pay for the 2011 statewide recount for the supreme court.

III

¶188 On June 5, 2012, Governor Walker won the recall election with more than 53 percent of the vote. Walker was the third governor in United States history to be recalled. He was the first to be reelected.

¶189 Approximately two months later, on August 10, 2012, a Milwaukee County assistant district attorney, David Robles, filed a petition for commencement of this John Doe investigation in Milwaukee County. The petition was filed in Milwaukee County Circuit Court. The petition sought leave to investigate alleged campaign finance violations and requested a secrecy order to cover the investigation in anticipation that documents would be sought from "[————————————————————————————————————————————————————————————————] personal campaign committee . . . and . . . related organizations."

¶190 The petition necessitated the appointment of a John Doe judge. The judge appointed was Barbara Kluka, a prominent

16

reserve judge from Kenosha County. Issues related to this appointment are presently before the court. I am not persuaded that there are defects in Judge Kluka's appointment.

¶191 On September 5, 2012, Judge Kluka granted the petition and issued an order for commencement of the John Doe proceeding. The same day, Judge Kluka granted a secrecy order.

¶192 The next day, the Milwaukee County District Attorney's Office sought and received search warrants for the private e-mail accounts of 13 individuals, including [————————]. The private e-mail accounts were obtained from [———————————————————————]. The search warrants required the recipient "electronic communication service providers" to produce

> all communications stored in the account[s] including all incoming and outgoing e-mail; subscriber names, user names, screen names or other identities associated with the account[s]; mailing addresses, residential addresses, business addresses, other e-mail addresses, telephone numbers or other contact or identifying information for [these] account[s] (in electronic or other form); billing records; contact lists, information about length of service, types of services or related information; connection logs and records of user activity, and any information related to sent and received communications, including any "chat" or "instant messaging" or related information for said account[s] . . . .

(Emphasis added.) The time frame for the search warrants was from April 11, 2009, to July 1, 2012.

¶193 The district attorney's office also obtained either a search warrant or a subpoena duces tecum for conference call records from [————————————] and for three bank accounts from a bank. All these search warrants and subpoenas were subject to a secrecy order.

17

¶194 On December 12, 2012, the Milwaukee District Attorney's Office asked for additional search warrants and subpoenas for the private e-mail accounts of 11 additional individuals, as well as additional private accounts for five previously named individuals, including [——————————].  These accounts were obtained from [12 electronic communication service providers].  E-mail accounts were sought from January 1, 2011, through July 31, 2012.  The office also sought bank account records from [a bank] and conference call records from two providers.  All these search warrants and subpoenas were subject to a secrecy order.

¶195 On January 18, 2013, Milwaukee County District Attorney John Chisholm met with then-Attorney General J.B. Van Hollen to discuss the ongoing investigation.  District Attorney Chisolm sought to determine whether, given the statewide nature of the investigation, the Attorney General's office wished to become involved in the investigation.  On May 31, 2013, Attorney General Van Hollen sent District Attorney Chisholm a letter declining involvement in the investigation.  Attorney General Van Hollen cited, among other things, potential conflicts of interest [———————————————————————————————————————————————].

¶196 On June 20, 2013, the Government Accountability Board met in closed session in Madison to discuss the investigation. The Board passed two motions [————————————————————————————————————————————————————————————

————————————] and one to hire special investigators to assist with the investigation.

¶197 On July 16, 2013, Francis Schmitz was chosen as a special investigator for the GAB.

¶198 In July 2013, three more petitions to commence John Doe proceedings were filed: District Attorney Jane Kohlwey filed a petition in Columbia County on July 22, District Attorney Larry Nelson filed a petition in Iowa County on July 25, and District Attorney Kurt Klomberg filed a petition in Dodge County on July 26. On August 21, District Attorney Ismael Ozanne filed a petition in Dane County to commence a John Doe proceeding. All these petitions included a request that the proceedings be subject to a secrecy order.

¶199 Also on August 21, 2013, the district attorneys from the five counties involved (Milwaukee, Columbia, Iowa, Dodge, and Dane) sent a letter to John Doe Judge Barbara Kluka requesting the appointment of a special prosecutor to oversee the entire investigation. The letter recommended Francis Schmitz. On August 23, Judge Kluka appointed Schmitz to be the special prosecutor for each of the five John Doe investigations.

¶200 On or about October 1, 2013, Special Prosecutor Schmitz applied to Judge Kluka for additional subpoenas and search warrants, supported by lengthy affidavits. The subpoena applications sought information about 29 businesses and organizations, including political party organizations, about a large number of persons who were not candidates, and about all candidates and campaign committees involved in 2011 and 2012

19

recall elections. The application sought subpoenas for at least 21 businesses, organizations, and party organizations to disclose information about and relationships with all the enumerated businesses, organizations, and individuals noted above. The special prosecutor issued more than 30 subpoenas.

¶201 There also were search warrant applications for residences and/or offices of five individuals. These search warrants were very broad in nature and covered the time period from March 1, 2009 to the date the warrants were issued.

¶202 The search warrants and subpoenas authorized on or about October 1 by Judge Kluka are at issue before the court.

IV

¶203 The first issue for discussion here is the legality of the appointment of Francis Schmitz as the John Doe special prosecutor. On August 21, 2013, district attorneys from the five counties involved in the John Doe investigation sent a letter to Judge Kluka requesting the appointment of a special prosecutor to oversee the entire investigation. The letter recommended the appointment of Francis Schmitz. On August 23, Judge Kluka appointed Schmitz to be the special prosecutor, at a rate of $130 per hour, for the John Doe investigation in each of the five counties.

¶204 Wisconsin Stat. § 978.045, entitled "Special prosecutors," constitutes most of the statutory authority for the appointment of special prosecutors.[4] This section, which

---

[4] See also Wis. Stat. §§ 978.03(3), 978.043.

20

dates back to 1989,[5] has four subsections. The first two subsections read, in part, as follows:

> (1g) A court on its own motion may appoint a special prosecutor under sub. (1r) or a district attorney may request a court to appoint a special prosecutor under that subsection. Before a court appoints a special prosecutor on its own motion or at the request of a district attorney for an appointment that exceeds 6 hours per case, the court or district attorney shall request assistance from a district attorney, deputy district attorney or assistant district attorney from other prosecutorial units or an assistant attorney general. A district attorney requesting the appointment of a special prosecutor, or a court if the court is appointing a special prosecutor on its own motion, shall notify the department of administration, on a form provided by that department, of the district attorney's or the court's inability to obtain assistance from another prosecutorial unit or from an assistant attorney general.

> (1r) Any judge of a court of record, by an order entered in the record stating the cause for it, may appoint an attorney as a special prosecutor to perform, for the time being, or for the trial of the accused person, the duties of the district attorney. An attorney appointed under this subsection shall have all of the powers of the district attorney. The judge may appoint an attorney as a special prosecutor at the request of a district attorney to assist the district attorney in the prosecution of persons charged with a crime, in grand jury proceedings or John Doe proceedings under s. 968.26, in proceedings under ch. 980, or in investigations. The judge may appoint an attorney as a special prosecutor if any of the following conditions exist:

Wis. Stat. § 978.045(1g)-(1r).

---

[5] 1989 Wis. Act 117, § 5.

21

¶205 At this point, the subsection lists nine "conditions" that justify appointment of a special prosecutor:

(a) There is no district attorney for the county.

(b) The district attorney is absent from the county.

(c) The district attorney has acted as the attorney for a party accused in relation to the matter of which the accused stands charged and for which the accused is to be tried.

(d) The district attorney is near of kin to the party to be tried on a criminal charge.

(e) The district attorney is physically unable to attend to his or her duties or has a mental incapacity that impairs his or her ability to substantially perform his or her duties.

(f) The district attorney is serving in the U.S. armed forces.

(g) The district attorney stands charged with a crime and the governor has not acted under s. 17.11.

(h) The district attorney determines that a conflict of interest exists regarding the district attorney or the district attorney staff.

(i) A judge determines that a complaint received under s. 968.26(2)(am) relates to the conduct of the district attorney to whom the judge otherwise would refer the complaint.

Wis. Stat. § 978.045(1r).

¶206 Section 978.045 is clear. The court appoints special prosecutors under these two subsections. The court can make an appointment on its own motion or it can make an appointment upon the request of a district attorney. When the court appoints on its own motion, it appoints under the conditions in subsection

22

(1r). When the court appoints upon the request of a district attorney, it appoints "under that subsection," that is, under the conditions of subsection (1r).

¶207 Section 978.045 spells out <u>prerequisites</u> for appointments under (1g) and (1r). One of these prerequisites is for the court or district attorney first to request assistance from other prosecutors, including "an assistant attorney general," before appointing a special prosecutor. Because the Milwaukee County District Attorney made a request for assistance to the Wisconsin Attorney General, this prerequisite arguably was satisfied.[6] However, the assumption that the prerequisite was satisfied is grounded on the proposition that if the district attorney or court asks the Department of Justice for assistance, they do not have to ask any other prosecutorial unit. This may be a tenuous proposition.

¶208 A second prerequisite is found in the nine conditions of subsection (1r). "The judge may appoint an attorney as a

---

[6] It is not clear to the writer whether a court from one county is required to make an appointment if a district attorney, deputy district attorney, or assistant district attorney from another county, or an assistant attorney general, responds to a request for assistance from the court or from the district attorney in the court's home county. Wis. Stat. § 978.045(1g). A district attorney may, on his own, appoint an attorney to serve as a special prosecutor "without state compensation." Wis. Stat. § 978.045(3)(a). A district attorney from a large county also may appoint "temporary counsel as may be authorized by the department of administration." Wis. Stat. § 978.03(3). Judicial appointment of a special counsel in these situations would appear unnecessary but fully authorized if the appointment is consistent with subsection (1r).

special prosecutor <u>if</u> any of the following conditions exists." (Emphasis added.) If none of the enumerated conditions exists, the judge is not authorized to make an appointment under subsections (1g) and (1r).

¶209 There are several reasons why one of the nine conditions <u>must</u> exist in order for the court to make an appointment. First, the Department of Administration is required to pay for a special prosecutor who is properly appointed under these subsections. Wis. Stat. § 978.045(2)(b) ("The department of administration <u>shall</u> pay the compensation ordered by the court from the appropriation under s. 20.475(1)(d).") (emphasis added). The department does not appear to have authority to reject payment for a properly appointed special prosecutor. However, the legislature did establish conditions for these appointments before requiring the department of administration to pay.

¶210 Second, if the conditions in subsection (1r) did not have to be followed, courts could grant requests from district attorneys for an unlimited number of special prosecutors to supplement district attorney staffs.[7] In other words, individual

---

[7] According to one study, Wisconsin employed only two-thirds of the number of prosecutors needed in 2012. <u>See</u> Eric Litke, <u>Wisconsin Needs 215 More Prosecutors, Study Says</u>, Green Bay Press-Gazette (Apr. 14, 2013), available at http://archive.greenbaypressgazette.com/article/20130413/GPG0198 /304130026/Wisconsin-needs-215-more-prosecutors-study-says. During the 2011-13 budget cycle, 42 of the 71 district attorneys in the state requested funding for additional positions; none of the requests was granted. <u>Id.</u>

judges could effectively disregard the number of positions for assistant district attorneys set out in statute. <u>Cf</u>. Wis. Stat. § 16.505. District attorneys in the state's largest counties already may appoint "temporary counsel" <u>as authorized by the department of administration</u>. Wis. Stat. § 978.03(3). Section 978.045 does not permit an alliance between a district attorney and a judge to override statutory limitations on prosecutor appointments.

¶211 Third, if the conditions in subsection (1r) did not have to be followed, courts could appoint special prosecutors on their own motion for "investigations" of interest to an individual judge without any involvement by the local district attorney. This would present a significant separation of powers issue.

¶212 Fourth, courts could appoint special prosecutors with "all the powers of the district attorney," without the accountability of any checks on the special prosecutor's conduct, except from the appointing court. A special prosecutor appointed on the court's own motion would not necessarily be overseen by a district attorney. The special prosecutor could not be recalled or defeated for reelection, never having been elected to the special prosecutor position. The special prosecutor could be appointed by a reserve judge who would never again face the electorate.

¶213 All these concerns are blunted if the court adheres to the conditions in subsection (1r). None of these concerns is addressed when the conditions are disregarded.

25

¶214 In State v. Carlson, 2002 WI App 44, 250 Wis. 2d 562, 641 N.W.2d 451, the court of appeals appeared to reach a different conclusion. The court of appeals noted that Wis. Stat. § 978.045 "authorizes two distinct ways in which a court may appoint a special prosecutor." Id., ¶8. The court said:

> Carlson directs us to the sentence in the statute that authorizes the court's appointment of a special prosecutor when it is at the request of a district attorney. . . . We agree with Carlson that the part of the statute that he relies upon for his argument lists, and arguably restricts, the circumstances in which a court may appoint a special prosecutor.[4] However, any restriction, if one exists, is triggered only when the appointment is made at the request of a district attorney, not when the appointment is made by a court on its own motion.

Id. (emphasis added).

¶215 Footnote 4 in the court's opinion reads as follows:

> The part of the statute that Carlson relies upon states: "The judge may appoint an attorney as a special prosecutor at the request of a district attorney to assist the district attorney in the prosecution of persons charged with a crime, in grand jury or John Doe proceedings or in investigations." Wis. Stat. § 978.045(1r)[(1999-2000)].

Id., ¶8 n.4. The quoted statutory sentence has been broadened to include "proceedings under ch. 980." Wis. Stat. § 978.045(1r).

¶216 The Carlson court's analysis is correct except for the language "not when the appointment is made by a court on its own motion." The court of appeals' interpretation of the "on its own motion" language is mistaken because it reads out of subsection (1r) the prerequisite that "[T]he judge may appoint an attorney as a special prosecutor if any" of the nine

26

conditions exists. (Emphasis added.) The court of appeals' interpretation would provide courts, including reserve judges, free rein to make special prosecutor appointments. In my view, such an interpretation contradicts the plain language and the obvious policy embedded in the statute.

¶217 The statutory history of the section supports this interpretation. As noted previously, Wis. Stat. § 978.045 was created by 1989 Wis. Act 117, § 5. The first version of the section read in part as follows:

> (1) If there is no district attorney for the county, if the district attorney is absent from the county, has acted as attorney for a party accused in relation to the matter of which the accused stands charged and for which he or she is to be tried, is near of kin to the party to be tried on a criminal charge, is unable to attend to his or her duties or is serving in the armed forces of the United States, or if the district attorney stands charged with a crime and the governor has not acted under s. 17.11, any judge of a court of record, by an order entered in the record stating the cause therefor, may appoint some suitable attorney to perform, for the time being, or for the trial of the accused person, the duties of the district attorney, and the attorney so appointed shall have all the powers of the district attorney while so acting.

¶218 This original subsection based judicial appointment of a special prosecutor on the existence of one or more specified conditions. The statutory history of § 978.045 shows that this qualification has been carried forward consistently in each revision of the statute.

¶219 It should also be noted that the original section listed six conditions permitting judicial appointment. Since 1989 three more conditions have been added. Why would the

27

legislature keep adding new justifications for the appointment of a special prosecutor if the appointing court could simply enter an order in the record "stating the cause" for the appointment? A court must state the cause for an appointment in its order so that the department of administration is informed why it <u>must</u> pay for compensation.

¶220 Section 978.045(1g) reads in part: "A district attorney requesting the appointment of a special prosecutor, or a court if the court is appointing a special prosecutor on its own motion, shall notify the department of administration, <u>on a form provided by that department</u>, of the district attorney's or the court's inability to obtain assistance from another prosecutorial unit or from an assistant attorney general." (Emphasis added.) In fact, the principal form used by courts when they appoint a special prosecutor is CR-210, developed by the Wisconsin Court Records Management Committee of the Wisconsin Supreme Court. <u>See</u> Exhibit 1. The Department of Administration approves this form.

¶221 Form CR-210 tracks Wis. Stat. § 978.045(1r). At the bottom, Form CR-210 states: "<u>This form shall not be modified</u>. It may be supplemented by additional material." (Emphasis added.)

¶222 Five district attorneys asked Judge Kluka to appoint a special prosecutor. They asked her to appoint Francis Schmitz. They explained the reasoning for the appointment of a special prosecutor. They advised her how to justify the appointment of

28

a special prosecutor. They even explained the amount that Attorney Schmitz would accept as compensation.

¶223 Two days later Judge Kluka made the requested appointment of Francis Schmitz. The appointment order was titled "APPOINTMENT OF SPECIAL PROSECUTOR UNDER CHAPTER 978." The order disregarded CR-210 and created a new document following the analysis in the district attorneys' letter. It twice cited the letter and even repeated the unusual citation of State v. Cummings, 199 Wis. 2d 721, 546 N.W.2d 406 (1996), and the mis-citation of State v. Carlson in the letter.

¶224 Judge Kluka's order stated:

> I make this appointment in light of the facts and circumstances set forth in the August 21, 2013 letter submitted by the District Attorneys for the counties of Columbia, Dane, Dodge, Iowa and Milwaukee. I make this appointment under my authority as expressed in State v. Carlson, 2002 WI App 44, 250 Wis. 2d 562, 641 N.W.2d 562 [sic]. I find that a John Doe run by five different local prosecutors, each with a partial responsibility for what is and ought to be one overall investigation and prosecution, is markedly inefficient and ineffective. Consequently, I also make this appointment as part of my inherent authority under State v. Cummings, 199 Wis. 2d 721, 735, 546 N.W.2d 406, 411 (1996).

¶225 Inasmuch as Judge Kluka appointed a special prosecutor for each of five counties two days after receiving a joint letter signed by the district attorney in each of the five counties, and inasmuch as the judge appointed the very person the district attorneys recommended to be special prosecutor and authorized precisely the amount of compensation the district attorneys said their nominee would accept, and inasmuch as the judge twice cited the letter of request from the district

attorneys in her order, followed the letter's legal analysis, utilized the cases contained in the letter, and even repeated a mis-citation of a case in the letter, it is simply not possible to contend that the court was acting on its own motion. Judge Kluka did not check personally to see whether any other prosecutorial units could assist in the John Doe. Instead, she accepted as fact and law everything the district attorneys presented to her. Thus, even under the half-correct decision in Carlson, the special prosecutor appointment violated the appointment statute if it did not satisfy one of the nine "conditions" in subsection (1r).

¶226 Judge Kluka made a gesture to comply with the statute. Her order stated: "The Attorney General and the District Attorneys . . . all note that their individual status as partisan elected prosecutors gives rise to the potential for the appearance of impropriety. I find that the Special Prosecutor will eliminate any appearance of impropriety."

¶227 This "finding" is plainly insufficient. The Milwaukee County District Attorney's Office had been investigating [————————————————] since August 10, 2012, the day it petitioned for the second John Doe, without concern for the "appearance of impropriety." It obviously had been investigating [——————————] even longer in light of the materials presented in the affidavits supporting the petition for the John Doe and the search warrants and subpoenas requested in 2012. This is markedly different from the Department of Justice, which in 2013 [—————————————————————————————————————————————————].

¶228 In any event, "the appearance of impropriety" is not the same as "a conflict of interest" as set out in Wis. Stat. § 978.045(1r)(h). If this potential "appearance" were deemed a conflict of interest, the five district attorneys and their staffs should have withdrawn from the case. They did not.

¶229 Thus, Judge Kluka's order failed to satisfy any of the nine conditions stated in subsection (1r). That is why the judge disregarded CR-210 and submitted a different order.

¶230 That also is why the order attempts to sever the relationship between the district attorneys and the court and to claim that the judge was acting on her own motion. The problem is twofold, beyond the implausibility of the claim. A court acting on its own motion also must satisfy one or more of the conditions in subsection (1r) if the judge is acting under Wis. Stat. § 978.045. The court simply cannot read out these conditions of the statute. Moreover, the statute itself links district attorneys and the court's appointment of special prosecutors for John Does. See also Wis. Stat. § 968.26.

¶231 The judge's second gambit to support the appointment of the special prosecutor was to invoke "inherent authority" under Cummings, 199 Wis. 2d at 735. This theory is completely at odds with the title of the order: "APPOINTMENT OF SPECIAL PROSECUTOR UNDER CHAPTER 978." Appointments made under the "inherent authority" of the court, if such authority exists in this matter, do not require payment by the Department of Administration because they are not made in conformity with Chapter 978.

31

¶232 In my view, the <u>Cummings</u> case does not recognize "inherent authority" to appoint a special prosecutor, especially in a John Doe matter. In <u>Cummings</u>, the court stated the relevant issues as follows: "(1) does a John Doe judge have the power to issue a search warrant; (2) does a John Doe judge have the power to seal a search warrant . . . ." <u>Cummings</u>, 199 Wis. 2d at 729. The court then observed:

> Next, defendant asserts that a John Doe judge does not have the authority to seal a search warrant. It is true that there is no statutory authority in Wisconsin granting judges this ability. However, a John Doe judge has been granted jurisdiction, the legal right to exercise its authority, pursuant to Wis. Stat. § [968.26]. A grant of jurisdiction by its very nature includes those powers necessary to fulfill the jurisdictional mandate.

<u>Id.</u> at 735-36. "The ability to seal a search warrant is exactly that type of power which a John Doe judge needs to fulfill the above jurisdictional mandate." <u>Id.</u> at 736-37.

¶233 The same cannot be said about the "inherent authority" to appoint a special prosecutor for a John Doe proceeding.

¶234 Judicial power to appoint a John Doe special prosecutor is governed by statute, in the same way that John Doe proceedings themselves have always been governed by statute. <u>State v. Washington</u>, 83 Wis. 2d 808, 819, 266 N.W.2d 597 (1978).

¶235 One statute, Wis. Stat. § 978.045, has already been discussed. It sets conditions for the appointment of a special prosecutor paid for by the state, and those conditions have not been satisfied here.

¶236 The other statute is the John Doe statute, Wis. Stat. § 968.26. This statute reads in part:

> (1) If a district attorney requests a judge to convene a proceeding to determine whether a crime has been committed in the court's jurisdiction, the judge shall convene a proceeding described under sub. (3) and shall subpoena and examine any witnesses the district attorney identifies.
>
> . . . .
>
> (am) . . . [I]f a person who is not a district attorney complains to a judge that he or she has reason to believe that a crime has been committed within the judge's jurisdiction, the judge shall refer the complaint to the district attorney . . . .
>
> (b) . . . [T]he district attorney [then] shall, within 90 days of receiving the referral, issue charges or refuse to issue charges. If the district attorney refuses to issue charges . . . [t]he judge shall convene a proceeding . . . if he or she determines that a proceeding is necessary to determine if a crime has been committed. . . .
>
> (c) In [such] a proceeding . . . the judge shall subpoena and examine under oath the complainant and any witnesses that the judge determines to be necessary and appropriate to ascertain whether a crime has been committed and by whom committed. The judge shall consider the credibility of testimony in support of and opposed to the person's complaint.
>
> (d) . . . [T]he judge may issue a criminal complaint if the judge finds sufficient credible evidence to warrant a prosecution of the complaint. . . .

¶237 This statute suggests that a judge has authority to proceed with a John Doe and, perhaps eventually, appoint a special prosecutor (but not under Chapter 978) if "the district attorney refuses to issue charges . . . ." Whatever the statute

33

implies, it is inapplicable in this case because of the proactive involvement of the district attorneys.

¶238 The Cummings case notes that "a John Doe judge does not have the statutory powers of a court. . . . This conclusion is indubitably correct. . . . [A] John Doe judge . . . enjoys those powers conferred to all judges by statute." Cummings, 199 Wis. 2d at 738.

¶239 Judicial power to appoint a special prosecutor is governed by statute. If "inherent authority" were permitted to trump the applicable statutes governing John Doe appointments, the restrictions in these statutes would be rendered meaningless. This court cannot permit that to happen. Cf. State v. Henley, 2010 WI 97, ¶76, 328 Wis. 2d 544, 787 N.W.2d 350. Judge Kluka's appointment of the special prosecutor was invalid.

V

¶240 The second issue for discussion is the validity of the search warrants and subpoenas sought by the special prosecutor on or about October 1, 2013. As noted above, the John Doe judge approved extremely broad search warrants for five individuals and at least 31 very broad subpoenas.

¶241 Motions to quash some of the subpoenas were filed on October 17 and October 25, 2013. On October 29, Judge Kluka recused herself from the entire proceeding, citing an unspecified conflict. Thereafter, the John Doe was reassigned to Reserve Judge Gregory Peterson of Eau Claire, who previously served as a member of the Wisconsin Court of Appeals.

34

¶242 Following various writ applications in the court of appeals and petitions in two circuit courts, the new John Doe judge granted the motions to quash the subpoenas and to return property seized under the search warrants.  The judge's decision was issued on January 10, 2014.  This court must determine whether Judge Peterson's decision should be affirmed or reversed.

¶243 Judge Peterson's decision is grounded in his interpretation of Wisconsin election law as affected by the First Amendment.  He noted specifically that the "subpoenas reach into the areas of First Amendment freedom of speech and freedom of association.  As a result, I must apply a standard of exacting scrutiny and, in interpreting statutes, give the benefit of any doubt to protecting speech and association."

¶244 The judge wrote:

> I am granting the motions to quash and ordering return of any property seized as a result of the subpoenas.  I conclude the subpoenas do not show probable cause that the moving parties committed any violations of the campaign finance laws.  I am persuaded the statutes only prohibit coordination by candidates and independent organizations for a political purpose, and political purpose, with one minor exception not relevant here . . . requires express advocacy.  There is no evidence of express advocacy.

¶245 Judge Peterson then wrote that "The subpoenaed parties raise other issues in their briefs, some quite compellingly. However, given the above decision, it is not necessary to address those issues."  This writing will address some of the

issues related to the search warrants and subpoenas as Judge Peterson's decision can be affirmed on additional grounds.

¶246 The Fourth Amendment to the United States Constitution reads as follows:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The equivalent provision in the Wisconsin Constitution is found in Article I, Section 11.[8]

¶247 These constitutional provisions are implemented in Wisconsin by several statutes, including Wis. Stat. §§ 968.12 (Search warrant), 968.13 (Search warrant: property subject to seizure), 968.14 (Use of force), 968.15 (Search warrants; when executable), 968.16 (Detention and Search of persons on premises), 968.17 (Return of search warrant), 968.18 (Receipt for seized property), 968.19 (Custody of property seized), 968.20 (Return of property seized), 968.205 (Preservation of certain evidence), 968.23 (Forms), 968.27 (Definitions), 968.28 (Application for court order to intercept communications), 968.29 (Authorization for disclosure and use of intercepted wire, electronic or oral communications), 968.30 (Procedure for interception of wire, electronic or oral communications), and

---

[8] The Supreme Court has incorporated the Fourth Amendment into the Fourteenth Amendment so that it applies to the states. See Ker v. California, 374 U.S. 23, 33 (1963).

968.375 (Subpoenas and warrants for records or communications of customers of an electronic communication service or remote computing service provider). Nestled among these search warrant statutes is Wis. Stat. § 968.135, which deals with "Subpoena for documents."

¶248 Judicial interpretation of the Fourth Amendment can narrow application of the Wisconsin search warrant statutes. The statutes, in turn, may provide limitations on warrants that are not required by the Fourth Amendment.

¶249 Questions about the search warrants and subpoenas arise here in the context of a John Doe proceeding. The nature of such a proceeding must be understood.

¶250 The John Doe statute, as amended in 2009, 2009 Wis. Act 24, reads in part as follows:

> (1) If a district attorney requests a judge to convene a proceeding to determine whether a crime has been committed in the court's jurisdiction, the judge shall convene a proceeding described under sub. (3) and shall subpoena and examine any witnesses the district attorney identifies.
>
> . . . .
>
> (3) The extent to which a judge may proceed in an examination under sub. (1) or (2) is within the judge's discretion. The examination may be adjourned and may be secret. . . .

Wis. 2d 968.26(1), (3).

¶251 In Cummings, this court held that "a John Doe judge may issue and seal a search warrant under appropriate circumstances." Cummings, 199 Wis. 2d at 730. The court added: "The John Doe statute need not specifically mention the issuance

37

of search warrants for a John Doe judge to have such power." Id. at 734-35. The court said:

> [S]tatutes should be interpreted in a manner which supports their underlying purpose. This court has repeatedly held that the John Doe proceeding was designed as an investigatory tool to be used as an "inquest for the discovery of crime." Washington, 83 Wis. 2d at 822. Denying John Doe judges the ability to issue search warrants would seriously reduce the investigatory power of the John Doe proceeding.

Id. at 735 (citations omitted).

¶252 The fact that a John Doe judge may issue search warrants and subpoenas for documents does not mean that the Fourth Amendment has no application in a John Doe proceeding. On the contrary, special vigilance on the part of a John Doe judge may be required.

¶253 The documents initiating a John Doe investigation "need not name a particular accused; nor need it set forth facts sufficient to show that a crime has probably been committed. The John Doe is, at its inception, not so much a procedure for the determination of probable cause as it is an inquest for the discovery of crime . . . ." Washington, 83 Wis. 2d at 822. Because the threshold for commencing a John Doe investigation is relatively low, a John Doe judge is responsible for limiting its scope to prevent the investigation from getting out of hand. This is why "The John Doe investigation is essentially limited to the subject matter of the complaint upon which the John Doe is commenced. The John Doe judge has no authority to ferret out crime wherever he or she thinks it might exist." Id. Likewise, a district attorney's use of a John Doe is limited.

38

¶254 This limitation on the scope of the John Doe is particularly relevant to the scope of search warrants and subpoenas. In Custodian of Records v. State, 2004 WI 65, ¶34, 272 Wis. 2d 208, 680 N.W.2d 792, a John Doe case, this court observed:

> [D]oes the issuance of a subpoena in a John Doe proceeding, the sole purpose of such proceeding being to investigate alleged criminal activity, have the potential to affect Fourth Amendment rights? The issue of whether the subpoena is overbroad and oppressive, and thus unreasonable, was raised by [the head of the Legislative Technology Services Bureau (LTSB)]. This is a Fourth Amendment concern. Hale v. Henkel, 201 U.S. 43, 71 (1906) (noting that a subpoena duces tecum may implicate Fourth Amendment rights).

¶255 The court ultimately concluded, following the two-step test set out in Katz v. United States, 389 U.S. 347 (1967), that there was a reasonable expectation of privacy in the data stored on backup tapes in the LTSB and thus the subpoena was overbroad. Id., ¶43. The court added:

> When we examine whether the Fourth Amendment was violated, we determine whether the government intrusion was reasonable. Overly broad subpoenas typically are held unreasonable in that their lack of specificity allows the government to go on an indiscriminate fishing expedition, similar to that provided by a general warrant. Marron v. United States, 275 U.S. 192, 196 (1927); Boyd [v. United States, 116 U.S. 616, 625-26 (1886)]. As the United States Supreme Court has explained, a subpoena is "equally [as] indefensible as a search warrant would be if couched in similar [general] terms. Hale, 201 U.S. at 77.

Custodian of Records, 272 Wis. 2d 208, ¶50.

¶256 This case involves multiple unnamed parties but it also involves many, many additional organizations and individuals. One unnamed party writes of its subpoena:

> The scope of the subpoenas required——explicitly, implicitly, or in effect——all material of any kind that related in any way to the identified elections and to the identified individuals or entities. Other than naming organizations and individuals, there was no attempt to limit or to filter the material subpoenaed or to distinguish between potentially regulated speech and unregulated speech.

¶257 Another unnamed party declared in its brief:

> At no point does the subpoena seek to differentiate materials and documents which relate to the subject of the John Doe, to wit: the recall elections of 2011 and 2012, from other activities in which the movants were engaged during that period. The broad sweeping request demands production of all the specific items in the possession of the movant organizations and their representatives.

¶258 The subpoenas issued on or about October 1, 2013, are actually narrower than the search warrants issued in 2012, as described in the quoted material in ¶192 above.

¶259 To illustrate the breadth of the search warrants and subpoenas, the special prosecutor now has possession of every private e-mail sent by [——————————] or received by [—————————] between April 11, 2009, and July 31, 2012, together with other information demanded from certain internet service providers. The special prosecutor has [——————————] private e-mails for more than 20 months [——————————————————————————] and 19 months [————————————————————————————]——as a result of this John Doe investigation. This does not include

40

information prosecutors obtained from government e-mail accounts that are alluded to in the record.

¶260 The substance of the captured e-mails inevitably includes communications with family members and personal friends, public officials and members of [—————] staff, party leaders and political strategists, fundraisers, contributors, and other allies, lawyers, health care providers, and other professional acquaintances. It is inconceivable that a public official [—————] would not subjectively expect a reasonable degree of privacy in his private e-mail accounts.[9]

¶261 The issue before us involves much more than [———————————] and the many other individuals and organizations directly affected by the search warrants and subpoenas. The issue before us is central to our time. How much information about our people is government entitled to obtain——without people's consent and perhaps without their knowledge?

¶262 The precedent set by this case has the potential to affect the privacy rights of millions of Wisconsin citizens. "Among online adults, 92% use email, with 61% using it on an average day."[10] Cell phones and smart phones are, of course,

---

[9] Cf. United States v. Warshak, 631 F.3d 266, 288 (6th Cir. 2010) ("[A] subscriber enjoys a reasonable expectation of privacy in the contents of emails 'that are stored with, or sent or received through, a commercial ISP.'") (citation omitted).

[10] See Kristen Purcell, Search and Email Still Top the List of Most Popular Online Activities, Pew Research Center Internet Project (Aug. 9, 2011), http://www.pewinternet.org/2011/08/09/search-and-email-still-top-the-list-of-most-popular-online-activities.

ubiquitous in our society, but countless numbers of people communicate by e-mail and texting.  The ability of government to capture——without notice——the substance of our non-aural communications is not dissimilar to government wiretaps that record the substance of telephone conversations.  The only difference is that wiretaps disclose the content of telephone conversations in real time.[11]

¶263 Concerns about privacy are especially critical when people engage in aspects of speech and association during political campaigns, "an area of the most fundamental First Amendment activities."  Buckley v. Valeo, 424 U.S. 1, 14 (1976).  The Supreme Court provided guidance in Zurcher v. Stanford Daily, 436 U.S. 547, 564 (1978), when it said:

> [I]n issuing warrants and determining the reasonableness of a search, state and federal magistrates should be aware that "unrestricted power of search and seizure could also be an instrument for stifling liberty of expression."  Marcus v. Search Warrant, 367 U.S. 717, 729 (1961).  Where the materials sought to be seized may be protected by the First Amendment, the requirements of the Fourth Amendment must be applied with "scrupulous exactitude."  Stanford v. Texas, 379 U.S. [476, 485

---

[11] Wisconsin Stat. § 968.28 limits the interception of electronic communications without a court order under Wis. Stat. § 968.30.  Court orders for interception may be obtained only for specified offenses ranging from homicide, felony murder, and kidnapping to soliciting a child for prostitution, Wis. Stat. § 968.28, and such orders may not exceed 30 days in duration without specific judicial extension.  Wis. Stat. § 968.30(5).  These statutory limitations and protections for interception do not appear to apply when search warrants are issued for past electronic communications that must be retrieved from electronic storage.

(1965)]. A seizure reasonable as to one type of material in one setting may be unreasonable in a different setting or with respect to another kind of material." Roaden v. Kentucky, 413 U.S. 496, 501 (1973). Hence, in Stanford v. Texas, the Court invalidated a warrant authorizing the search of a private home for all books, records, and other materials relating to the Communist Party, on the ground that whether or not the warrant would have been sufficient in other contexts, it authorized the searchers to rummage among and make judgments about books and papers and was the functional equivalent of a general warrant, one of the principal targets of the Fourth Amendment. Where presumptively protected materials are sought to be seized, the warrant requirement should be administered to leave as little as possible to the discretion or whim of the officer in the field.

¶264 The violation of Fourth Amendment rights requires special attention when it has a chilling effect on First Amendment freedoms. Cf. NAACP v. Alabama, 357 U.S. 449 (1958).

¶265 The search warrants and subpoenas in this case are so broad and so extensive that they make the fruits of the legendary Watergate break-in look insignificant by comparison.[12] After all, the special prosecutor has access to thousands and

---

[12] On Memorial Day weekend in 1972, an intelligence gathering team from Richard Nixon's Committee to ReElect the President broke into the Democratic National Committee's (DNC) headquarters at the Watergate complex in Washington, D.C. The operatives wiretapped the telephones of the chairman of the DNC and the executive director of the Association of State Democratic Chairmen. A member of the team also photographed certain documents. One phone tap did not work and the other yielded little information. When the burglars returned for a second visit, they were apprehended. Cf. Keith W. Olsen, Watergate: The Presidential Scandal That Shook America (2003). President Nixon was forced to resign, in part for attempting to cover up a burglary to gain political intelligence that he did not personally authorize.

43

thousands of electronic communications about the 2010 election, Act 10, the 2011-13 state budget, other legislation, all the recall elections and the strategies and fundraising efforts employed in them, [——————], litigation, and the then-upcoming 2012 general election. As the substance of this John Doe leaks out, as it already has, the search warrants and subpoenas have an eerie similarity to SLAPP suits in a civil context.[13] SLAPP suits have the effect, whether intended or not, to cost defendants tremendous amounts of money, to extract privileged information from them, and to cause the defendants and others to withdraw from the political process out of fear of harassment.

¶266 The special prosecutor insists that he had probable cause for all his investigative efforts. This is sharply disputed. In any event, probable cause for a search warrant may be wholly devoid of probable cause that the recipient of the search warrant or subpoena or even the subject of the search warrant or subpoena has committed any crime. Rather, the supposed probable cause is that evidence that will aid in the conviction of some crime will be found in the place to be searched, particularly if the items to be seized include

---

[13] "SLAPP is an acronym for Strategic Lawsuit Against Public Participation. Vultaggio v. Yasko, 215 Wis. 2d 326, 359, 572 N.W.2d 450 (1998) (Bradley, J., dissenting); Briggs v. Eden Council, 969 P.2d 564, 565 n.1 (Cal. 1999)." Lassa v. Rongstad, 2006 WI 105, ¶108 n.1, 294 Wis. 2d 187, 718 N.W.2d 673 (Prosser, J., dissenting). See also id., ¶161 n.10.

everything found at that place——here, the e-mail accounts of people who have been targeted.

¶267 This sort of probable cause must be weighed against the privacy being invaded by the search warrants and subpoenas. The special prosecutor has not been targeting terrorists or mobsters who impose an imminent danger to society. Covering up the breathtaking extent of the John Doe investigation through secrecy orders is highly problematic and cannot last.[14]

¶268 I conclude the following:

1. The search warrants and subpoenas issued on or about October 1, 2013, are invalid because they were presented by a special prosecutor who had none of the powers of a district attorney because his appointment was invalid.

2. The search warrants and subpoenas issued on or about October 1, 2013, were unconstitutionally overbroad because they covered a time period before recall elections were even contemplated, thereby exceeding the subject matter of the

---

[14] The precise scope of a permissible secrecy order will . . . vary from proceeding to proceeding. However, as we observed in [State v. O'Connor, 77 Wis. 2d 261, 252 N.W.2d 671 (1977)], "[s]ecrecy of John Doe proceedings and the records thereof is not maintained for its own sake." Id. at 283. The policy underlying secrecy is directed to promoting the effectiveness of the investigation. Id. at 286. Therefore, any secrecy order "should be drawn as narrowly as is reasonably commensurate with its purposes."

State ex rel. Unnamed Person No. 1 v. State, 2003 WI 30, ¶61, 260 Wis. 2d 653, 688-89, 660 N.W.2d 260.

45

investigation; included all periods of exemption within the time period——246 days——thereby permitting secret investigation of lawful First Amendment activities; lacked the level of particularity required as to those things that might lawfully be seized; and improperly invaded the privacy of persons who were not suspects by seeking information virtually without limitation.

3.   The search warrants and subpoenas issued in September and December 2012 were unconstitutionally overbroad, for the reasons stated in point 2, but especially because they dated back more than 21 months before recalls were contemplated, a period unrelated to the recall elections in 2011 and 2012, the purported subject of the John Doe.

¶269 Consequently, I would affirm the decision of Judge Peterson to quash the subpoenas and return seized property and expand his ruling to cover the search warrants and subpoenas issued in September and December of 2012.

VI

¶270 Chapter 11 of the Wisconsin Statutes is the source of most Wisconsin statutory law on the regulation of campaign finance.  Much of the chapter was created in 1974, Chapter 334, Laws of 1973, in the wake of the Watergate scandal.  Various provisions have been revised over the years, but the 2011-12 version of the statutes contains a number of provisions that are suspect or unconstitutional.  These will be discussed below.

A

46

¶271 Section 11.01 sets out the definitions used in Chapter 11. Subsection (16) defines "political purpose," which Judge Peterson and the majority opinion deem critical to the interpretation and enforcement of the chapter.

¶272 Section 11.01(16) reads in part as follows:

(16) An act is for "political purposes" when it is done for the purpose of influencing the election or nomination for election of any individual to state or local office, for the purpose of influencing the recall from or retention in office of an individual holding a state or local office, . . . or for the purpose of influencing a particular vote at a referendum. In the case of a candidate, or a committee or group which is organized primarily for the purpose of influencing the election or nomination for election of any individual to state or local office, for the purpose of influencing the recall from or retention in office of an individual holding a state or local office, or for the purpose of influencing a particular vote at a referendum, all administrative and overhead expenses for the maintenance of an office or staff which are used principally for any such purpose are deemed to be for a political purpose.

(a) Acts which are for "political purposes" include but are not limited to:

1. The making of a communication which expressly advocates the election, defeat, recall or retention of a clearly identified candidate or a particular vote at a referendum.

2. The conduct of or attempting to influence an endorsement or nomination to be made at a convention of political party members or supporters concerning, in whole or in part, any campaign for state or local office.

(b) A "political purpose" does not include expenditures made for the purpose of supporting or defending a person who is being investigated for, charged with or convicted of a criminal violation of state or federal law, or an agent or dependent of such a person.

47

¶273 "Political purpose" is a very imprecise term, especially when it is defined by phrases such as "influencing the recall from or retention in office of an individual." (Emphasis added.) What does "influencing" mean?

¶274 Paragraph (a) provides that "Acts which are for 'political purposes' include but are not limited to: 1. The making of a communication which expressly advocates the election, defeat, recall or retention of a clearly identified candidate . . . ." (Emphasis added.) Plainly, the statute seeks to reach "acts" beyond express advocacy that "influence" elections. Consequently, there are no bright lines in the subsection, as drafted, leaving it so vague that it has the potential of chilling constitutionally permissible activity that permits no regulation.

¶275 The definition of "political purpose" has been controversial for years. The original definition, dating back to 1974, read, in part: "an act is for 'political purposes' when, by its nature, intent or manner it directly or indirectly influences or tends to influence voting at any election."

¶276 Attorney General Bronson La Follette was asked to address this definition in an opinion. The Attorney General wrote:

> This section . . . evidences a legislative intent to restrict and regulate a broad scope of political activity, including that which may not be directly related to the electoral process. This sweeping effort to regulate First Amendment activity, in light of Buckley, may be constitutionally overbroad unless subject to narrow interpretation and application.

48

. . . .

The Court adopted the standard of "express advocacy" of the election or defeat of a particular candidate as an acceptably narrow definition of activity subject to regulation.

. . . .

I am of the opinion that the "express" advocacy standard should be applied by the [State Elections] Board to all phases of political activity regulated under ch. 11.

65 Wis. Op. Att'y Gen. 145, 151-52 (1976).

¶277 The Elections Board ran into trouble in 1999 in Elections Board v. Wisconsin Manufacturers & Commerce, 227 Wis. 2d 650, 597 N.W.2d 721 (1999), in a dispute about express advocacy. The issue appeared again in Wisconsin Prosperity Network v. Myse, 2012 WI 27, 339 Wis. 2d 243, 810 N.W.2d 356.

¶278 When the government enacts criminal penalties to regulate First Amendment activities that do not constitute express advocacy, it is standing on perilous ground.

B

¶279 The affidavit supporting the commencement of the John Doe twice cited Wis. Stat. § 11.26, which is the statute entitled "Limitations on contributions." This statute limits individual contributions to the campaign committee of a candidate for governor or lieutenant governor to $10,000, § 11.26(1)(a), and $1,000 to the committee of a candidate for state senator, § 11.26(1)(b). The statute limits contributions from a committee other than a political party or legislative campaign committee to the committee of a candidate for governor to 4% of the value of the disbursement level in the schedule

49

under Wis. Stat. § 11.31. Wis. Stat. § 11.26(2)(a). This now amounts to $43,128. Wis. Stat. § 11.31(1)(a). However, a committee other than a party committee may contribute only $1,000 to the committee of a candidate for state senator. Wis. Stat. § 11.26(2)(b).

¶280 The individual contribution limits in the statute for candidates for governor, lieutenant governor, and state senator were exactly the same in 2011-2012 as they were in 1975. See Wis. Stat. § 11.26(1)(a) and (b) (1975-76). If the limits on individual contributions to the committees of these candidates had kept pace with the buying power of our currency, the contribution limits at the start of 2011 would have had to be 4.42 times higher——i.e., $44,201.67 for governor. Over the years the limit on contributions from a committee to the committee of a candidate for state senator increased from $500 in 1975 to $1,000 in 2011, provided the candidate in 1975 had no primary. Wis. Stat. §§ 11.26(2)(b) and 11.31(1)(e). If the 1975 candidate had a primary, the maximum committee contribution for the election was $800.

¶281 Individual contribution limits have been consistently upheld beginning with Buckley, 424 U.S. at 23-35. Buckley acknowledged, however, that given "the important role of contributions in financing political campaigns, contribution restrictions could have a severe impact on political dialogue if the limitations prevent candidates and political committees from amassing resources necessary for effective advocacy." Id. at 21. Inasmuch as static contribution limits render contributions

50

today worth only 25 percent of their value 35 years ago, many candidates are forced to look for support from expenditures outside their own committees.

C

¶282 Subsection (9) of Wis. Stat. § 11.26 is critically important in relation to the contribution limits.  It provides:

> (9)(a) No individual who is a candidate for state or local office may receive and accept more than 65 percent of the value of the total disbursement level determined under s. 11.31 for the office for which he or she is a candidate during any primary and election campaign combined from all committees subject to a filing requirement, including political party and legislative campaign committees.

> (b) No individual who is a candidate for state or local office may receive and accept more than 45 percent of the value of the total disbursement level determined under s. 11.31 for the office for which he or she is a candidate during any primary and election campaign combined from all committees other than political party and legislative campaign committees subject to a filing requirement.

¶283 The practical effect of subsection (9) is that all political party committees may contribute no more than $700,830 directly to the campaign committee of a candidate for governor, nor more than $22,425 directly to the committee of a candidate for state senator, except for exempt contributions under Wis. Stat. § 11.26(13m).  However, in all actual elections, including recall elections, every dollar received from a non-party committee reduces the amount that the candidate may receive from a party committee.

¶284 Political action committees collectively may contribute no more to a candidate for governor than 45 percent

51

of the schedule in Wis. Stat. § 11.31, namely, $486,090, or to a candidate for state senator, no more than $15,525, except for exempt contributions under Wis. Stat. § 11.26(13m). The effect of this law is obvious. Political party committees singularly or collectively and political action committees collectively are never permitted——at the same time——to give the maximum contributions allowed by law for regular election expenses. In fact, some political action committees may be precluded altogether from making a direct contribution to the committee of a candidate for governor or a candidate for state senator.

¶285 To illustrate, all non-party committees may contribute only $15,525 to a state senate candidate. Thus, only 15 political action committees may make the maximum contribution of $1,000 to the committee of a candidate for state senator. The sixteenth committee is limited to $525. The seventeenth committee and all other such committees cannot contribute at all. The contributions of these non-party committees must be reduced if party committees give more than $6,900.

¶286 Subsection (9) was challenged in the Wisconsin Supreme Court in Gard v. Wisconsin State Elections Board, 156 Wis. 2d 28, 456 N.W.2d 809 (1990). John Gard, running in a 1987 special election to fill a vacancy in the Assembly, won a hotly contested primary and a close general election. In the process, he received $7,607.32 more from political party committees than the total $11,213 from all committees permitted by subsection (9). He was prosecuted by the state elections board. The

52

petitioners argued that Wis. Stat. § 11.26(9)(a) was unconstitutional on several grounds.

> First, [petitioners] claim that the aggregate limit on the amount of money committees may contribute to a candidate's campaign violates committee members' first amendment rights to political expression because it completely bars some committees from making even a symbolic expression of support evidenced by a contribution once the aggregate limit has been reached. Second, they argue that the aggregate limit on committee contributions is, in effect, a limit on the candidate's ability to spend, which impermissibly burdens a candidate's freedom of speech guaranteed by the first amendment under Buckley v. Valeo, 424 U.S. 1, 96 S. Ct. 612, 46 L.Ed.2d 659 (1976). Third, they assert that the statute impermissibly burdens freedom of association also guaranteed by the first amendment by encouraging individuals to disassociate themselves from committees. Fourth, petitioners argue that the statute imposes a greater burden on the first amendment rights of committees than it does on the first amendment rights of individuals in violation of the equal protection clauses of the United States and Wisconsin Constitutions. Petitioners also assert that the statute imposes a greater burden on the first amendment rights of committees who contribute "late" in a campaign than on committees who contribute "early" in a campaign in violation of equal protection guarantees.

Id. at 36.

¶287 This court upheld subsection (9) of the 1974 statute, holding that the state had a compelling interest, namely, to prevent corruption or the appearance of corruption, and that the provision was narrowly tailored to accomplish this objective.

¶288 The effect of the Gard decision has been to weaken political parties and to encourage non-party committees to engage in issue advocacy spending on campaigns, instead of

53

making direct, reportable contributions to candidates. This dynamic has been recognized for decades.

¶289 More recently, however, subsection (9) has come under significant scrutiny. In September 2014, United States District Judge Rudolph Randa entered an order enjoining the GAB from enforcing subsection (9). CRG Network v. Barland, 48 F. Supp. 3d 1191 (E.D. Wis. Sept. 5, 2014). Judge Randa noted that the Supreme Court has demonstrated "increasing impatience" with the type of "'prophylaxis-upon-prophylaxis' approach" created by statutes such as Wis. Stat. § 11.26(9), and that the other provisions in place to prohibit unlawful circumvention of the base contribution limit rendered subsection (9) unnecessary and unconstitutional. Id. at 1195-96. Following the issuance of Judge Randa's order, the GAB issued a press release stating it would not seek enforcement of subsection (9). Mike B. Wittenwyler & Jodi E. Jensen, Decoding the Maze: Wisconsin's Campaign Finance Laws, 87 Wis. Law. 22, 25 (Oct. 2014).

D

¶290 Subsection (4) of § 11.26 reads:

No individual may make any contribution or contributions to all candidates for state and local offices and to any individuals who or committees which are subject to a registration requirement under s. 11.05, including legislative campaign committees and committees of a political party, to the extent of more than a total of $10,000 in any calendar year.

¶291 Statutes limiting total contributions, as opposed to capping contributions to one candidate, were declared unconstitutional in McCutcheon v. Federal Election Commission,

54

134 S. Ct. 1434 (2014). In short, Wis. Stat. § 11.26(4) is unconstitutional.

¶292 Many people have violated subsection (4), often unintentionally, since its enactment. The State has pursued some violators criminally. Cf. State v. Gardner, No. 2011CF137, Washington Cnty., Wis., Cir. Ct. (Apr. 11, 2011).

¶293 Important for this review is the fact that the Government Accountability Board insisted on enforcing Wis. Stat. §§ 11.26(4) and 11.26(9) during the recall elections. See MEMORANDUM from Kevin Kennedy to Interested Persons and Committees Involved With Recall Efforts, March 15, 2011. Kennedy's memo also sought to limit the exception to contribution limits for certain recall expenses. Wis. Stat. § 11.26(13m).

E

¶294 The overall effect of Wisconsin's complicated, confusing, outdated, and sometimes unconstitutional campaign finance statutes is to compel candidates to depend increasingly upon expenditures by 501(c)(4) committees that engage in issue advocacy.[15]

¶295 The special prosecutor concedes that without "the authorization and consent of [a] candidate committee," an expenditure is independent and constitutionally protected.

---

[15] This was especially evident in the 2011 Wisconsin Supreme Court election in which both candidates were bound by minimal contribution limits and tight spending limits because they accepted public funding.

However, the special prosecutor contends that a committee's "coordination" with a candidate committee eliminates many constitutional protections, and that "there can never be 'coordinated' fundraising between a candidate and a truly independent third party."

¶296 In view of the above, the pivotal concern with application of Chapter 11's campaign finance laws is Wis. Stat. § 11.10(4). This subsection reads:

> (4) No candidate may establish more than one personal campaign committee. Such committee may have subcommittees provided that all subcommittees have the same treasurer, who shall be the candidate's campaign treasurer. The treasurer shall deposit all funds received in the campaign depository account. <u>Any committee which is organized or acts with the cooperation of or upon consultation with a candidate or agent or authorized committee of a candidate, or which acts in concert with or at the request or suggestion of a candidate or agent or authorized committee of a candidate is deemed a subcommittee of the candidate's personal campaign committee</u>.

(Emphasis added.)

¶297 In evaluating the meaning of this provision, we must understand the definition of "committee" in Wis. Stat. § 11.01(4):

> "Committee" or "political committee" means any person other than an individual and any combination of 2 or more persons, permanent or temporary, which makes or accepts contributions or makes disbursements, whether or not engaged in activities which are exclusively political, except that a "committee" does not include a political "group" under this chapter.

¶298 Put together, these two provisions are vague and absurdly overbroad. Committees include political party committees and legislative campaign committees. Committees

56

include campaign committees of a candidate's fellow party members.  Committees include political action committees of every description.  The two sections create dire consequences for candidates who exercise the most fundamental political discourse with committees of the candidate's own party and with the candidate's most ardent allies.  By fundamental discourse, I mean "cooperation," "consultation," "requests" for support, and "suggestions."

¶299 Any person who believes that the statute does not apply to coordination between a candidate and his state political party must understand that the special prosecutor has in his possession 39 months of emails from [————————————————————————————————————————————————————————————————], obtained by secret search warrant.  Anyone who believes that the special prosecutor was not interested in coordination among the Republican candidates in the state senate recalls would be mistaken.

¶300 Turning to non-party committees, how does Wis. Stat. § 11.10(4) apply to a candidate who answers a candidate questionnaire from a committee, which asks the candidate pointed questions on issues, then asks whether the candidate will accept an endorsement and campaign contributions?  Surely, a non-judicial candidate is permitted to ask for financial support.

¶301 The "coordination" statute cannot be constitutional as written because it makes the candidate who behaves as a perfectly normal candidate, meeting with organizations and discussing plans, issues, and themes, run the intolerable risk

57

of <u>impairing</u> a committee that does no more than engage in issue advocacy. The committee is neutered if it is made a subcommittee of the candidate's committee because it cannot exceed the candidate's contribution limits. The committee is disqualified because it cannot receive and spend corporate dollars as a subcommittee of a candidate, and it cannot maintain the anonymity of its donors, as permitted by law, if it engages in issue advocacy that helps the candidate.

¶302 Under the statute as written, a candidate must surrender his First Amendment freedom to communicate if he is to prevent criminal liability.

¶303 A more carefully drafted statute might be able to pass constitutional muster. But not this statute, in the circumstances of this case. And no statute can vest government regulators and special prosecutors with broad discretion to decide whether First Amendment activities violate the law.

¶304 In my view, Wis. Stat. § 11.01(16) is unconstitutional if it is not limited to express advocacy; Wis. Stat. § 11.10(4) is unconstitutional as drafted; Wis. Stat. § 11.26(4) is unconstitutional; Wis. Stat. § 11.26(9) is unconstitutional; and Wis. Stat. § 11.26(13m) must be broadly interpreted under the circumstances facing Wisconsin in 2011-2012. As a result, the special prosecutor cannot sustain the theories of prosecutorion that served as the foundation for his John Doe investigation.

¶305 For the foregoing reasons, I respectfully concur in the decision to dismiss the John Doe investigation.

¶306 I am authorized to state that Chief Justice PATIENCE DRAKE ROGGENSACK joins Sections IV and V of this opinion, and that Justices ANNETTE KINGSLAND ZIEGLER and MICHAEL J. GABLEMAN join Section IV of this opinion.

STATE OF WISCONSIN, CIRCUIT COURT, _____ COUNTY | For Official Use

## Appointment of Special Prosecutor under Chapter 978

☐ I am the district attorney for _____ County and request the appointment of a special prosecutor under §978.045, Wisconsin Statutes.

| Signature of District Attorney | Name Printed or Typed | Date |
|---|---|---|
| | | |

☐ The court on its own motion is appointing a special prosecutor under §978.045, Wisconsin Statutes.

## APPOINTMENT ORDER

**THE COURT FINDS AND ORDERS:**

1. Attorney _____ is appointed special prosecutor for:
    ☐ The period _____ to _____, plus reasonable preparation time.
    ☐ The matter of: State of Wisconsin     ☐ Other: _____
        vs. _____, Case No. _____.
2. The reason for the appointment:
    ☐ There is no district attorney for the county.
    ☐ The district attorney is absent from the county.
    ☐ The district attorney is physically unable to attend to duties or has a mental incapacity that impairs ability to perform duties.
    ☐ The district attorney has a conflict of interest under statute: _____.
    ☐ The district attorney is serving in the U.S. armed forces.
    ☐ The district attorney is charged with a crime and the governor has not acted under §17.11, Wisconsin Statutes.
    ☐ Other statutory reason: _____. Cite statute: _____
3. Compensation is set at the following rate:
    ☐ No compensation is to be paid because this person is from another prosecutorial unit or an assistant attorney general.
    ☐ Hourly rate specified in §977.08(4m)(b), Wisconsin Statutes.
    ☐ Other: _____
4. Disbursements shall be submitted to _____ County for payment, if incurred.
5. The Department of Administration shall pay the compensation ordered by the court.

> **Send a copy of this Appointment to:**

1. Director
   State Prosecutor's Office
   Department of Administration
   P.O. Box 7869
   Madison, WI 53707-7869
   Telephone: (608)267-2700

2. Agency responsible for paying disbursements.

**BY THE COURT:**

_____
Circuit Court Judge

_____
Name Printed or Typed

_____
Date

## OATH AND CONSENT TO SERVE

I accept this appointment and (swear) or (affirm) that I will support the constitutions of the United States and the State of Wisconsin, and will faithfully discharge the duties of this office to the best of my ability.

Subscribed and sworn to before me
on _____

| Signature of Attorney | Telephone Number |
|---|---|
| Name Printed or Typed | Bar Number |
| Address of Principal Office | |

_____
Notary Public, State of Wisconsin

My commission expires: _____

CR-210, 10/09 Appointment of Special Prosecutor under Chapter 978                §978.045, Wisconsin Statutes
This form shall not be modified. It may be supplemented with additional material.
Page 1 of 1

*Exhibit 1*

¶307 ANNETTE KINGSLAND ZIEGLER, J. *(concurring)*. During pre-dawn darkness in October 2013, several armed law enforcement officers wearing flak jackets, carrying battering rams, and using bright floodlights executed secret John Doe search warrants in the homes of Wisconsin residents. What was the prosecution searching for? The prosecution was in search of documents and electronic evidence, including personal computers and cell phones, to support alleged violations of Wisconsin's campaign finance law. The warrants sought evidence that had been around for more than four years. The warrants were executed shortly before morning, days after a judge signed them, while it was still dark outside. Law enforcement certainly has, and should have, a great deal of discretion when it comes to how and when a warrant will be executed, but ultimately courts may review the reasonableness of that execution.[1]

¶308 Because these searches were executed in pre-dawn darkness, they are essentially what courts and legal commentators refer to as a nighttime search.[2] Because no

---

[1] "'[I]t is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by the warrant——subject of course to the general Fourth Amendment protection against unreasonable searches and seizures.'" State v. Sveum, 2010 WI 92, ¶53, 328 Wis. 2d 369, 787 N.W.2d 317 (alteration added in Sveum) (quoting Dalia v. United States, 441 U.S. 238, 257 (1979)) (internal quotation marks omitted).

[2] For a more comprehensive discussion of the law regarding nighttime searches, see Claudia G. Catalano, Annotation, Propriety of Execution of Search Warrants at Nighttime, 41 A.L.R. 5th 171 (1996).

Wisconsin law specifically addresses the legality of nighttime searches of private homes, under the existing facts of this case, these pre-dawn searches could raise questions as to whether they would pass constitutional muster.  I recognize that because no challenge has been made to the execution of the warrants, the record is without explanation as to why the search warrants were executed as they were.  I also recognize that the State might have had a legitimate reason for executing the search warrants pre-dawn in paramilitary fashion.

¶309 I join the majority opinion in all three cases.  I write separately to explain that, even if the search warrants were lawfully issued, the execution of them could be subject to the reasonableness analysis of the Fourth Amendment to the United States Constitution and the Wisconsin Constitution's counterpart.[3]  A totality of the circumstances analysis could include consideration of, among other things, the timing of the issuance and execution of the warrants, the manner in which the warrants were executed, whether public or officer safety concerns justified the manner of execution, and what type of evidence was being sought.

I. FUNDAMENTAL PRINCIPLES

---

[3] "Even if a court determines that a search warrant is constitutionally valid, the manner in which the warrant was executed remains subject to judicial review."  Sveum, 328 Wis. 2d 369, ¶53 (citing State v. Andrews, 201 Wis. 2d 383, 390, 549 N.W.2d 210 (1996)).

¶310 The Fourth Amendment "contain[s] two separate clauses, the first protecting the basic right to be free from unreasonable searches and seizures and the second requiring that warrants be particular and supported by probable cause." Payton v. New York, 445 U.S. 573, 584 (1980). The Fourth Amendment's second clause provides that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized." U.S. Const. amend. IV. With respect to the other clause, "[t]he Fourth Amendment to the United States Constitution and Article I, Section 11 of the Wisconsin Constitution protect '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" State v. Robinson, 2010 WI 80, ¶24, 327 Wis. 2d 302, 786 N.W.2d 463 (quoting U.S. Const. amend. IV; Wis. Const. art. 1, § 11).[4]

---

[4] The Fourth Amendment to the United States Constitution provides in full:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Article I, Section 11 of the Wisconsin Constitution states:

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing

(continued)

3

¶311 "'The touchstone of the Fourth Amendment is reasonableness.'" State v. Tullberg, 2014 WI 134, ¶29, 359 Wis. 2d 421, 857 N.W.2d 120 (quoting Florida v. Jimeno, 500 U.S. 248, 250 (1991)). "'The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable.'" Id. (quoting Jimeno, 500 U.S. at 250). "Constitutional reasonableness relates not only to the grounds for a search or seizure but to the circumstances surrounding the search or seizure's execution." State v. Henderson, 2001 WI 97, ¶18, 245 Wis. 2d 345, 629 N.W.2d 613 (citing Tennessee v. Garner, 471 U.S. 1, 8 (1985)). "The determination of reasonableness is made by reference to the particular circumstances of each individual case, and balances the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." Id. (internal quotation marks omitted) (citations omitted). In other words, "reasonableness" is "determined by balancing the degree to which a challenged action intrudes on an individual's privacy and the degree to which the action promotes a legitimate government interest." Green v. Butler, 420 F.3d 689, 694 (7th Cir. 2005) (citing United States v. Knights, 534 U.S. 112, 118-19 (2001); Ohio v. Robinette, 519 U.S. 33, 39 (1996)). A court determines whether a search was reasonably executed by

---

the place to be searched and the persons or things to be seized.

4

considering "the totality of the circumstances." United States v. Banks, 540 U.S. 31, 35-36 (2003).

### A. Constitutional Protection of a Home

¶312 "The people's protection against unreasonable search and seizure in their 'houses' was drawn from the English common-law maxim, 'A man's home is his castle.'" Minnesota v. Carter, 525 U.S. 83, 94 (1998) (Scalia, J., concurring). "Courts have long extolled the importance of the home, noting that the [Fourth Amendment] was drafted in part to codify 'the overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic.'" State v. Scull, 2015 WI 22, ¶19, 361 Wis. 2d 288, 862 N.W.2d 562 (quoting Payton, 445 U.S. at 601). The United States Supreme Court has noted that "the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" Payton, 445 U.S. at 585 (quoting United States v. United States District Court, 407 U.S. 297, 313 (1972)). "The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home——a zone that finds its roots in clear and specific constitutional terms: 'The right of the people to be secure in their . . . houses . . . shall not be violated.'" Id. at 589 (ellipses added in Payton). "That language unequivocally establishes the proposition that '[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental

5

intrusion.'" <u>Id.</u> at 589-90 (alterations added in <u>Payton</u>) (quoting <u>Silverman v. United States</u>, 365 U.S. 505, 511 (1961)).[5]

## B. Nighttime Search of a Home

¶313 A nighttime search of a home conflicts with the fact that "[a] home is entitled to special dignity and special sanctity." <u>Holt v. State</u>, 17 Wis. 2d 468, 477, 117 N.W.2d 626 (1962). "Searches of the dwelling house were the special object of this universal condemnation of official intrusion. Nighttime search was the evil in its most obnoxious form." <u>Monroe v. Pape</u>, 365 U.S. 167, 210 (1961) (Frankfurter, J., dissenting in part). "The Supreme Court has consistently recognized that a police search of a residence at night is a greater intrusion upon an individual's privacy interest than an ordinary search." <u>United States v. Gibbons</u>, 607 F.2d 1320, 1326 n.15 (10th Cir.

---

[5] The Supreme Court has noted that a search of a cell phone or personal computer could carry some of the implications of a home search. The Court noted that "many [cell phones] are in fact minicomputers that also happen to have the capacity to be used as a telephone." <u>Riley v. California</u>, 573 U.S. \_\_\_\_, 134 S. Ct. 2473, 2489 (2014). Given the "storage capacity of cell phones," "a cell phone search would typically expose to the government far <u>more</u> than the most exhaustive search of a house: A phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form . . . ." <u>Id.</u> at 2489, 2491. In fact, some courts have required warrants to be more particular than just seeking all e-mails. <u>See</u> <u>In re Applications for Search Warrants for Info. Associated with Target Email Accounts/Skype Accounts</u>, No. 13-MJ-8163-JPO, 2013 WL 4647554, at *8 (D. Kan. Aug. 27, 2013) (holding that "the warrants proposed by the government violate the Fourth Amendment" because they did not particularly describe the e-mails to be searched).

1979). In Jones v. United States, the Supreme Court stated that it was "difficult to imagine a more severe invasion of privacy than the nighttime intrusion into a private home . . . ." Jones v. United States, 357 U.S. 493, 498 (1958); see also Coolidge v. New Hampshire, 403 U.S. 443, 477 (1971) (describing a "midnight entry" of a home as an "extremely serious intrusion"); United States v. Reed, 572 F.2d 412, 422 (2d Cir. 1978) (citations omitted) ("[T]he Fourth Amendment protects citizens' reasonable expectations of privacy . . . [and] one's reasonable expectation of privacy in the home is entitled to a unique sensitivity from federal courts."); United States v. Martinez-Fuerte, 428 U.S. 543, 561 (1976) (citation omitted) (noting that "the sanctity of private dwellings[ is] ordinarily afforded the most stringent Fourth Amendment protection").[6]

¶314 "At common law, prior to the adoption of the Fourth Amendment, there was a strong aversion to nighttime searches." United States ex rel. Boyance v. Myers, 398 F.2d 896, 897 (3d Cir. 1968) (citations omitted). "This aversion was then and is now primarily focused on intrusions into the home." United

---

[6] "Because the fourth amendment's proscriptions against unreasonable searches are virtually identical to those in art. I, sec. 11 of the Wisconsin Constitution, state law of search and seizure conforms to that developed under federal law." State v. Long, 163 Wis. 2d 261, 266, 471 N.W.2d 248 (Ct. App. 1991) (citing State v. Reed, 156 Wis. 2d 546, 551, 457 N.W.2d 494 (Ct. App. 1990)). See also State v. Tullberg, 2014 WI 134, ¶29 n.17, 359 Wis. 2d 421, 857 N.W.2d 120.

States v. Tucker, 313 F.3d 1259, 1263 (10th Cir. 2002) (citing Gibbons, 607 F.2d at 1326). "Nighttime searches were regarded with revulsion [at common law] because of the indignity of rousing people from their beds." Com. v. Grimshaw, 595 N.E.2d 302, 304 (Mass. 1992) (citing Com. v. DiStefano, 495 N.E.2d 328, 332 (Mass. App. Ct. 1986)). "The significance of this aversion of the common law to nighttime searches is underscored by the Supreme Court's reminder that the search and seizure clause is properly 'construed in the light of what was deemed an unreasonable search and seizure when it was adopted.'" Boyance, 398 F.2d at 897 (quoting Carroll v. United States, 267 U.S. 132, 149 (1925)). When a home is invaded during pre-dawn darkness of night, special protections should apply because of the sanctity of a home. This is not to say that a home search can never occur in pre-dawn darkness, but when it does, that timing could be considered as a part of the totality of the circumstances reasonableness analysis of the Fourth Amendment.

¶315 Although Wisconsin does not have a statute directing that a judge must determine whether a nighttime search is justified, 23 states have statutory protections that allow a nighttime search only upon a "special showing and authorization." Wayne R. LaFave, Search and Seizure § 4.7(b) (5th ed. 2014). Similarly, the Federal Rules of Criminal Procedure implement the essentials of the Fourth Amendment by requiring that a warrant be served "during the daytime, unless the judge, for good cause expressly authorizes execution at

8

another time." Fed. R. Crim. P. 41(e)(2)(A)(ii).[7] The federal rule and these 23 states recognize and codify Fourth Amendment protections against unreasonable nighttime searches and seizures. See United States v. Searp, 586 F.2d 1117, 1124 (6th Cir. 1978) (holding that Federal Rule 41's "night search provisions . . . explicate fundamental purposes of the Fourth

---

[7] The Federal Rules of Criminal Procedure require special justification for a nighttime search. Fed. R. Crim. P. 41(e)(2)(A)(ii). However, "'[d]aytime' means the hours between 6:00 a.m. and 10:00 p.m. according to local time." Fed. R. Crim. P. 41(a)(2)(B). Although this Federal Rule may have been technically complied with because the searches at issue might have begun a few minutes after 6:00 a.m., technical compliance with the Federal Rule does not automatically render these searches immune from constitutional scrutiny in this state court matter. While federal rules attempt to provide for consistency from state to state, courts have often taken a practical approach when defining "nighttime" for Fourth Amendment purposes. See Claudia G. Catalano, Annotation, Propriety of Execution of Search Warrants at Nighttime, 41 A.L.R. 5th 171 (1996). See also United States v. Palmer, 3 F.3d 300, 303 (9th Cir. 1993) (holding that Federal Rule of Criminal Procedure 41 did not apply because "[t]he investigation in this case was initiated and controlled by the local law enforcement officials involved"). In the case at issue, although the Special Prosecutor is a former Federal Prosecutor, his investigation of this matter was not in the federal system. This investigation was initiated and controlled by local law enforcement officials.

Amendment" (internal quotation marks omitted) (citation omitted)).[8]

¶316 When a court is confronted with a challenge to a search that is conducted in the pre-dawn darkness of night, it might consider whether the exigencies of the situation justify the greater intrusiveness of a search at this time. A court could look at factors including, but not limited to, the timing of the issuance and execution of the warrants, the manner in which the warrants were executed, whether public or officer safety concerns justified the manner of execution, and what type of evidence was being sought. Law enforcement is certainly endowed with a great deal of discretion regarding how and when to execute a warrant, but ultimately a court could be called upon to review the reasonableness of that execution under a totality of the circumstances analysis.

¶317 Certainly, the necessity of immediate police action may be evident from the facts and circumstances of the situation. Warrant execution in some criminal matters, such as some human trafficking or drug cases, may militate in favor of a warrant being executed at night or in a forceful manner because

---

[8] A violation of these rules may result in suppression of the evidence if the violation rises to constitutional proportion. See, e.g., United States v. Bieri, 21 F.3d 811, 816 (8th Cir. 1994) (citation omitted) ("We apply the exclusionary rule to violations of [the nighttime search provision of] Rule 41 only if a defendant is prejudiced or reckless disregard of proper procedure is evident."); see also United States v. Berry, 113 F.3d 121, 123 (8th Cir. 1997) (noting that a violation of Federal Rule of Criminal Procedure 41's nighttime search provision can be "of constitutional magnitude").

the criminal activity is likely occurring at night, evidence may likely be lost if law enforcement waits, or dangerous activity is afoot. "It has been held that the danger of destruction or removal of the evidence is sufficient reason for nighttime execution of a search warrant, in part because such circumstances could even constitute exigent circumstances for a search without a warrant." Tucker, 313 F.3d at 1265 (citations omitted). See, e.g., United States v. Howard, 532 F.3d 755, 760-61 (8th Cir. 2008) (upholding a nighttime search because a confidential informant advised police that drug trafficking occurred in the home "during all hours of the night"); Fair v. State, 664 S.E.2d 227, 235 (Ga. 2008) (upholding a 1:15 a.m. search "because the officers knew from experience that the peak time for drug dealers to conduct business was after midnight"). Law enforcement needs a wide berth when determining how and when to execute a warrant, but under the totality of the circumstances, the execution of the warrant must still be reasonable in order to pass constitutional muster.

## II. THE TOTALITY OF THE CIRCUMSTANCES

¶318 With Fourth Amendment principles in mind, understanding that the record is not complete because no challenge has been made to the warrant execution, the following discussion will nonetheless endeavor to consider the timing of the issuance and execution of the warrants, the manner of execution, whether public or officer safety concerns existed, and what type of evidence was being sought.

A. The Timing of the Issuance and Execution of the Warrants

11

¶319 In the case at issue, Investigator Dean Nickel obtained two secret John Doe warrants from Reserve Judge Barbara Kluka to search the homes of Unnamed Movants Nos. 6 and 7. The warrants were obtained in the course of a secret John Doe investigation.[9] Those warrants and their supporting affidavit did not set forth any particular time at which, or manner in which, the warrants would be executed. Unlike many warrants that must be executed at nighttime for fear of the evidence being destroyed or removed from the location or because of public or officer safety reasons, much of this evidence had been sitting on computers and in cyberspace for years.

¶320 This was not, as sometimes occurs, a situation where a judge was awoken in the middle of the night to issue a warrant because law enforcement needs to execute it promptly in order to seize the evidence. Reserve Judge Kluka signed the warrants at 11:30 a.m. on Monday, September 30, 2013. However, they were not executed until Thursday, October 3, 2013, at approximately

---

[9] A John Doe proceeding, known as "John Doe I," was commenced in the spring of 2010 "for the purpose of investigating the alleged misuse of public resources in the Milwaukee County Executive's office." Majority op., ¶14. The John Doe I investigation "triggered a second John Doe proceeding (John Doe II), the investigation at issue here." Id., ¶15. On August 10, 2012, Milwaukee County Assistant District Attorney David Robles filed a petition for the commencement of John Doe II in the Milwaukee County circuit court. Id. On September 5, 2012, "Reserve Judge Kluka authorized the commencement of the John Doe [II] proceeding and also granted the requested secrecy order." Id., ¶17.

6:00 a.m.[10] "A search warrant must be executed and returned not more than 5 days after the date of issuance." Wis. Stat. § 968.15(1). These warrants were executed three days after they were issued. "The return of the search warrant shall be made within 48 hours after execution . . . ." Wis. Stat. § 968.17(1). The warrants were returned on October 4, four days after they were issued and one day after they were executed.

¶321 The warrants were executed in the pre-dawn darkness. On October 3 civil twilight began in Madison at 6:29 a.m. and sunrise began at 6:57 a.m.[11] For all practical purposes, each of these searches was the equivalent of a nighttime search. Because no challenge to the warrant execution has been made, the record lacks any explanation as to why law enforcement did not execute the warrants any time during the preceding 66.5 hours——or more specifically, the 29.5 daylight hours——between issuance and actual execution.

---

[10] The return on the warrant to search Unnamed Movant No. 6's house, in a box titled "Recovery Date," reads "10/03/2013 06:15:00." Similarly, the return on the warrant to search Unnamed Movant No. 7's house, in a box titled "Recovery Date," reads "10/03/2013 6:03:13." The record does not indicate to what these times correspond. Media reports indicate that the searches lasted two and a half hours. See, e.g., Kittle, infra note 12. The record is unclear.

[11] See U.S. Naval Observatory: Astronomical Applications Department, Sun and Moon Data for One Day, available at http://aa.usno.navy.mil/rstt/onedaytable?form=1&ID=AA&year=2013&month=10&day=3&state=WI&place=Madison (last visited June 13, 2015).

¶322 A nighttime search will often occur shortly after a judge has issued the warrant, as there is some urgency in needing to conduct the search in non-daylight hours. Courts often consider "nighttime" as the time when it is "dark" outside, between sunset and sunrise, between dusk and dawn, or when most people are asleep. See Claudia G. Catalano, Annotation, Propriety of Execution of Search Warrants at Nighttime, 41 A.L.R. 5th 171 (1996). This record, understandably, lacks any indication of why it was reasonable to execute these warrants in this manner, especially since the warrants had been issued three days earlier. The prosecution might have obtained the same evidence in the daylight by waiting a mere hour or two or by executing the warrants in any of the preceding daylight hours. Why did law enforcement execute these secret John Doe warrants days after obtaining them, in the pre-dawn darkness, needing floodlights to illuminate the homes, and with such forceful presence?

¶323 While there may be reasons why the warrants were executed when they were, the current state of the record provides no indication that the prosecution "felt some exigency" so as to necessitate the execution of the warrants in the pre-dawn darkness three days after the warrants were issued. See United States v. Berry, 113 F.3d 121, 123 (8th Cir. 1997) (upholding a 12:30 a.m. search for a large quantity of marijuana because the officers "obviously felt some exigency"). See also Harris, 324 F.3d at 606 (upholding a nighttime search performed two hours and 15 minutes after the warrant was issued); Tucker,

313 F.3d at 1261 (same, one hour and 10 minutes); Berry, 113 F.3d at 122 (same, 45 minutes); Boyance, 398 F.2d at 897 (holding that a nighttime search performed 90 minutes after issuance of a warrant was unconstitutional because there was no indication that "the evidence within the house would be removed, hidden or destroyed before morning").

## B. The Manner of Execution

¶324 Courts have also considered the specific manner in which warrants are executed as part of the totality of the circumstances. "The[se] search warrants were executed at approximately 6:00 a.m. on October 3, 2013, in pre-dawn, armed, paramilitary-style raids in which bright floodlights were used to illuminate the targets' homes." Majority op., ¶28. "Deputies seized business papers, computer equipment, phones, and other devices, while their targets were restrained under police supervision and denied the ability to contact their attorneys." Id., ¶29. While there may be reasons why the warrants were executed in the manner that they were, the record lacks any such explanation as the execution was not challenged.

¶325 Although not critical to my analysis, it is worth noting how some news outlets have described these searches. Had a hearing been held on the manner in which these searches were executed, it is uncertain whether the facts established in such a hearing would be consistent with these news reports or whether there is nonetheless "a legitimate government interest" in the execution of the searches. See Green, 420 F.3d at 694.

15

¶326 Reportedly, about an hour before sunrise, police "surrounded" the homes of Unnamed Movants Nos. 6 and 7 and "hit them with floodlights."[12]  "Police didn't draw their guns.  They didn't have to.  Garish light blinded the groggy targets of the secret probe, startling neighbors.  The uniforms, the lights, the early hour got everybody's attention."[13]  "One of the targets [said] police threatened to use battering rams to break down the front door, but the targets let them in."[14]  Each of these pre-dawn searches of the homes of Unnamed Movants Nos. 6 and 7 reportedly involved at least half a dozen sheriff's deputies and at least one official from the Milwaukee County District Attorney's Office.[15]  It has been reported that deputies "[s]hout[ed] [] at the front door"[16] and, once inside, continued "yelling and running, into every room in the house."[17]

---

[12] M. D. Kittle, The day John Doe Rushed Through the Door, WisconsinWatchdog.org, Oct. 3, 2014, available at http://watchdog.org/174987/john-doe-raids-eric-okeefe.

[13] Id.

[14] Id.

[15] The record is not clear as to why at least one representative from the Milwaukee County District Attorney's Office was on scene for the searches.  The record is also unclear as to whether it is typical protocol for a Milwaukee County District Attorney's Office representative to be present when a search warrant is executed.

[16] Rich Lowry, Politicized Prosecution Run Amok in Wisconsin, National Review, Apr. 21, 2015, available at http://www.nationalreview.com/article/417207/politicized-prosecution-run-amok-wisconsin-rich-lowry.

[17] David French, Wisconsin's Shame: "I Thought It Was a Home Invasion", National Review, Apr. 20, 2015, available at

(continued)

¶327 Other media outlets described the searches as follows:

The early-morning paramilitary-style raids on citizens' homes were conducted by law-enforcement officers, sometimes wearing bulletproof vests and lugging battering rams, pounding on doors and issuing threats. Spouses were separated as the police seized computers, including those of children still in pajamas. Clothes drawers, including the children's, were ransacked, cell phones were confiscated, and the citizens were told it would be a crime to tell anyone of the raids.[18]

¶328 At least one person who was subjected to a pre-dawn search of his or her residence reportedly described it as "a home invasion."[19] The targets of the pre-dawn searches have described these experiences as "terrifying" and "traumatic."[20]

¶329 Due to the terms of the John Doe secrecy order itself, the targets were instructed not to tell other people about the searches. The search warrants stated: "This John Doe search warrant is issued subject to a secrecy order. By order of the court, pursuant to a secrecy order that applies to this proceeding, you are hereby commanded and ordered not to disclose to anyone, other than your attorney, the contents of this search warrant and/or the fact that you have received this search warrant. Violation of this secrecy order is punishable as

_____

http://www.nationalreview.com/article/417155/wisconsins-shame-i-thought-it-was-home-invasion-david-french.

[18] George Will, Done in by John Doe, National Review, Oct. 25, 2014, available at http://www.nationalreview.com/article/391130/done-john-doe-george-will.

[19] French, supra note 17.

[20] Id.

contempt of court." Reportedly, "[m]ultiple targets . . . received verbal instructions from investigators about the secrecy order applying to every member of the household."[21] Despite the language of the secrecy order, some have otherwise averred that the targets "were told not to tell their lawyers, or their friends, or their neighbors."[22]

### C. Public and Officer Safety Concerns

¶330 As part of the totality of the circumstances, courts have also considered whether safety concerns of the public or the officers justify the timing and the manner of a warrant's execution. Although a paramilitary-style search in the darkness is undoubtedly justified in some circumstances, the current state of this record provides no indication that Unnamed Movants Nos. 6 and 7 "posed an immediate threat to the safety of the officers or others," were "actively resisting arrest or attempting to evade arrest by flight," or were "themselves violent or dangerous." See Estate of Smith v. Marasco, 430 F.3d 140, 150 (3d Cir. 2005) (holding that these facts are important for determining whether a SWAT-type search was reasonable). In the present case, executing the warrants in paramilitary fashion during pre-dawn darkness arguably might have actually increased the risk of injury to the public or the officers. See Bravo v.

---

[21] M. D. Kittle, Warrants Command John Doe Targets to Remain Silent, WisconsinWatchdog.org, May 14, 2015, available at http://watchdog.org/218761/john-doe-warrants-raids/.

[22] Lowry, supra note 16 (emphasis added).

City of Santa Maria, 665 F.3d 1076, 1086 (9th Cir. 2011) ("SWAT officers' nighttime searches . . . both constitute much greater intrusions on one's privacy than ordinary daytime searches and carry a much higher risk of injury to persons and property.").

¶331 A "nighttime police intrusion pose[s] a great threat to privacy, violate[s] the sanctity of home, and endanger[s] the police and slumbering citizens." Grimshaw, 595 N.E.2d at 304 (citing 2 W.R. LaFave, Search and Seizure § 4.7(b), at 266 (2d ed. 1987)). In the present case, whether any public or officer safety concern justified the pre-dawn searches is unknown because the execution was not challenged. Cf. United States v. Colonna, 360 F.3d 1169, 1176 (10th Cir. 2004) (upholding a nighttime search because of the defendant's "prior extensive involvement with law enforcement, the expressed fear of a concerned citizen that [the defendant] would retaliate violently, and the presence of children in the vicinity" during the daytime).

### D. The Evidence

¶332 I turn now to the nature of the evidence being sought. This case is not one where the alleged crime is occurring at night during the search. This is not a drug or human trafficking investigation where it is apparent that the evidence of the crime may no longer be present at the search location if the warrants are not executed promptly. The circumstances of this case do not plainly suggest that waiting until daybreak would have posed a safety risk to the public or officers.

19

¶333 These pre-dawn searches sought, among other things, electronic evidence, including e-mails and communications stored on cell phones and personal computers.[23] The search warrants sought information from March 1, 2009, to September 30, 2013, the date that the warrants were issued. This evidence, which seemingly had been around for years and likely otherwise exists in cyberspace, did not appear to be "volatile" and no reason is readily apparent to explain why executing the warrants in a more traditional manner, by far less forceful means, would pose any "risk of personal injuries and property damage." See Tucker, 313 F.3d at 1266 (upholding a nighttime search because "there was not just risk of destruction of the evidence but also risk of personal injuries and property damage due to the volatile nature of the chemicals and the process of methamphetamine manufacture").

¶334 While not jugular to the totality of the circumstances analysis, it seems that this electronic evidence was not in "danger of destruction or removal" from the homes before morning. See id. at 1265. The process of erasing a file on a personal computer "is time consuming and does not wipe out all

––––––––––––
[23] From Unnamed Movant No. 6's home, law enforcement officers seized tax records, check stubs, invoices, a binder containing documents, a box of documents, an external hard drive, and a laptop computer. From Unnamed Movant No. 7's home, officers seized three cell phones, three external hard drives, two computer towers, two laptop computers, two Apple iPods, a document folder, three compact discs, a thumb drive, a voice recorder, bank stubs, personal pocket calendars, and financial records.

data."[24] A cell phone's files may likewise be difficult to erase. "Smartphone forensics experts can retrieve just about anything from any phone," "whether or not a user deleted it from their phone."[25] In fact, the affidavit in support of the warrants to search the homes of Unnamed Movants Nos. 6 and 7 seemed to recognize that the evidence was not at risk of being destroyed, even if deleted. The affidavit itself declared that "computer files or remnants of such files can be recovered <u>months or even years</u> after they have been downloaded onto a storage medium, <u>deleted</u>, or viewed via the Internet." (Emphases added.)

¶335 Even if the computers and cell phones had been totally destroyed, investigators still could have sought to obtain Unnamed Movants Nos. 6's and 7's e-mail messages from third parties, such as Internet service providers or e-mail service providers.[26] Wisconsin law expressly authorizes subpoenas and search warrants to be issued to such third parties. <u>See</u> Wis. Stat. § 968.375. Milwaukee County prosecutors have used these

---

[24] Christine Galves & Fred Galves, <u>Ensuring the Admissibility of Electronic Forensic Evidence and Enhancing Its Probative Value at Trial</u>, 19 Criminal Justice Magazine 1 (Spring 2004), <u>available at</u> http://www.americanbar.org/ publications/criminal_justice_magazine_home/crimjust_cjmag_19_1_ electronic.html.

[25] David Goldman, <u>How Police Can Find Your Deleted Text Messages</u>, CNN Money, May 22, 2013, <u>available at</u> http://money.cnn.com/2013/05/22/technology/mobile/smartphone-forensics/.

[26] Galves, <u>supra</u> note 24.

techniques in recent prosecutions of a somewhat similar nature. See State v. Rindfleisch, 2014 WI App 121, 359 Wis. 2d 147, 857 N.W.2d 456 (holding that search warrants, which required Google Inc. and Yahoo Inc. to provide evidence from the defendant's personal e-mail messages, were sufficiently particular).

¶336 In fact, previously during this very John Doe investigation, the State did obtain Unnamed Movants Nos. 6's and 7's e-mails from their e-mail service providers. Specifically, on September 5, 2012, the same day that Reserve Judge Kluka commenced this John Doe investigation, she signed a warrant requiring Yahoo Inc. to supply information from Unnamed Movant No. 6's Yahoo e-mail account. Also on September 5 Reserve Judge Kluka signed a similar warrant requiring Charter Communications Inc. to provide information from Unnamed Movant No. 7's Charter e-mail account. Each of these warrants required the production of, inter alia, "[t]he contents of all communications stored in the E-mail accounts for the subscriber(s) . . . , including all emails stored in the account, whether sent from or received in the account, including any 'chat or instant messaging,' as well as e-mails held in a 'Deleted' status," from April 1, 2009, to July 1, 2012. Yahoo and Charter complied with the warrants within six weeks and two weeks, respectively. Thus, at least some of the evidence that the prosecution hoped to obtain by searching the homes of Unnamed Movants Nos. 6 and 7 in October 2013 could very well have been duplicative of the e-mail evidence that Yahoo and Charter produced pursuant to the September 2012 search warrants.

¶337 While not required, another avenue of obtaining evidence may have existed through subpoenas duces tecum, which could have been served on Unnamed Movants Nos. 6 and 7 as an alternative to the pre-dawn, paramilitary-style searches of their homes. See Wis. Stat. § 968.135. In fact, such subpoenas were issued on other Unnamed Movants. Specifically, on the same day that Reserve Judge Kluka issued the warrants to search the homes of Unnamed Movants Nos. 6 and 7, she issued subpoenas duces tecum to the other six Unnamed Movants. These subpoenas duces tecum required the production of, inter alia, information regarding Unnamed Movants Nos. 6 and 7. Although law enforcement is not required to obtain information by subpoena instead of a warrant, the type of evidence being sought and the ways in which it may be obtained could possibly be of some significance in the totality of the circumstances test of reasonableness.

¶338 Milwaukee County Sheriff David A. Clarke, Jr. has been vocal in explaining his belief that it was unreasonable and unnecessary to execute these pre-dawn searches in the manner in which they were executed. He said, "[a] simple knock on the door by a couple of suit wearing investigators with . . . one uniform back-up [officer] to verify who they were was all that was necessary to execute this search warrant."[27]

---

[27] David French, Wisconsin's Shame: Sheriff Clarke Weighs In, National Review, Apr. 23, 2015, available at http://www.nationalreview.com/corner/417406/wisconsins-shame-sheriff-clarke-weighs-david-french.

23

III. CONCLUSION

¶339 "Constitutional reasonableness relates not only to the grounds for a search or seizure but to the circumstances surrounding the search or seizure's execution." Henderson, 245 Wis. 2d 345, ¶18 (citing Garner, 471 U.S. at 8).[28] "The determination of reasonableness is made by reference to the particular circumstances of each individual case, and balances the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." Id. (internal quotation marks omitted) (citations omitted). "The idea of the police unnecessarily forcing their way into the homes in the middle of the night . . . rousing the residents out of their beds, and forcing them to stand by in indignity in their night clothes while the police rummage through their belongings does indeed smack of a 'police state lacking in the respect for . . . the right of privacy dictated by the U.S. Constitution.'" Gooding v. United States, 416 U.S. 430, 462 (1974) (Marshall, J., dissenting) (quoting S. Rep. No. 91—538, p. 12 (1969)).

---

[28] See State v. Henderson, 2001 WI 97, ¶3, 245 Wis. 2d 345, 629 N.W.2d 613 (recognizing that the Fourth Amendment reasonableness inquiry considers whether officers knocked and announced their presence before entry); see also United States v. Gibbons, 607 F.2d 1320, 1326 (10th Cir. 1979) (holding that "a nighttime intrusion is one element in considering the reasonableness of the search"); State v. Jackson, 742 N.W.2d 163, 177 (Minn. 2007) (holding that "the search of a home at night is a factor to be considered in determining whether a search is reasonable under the Fourth Amendment").

24

¶340 I join the majority opinion in all three cases.  I write separately to explain that even if the search warrants were lawfully issued, the execution of them could be subject to the reasonableness analysis of the Fourth Amendment to the United States Constitution and the Wisconsin Constitution's counterpart.  A totality of the circumstances analysis could include consideration of, among other things, the timing of the issuance and execution of the warrants, the manner in which the warrants were executed, whether public or officer safety concerns justified the manner of execution, and what type of evidence was being sought.

¶341 For the foregoing reasons, I respectfully concur.

¶342 SHIRLEY S. ABRAHAMSON, J. *(concurring in part, dissenting in part).*

**Nos. 2014AP296-OA: Original Action: <u>Two Unnamed Petitioners v. Peterson</u>**

**2014AP417-421-W: Supervisory Writ & Appeal: <u>Schmitz v. Peterson</u>**

**2013AP2504-2508-W: Supervisory Writ & Review: <u>Three Unnamed Petitioners v. Peterson</u>**

¶343 The majority opinion decides three different cases related to John Doe proceedings underway in five different counties. These John Doe proceedings share a common objective: To investigate potential violations of Wisconsin's campaign finance law, Wis. Stat. ch. 11 (2011-12).[1] The proceedings also share a single John Doe judge, who was assigned to the proceedings in all five counties, and a single Special Prosecutor, who was appointed by the John Doe judge to conduct the investigation in all five counties.[2]

¶344 The John Doe cases were consolidated for purposes of briefing and oral argument, but not for any other purpose.[3]

---

[1] All subsequent references to the Wisconsin Statutes are to the 2011-12 version unless otherwise indicated.

[2] <u>See</u> majority op., ¶¶17-27.

[3] The order consolidating the cases for purposes of briefing and oral argument is dated December 16, 2014, and is attached hereto, along with my concurrence and that of Justice Prosser, as Exhibit A.

1

Briefs have been filed. The court, over dissent, canceled oral argument.[4]

¶345 The majority opinion and concurrences in these John Doe cases resolve issues raised by the parties; issues raised by the court in its December 16, 2014, order (attached hereto as Exhibit A); and new issues not previously raised by the parties or the court. These writings have far-reaching implications, not just for the John Doe investigation underlying the instant cases but also for this state's electoral process, future John Doe proceedings, and criminal proceedings generally.

¶346 I begin by addressing the majority opinion.

¶347 Lest the length, convoluted analysis, and overblown rhetoric of the majority opinion obscure its effect, let me state clearly: The majority opinion adopts an unprecedented and faulty interpretation of Wisconsin's campaign finance law and of the First Amendment. In doing so, the majority opinion delivers a significant blow to Wisconsin's campaign finance law and to its paramount objectives of "stimulating vigorous campaigns on a fair and equal basis" and providing for "a better informed electorate."[5]

¶348 Disregarding the statutory text that the majority opinion professes to interpret, the majority opinion takes the

---

[4] Oral argument was canceled in the three cases pursuant to an order entered by this court on March 27, 2015. That order, along with my dissent and that of Justice Prosser, is attached hereto as Exhibit B.

[5] Wis. Stat. § 11.001(1).

absolutist position that Chapter 11 does not reach <u>any</u> issue advocacy and that <u>any</u> manner of government regulation of <u>any</u> issue advocacy contravenes the First Amendment.[6]  Thus, within the realm of issue advocacy, the majority opinion's theme is "Anything Goes."[7]

¶349 But it is not just the letter of Wisconsin's campaign finance law that the majority opinion disregards.  It also disregards the spirit of the law.[8]

¶350 The legislative declaration of policy set forth at Wis. Stat. § 11.001(1) provides that "[w]hen the true source of support or extent of support [for a candidate] is not fully disclosed, or when a candidate becomes overly dependent upon large private contributors, the democratic process is subjected to potential corrupting influence."  To prevent such corrupting influence, the legislature has declared that "the state has a

---

[6] <u>See</u> majority op., ¶¶10, 41, 50, 57, 66-67, 69.

Issue advocacy is speech that pertains to issues of public concern and does not expressly advocate the election or defeat of a candidate.  <u>Fed. Election Comm'n v. Wis. Right to Life, Inc.</u>, 551 U.S. 449, 456 (2007).  In contrast, express advocacy is speech that expressly advocates the election or defeat of a candidate.  <u>Id.</u> at 453.

[7] "Anything Goes" is a song written by Cole Porter for his musical <u>Anything Goes</u> (1934).  Many of the lyrics feature humorous (but dated) references to various figures of scandal and gossip in Depression-era high society.  Many modern versions of the song omit the outdated lyrics, replacing them with present-day examples of social and political scandal.

[8] For the importance of the spirit of the law, see <u>Jackson County v. DNR</u>, 2006 WI 96, ¶32, 293 Wis. 2d 497, 717 N.W.2d 713; <u>State v. Dagnall</u>, 2000 WI 82, ¶59, 236 Wis. 2d 339, 612 N.W.2d 680; <u>Harrington v. Smith</u>, 28 Wis. 43, 59 (1871).

compelling interest in designing a system for fully disclosing contributions and disbursements made on behalf of every candidate for public office. . . ."[9]

¶351 Despite these clear statements of legislative policy, the majority opinion holds that disbursements made on behalf of candidates need not be fully disclosed——indeed, they need not be disclosed at all——if such disbursements are made for issue advocacy.[10]

¶352 In taking this absolutist position, the majority opinion attempts to terminate the John Doe investigation underlying the instant cases in its infancy. The majority opinion's unsupported, ultra vires declaration that its resolution of the original action brought by two of the eight Unnamed Movants "ends the John Doe investigation" contradicts other aspects of the majority opinion and reveals the majority opinion's blatant attempt to reach its desired result by whatever means necessary.[11]

---

[9] Wis. Stat. § 11.001(1) (emphasis added).

[10] See majority op, ¶¶50, 57, 66-67.

[11] See majority op., ¶¶11, 76.

The majority opinion fails to acknowledge that the Special Prosecutor is pursuing multiple theories of criminal activity, not all of which revolve around issue advocacy. For example, the Special Prosecutor states that the John Doe investigation is premised in part "on a reason to believe that certain express advocacy groups who had filed sworn statements indicating they acted independently of certain campaign committees" did not in fact act independently. Despite the majority opinion's invalidating the Special Prosecutor's issue-advocacy-based theory of criminal activity, this express-advocacy-based theory lives on.

(continued)

4

¶353 According to the United States Court of Appeals for the Seventh Circuit, no opinion of the United States Supreme Court or a federal court of appeals has established that the First Amendment forbids regulation of, or inquiry into, coordination between a candidate's campaign committee and issue advocacy groups.[12] In repeatedly and single-mindedly declaring a rule that federal case law has declined to adopt, the majority opinion betrays its result-oriented, agenda-driven approach.

¶354 If the majority opinion succeeds in terminating the John Doe investigation, the majority opinion will deny the people of this state the opportunity to determine once and for

---

The majority opinion also fails to acknowledge that the original action was brought by only two Unnamed Movants. It seems the Special Prosecutor's investigation of individuals and organizations that are not parties to the original action is not affected by this court's decision in the original action. See Madison Teachers, Inc. v. Walker, 2013 WI 91, ¶20, 351 Wis. 2d 237, 839 N.W.2d 388 (holding that a declaratory judgment was binding only insofar as the parties to the lawsuit were concerned; a declaratory judgment is not the equivalent of an injunction binding on the defendant state officers). Indeed, the majority opinion and concurring opinions imply that the original action does not bind the other Unnamed Movants by deciding the second and third John Doe cases within the John Doe trilogy. If the majority opinion's decision in the original action disposes of the John Doe investigation in its entirety, why address the other John Doe cases?

[12] See O'Keefe v. Chisholm, 769 F.3d 936, 942 (7th Cir. 2014). For discussions of the constitutionality of regulating coordinated issue advocacy, see Brent Ferguson, Beyond Coordination: Defining Indirect Campaign Contributions for the Super PAC Era, 42 Hastings Const. L.Q. 471 (2015); Richard Briffault, Coordination Reconsidered, 113 Columbia L. Rev. Sidebar 88 (2013); Bradley A. Smith, Super PACs and the Role of "Coordination" in Campaign Finance Law, 49 Willamette L. Rev. 603 (2013).

all whether the targets of the John Doe investigation are guilty of systematically violating Wisconsin's campaign finance law through undisclosed campaign coordination.

¶355 I write separately to provide an objective, precedent-based analysis of the statutory and constitutional issues presented in the John Doe cases.

¶356 I note at the outset that the statutory and constitutional issues presented in the John Doe cases do <u>not</u> include whether the subpoenas and search warrants issued by the John Doe judge were unconstitutionally overbroad or executed in an unconstitutional manner.

¶357 The parties did not raise these issues and this court did not seek comment on them.[13] These issues have not been briefed by some parties and have not been fully briefed by others. Nevertheless, these issues are discussed at length in the separate writings by Justices Prosser and Ziegler.

¶358 Justice Prosser declares that he is writing on Issue 14. Issue 14 addresses whether there was <u>probable cause</u> for the search warrants issued in the John Doe proceedings. Issue 14 does <u>not</u> concern the breadth or execution of the search warrants, does <u>not</u> concern subpoenas, and is limited to <u>two Unnamed Movants</u> (not five individuals, as Justice Prosser states in ¶201 of his concurrence). Issue 14 asks the parties to address the following issue:

---

[13] See items 1-14 in this court's order dated December 16, 2014 (attached hereto as Exhibit A), setting forth the questions this court accepted for review.

Whether the affidavits underlying the warrants issued in the John Doe proceedings provided probable cause to believe that evidence of a criminal violation of Wis. Stat. §§ 11.27, 11.26(2)(a), 11.61(1), 939.31, and 939.05 would be found in the private dwellings and offices of the <u>two individuals</u> whose dwellings and offices were searched and from which their property was seized.[14]

¶359 Justice Ziegler makes no similar attempt to tether her analysis to the issues this court accepted for review.

¶360 I turn now to my analysis of the three John Doe cases, which I address in three separate sections of this writing. I summarize my discussion and conclusions in each of the three cases as follows:

¶361 <u>The First Case</u>. This case is an original action filed by Unnamed Movants 6 and 7 against the John Doe judge and the Special Prosecutor.[15] <u>See</u> ¶¶389-507, <u>infra</u>.

¶362 Two issues of law are presented in the original action.

¶363 First is whether Chapter 11 requires a candidate's campaign committee to report certain coordinated disbursements as contributions received by the candidate or candidate's campaign committee——namely, coordinated disbursements made for issue advocacy purposes. Under Chapter 11, a disbursement is coordinated if it is made by a third party "for the benefit of a

---

[14] See this court's December 16, 2014, order, attached hereto as Exhibit A (emphasis added).

[15] I refer to the eight challengers to the John Doe proceedings as Unnamed Movants because that has been the parties' practice in briefing. In the case captions for two of the three John Doe cases, the Unnamed Movants are referred to as Unnamed Petitioners.

candidate" and "with the authorization, direction or control of or otherwise by prearrangement with the candidate or the candidate's agent."[16]

¶364 If Chapter 11 requires a candidate's campaign committee to report coordinated disbursements for issue advocacy as contributions received by the candidate or candidate's campaign committee, then the second issue presented is whether this reporting requirement is consistent with the state and federal constitutions.

¶365 The majority opinion concludes that Chapter 11 does not require a candidate's campaign committee to report any coordinated disbursements for issue advocacy as contributions received by the candidate or candidate's campaign committee. The majority opinion further concludes that such a requirement would be unconstitutional.[17]

¶366 The majority opinion frequently refers to "independent groups," "independent organizations," and "independent advocacy organizations." I agree with the United States Court of Appeals for the Seventh Circuit that the word "independent" should be considered to be in quotation marks throughout the John Doe

---

[16] Wis. Stat. § 11.06(4)(d). See also Wis. Stat. § 11.06(7) (describing independent disbursements as disbursements made by a committee or individual who "does not act in cooperation or consultation with any candidate or authorized committee of a candidate" and who "does not act in concert with, or at the request or suggestion of, any candidate or agent or authorized committee of a candidate").

[17] See majority op., ¶¶50, 57, 66-67.

cases "because the Special Prosecutor suspected that the group's independence is ostensible rather than real."[18]

¶367 I conclude that Chapter 11 <u>does</u> require a candidate's campaign committee to report coordinated disbursements for issue advocacy as contributions received by the candidate or candidate's campaign committee. I further conclude this reporting requirement is consistent with the First Amendment.

¶368 To be clear: I do <u>not</u> conclude that Chapter 11 regulates disbursements for issue advocacy made by truly independent third parties. Chapter 11 does not reach independent disbursements for issue advocacy, even when such disbursements are intended to influence an election.

¶369 <u>The Second Case</u>. This case is a supervisory writ petition filed by the Special Prosecutor in the court of appeals against the John Doe judge and the eight Unnamed Movants. The Special Prosecutor's writ petition seeks review of an order of the John Doe judge quashing subpoenas and ordering the return of property seized pursuant to search warrants. The order was based on the John Doe judge's conclusion of law that Chapter 11 does not regulate coordinated disbursements for issue advocacy.[19] The writ petition is before this court on multiple petitions for bypass. <u>See</u> ¶¶508-541, <u>infra</u>.

¶370 The majority opinion concludes that even if the John Doe judge misinterpreted and misapplied Chapter 11 and the First

---

[18] <u>O'Keefe</u>, 769 F.3d at 937.

[19] <u>See</u> majority op., ¶¶34-36, 97.

Amendment when exercising his discretion to quash subpoenas and order the return of property seized pursuant to search warrants, a supervisory writ is not warranted. The majority opinion reasons that the Special Prosecutor has failed to prove that the John Doe judge violated a plain legal duty.

¶371 I conclude that the majority opinion misinterprets and misapplies the plain legal duty criterion for the issuance of a supervisory writ.[20] I conclude that correctly interpreting and applying the law is a plain legal duty. To properly exercise his discretion, the John Doe judge was required to correctly decide the question of law presented. This court can and should, in the exercise of its discretion, issue a supervisory writ to correct a John Doe judge's error of law when appellate review would provide no relief (or inadequate relief) for the harm caused by the error. Because the John Doe judge misinterpreted and misapplied the law and appellate review is not available, I would grant the Special Prosecutor's writ petition.

¶372 The Third Case. This case is a review of a court of appeals opinion and order denying a supervisory writ petition filed by Unnamed Movants 2, 6, and 7 against the John Doe judge, the chief judges of the counties in which the proceedings are underway, and the Special Prosecutor. See ¶¶542-554, infra.

¶373 The petition for review raises questions of law regarding the validity of the Special Prosecutor's appointment

---

[20] See majority op., ¶97.

and the competency of the Special Prosecutor to conduct the John Doe investigation.

¶374 The majority opinion concludes that the court of appeals properly denied the three Unnamed Movants' writ petition because, like the Special Prosecutor in the second case, the three Unnamed Movants have failed to prove that the John Doe judge violated a plain legal duty.[21]

¶375 I agree with the majority opinion's affirmance of the court of appeals order denying the writ petition. I conclude, however, that the court of appeals can, should, and did properly decide the issues of law presented in the Unnamed Movants' writ petition. To properly exercise his discretion, the John Doe judge was required to correctly decide these questions of law.[22]

¶376 Three Additional Issues. Finally, there are three issues presented in this litigation that are relevant to the John Doe trilogy as a whole. I discuss these three issues in my analysis of the first case (the original action).

¶377 First, several motions to file amicus briefs on the merits of the John Doe cases have been filed in this court. I join the majority opinion's decision to grant them all.

¶378 Second, the Special Prosecutor filed a motion seeking the recusal of certain named justices. Three motions to file amicus briefs on the recusal issue have also been filed. Neither the named justices nor the court as a whole has

---

[21] See majority op., ¶13.

[22] See majority op., ¶¶105-106.

11

responded to the Special Prosecutor's recusal motion. The recusal motion and the amicus motions remain pending, and the due process concerns they raise remain unresolved.

¶379 Third, this court——over my dissent——ordered extensive redactions and sealing in these John Doe cases.[23] Even if some secrecy remains appropriate, the extent of the secrecy this court has imposed is unwarranted.

¶380 Despite my numerous dissents objecting to the level of secrecy imposed by this court in the John Doe trilogy, I have endeavored to adhere to this court's sealing and redaction orders. The same cannot be said for the majority opinion and the concurrences authored by Justices Prosser and Ziegler.

¶381 The majority opinion declares that "we can interpret the secrecy order and modify it to the extent necessary for the public to understand our decision herein." See majority op., ¶14 n.11. Justice Prosser's concurrence discusses the policy reasons underlying secrecy in John Doe proceedings, concludes that they are inapplicable to certain facts underlying the John Doe trilogy, and thus determines that "discussion of these facts is not inconsistent with the secrecy order." See Justice Prosser's concurrence, ¶145.

¶382 The majority opinion and Justice Prosser's concurrence decide that the secrecy order does not bind the justices of this

---

[23] See this court's December 16, 2014, order and my concurrence thereto (attached as Exhibit A) and this court's March 27, 2015, order regarding redactions and my dissent thereto (attached as Exhibit C).

court. The secrecy order, in their view, binds only the parties and the public.

¶383 Because the majority of this court disregards its own secrecy order, Justice Prosser opines at length, without the benefit of briefs or facts, about allegedly overbroad search warrants and subpoenas. Moreover, he waxes eloquent about privacy and the limits that should be placed on search warrants seeking electronic material. But he has previously waxed eloquent about privacy rights and has nevertheless upheld searches of electronic material that he recognized raise substantial privacy concerns.[24]

¶384 Likewise, Justice Ziegler opines at length about the allegedly unconstitutional manner in which the search warrants were executed. She does so without the benefit of briefs or facts.

¶385 Both justices opine about issues not previously raised by the parties or the court without giving the parties an opportunity to brief or argue the facts or law relevant to those issues.

¶386 In my dissent to the court's redaction order dated March 27, 2015, I explained at length why this court had the power to disclose information that was ordered by the John Doe judge to be concealed. See my dissent to this court's March 27, 2015, redaction order (attached hereto as Exhibit C). This

---

[24] See State v. Subdiaz-Osorio, 2014 WI 87, ¶¶9–10, 357 Wis. 2d 41, 849 N.W.2d 748; State v. Tate, 2014 WI 89, 357 Wis. 2d 172, 849 N.W.2d 798.

court disagreed, stating the following in its March 27, 2015, redaction order:

> The John Doe investigation that is the subject of the several proceedings this court is reviewing remains an open investigation. While that may complicate how this court normally conducts its appellate review functions, the convenience of this court and the parties/counsel appearing before it does not provide a sufficient basis on which to ignore the statutory commands to maintain secrecy or the rules we have already established for maintaining the secrecy of John Doe materials.

¶387 It is unclear what has changed since this court issued its March 27, 2015, redaction order that enables the court to now exempt itself from the secrecy order.

¶388 For the reasons set forth, I write separately.

**No. 2014AP296-OA:  Original Action:  <u>State of Wisconsin ex rel. Two Unnamed Petitioners v. Gregory A. Peterson, John Doe Judge, and Francis D. Schmitz, as Special Prosecutor</u>**

¶389 This original action was filed by Unnamed Movants 6 and 7, naming the Special Prosecutor and the John Doe judge as defendants.

¶390 Unnamed Movants 6 and 7 seek a declaration that Chapter 11 restricts campaign finance regulation to express advocacy and regulation of issue advocacy violates the United States and Wisconsin constitutions.

¶391 The majority opinion grants Unnamed Movants 6 and 7 their requested relief.  I would not.

¶392 I conclude that coordinated disbursements for issue advocacy constitute regulated contributions under Chapter 11 and that such regulation does not violate the First Amendment.  By coordinated disbursements, I mean disbursements made by third parties "for the benefit of a candidate" and "with the authorization, direction or control of or otherwise by prearrangement with the candidate or the candidate's agent."[25] By issue advocacy, I mean speech regarding issues of public concern that does not expressly advocate the election or defeat of a candidate.[26]

---

[25] <u>See</u> Wis. Stat. § 11.06(4)(d).  <u>See also</u> § 11.06(7) (describing independent disbursements as disbursements made by a committee or individual who "does not act in cooperation or consultation with any candidate or authorized committee of a candidate" and who "does not act in concert with, or at the request or suggestion of, any candidate or agent or authorized committee of a candidate").

[26] <u>Wis. Right to Life</u>, 551 U.S. at 456.

15

¶393 Because I conclude that the Special Prosecutor has a valid legal theory to support his investigation, I would allow the John Doe proceedings to continue. Accordingly, I dissent.

¶394 I address the statutory and constitutional issues presented in this original action as follows:

- In Part I, I describe the alleged election-related activities of Unnamed Movants 6 and 7 that are the subject of the John Doe investigation.

- In Part II, I determine that the Special Prosecutor's theory of criminal activity is supported by Chapter 11. I disagree with the majority opinion's holding that coordinated issue advocacy, like independent issue advocacy, is beyond the reach of Chapter 11.

- In Part III, I conclude that the Special Prosecutor's theory of criminal activity does not contravene the state or federal constitution. I disagree with the majority opinion's declarations that the Special Prosecutor's interpretation of Chapter 11 renders Chapter 11 unconstitutional and that a narrowing construction must be applied to prevent Chapter 11's invalidation.

¶395 In Part IV, I address three issues that are common to the three cases before the court:

- In section A, I consider the motions to file amicus briefs regarding the merits of the three cases. I join the majority opinion's decision to grant them all.

16

- In section B, I discuss this court's insistence on continued observance of the sweeping John Doe secrecy order to which the three John Doe cases are subject. In my view, the extent of secrecy mandated by the court is not warranted.

- In section C, I consider the Special Prosecutor's motion requesting the recusal of certain justices from the John Doe cases. The recusal motion is still pending (including any due process concerns), as are three motions to file amicus briefs on the recusal issue.

I

¶396 I cannot begin this writing with the usual recitation of facts. There have been no findings of substantive fact by a court or judge, nor stipulations of fact by the parties.[27] This

---

[27] The only facts set forth in the petition and briefs filed by Unnamed Movants 6 and 7 are procedural in nature, regarding the appointment of the John Doe Judge and the Special Prosecutor and the issuance and execution of subpoenas and search warrants.

Justice Ziegler's concurrence in the John Doe trilogy is based solely on unsubstantiated allegations made in the parties' briefs regarding the execution of the search warrants issued by the John Doe judge. Although there have been no findings or stipulations of fact regarding the execution of the search warrants, Justice Ziegler nevertheless writes at length to suggest that the execution of the search warrants rendered them unconstitutional under the Fourth Amendment. She states: "[E]ven if the search warrants were lawfully issued, the execution of them could be subject to the reasonableness analysis of the Fourth Amendment . . . ." Justice Ziegler's concurrence, ¶¶309, 340. This issue has not been litigated and is not, in my view, properly before this court.

17

dearth of facts is in sharp contrast to the undisputed facts underlying all prior original actions this court has accepted.[28]

¶397 Although Unnamed Movants 6 and 7 claim that the election-related activities alleged by the Special Prosecutor are not regulated by Chapter 11, neither their petition for leave to commence an original action nor their briefs in this court specify the election-related activities to which they are referring.

¶398 The Special Prosecutor's brief, on the other hand, sets forth information he has gathered regarding the election-related activities of Unnamed Movants 6 and 7, among others. On the basis of this information, the Special Prosecutor asserts that he has reason to believe that a particular candidate or candidate's campaign committee coordinated with one or more 501(c) nonprofit entities; that these 501(c) nonprofit entities made disbursements for issue ads in coordination with the candidate or candidate's campaign committee; that the ads were intended to benefit the candidate's campaign; and that the candidate's campaign committee unlawfully failed to report these

---

[28] See Wis. S. Ct. IOP II.B.3. (May 4, 2012), which provides in relevant part as follows:

The Supreme Court is not a fact-finding tribunal, and although it may refer issues of fact to a circuit court or referee for determination, it generally will not exercise its original jurisdiction in matters involving contested issues of fact. Upon granting a petition to commence an original action, the court may require the parties to file pleadings and stipulations of fact.

18

coordinated disbursements as contributions received by the candidate or candidate's campaign committee.[29]

¶399 According to the Special Prosecutor, the candidate and candidate's campaign committee coordinated with the 501(c) nonprofit entities in large part through two political operatives, namely Unnamed Movants 6 and 7. The Special Prosecutor contends that Unnamed Movants 6 and 7 were paid by the candidate's campaign committee and by one or more of the

---

[29] The Special Prosecutor has a second and related theory based on Wis. Stat. § 11.10(4). Section 11.10(4) provides that a putatively separate committee that "acts with the cooperation of or upon consultation with a candidate or agent or authorized committee of a candidate, or which acts in concert with or at the request or suggestion of a candidate or agent or authorized committee of a candidate is deemed a subcommittee of the candidate's personal campaign committee."

The Special Prosecutor asserts that coordination between various 501(c) entities and the candidate's campaign committee may have rendered one or more of the 501(c) entities statutory subcommittees, whose receipt of contributions and disbursement of funds are reportable by the candidate's campaign committee. Under this theory, the candidate's campaign committee violated Chapter 11 by failing to report issue advocacy disbursements made by a subcommittee of the candidate's campaign committee. The subcommittee theory is not as fully developed in the Special Prosecutor's brief as the theory set forth above. Because I conclude that the Special Prosecutor's primary theory is sufficient to support the continuation of the John Doe proceedings, it is unnecessary to decide whether the subcommittee theory does so as well. Accordingly, I do not address the subcommittee theory.

I note, as well, that the John Doe judge determined that the Special Prosecutor offered no evidence of express advocacy. The Special Prosecutor disagrees. I do not address this factual dispute.

501(c) nonprofit entities. Thus, Unnamed Movants 6 and 7 are alleged to have acted in a dual capacity.

¶400 One of the Special Prosecutor's central allegations is that Unnamed Movants 6 and 7 created and managed a particular 501(c) nonprofit organization to run issue ads for the benefit of the candidate and the candidate's campaign, while the candidate asked donors to contribute to the 501(c) nonprofit organization instead of to the candidate's campaign committee in a blatant attempt to avoid the regulations governing contributions to candidates and their campaign committees. Further, says the Special Prosecutor, while the 501(c) nonprofit entities purchased the issue ads, the candidate——via Unnamed Movants 6 and 7——controlled their content, timing, and placement.

¶401 The "coordination" alleged by the Special Prosecutor thus includes consultation between the candidate, the candidate's campaign committee, Unnamed Movants 6 and 7, various 501(c) nonprofit entities, and associated individuals regarding the content, timing, and placement of issue ads.

¶402 The Special Prosecutor contends that the objective underlying this alleged coordination was to ensure that issue ads purchased by the 501(c) nonprofit entities provided the maximum benefit possible to the candidate's campaign. For example, coordination would ensure correct and consistent messaging in the issue ads purchased by the 501(c) nonprofit entities.

¶403 Such coordination could also serve to circumvent Chapter 11's contribution restrictions and disclosure requirements. Untold millions of dollars in undisclosed contributions could be funneled into a 501(c) nonprofit entity that purchases issue ads written or approved by a candidate or the candidate's campaign manager. "If campaigns tell potential contributors to divert money to nominally independent groups that have agreed to do the campaigns' bidding, these contribution limits become porous, and the requirement that politicians' campaign committees disclose the donors and amounts become useless."[30]

¶404 The Special Prosecutor contends in the instant case that coordination transformed the 501(c) nonprofit entities' disbursements for issue advocacy into reportable contributions to the candidate or candidate's campaign committee that the candidate's campaign committee failed to report, violating Chapter 11.[31]

¶405 At this stage in the John Doe proceedings, the Special Prosecutor need not prove that the 501(c) nonprofit entities in fact made coordinated disbursements for issue advocacy that were reportable by the candidate's campaign committee as contributions received by the candidate or candidate's campaign committee. Rather, this original action requires the court to determine only whether the Special Prosecutor has a valid legal

---

[30] O'Keefe, 769 F.3d at 941.

[31] See Wis. Stat. §§ 11.27 and 11.61(1)(b).

theory to support his investigation. If charges are eventually filed, only then will a court face the question of whether the alleged coordination took place.

¶406 According to the majority opinion, even if the alleged coordination took place, Chapter 11 does not regulate it, and thus the Special Prosecutor does <u>not</u> have a valid legal theory to support his investigation. The majority opinion allows a 501(c) nonprofit entity to work hand-in-glove with a candidate or candidate's campaign committee without violating Chapter 11 so long as the 501(c) nonprofit entity engages only in issue advocacy.

¶407 I address the statutory and constitutional issues presented in turn.

## II

¶408 The first question presented is whether Chapter 11 requires a candidate's campaign committee to report certain disbursements by 501(c) nonprofit entities as contributions received by the candidate or candidate's campaign committee——namely, disbursements for issue advocacy made in coordination with the candidate or candidate's campaign committee. I conclude that it does.

¶409 Chapter 11 is not easy to read or understand. It has been described as "labyrinthian [sic] and difficult to decipher <u>without a background in this area of the law</u>."[32] Nevertheless, through careful reading and cognizance of certain fundamentals

---

[32] <u>Wis. Right to Life v. Barland</u> (<u>Barland II</u>), 751 F.3d 804, 808 (7th Cir. 2014) (emphasis added).

of campaign finance law, Chapter 11 can be and has been deciphered. State and federal courts have successfully interpreted and applied its provisions in a number of cases.[33]

¶410 With that in mind, I turn to an examination of the provisions of Chapter 11 at issue in this original action.

¶411 As an initial matter, there is no dispute that under Wis. Stat. § 11.05(2g), a candidate's campaign committee is a "registrant" for purposes of Chapter 11. It is also undisputed that under Wis. Stat. § 11.06(1), "each registrant" must report all "contributions received" and all "disbursements made."

¶412 But what constitutes a "contribution" or "disbursement" under Chapter 11? Because the parties contest the proper interpretation of these words (and thus the scope of the reporting obligation to which a candidate's campaign committee is subject), I turn to their statutory definitions.

¶413 "Contribution" is defined as, among other things, "[a] gift, subscription, loan, advance, or deposit of money or anything of value . . . made <u>for political purposes</u>." Wis. Stat. § 11.01(6)(a) (emphasis added).[34] "Disbursement" is

---

[33] <u>See, e.g.</u>, <u>id.</u>

[34] Section 11.01(6)(a) reads in relevant part as follows:

(6)(a) Except as provided in par. (b), "contribution" means any of the following:

1. A gift, subscription, loan, advance, or deposit of money or anything of value, except a loan of money by a commercial lending institution made by the institution in accordance with applicable laws and regulations in the ordinary course of business, made for political purposes. In this subdivision "anything of value" means a thing of merchantable value.

23

defined as, among other things, "[a] purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value . . . made <u>for political purposes</u>." Wis. Stat. § 11.01(7)(a) (emphasis added).[35]

¶414 An act done "for political purposes" is defined by Wis. Stat. § 11.01(16) as an act "done for the <u>purpose of influencing the election</u> or nomination for election <u>of any individual</u> to state or local office . . . ." (Emphasis added.)[36]

---

[35] Section 11.01(7)(a) reads in relevant part as follows:

(7)(a) Except as provided in par. (b), "disbursement" means any of the following:

1. A purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, except a loan of money by a commercial lending institution made by the institution in accordance with applicable laws and regulations in the ordinary course of business, made for political purposes. In this subdivision, "anything of value" means a thing of merchantable value.

[36] Section 11.01(16) reads in full as follows:

(16) An act is for "political purposes" when it is done for the purpose of influencing the election or nomination for election of any individual to state or local office, for the purpose of influencing the recall from or retention in office of an individual holding a state or local office, for the purpose of payment of expenses incurred as a result of a recount at an election, or for the purpose of influencing a particular vote at a referendum. In the case of a candidate, or a committee or group which is organized primarily for the purpose of influencing the election or nomination for election of any individual to state or local office, for the purpose of influencing the recall from or retention in office of an individual holding a state or local office, or for the purpose of influencing a particular vote at a referendum, all administrative and overhead expenses for the

(continued)

According to Unnamed Movants 6 and 7, the phrase "for the purpose of influencing [an] election," and thus the phrase "for political purposes," encompasses only express advocacy. The Special Prosecutor, on the other hand, contends that the phrase is broader and can encompass both express advocacy and issue advocacy.

¶415 The statutory definition of the phrase "for political purposes" specifically mentions express advocacy, stating: "Acts which are for 'political purposes' include but are not limited to . . . communication which expressly advocates the election, defeat, recall or retention of a clearly identified candidate . . . ."[37]    Thus, there is no question that

---

maintenance of an office or staff which are used principally for any such purpose are deemed to be for a political purpose.

(a) Acts which are for "political purposes" include but are not limited to:

1. The making of a communication which expressly advocates the election, defeat, recall or retention of a clearly identified candidate or a particular vote at a referendum.

2. The conduct of or attempting to influence an endorsement or nomination to be made at a convention of political party members or supporters concerning, in whole or in part, any campaign for state or local office.

(b) A "political purpose" does not include expenditures made for the purpose of supporting or defending a person who is being investigated for, charged with or convicted of a criminal violation of state or federal law, or an agent or dependent of such a person.

[37] Wis. Stat. § 11.01(16)(a).

disbursements made for express advocacy are made "for political purposes" within the meaning of Chapter 11.

¶416 But the statutory definition of the phrase "for political purposes" makes equally clear that its meaning is not limited to express advocacy. Section 11.01(16) states that acts for political purposes "include but are not limited to" express advocacy. It further states that "[i]n the case of a candidate . . . all administrative and overhead expenses . . . are deemed to be for a political purpose."[38] Administrative and overhead expenses are not advocacy at all, let alone express advocacy.

¶417 Thus, the contention by Unnamed Movants 6 and 7 and the conclusion of the majority opinion that contributions and disbursements are reportable under Chapter 11 only when they are made for express advocacy purposes do not square with the statutory language.

¶418 Nor does their position square with the function that issue advocacy may play in elections. An issue ad may seek to raise awareness about an issue generally or to inform voters of a candidate's position on an issue. The latter category of issue advocacy may influence voters' impressions of certain

---

[38] Wis. Stat. § 11.01(16).

candidates and may therefore influence elections.[39] Accordingly, I conclude that the statutory definition of the phrase "for political purposes" encompasses issue advocacy.

¶419 Not every issue ad, however, will benefit a particular candidate's campaign——even if it is intended to do so. When issue ads are developed independently of the candidate or the candidate's campaign committee, the issue advocacy "might be duplicative or counterproductive from a candidate's point of view."[40]

¶420 In contrast, when issue ads are developed in coordination with the candidate or the candidate's campaign committee, the disbursements made for such ads "are as useful to the candidate as cash . . . ."[41] For this reason, the United

---

[39] As the United States Supreme Court has explained, "[c]andidates, especially incumbents, are intimately tied to public issues involving legislative proposals and governmental actions." Buckley v. Valeo, 424 U.S. 1, 42 (1976). See also Wis. Right to Life, 551 U.S. at 456-57 (explaining that the distinction between express advocacy and issue advocacy may dissolve in practice because, as Buckley put it, "[c]andidates . . . are intimately tied to public issues" (quoting Buckley, 424 U.S. at 42)).

[40] Fed. Election Comm'n v. Colo. Republican Fed. Campaign Comm. (Colorado II), 533 U.S. 431, 446 (2001) (explaining why independent disbursements made for issue advocacy are "poor sources of leverage for a spender").

[41] Id. at 446 (explaining why coordinated expenditures are treated as contributions under federal law).

(continued)

States Supreme Court has consistently treated coordinated expenditures as regulated contributions.[42] The United States Supreme Court has not differentiated between coordinated expenditures made for issue advocacy purposes and coordinated expenditures made for express advocacy purposes. The key factor for the Court has been coordination.

¶421 This brings me to the next relevant provision within Chapter 11: Wis. Stat. § 11.06(4).[43] This provision dictates

---

This is a point the United States Supreme Court has made again and again. For example, in Buckley, 424 U.S. at 46, the Court stated that "expenditures controlled by or coordinated with the candidate and his campaign might well have virtually the same value to the candidate as a contribution . . . ." Similarly, in McConnell v. Fed. Election Comm'n, 540 U.S. 93, 221-22 (2003), overruled on other grounds by Citizens United v. Fed. Election Comm'n, 558 U.S. 310 (2010), the Court explained that "expenditures made after a 'wink or nod' often will be 'as useful to the candidate as cash.'"

[42] See, e.g., McConnell, 540 U.S. at 214-15 (explaining that federal law "treats expenditures that are coordinated with a candidate as contributions to that candidate"); Colo. Republican Fed. Campaign Comm. v. Fed. Election Comm'n, 518 U.S. 604, 611 (1996) (stating that contribution limits in federal campaign finance law apply not only to direct contributions but also to "coordinated expenditures," that is, indirect contributions); Buckley, 424 U.S. at 46 (providing that under federal law, "controlled or coordinated expenditures are treated as contributions rather than expenditures").

United States Supreme Court case law governing the constitutionality of campaign finance statutes discusses "expenditures," not "disbursements," because the word "expenditure" is used in federal law. The word "disbursement" is used in the Wisconsin statutes.

[43] Section 11.06(4) provides in full as follows:

**(4) When transactions reportable.** (a) A contribution is received by a candidate for purposes of this chapter when it is under the control of the candidate

(continued)

when contributions are reportable by registrants. Two subsections are relevant here.

¶422 First, Wis. Stat. § 11.06(4)(a) declares as a general matter that a contribution is received by a candidate "when it is under the control of the candidate or campaign treasurer," or the candidate or treasurer accepts the benefit thereof. When a contribution is so received, it becomes reportable.

---

or campaign treasurer, or such person accepts the benefit thereof. A contribution is received by an individual, group or committee, other than a personal campaign committee, when it is under the control of the individual or the committee or group treasurer, or such person accepts the benefit thereof.

(b) Unless it is returned or donated within 15 days of receipt, a contribution must be reported as received and accepted on the date received. This subsection applies notwithstanding the fact that the contribution is not deposited in the campaign depository account by the closing date for the reporting period as provided in s. 11.20(8).

(c) All contributions received by any person acting as an agent of a candidate or treasurer shall be reported by such person to the candidate or treasurer within 15 days of receipt. In the case of a contribution of money, the agent shall transmit the contribution to the candidate or treasurer within 15 days of receipt.

(d) A contribution, disbursement or obligation made or incurred to or for the benefit of a candidate is reportable by the candidate or the candidate's personal campaign committee if it is made or incurred with the authorization, direction or control of or otherwise by prearrangement with the candidate or the candidate's agent.

(e) Notwithstanding pars. (a) to (e), receipt of contributions by registrants under s. 11.05(7) shall be treated as received in accordance with that subsection.

29

¶423 Second, Wis. Stat. § 11.06(4)(d) declares that when a disbursement is made "for the benefit of a candidate," it "is reportable by the candidate or the candidate's personal campaign committee if it is made . . . with the authorization, direction or control of or otherwise by prearrangement with the candidate or the candidate's agent." (Emphasis added.)

¶424 Although Wis. Stat. § 11.06(4)(d) fails to explicitly state that coordinated disbursements are reportable by the candidate's campaign committee as contributions to the candidate or candidate's campaign committee, this interpretation is compelled by the statutory context. All other subsections of § 11.06(4) explicitly govern the receipt and reporting of contributions. The clear implication is that § 11.06(4)(d) governs the receipt and reporting of contributions.

¶425 This interpretation is also supported by common sense. Disbursements made in coordination with a candidate are as valuable to the candidate as cash, according to the United States Supreme Court, and are therefore treated as contributions under federal law.[44] The same logic applies here: Disbursements made "by prearrangement with the candidate or the candidate's

---

[44] Buckley, 424 U.S. at 46.

30

agent" are as valuable to the candidate as cash and are therefore treated as contributions under Wisconsin law.[45]

¶426 In contrast, a disbursement made without prearrangement with a candidate or the candidate's agent is an independent disbursement, not a contribution to the candidate or candidate's campaign committee, and is governed by different rules.[46]

¶427 As this discussion makes clear, the words "contribution" and "disbursement" have distinct but intertwined meanings within Chapter 11. The Special Prosecutor's theory of criminal activity in the instant case relies upon the connection between the two. He argues that when a 501(c) nonprofit entity makes disbursements for issue advocacy in coordination with a candidate's campaign committee, such disbursements are reportable by the candidate's campaign committee as contributions received by the candidate or candidate's campaign committee. He further argues that he has reason to believe a

---

[45] Wis. Stat. § 11.06(4)(d). See also Wis. Coalition for Voter Participation, Inc. v. State Elections Bd. (WCVP), 231 Wis. 2d 670, 681, 605 N.W.2d 654 (Ct. App. 1999) (explaining that both federal campaign finance regulations and Chapter 11 "treat expenditures that are 'coordinated' with, or made 'in cooperation with or with the consent of a candidate . . . or an authorized committee' as campaign contributions" (emphasis added)). The majority opinion apparently overrules WCVP to the extent that WCVP implies that the definition of the phrase "for political purposes" in Chapter 11 extends beyond express advocacy and its functional equivalent. See majority op., ¶68 n.23.

[46] See, e.g., Wis. Stat. § 11.06(2) (providing that independent disbursements are reportable only if they are for express advocacy purposes).

particular candidate's campaign committee is guilty of violating Chapter 11 by failing to fulfill this reporting obligation.[47]

¶428 For the reasons set forth, the Special Prosecutor's theory of criminal activity in the John Doe proceedings underlying this original action has a sound basis in the statutory text.

¶429 Because I agree with the Special Prosecutor that Chapter 11 requires a candidate's campaign committee to report coordinated disbursements for issue advocacy as contributions received by the candidate or candidate's campaign committee, I now consider whether this interpretation of Chapter 11 is constitutionally permissible. As might be expected, the Special Prosecutor says it is, while Unnamed Movants 6 and 7 and the majority opinion say it is not.

### III

¶430 Two constitutional questions are presented in this original action. The first is whether Chapter 11's requirement that a candidate's campaign committee report coordinated disbursements for issue advocacy as contributions to the candidate or candidate's campaign committee violates the First Amendment. The second is whether the provisions of Chapter 11 that impose the reporting requirement at issue are

_____

[47] See Wis. Stat. § 11.27(1) (providing that "[n]o person may prepare or submit a false report or statement to a filing officer under this chapter"); Wis. Stat. § 11.61(1)(b) (stating that "[w]hoever intentionally violates . . . 11.27(1) . . . is guilty of a Class I felony if the intentional violation does not involve a specific figure or if the intentional violation concerns a figure which exceeds $100 in amount or value").

32

unconstitutionally vague or overbroad. Whether the reporting requirement at issue is contrary to the First Amendment and whether the provisions imposing that requirement are unconstitutionally vague or overbroad are interrelated questions.[48] I address these questions in turn.

¶431 The absolutist constitutional position advanced by Unnamed Movants 6 and 7 and adopted by the majority opinion hook, line, and sinker is that the First Amendment bars the State from regulating any issue advocacy in any manner. In their view, the First Amendment protects against state regulation of disbursements for issue advocacy regardless of whether the disbursements are made independently or in coordination with a candidate or candidate's campaign committee. I disagree.

¶432 The majority opinion's rhetoric would lead the reader to conclude that the case law provides a clear answer to the First Amendment issue before the court, namely that the Unnamed Movants' position is correct and that the Special Prosecutor's position "is unsupported in either reason or law."[49] The majority opinion's view contradicts the views expressed by both the John Doe judge and the United States Court of Appeals for the Seventh Circuit.

---

[48] Center for Individual Freedom v. Madigan, 697 F.3d 464, 479 (7th Cir. 2012) ("In the First Amendment context, vagueness and overbreadth are two sides of the same coin . . . .").

[49] Majority op., ¶11.

¶433 The John Doe judge observed that the First Amendment question presented in this original action has "spawned considerable litigation."[50] It is, he explained, "an important question" that deserves, but does not yet have, "a definitive answer."[51]

¶434 Similarly, in O'Keefe v. Chisholm, 769 F.3d 936 (7th Cir. 2014), cert. denied, 135 S. Ct. 2311 (2015), the Seventh Circuit Court of Appeals made it perfectly clear that the Special Prosecutor's theory is rooted in a live legal issue. The O'Keefe court stated that whether coordinated issue advocacy disbursements are regulable under the First Amendment is far from "beyond debate."[52] On the contrary, it explained: The Special Prosecutor's theory of criminal activity in the John Doe

---

[50] In his November 6, 2014, order denying the two Unnamed Movants' motion to have the Special Prosecutor show cause why the John Doe investigation should not be ended, the John Doe judge stated:

> [T]here is a strong public interest in having the appellate courts answer the statutory question that is at the heart of this litigation: when Wisconsin's campaign finance laws prohibit coordination between candidates and independent organizations for a political purpose, does that political purpose require express advocacy? This is an important question that has spawned considerable litigation. The citizens of this state need and deserve a definitive answer. They will not get one if I grant the motion.

This order was not publicly released. Other portions of the order refer to matters subject to the John Doe secrecy order. The above-quoted portion does not.

[51] See the John Doe judge's November 6, 2014, order.

[52] O'Keefe, 769 F.3d at 942.

investigation underlying this litigation "reflects Buckley's interpretation of the First Amendment."[53] Indeed, the O'Keefe court stated, "[n]o opinion issued by the Supreme Court, or by any court of appeals, establishes ('clearly' or otherwise) that the First Amendment forbids regulation of coordination between campaign committees and issue-advocacy groups——let alone that the First Amendment forbids even an inquiry into that topic."[54]

¶435 This statement in O'Keefe is particularly telling considering that the majority opinion relies heavily on a prior opinion of the same federal court of appeals: Wisconsin Right to Life, Inc. v. Barland (Barland II), 751 F.3d 804 (7th Cir. 2014). Barland II does not render this original action an open-

---

[53] Id. at 941.

[54] The relevant portion of the O'Keefe opinion provided in full as follows:

> Plaintiffs' claim to constitutional protection for raising funds to engage in issue advocacy coordinated with a politician's campaign committee [the same claim asserted by Unnamed Movants 6 and 7 in this original action] has not been established "beyond debate." To the contrary, there is a lively debate among judges and academic analysts. The Supreme Court regularly decides campaign-finance issues by closely divided votes. No opinion issued by the Supreme Court, or by any court of appeals, establishes ("clearly" or otherwise) that the First Amendment forbids regulation of coordination between campaign committees and issue-advocacy groups——let alone that the First Amendment forbids even an inquiry into that topic.

O'Keefe, 769 F.3d at 942.

For discussion of whether coordinated issue advocacy is constitutionally protected, see, e.g., Ferguson, supra note 12; Briffault, supra note 12; Smith, supra note 12.

and-shut case, much as the majority opinion would like us to believe.

¶436 Like the John Doe judge and the Seventh Circuit Court of Appeals, I conclude that the constitutional question presented has not yet been definitively resolved. The answer must be deduced through careful analysis of a complex body of federal case law that has set forth principles governing the constitutionality of campaign finance statutes. In my view, this careful analysis reveals that Chapter 11's requirement that a candidate's campaign committee report coordinated issue advocacy disbursements as contributions received by the candidate or candidate's campaign committee does not violate the First Amendment.

¶437 The federal case law governing the constitutionality of campaign finance statutes, much like Chapter 11, presents a labyrinth that must be navigated. The starting point is Buckley v. Valeo, 424 U.S. 1 (1976), a long and complex opinion that considered whether various provisions of the Federal Election Campaign Act of 1971, as amended in 1974, were consistent with the First Amendment.

¶438 Buckley drew a distinction between contributions to candidates and their campaign committees, on the one hand, and independent expenditures for political expression, on the other

hand.[55]  It declared that under the First Amendment, ceilings may be imposed on contributions but not on independent expenditures.[56]  The Buckley Court reached this conclusion by scrutinizing the burdens imposed on political speech by contributions and independent expenditure limits, respectively, and by evaluating those burdens in light of the governmental interests such limits serve.[57]

¶439 The Buckley Court first determined that the burden imposed on political speech by contribution limits is minimal: "A limitation on the amount of money a person may give to a candidate or campaign organization [] involves little direct restraint on his political communication, for it permits the symbolic expression of support evidenced by a contribution but does not . . . infringe [on] the contributor's freedom to discuss candidates and issues."[58]  The Court then declared that the government's interest in "the prevention of corruption and the appearance of corruption spawned by the real or imagined coercive influence of large financial contributions" provides a

---

[55] See generally Buckley, 424 U.S. at 14-23.  See also Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 345 (2010) ("The Buckley Court explained that the potential for quid pro quo corruption distinguished direct contributions to candidates from independent expenditures.").

[56] Buckley, 424 U.S. at 23-59.

[57] Id.

[58] Id. at 21.

"constitutionally sufficient justification" for this minimal burden.[59]

¶440 In contrast, the Buckley Court declared that independent expenditure limits "impose direct and substantial restraints on the quantity of political speech" that are not justified by the government's anti-corruption interest.[60] Unlike contributions, the Court explained,

> independent expenditures may [] provide little
> assistance to the candidate's campaign and indeed may
> prove counterproductive. The absence of
> prearrangement and coordination of an expenditure with
> the candidate or his agent not only undermines the
> value of the expenditure to the candidate, but also
> alleviates the danger that expenditures will be given
> as a quid pro quo for improper commitments from the
> candidate.[61]

¶441 After upholding contribution limits and striking down independent expenditure limits, the Buckley Court turned to the constitutionality of disclosure requirements. It concluded that such requirements are constitutionally permissible as applied both to contributions and to independent expenditures made for express advocacy purposes,[62] reasoning that disclosure

---

[59] Id. at 25-26.

[60] Id. at 39.

[61] Id. at 47.

[62] As a matter of statutory interpretation (to avoid invalidation on vagueness grounds), the Buckley Court determined that the independent expenditure disclosure requirement applied only to independent expenditures made for express advocacy purposes, not to independent expenditures made for issue advocacy purposes. Buckley, 424 U.S. at 78-80. The Court did not so limit the contribution disclosure requirement. Id. at 78.

requirements impose no ceiling on political speech and are an effective anti-corruption measure.[63] Indeed, the Court explained, disclosure requirements "appear to be the least restrictive means of curbing the evils of campaign ignorance and corruption that Congress found to exist."[64]

¶442 In all three regulatory contexts——that is, with regard to contribution limits, independent expenditure limits, and disclosure requirements——the Buckley Court made one point eminently clear: Coordinated expenditures constitute contributions to the candidate or candidate's campaign committee for purposes of federal law. More specifically, the Court held that federal law treats expenditures as contributions received by the candidate or candidate's campaign committee if the expenditures are prearranged or coordinated with the candidate or are "placed in cooperation with or with the consent of a candidate."[65] After all, the Court explained, these expenditures are in reality "disguised contributions."[66] Disguised contributions are subject to the limitations and disclosure requirements that govern all other contributions.[67]

---

[63] Buckley, 424 U.S. at 66.

[64] Id. at 68.

[65] Id. at 78.

[66] Id. at 46-47. See also Ferguson, supra note 12, at 479 (explaining that the United States Supreme Court "continues to clearly signal that the line between contributions and expenditures depends on a spender's independence").

[67] Buckley, 424 U.S. at 46-47.

¶443 In declaring that coordinated expenditures constitute disguised contributions to the candidate or candidate's campaign committee, the Buckley Court did not specify whether it meant all coordinated expenditures or only coordinated expenditures made for express advocacy purposes. The Buckley Court's broad statement that coordinated expenditures constitute disguised contributions would seem to compel the conclusion that the type of advocacy such expenditures implement is irrelevant; the coordination is what matters. This is the approach taken by the Special Prosecutor. Unnamed Movants 6 and 7, however, urge this court to hold that only coordinated expenditures for express advocacy constitute disguised contributions.

¶444 Subsequent case law sheds light on this issue. Post-Buckley decisions have followed Buckley's holding that coordinated expenditures are subject to the limitations and disclosure requirements governing contributions. The case law discussing coordinated expenditures has not distinguished between coordinated expenditures for express advocacy and for issue advocacy.

¶445 Federal Election Commission v. Colorado Republican Federal Campaign Committee (Colorado II), 533 U.S. 431, 446 (2001), is illustrative. The Colorado II Court reaffirmed Buckley's analysis of disguised contributions, explaining that there is no difference between coordinated expenditures and direct contributions to a candidate or candidate's campaign committee that would justify treating the two differently.[68]

---

[68] Colorado II, 533 U.S. at 464-65.

Coordinated expenditures, like contributions, might be given as a quid pro quo for improper commitments from the candidate.

¶446 The Colorado II Court summarized Buckley's discussion of disguised contributions as follows:

> [In Buckley], the rationale for endorsing Congress's equation of coordinated expenditures and contributions was that the equation "prevent[s] attempts to circumvent the Act through prearranged or coordinated expenditures amounting to disguised contributions." The idea was that coordinated expenditures are as useful to the candidate as cash, and that such "disguised contributions" might be given "as a quid pro quo for improper commitments from the candidate" (in contrast to independent expenditures, which are poor sources of leverage for a spender because they might be duplicative or counterproductive from a candidate's point of view). In effect, therefore, Buckley subjected limits on coordinated expenditures by individuals and nonparty groups to the same scrutiny it applied to limits on their cash contributions.[69]

---

[69] Id. at 446 (citations omitted).

Later on, the Colorado II Court further stated that

> [t]here is no significant functional difference between a party's coordinated expenditure and a direct party contribution to the candidate, and there is good reason to expect that a party's right of unlimited coordinated spending would attract increased contributions to parties to finance exactly that kind of spending. Coordinated expenditures of money donated to a party are tailor-made to undermine contribution limits. Therefore the choice here is not, as in Buckley and Colorado I, between a limit on pure contributions and pure expenditures. The choice is between limiting contributions and limiting expenditures whose special value as expenditures is also the source of their power to corrupt.

Colorado II, 533 U.S. at 464–65.

¶447 In Federal Election Commission v. Christian Coalition, 52 F. Supp. 2d 45, 87-88 (D.D.C. 1999), the D.C. District Court rejected as untenable the notion that coordinated express advocacy expenditures and coordinated issue advocacy expenditures should be treated differently.[70] Both constitute disguised contributions, the court held, and both should be treated as such.[71]

¶448 The Christian Coalition court made clear that issue advocacy is not beyond the reach of a state's regulatory power as a matter of constitutional law, explaining that the First Amendment permits "only narrowly tailored restrictions on speech that advance the Government's anti-corruption interest, but the Coalition's position allows for no restrictions at all on [coordinated issue advocacy] expenditures."[72] The Christian Coalition court then declared that the distinction drawn in Buckley between issue advocacy and express advocacy is of no constitutional or statutory import in the realm of coordinated expenditures:

> [I]mporting the 'express advocacy' standard into [the contribution regulation at issue] would misread

---

[70] Federal Election Commission v. Christian Coalition, 52 F. Supp. 2d 45 (D.D.C. 1999).has had a far-reaching impact on state and federal regulation of campaign coordination. See Ferguson, supra note 12, at 481.

[71] Christian Coalition, 52 F. Supp. 2d at 88.

[72] Christian Coalition, 52 F. Supp. 2d at 88. See also McConnell, 540 U.S. at 190 ("[T]he express advocacy restriction [imposed by Buckley] was an endpoint of statutory interpretation, not a first principle of constitutional law.").

_Buckley_ and collapse the distinction between contributions and independent expenditures in such a way as to give short shrift to the government's compelling interest in preventing real and perceived corruption that can flow from large campaign contributions.[73]

¶449 _Christian Coalition_ recognizes that distinguishing between coordinated issue advocacy expenditures and coordinated express advocacy expenditures would ignore the basic fact that both can be "as useful to the candidate as cash."[74] Indeed, the _Christian Coalition_ court explained that

> [c]oordinated expenditures for [communications that spread a negative message about an opponent] would be substantially more valuable than dollar-equivalent contributions [to a candidate] because they come with an 'anonymity premium' of great value to a candidate running a positive campaign. Allowing such coordinated expenditures would frustrate both the anticorruption and disclosure goals of the Act.[75]

¶450 In my opinion, _Christian Coalition_ provides a persuasive reading of the First Amendment principles set forth

---

[73] _Christian Coalition_, 52 F. Supp. 2d at 88.

[74] _McConnell_, 540 U.S. at 221.

[75] _Christian Coalition_, 52 F. Supp. 2d at 88.

in Buckley and its progeny.[76]  It pays heed to the functionalist approach the case law takes to distinguishing between contributions to the candidate or candidate's campaign committee and independent expenditures,[77] and it is careful not to extend prior campaign finance holdings beyond their intended scope.  It is also supported by federal case law, which makes clear that campaign finance disclosure requirements can constitutionally reach beyond express advocacy and its functional equivalent and

---

[76] The few Wisconsin authorities available on the subject of coordinated disbursements track the reasoning of Christian Coalition.  See, e.g., Wis. Coalition for Voter Participation, Inc. v. State Elections Bd. (WCVP), 231 Wis. 2d 670, 605 N.W.2d 654 (Ct. App. 1999) (addressing Chapter 11's regulation of coordinated issue advocacy disbursements in Justice Jon Wilcox's election campaign).  In WCVP, the Wisconsin court of appeals explained that although Buckley imposed limits on the regulation of independent disbursements for issue ads, "neither Buckley nor [Chapter 11] limit the state's authority to regulate or restrict campaign contributions."  Id. at 679.  The WCVP court further explained that Chapter 11 "treat[s] expenditures that are 'coordinated' with, or made 'in cooperation with or with the consent of a candidate . . . or an authorized committee' as campaign contributions."[76]  Id. at 681  Under WCVP, the mere fact that Chapter 11 regulates coordinated disbursements for issue ads does not conflict with the constitutional principles set forth in Buckley.

See also Wis. El. Bd. Op. 00-2 (reaffirmed Mar. 26, 2008) adopting the Christian Coalition approach to examining the conduct of the candidate and the entity disbursing funds and explaining that "the Courts seemed to be willing to merge express advocacy with issue advocacy if 'coordination' between the spender and the campaign is sufficient."

[77] See, e.g., McConnell, 540 U.S. at 221 (2003) ("[T]he rationale for affording special protection to wholly independent expenditures has nothing to do with the absence of agreement and everything to do with the functional consequences of different types of expenditures.").

thus makes clear that the express/issue advocacy distinction is not constitutionally relevant in all campaign finance contexts.[78]

---

[78] In Citizens United, 558 U.S. at 368-69, the Court rejected the contention that "the disclosure requirements in § 201 [of the Bipartisan Campaign Reform Act of 2002] must be confined to speech that is the functional equivalent of express advocacy." Id. at 368. The distinction between issue advocacy and express advocacy drawn by the Court in prior cases considering restrictions on independent expenditures should not, the Citizens United Court held, be imported into the realm of disclosure requirements. By making clear that the express/issue advocacy distinction is relevant only with regard to independent expenditures, Citizens United corroborates Christian Coalition's holding that the distinction is irrelevant to the limits and disclosure requirements applicable to coordinated expenditures.

Madigan, 697 F.3d at 484, relies on this discussion in Citizens United to support its conclusion that the express/issue advocacy distinction is constitutionally irrelevant in the context of disclosure requirements:

> [M]andatory disclosure requirements are constitutionally permissible even if ads contain no direct candidate advocacy . . . . Whatever the status of the express advocacy/issue discussion distinction may be in other areas of campaign finance law, Citizens United left no doubt that disclosure requirements need not hew to it to survive First Amendment scrutiny. With just one exception, every circuit that has reviewed First Amendment challenges to disclosure requirements since Citizens United has concluded that such laws may constitutionally cover more than just express advocacy and its functional equivalents, and in each case the court upheld the law.

(Citation omitted.)

(continued)

¶451 I move on to <u>Wisconsin Right to Life v. Barland</u> (<u>Barland II</u>), 751 F.3d 804 (7th Cir. 2014). Despite implications to the contrary in the majority opinion, <u>Barland II</u> is consistent with <u>Christian Coalition</u>. <u>Barland II</u> addresses the regulation of <u>independent</u> spending under Chapter 11, while

---

<u>Madigan</u> cites and relies on other federal cases that reach the same conclusion in light of <u>Citizens United</u>, including <u>The Real Truth About Abortion, Inc. v. Fed. Election Comm'n</u>, 681 F.3d 544, 551 (4th Cir. 2012) (explaining that <u>Citizens United</u> upheld disclosure requirements for communications "that are <u>not</u> the functional equivalent of express advocacy"); <u>Nat'l Org. for Marriage v. McKee</u>, 649 F.3d 34, 54-55 (1st Cir. 2011) ("We find it reasonably clear, in light of <u>Citizens United</u>, that the distinction between issue discussion and express advocacy has no place in First Amendment review of these sorts of disclosure-oriented laws."); and <u>Human Life of Wash., Inc. v. Brumsickle</u>, 624 F.3d 990, 1016 (9th Cir. 2010) ("Given the Court's analysis in <u>Citizens United</u>, and its holding that the government may impose disclosure requirements on speech, the position that disclosure requirements cannot constitutionally reach issue advocacy is unsupportable.").

Since <u>Madigan</u> was decided, additional federal cases have interpreted <u>Citizens United</u> in the same manner, that is, as declaring that campaign finance disclosure requirements can cover more than express advocacy and its functional equivalent without running afoul of the First Amendment. <u>See</u> <u>Vt. Right to Life Comm. v. Sorrell</u>, 758 F.3d 118, 132 (2d Cir. 2014) ("In <u>Citizens United</u>, the [United States] Supreme Court expressly rejected the 'contention that the disclosure requirements must be limited to speech that is the functional equivalent of express advocacy,' because disclosure is a less restrictive strategy for deterring corruption and informing the electorate."); <u>Iowa Right to Life Comm. v. Tooker</u>, 717 F.3d 576, 591 n.1 (8th Cir. 2013) ("Disclosure requirements need not 'be limited to speech that is the functional equivalent of express advocacy.'" (quoting <u>Citizens United</u>); <u>Independence Inst. v. Fed. Election Comm'n</u>, ___ F. Supp. 3d ___, 2014 WL 4959403 (D.D.C. Oct. 6, 2014) (stating that the <u>Citizens United</u> Court "in no uncertain terms . . . rejected the attempt to limit [federal campaign finance law] disclosure requirements to express advocacy and its functional equivalent").

46

Christian Coalition tackles the regulation of coordinated spending under federal law.

¶452 In Barland II, Wisconsin Right to Life (a 501(c) nonprofit entity) and its state political action committee challenged various provisions within Chapter 11 as unconstitutional only insofar as those provisions "trigger[ed] . . . restrictions and requirements for independent groups not under the control of a candidate or candidate's committee . . . ."[79] The Barland II court was careful to note that Wisconsin Right to Life and its state PAC "operate[d] independently of candidates and their campaign committees."[80]

¶453 In contrast to the independent groups at issue in Barland II, in the instant case the Special Prosecutor contends that 501(c) nonprofit entities made disbursements for issue ads in coordination with a candidate's campaign committee. The disbursements at issue in the present case are not independent. Barland II does not extend beyond the context of independent political speech and is therefore not dispositive of the First Amendment question presented in this original action.

¶454 Given this case law, I would hold that in the eyes of both Chapter 11 and the First Amendment, coordinated disbursements are disguised contributions regardless of whether they are made for express advocacy or issue advocacy purposes. Accordingly, in contrast to the majority opinion, I would hold

---

[79] Barland II, 751 F.3d at 829 (emphasis added).

[80] Id. at 809.

47

that Chapter 11's requirement that a candidate's campaign committee report coordinated issue advocacy disbursements as contributions is consistent with the First Amendment.

¶455 Unnamed Movants 6 and 7 further contend, and the majority opinion holds, that their interpretation of Chapter 11 is compelled by the doctrines of overbreadth and vagueness. I turn to this argument now.

¶456 The Unnamed Movants' positions on overbreadth and vagueness are twofold.

¶457 First, they urge that the phrase "for political purposes," which is part of Chapter 11's definitions of the words "contribution"[81] and "disbursement,"[82] is unconstitutionally vague and overbroad unless the phrase is read to mean "for express advocacy purposes."

¶458 Second, Unnamed Movants 6 and 7 contend that the concept of "coordination" within Chapter 11 is fatally imprecise. In their view, the provisions of Chapter 11 that ostensibly regulate coordination, including § 11.06(4)(d), should be struck down as unconstitutionally vague and overbroad or, at the very least, limited to express advocacy.

¶459 I address these arguments in turn. To address overbreadth and vagueness arguments relating to the phrase "for political purposes," I return to Buckley and Barland II. Unnamed Movants 6 and 7 contend, and the majority opinion

---

[81] See Wis. Stat. § 11.01(6)(a).

[82] See Wis. Stat. § 11.01(7)(a).

48

agrees, that an express-advocacy limiting construction must be applied in the instant case based on <u>Buckley</u> and <u>Barland II</u>. They misread the case law.

¶460 The <u>Buckley</u> Court applied an express-advocacy limiting construction to two statutory provisions, one imposing a limit on expenditures and one requiring that expenditures be reported.

¶461 The provision imposing a limit on expenditures stated that "[n]o person may make any expenditure . . . <u>relative to a clearly identified candidate</u> during a calendar year which, <u>when added to all other expenditures made by such person during the year advocating the election or defeat of such candidate</u>, exceeds $1,000."[83] The challengers in <u>Buckley</u> argued that the phrase "relative to a clearly identified candidate" is unconstitutionally vague. The <u>Buckley</u> Court agreed.

¶462 The <u>Buckley</u> Court explained that the challenged provision failed to clarify whether it covered both express advocacy and issue advocacy expenditures. The Court decided, however, that in the context of the provision as a whole, the phrase "relative to a clearly identified candidate" could mean "advocating the election or defeat of a candidate," that is, could mean express advocacy.[84] The Court determined that this reading would avoid vagueness concerns. Thus, it construed the expenditure limit as applying only to express advocacy.

---

[83] <u>Buckley</u>, 424 U.S. at 39 (emphasis added).

[84] <u>Id.</u> at 42.

49

¶463 The second provision to which the Buckley Court applied an express-advocacy limiting construction required expenditures to be disclosed. The word "expenditure" was defined "in terms of the use of money or other valuable assets 'for the purpose of . . . influencing' the nomination or election of candidates for federal office."[85] The Court determined that vagueness concerns arose insofar as this expenditure disclosure provision applied to individuals other than candidates and political committees because the phrase "for the purpose . . . of influencing [an election]" carries the potential "for encompassing both issue discussion and advocacy of a political result."[86]

¶464 To avoid vagueness concerns, the Court again applied an express-advocacy limiting construction, this time to the phrase "for the purpose of . . . influencing [an election]." The Court held that the expenditure disclosure provision required expenditures by entities other than candidates and political committees to be disclosed under only two circumstances: (1) when the expenditures were authorized or requested by a candidate or his agent (i.e., coordinated expenditures); and (2) when the expenditures were for express advocacy (i.e., independent express advocacy expenditures).[87] Independent issue advocacy expenditures were not required to be disclosed.

---

[85] Id. at 77.

[86] Id. at 79.

[87] Id. at 80.

50

¶465 Importantly, the Buckley Court's application of these express-advocacy limiting constructions was confined to the realm of independent expenditures. As previously explained, the Buckley Court considered coordinated expenditures to be "disguised contributions."[88] Buckley expressly rejected the argument that the statutory provisions imposing limits and disclosure requirements on contributions were unconstitutionally vague or overbroad.[89]

¶466 Further, in applying express-advocacy limiting constructions to the statutory provisions imposing limits and disclosure requirements on independent expenditures, the Buckley Court did not establish as a matter of constitutional law that regulation of issue advocacy is impermissible. No United States Supreme Court decision, and no decision of this court (until today), has gone so far.[90]

¶467 Although the majority opinion removes all issue advocacy from state regulation, the United States Supreme Court in McConnell v. Federal Election Commission, 540 U.S. 93, 190-91

---

[88] Id. at 46-47. See also Colorado II, 533 U.S. at 463-64 (explaining that the imposition of a limiting construction on provisions imposing expenditure limits in Buckley and subsequent federal cases "ultimately turned on the understanding that the expenditures at issue were not potential alter egos for contributions, but were independent . . . . [T]he constitutionally significant fact . . . was the lack of coordination between the candidate and the source of the expenditure" (internal quotation marks and citation omitted) (emphasis added)).

[89] See Buckley, 424 U.S. at 29-30, 78.

[90] See O'Keefe, 769 F.3d at 942.

51

(2003), <u>overruled on other grounds by</u> <u>Citizens United v. Fed. Election Comm'n</u>, 558 U.S. 310 (2010), explicitly ruled that it would be a "misapprehen[sion]" to read <u>Buckley</u> as holding that there exists "a constitutionally mandated line between express advocacy and so-called issue advocacy, and that speakers possess an inviolable First Amendment right to engage in the latter category of speech."[91] Rather, said the <u>McConnell</u> Court,

> a plain reading of <u>Buckley</u> makes clear that the express advocacy limitation, in both the expenditure and the disclosure contexts, was the product of statutory interpretation rather than a constitutional command. In narrowly reading the [federal law] provisions in <u>Buckley</u> to avoid problems of vagueness and overbreadth, we nowhere suggested that a statute that was neither vague nor overbroad would be required to toe the same express advocacy line.[92]

¶468 With this United States Supreme Court precedent in mind, the <u>Barland II</u> court took up the issues of vagueness and overbreadth within Chapter 11.

¶469 The statutory provision considered by the <u>Barland II</u> court that is relevant to this original action is Wis. Stat. § 11.01(16), which (as explained previously) defines the phrase "for political purposes."

¶470 Pursuant to § 11.01(16), an act is done "for political purposes" when it is intended to influence an election. The

---

[91] <u>McConnell</u>, 540 U.S. at 190.

[92] <u>Id.</u> at 191-92 (footnote omitted).

<u>See also</u> <u>Wis. Right to Life</u>, 551 U.S. at 474 n.7 (Roberts, C.J., controlling opinion) ("<u>Buckley</u>'s intermediate step of statutory construction on the way to its constitutional holding does not dictate a constitutional test.").

Barland II court considered the meaning of the "influence an election" language in the context of reporting requirements and other duties and restrictions applicable to the independent political speakers at issue in that case.

¶471 The Barland II court announced that as applied to independent political speakers, the phrase "for political purposes" must be narrowly construed to cover only "express advocacy and its functional equivalent."[93] The factual scenario presented to this court in this original action was expressly excluded from Barland II's express-advocacy limiting construction.[94] Barland II does not require this court to apply an express-advocacy limiting construction beyond the context of the independent political speech involved in that case.

¶472 Keeping in mind the express-advocacy limiting constructions applied in Buckley to the phrases "relative to a clearly identified candidate" and "for the purposes of . . . influencing . . . [an] election," and in Barland II to the phrase "for the purpose of influencing [an] election," I turn to the vagueness and overbreadth challenges advanced by Unnamed Movants 6 and 7 and accepted by the majority opinion in this original action.

---

[93] Barland II, 751 F.3d at 834.

[94] Barland II, 751 F.3d at 834 ("As applied to political speakers other than candidates, their committees, and political parties, the statutory definition of 'political purposes' . . . [is] limited to express advocacy and its functional equivalent . . . .") (emphasis added).

53

¶473 The fundamental point to remember in deciding campaign finance law cases is that context is key. When vagueness or overbreadth concerns arise in the campaign finance context, they arise with regard to particular conduct and specified political speakers. When a limiting construction has been applied to a campaign finance statute, it has been applied with regard to particular conduct and specified political speakers.[95] Just because a phrase is vague or overbroad in one context within Chapter 11 does not mean it is vague or overbroad throughout the Chapter.

¶474 The provision at issue in the instant case is the requirement in Wis. Stat. § 11.06(1) that registrants report all contributions received. The definition of "contribution" under Chapter 11 comports with the definition of "contribution" considered in Buckley: Anything of value given for the purposes of influencing an election. The Buckley Court expressly declined to apply an express-advocacy limiting construction to the phrase "for the purpose of influencing [an] election" in the definition of "contribution," finding no constitutional infirmity:

> The Act does not define the phrase "for the purpose of influencing" an election that determines when a gift, loan, or advance constitutes a contribution. Other

---

[95] See Barland II, 751 F.3d at 837 ("The First Amendment vagueness and overbreadth calculus must be calibrated to the kind and degree of the burdens imposed on those who must comply with the regulatory scheme."). See also United States v. Williams, 553 U.S. 285, 293 (2008) ("[I]t is impossible to determine whether a statute reaches too far without first knowing what the statute covers.").

courts have given that phrase a narrow meaning to alleviate various problems in other contexts. The use of the phrase presents fewer problems in connection with the definition of a contribution because of the limiting connotation created by the general understanding of what constitutes a political contribution.[96]

¶475 I would adhere to <u>Buckley</u> and its progeny. I would not construe Wis. Stat. § 11.06(1) as excluding coordinated disbursements for issue advocacy from its general requirement that "all contributions received" by a candidates or candidate's campaign committee be reported by the candidate's campaign committee.

---

[96] <u>Buckley</u>, 424 U.S. at 23 n.24 (citations omitted). <u>See also</u> <u>id.</u> at 78-80, which addresses the vagueness challenge brought against disclosure and reporting requirements applicable to contributions and expenditures. The Court denied the challenge insofar as it reached contributions. With regard to expenditures, the Court denied the challenge insofar as it reached non-independent political speakers:

> The general requirement that "political committees" and candidates disclose their expenditures could raise similar vagueness problems, for "political committee" is defined only in terms of amount of annual "contributions" and "expenditures," and could be interpreted to reach groups engaged purely in issue discussion. The lower courts have construed the words "political committee" more narrowly. To fulfill the purposes of the Act they need only encompass organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate. Expenditures of candidates and of "political committees" so construed can be assumed to fall within the core area sought to be addressed by Congress. They are, by definition, campaign related.

<u>Buckley</u>, 424 U.S. at 79 (footnotes omitted).

¶476 The second contention advanced by Unnamed Movants 6 and 7——that the concept of "coordination" is vague and overbroad and thus must be limited to express advocacy or invalidated altogether——also fails.[97]

¶477 Unnamed Movants 6 and 7 do not tether their broader argument to a particular statutory text. They claim that the various provisions within Chapter 11 that might be interpreted as regulating coordination (such as § 11.06(4)(d), which provides that coordinated disbursements are reportable by a candidate's campaign committee) fail to define sufficiently the concept of coordination. Thus, Unnamed Movants 6 and 7 assert that the provisions are unconstitutionally vague and overbroad.

¶478 In McConnell v. Federal Election Commission, 540 U.S. 93 (2003), overruled on other grounds by Citizens United v. Fed. Election Comm'n, 558 U.S. 310 (2010), the United States Supreme Court rejected a similar argument. The federal law under review in McConnell provided that coordinated expenditures were "expenditures made 'in cooperation, consultation, or concer[t] with, or at the request or suggestion of' a candidate."[98] The McConnell Court stated that this "longstanding definition of coordination 'delineates its reach in words of common

---

[97] For a discussion of state and federal campaign finance statutes that regulate or define campaign coordination, see Ferguson, supra note 12. This article argues not only that campaign coordination can be regulated consistent with the First Amendment but also that the coordination subject to regulation should include third-party expenditures that a candidate deems valuable, as evidenced by the candidate's conduct.

[98] McConnell, 540 U.S. at 222 (2003).

understanding.'"[99]   Thus, the Court observed, it had "survived without constitutional challenge for almost three decades."[100] The Court concluded that this "definition of coordination gives 'fair notice to those to whom [it] is directed,' and is not unconstitutionally vague."[101]

¶479 The language of Wis. Stat. § 11.06(4)(d) is similar, though not identical, to the language at issue in McConnell.  As in McConnell, this language delineates the reach of Chapter 11's concept of coordination "in words of common understanding."[102]

¶480 Center for Individual Freedom v. Madigan, 697 F.3d 464 (7th Cir. 2012) is also instructive.  In Madigan, a 501(c) nonprofit entity engaged in issue advocacy challenged the disclosure regime in effect in Illinois as unconstitutionally vague and overbroad on its face.[103]

¶481 As under Chapter 11, the Illinois statutes required contributions to be reported.  The challengers took issue with the definition of "contribution," which included "[an] expenditure 'made in cooperation, consultation, or concert with another political committee' . . . ."[104]  The Illinois statutes further provided that the word "contribution" included "any

---

[99] Id. (quoted source omitted)

[100] Id.

[101] Id. at 223 (citation omitted).

[102] Id. at 222 (internal quotation marks omitted).

[103] Madigan, 697 F.3d at 470.

[104] Id. at 494 (emphasis added).

'electioneering communication made <u>in concert or cooperation with</u> or at the <u>request, suggestion, or knowledge</u> of a candidate, a political committee, or any of their agents.'"[105]

¶482 According to the challengers, these provisions "are vague because they do not specify the 'degree of actual agreement required.'"[106] Citing <u>McConnell</u>, the <u>Madigan</u> court observed that the challenged provisions are "no less clear than the federal definition which has long passed muster in the Supreme Court."[107] The <u>Madigan</u> court thus rejected the challengers' claim, concluding that "the coordination language of [Illinois' campaign finance law] is clear enough to provide a reasonably intelligent person 'fair warning' of what sort of conduct is covered."[108]

¶483 I would adhere to <u>McConnell</u> and <u>Madigan</u> and would decline to hold that the concept of "coordination" within Chapter 11 is unconstitutionally vague or overbroad. Accordingly, no limiting construction need be applied.

¶484 In sum, I conclude that Chapter 11's requirement that a candidate's campaign committee report coordinated disbursements for issue advocacy as contributions received by the candidate or candidate's campaign committee does not violate

---

[105] <u>Id.</u> at 495.

[106] <u>Id.</u> at 496.

[107] <u>Id.</u>

[108] <u>Id.</u> at 497.

the First Amendment and that the provisions of Chapter 11 imposing this requirement are neither vague nor overbroad.

¶485 In light of the statutory and constitutional validity of the Special Prosecutor's interpretation of Chapter 11 and given the strong policy against intervening in ongoing criminal investigations, I conclude that the John Doe proceedings should not be terminated.

IV

¶486 I now examine three issues that are common to all three of the John Doe cases before the court.

A

¶487 This court has received several non-party motions to file amicus briefs regarding the merits of the John Doe trilogy. I join the majority opinion's decision to grant these motions. A grant is consistent with the court's Internal Operating Procedures and past practices.

¶488 Motions to submit amicus briefs addressing the merits of the John Doe trilogy have been filed by the following: (1) Wyoming Liberty Group; (2) the Wisconsin Government Accountability Board; (3) various former members of the Federal Election Commission; (4) the Honorable Bradley A. Smith, the Center for Competitive Politics, and Wisconsin Family Action; (5) Campaign Legal Center, Democracy 21, Common Cause in Wisconsin, and League of Women Voters of Wisconsin; (6) Citizens for Responsible Government Advocates, Inc.; and (7) Wisconsin Right to Life.

¶489 This court generally grants motions to file amicus briefs "if it appears that the movant has special knowledge or experience in the matter at issue in the proceedings so as to render a brief from the movant of significant value to the court." Wis. S. Ct. IOP II-B.6.c. (May 4, 2012). I conclude that the movants listed above have special knowledge or experience and thus that their views would be of significant value to the court. Indeed, in a case of such profound public importance, this court can use all the help that is offered.

B

¶490 The Special Prosecutor requested the recusal of certain justices from the John Doe trilogy.

¶491 Non-party motions requesting to file amicus briefs on the recusal issue were filed by the following: (1) the James Madison Center for Free Speech; (2) the Ethics and Public Policy Center; and (3) a group of professors of legal ethics.

¶492 On a motion to disqualify a justice, justices have, in other cases, explained why they will participate[109] or why they

---

[109] See, e.g., State v. Henley, 2010 WI 12, 322 Wis. 2d 1, 778 N.W.2d 853 (memorandum opinion by Justice Roggensack explaining her decision not to disqualify herself).

(continued)

will not.[110]   The justices named in the recusal motion at issue are obviously participating.   They have provided no response to the motion, however, choosing instead to remain silent.

¶493 The Special Prosecutor's recusal motion can be read in multiple ways.   It can easily be read as being directed only to the named justices, seeking their self-disqualification. It can also be read as directed to the court, seeking the court's review of a Justice's statement that he or she need not self-disqualify.   No Justice has made such a statement in the instant cases.   Finally, the Special Prosecutor's recusal motion can be read as seeking the court's review of due process considerations should the named Justices choose not to self-disqualify.

¶494 The Special Prosecutor's recusal motion cites Caperton v. A.T. Massey Coal Co., 556 U.S. 868 (2009).   In Caperton, the

---

See also State v. Allen, 2010 WI 10, 322 Wis. 2d 372, 778 N.W.2d 863.   In Allen, the defendant filed a motion before Justice Gableman individually seeking his recusal.   Justice Gableman denied the motion without explanation on September 10, 2009.   Id., ¶15.   The defendant then filed a supplemental motion addressed to the whole court, seeking review of whether Justice Gableman had properly considered whether he could act impartially or whether it appeared he could not act impartially. Id., ¶16.   On January 15, 2010, Justice Gableman then filed a supplement to his September 10, 2009, order, explaining why he had denied the recusal motion.   Id., ¶17.   On February 4, 2010, he withdrew from participation in the court's consideration of the recusal motion.   Id., ¶18.   The remaining members of the court were evenly divided regarding whether to deny the defendant's recusal motion or order briefs and oral argument on the matter.   Accordingly, the motion was not granted.

[110] Early on in the instant litigation (long before any recusal motion was filed), Justice Ann Walsh Bradley advised all parties that she was not participating.   Her statement of non-participation is attached hereto as Exhibit D.

61

plaintiff moved to disqualify a justice of the Supreme Court of West Virginia on the grounds of bias resulting from campaign contributions and expenditures. The justice denied the plaintiff's motion, and the Supreme Court of West Virginia ruled against the plaintiff on the merits of the case. The United States Supreme Court reversed and remanded, ruling that due process required recusal under the circumstances presented.

¶495 Caperton teaches that there are "circumstances 'in which experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable.'"[111]

¶496 Caperton holds that "Due Process requires an objective inquiry into whether the contributor's influence on the election under all the circumstances 'would offer a possible temptation to the average . . . judge to . . . lead him [or her] not to hold the balance nice, clear and true.'"[112] See also Williams-Yulee v. Fla. Bar, 135 S. Ct. 1656, 1667 (2015) ("[E]ven if judges were able to refrain from favoring donors, the mere possibility that judges' decisions may be motivated by the desire to repay campaign contributions is likely to undermine the public's confidence in the judiciary.") (internal quotation marks omitted).

¶497 According to the Caperton Court, the participation of a justice who should have disqualified himself or herself

---

[111] Caperton v. A.T. Massey Coal Co., 556 U.S. 868, 877 (2009) (citations omitted).

[112] Id. (citations omitted).

violates a litigant's constitutional due process rights and necessitates a do-over.[113] For a discussion of a justice's recusal in Wisconsin , see State v. Herrmann, ___ WI ___, ___ Wis. 2d ___, ___ N.W.2d ___.

¶498 If the Special Prosecutor is presenting a due process argument to the court as a whole——that is, if the Special Prosecutor is asking the court to declare whether participation by the justices named in the recusal motion violates due process rights——such a motion should be made more clearly.

¶499 In any event, the Special Prosecutor's recusal motion and the motions to file amicus briefs on the issue of recusal remain unresolved.

C

¶500 Over the extended lives of the John Doe trilogy in this court, the court has accepted the parties' filings under seal for long periods without examining or ruling on the validity of the parties' motions to seal. Since beginning to examine the sealed documents, the court has kept too many documents under seal and has allowed the parties to redact too much information from their filings.[114]

---

[113] Id. at 885-87.

[114] The Special Prosecutor claims that much of the information the John Doe secrecy orders and this court's redaction orders intended to conceal has been divulged through media leaks. The Special Prosecutor pointedly wonders what the court is going to do, if anything, about these alleged leaks.

(continued)

¶501 The court's decisions on sealing and redaction up to this point have been rooted entirely in the sweeping John Doe secrecy orders that were issued by the John Doe judge many months ago under very different circumstances. This court, in my opinion, should have <u>independently determined</u> whether the justifications for secrecy in John Doe proceedings still apply to the John Doe trilogy in this court. Instead, the court has, for the most part, continued to seal or redact all documents that were sealed by the John Doe judge <u>without making this determination</u>, concluding that its obligation is to abide by the John Doe judge's secrecy order.

¶502 Although I have publicly disagreed with the court's orders regarding sealing and redactions,[115] I have made every effort to abide by those orders. Precedent requires me and this court to abide by this court's secrecy orders. <u>State ex rel.</u>

I anticipate that a motion to open this court's records and briefs regarding the John Doe trilogy will be filed when the three cases are completed. The sealed and redacted material will not be released, however, without a motion, opportunity to be heard, and court order.

[115] For a full discussion of my reasons for objecting to the extensive sealing and redactions ordered by the court in these cases, please see my dissents in each of the following three orders issued by this court on March 27, 2015: (1) an order denying the Milwaukee Journal Sentinel's motion to intervene in the John Doe cases for the sole purpose of advocating for increased public access (attached hereto as Exhibit E); (2) an order canceling oral argument (attached hereto as Exhibit B); and (3) an order relating to redaction (attached hereto as Exhibit C).

See also my dissents to orders issued by this court on April 1, 2015, and April 17, 2015, as well as a letter dated May 12, 2015 issued by Diane Fremgen, Clerk of Supreme Court.

<u>Niedziejko v. Coffey</u>, 22 Wis. 2d 392, 398, 126 N.W.2d 96 (1964), relied on by this court's sealing and redaction orders, provides that secrecy orders issued by a magistrate are binding on that magistrate.  In the instant case, this court is the magistrate that issued the relevant secrecy orders.  Thus, the secrecy orders bind not just the parties, but also this court.

¶503 The court's March 27, 2015, redaction order recognizes this principle, stating that "the fact that a John Doe proceeding becomes the subject of review in an appellate court . . . does not eliminate the secrecy of documents and other information that are covered by a secrecy order issued by a John Doe judge."

¶504 The majority opinion and Justice Prosser's concurrence disregard this principle.[116]  The majority opinion declares, without citation to any authority, that "we can interpret the secrecy order and modify it to the extent necessary for the public to understand our decision herein."[117]  Justice Prosser's concurrence discusses the policy reasons underlying secrecy in John Doe proceedings, concludes that they do not support continued concealment of certain facts underlying the John Doe trilogy, and then unilaterally determines that "those facts are now outside the scope of the secrecy order."[118]

---

[116] See, for example, the quote set forth in ¶256 of Justice Prosser's concurrence, pulled from an Unnamed Movant's brief. This quote is redacted in its entirety in the Unnamed Movant's redacted brief.

[117] Majority op., ¶14 n.11.

[118] Justice Prosser's concurrence, ¶145.

¶505 The majority opinion and Justice Prosser's concurrence not only defy this court's March 27, 2015, redaction order; they also contradict that order's reasoning. The court's March 27, 2015, redaction order explicitly concludes that a John Doe judge's secrecy order remains binding when the John Doe proceedings subject to that order reach this court.

¶506 In sum: I have repeatedly dissented to the excessive sealing and redactions this court has imposed in the John Doe trilogy and I have repeatedly dissented to this court's position that the John Doe secrecy order automatically binds this court, but I nevertheless conclude that the secrecy orders issued by this court (over my dissent) are binding on this court. As explained above, it is settled law that a "magistrate" who issues a secrecy order is bound by that secrecy order. The majority opinion and Justice Prosser's concurrence improperly ignore this principle.

* * * *

¶507 For the reasons set forth, I dissent to the majority opinion's resolution of the original action.

66

**2014AP417-W through 2014AP421-W: Supervisory Writ & Appeal:
State of Wisconsin ex rel. Francis D. Schmitz v. Gregory A.
Peterson, John Doe Judge**

¶508 In the second John Doe case before the court, the Special Prosecutor petitioned the court of appeals for a supervisory writ and writ of mandamus seeking review of a decision and order of the John Doe judge dated January 10, 2014, which quashed subpoenas and ordered the return of property seized pursuant to search warrants.

¶509 The defendants are the John Doe judge and eight Unnamed Movants. Several Unnamed Movants filed petitions to bypass the court of appeals, which this court granted.

¶510 The John Doe judge's January 10, 2014, order was based on his conclusion of law that the Wisconsin statutes do not regulate disbursements for issue advocacy made by a 501(c) nonprofit entity in coordination with a candidate or candidate's campaign committee.[119] The John Doe judge appears to have reached this conclusion of law based in part on First Amendment principles.

¶511 This court must decide whether to issue a supervisory writ reversing the John Doe judge's January 10, 2014, order. The majority opinion holds that no supervisory writ shall issue because the Special Prosecutor has not met one of the criteria for the issuance of a supervisory writ. According to the majority opinion, the Special Prosecutor has failed to prove

---

[119] See majority op., ¶¶34-36, 75, 97.

that the John Doe judge violated a plain legal duty when he quashed subpoenas and ordered the return of property seized pursuant to search warrants.[120]

¶512 The majority opinion holds not that the John Doe judge's interpretation of Wisconsin's campaign finance statutes was correct (although the majority opinion's discussion of the original action implies as much), but rather that the validity of the John Doe judge's interpretation and application of statutes is not a proper basis upon which this court can issue a supervisory writ.[121]    I strongly disagree with the majority opinion.

¶513 The purpose of the supervisory writ sought by the Special Prosecutor is to provide for "the direct control of . . . judicial officers who fail to fulfill non-discretionary duties, causing harm that cannot be remedied through the appellate review process."[122]

¶514 The John Doe judge had a non-discretionary legal duty in the instant case to correctly interpret Wisconsin's campaign finance statutes to determine whether and how they address coordination between a candidate or candidate's campaign committee and a 501(c) nonprofit entity engaged in issue advocacy.   For the reasons set forth in my dissent to the

---

[120] See majority op., ¶12.

[121] See majority op., ¶97.

[122] See majority op., ¶81 (quoting State ex rel. Kalal v. Circuit Court, 2004 WI 58, ¶24, 271 Wis. 2d 633, 681 N.W.2d 110 (emphasis added)).

original action, I conclude that the John Doe judge violated this nondiscretionary legal duty by misinterpreting and misapplying the law.[123]

¶515 A decision of a John Doe judge can be reviewed only by means of a supervisory writ.  A decision of a John Doe judge cannot be reviewed by direct appeal.  Because the John Doe judge "fail[ed] to fulfill [a] non-discretionary dut[y], causing harm that cannot be remedied through the appellate review process," I would grant the Special Prosecutor's writ petition.

¶516 In contrast, the majority opinion reaches the perplexing conclusion that although the foundation of the entire legal system rests on a judge's obligation to correctly interpret and apply the law, the John Doe judge's obligation to correctly interpret and apply the law is not the type of plain legal duty contemplated by the supervisory writ procedure.  In reaching this conclusion, the majority opinion relies on a single conclusory sentence (devoid of citation to any authority) that appears in State ex rel. Kalal v. Circuit Court, 2004 WI 58, ¶24, 271 Wis. 2d 633, 681 N.W.2d 110.

¶517 In Kalal, a supervisory writ case, the petitioner argued that judges have a plain legal duty to correctly find the facts and apply the law.[124]  The Kalal court declared that it

---

[123] My dissent in the instant case should be read in conjunction with my dissent in the original action. See ¶¶368-486, infra.

[124] State ex rel. Kalal v. Circuit Court, 2004 WI 58, ¶23, 271 Wis. 2d 633, 681 N.W.2d 110.

could not accept this proposition "as it would extend supervisory jurisdiction to a virtually unlimited range of decisions involving the finding of facts and application of law."[125] The Kalal court explained its position as follows:

> The obligation of judges to correctly apply the law is general and implicit in the entire structure of our legal system. The supervisory writ, however, serves a narrow function: to provide for the direct control of lower courts, judges, and other judicial officers who fail to fulfill non-discretionary duties, causing harm that cannot be remedied through the appellate review process. To adopt the Kalals' interpretation of the plain duty requirement in supervisory writ procedure would transform the writ into an all-purpose alternative to the appellate review process.[126]

¶518 The majority opinion takes this discussion in Kalal out of context, reading it without any meaningful understanding of precedent or the nature of review by supervisory writ of a John Doe judge's order. Indeed, the majority opinion's interpretation of Kalal is so overbroad that Kalal and the majority opinion are reduced to balderdash.

¶519 To understand Kalal and the plain legal duty criterion in supervisory writ cases, one must harken back to the classic expression of what constitutes a plain legal duty and then trace the evolution of the concept in the context of supervisory writ procedure. Kalal must be read and understood in historical context, in light of supervisory writ cases preceding and

---

[125] Id., ¶24.

[126] Id. (emphasis added, citations omitted).

subsequent to <u>Kalal</u>, and in recognition of a court's discretion to grant or deny a requested supervisory writ.

¶520 The classic articulation of the plain legal duty concept was set forth in <u>In re Petition of Pierce-Arrow Motor Car Co.</u>, 143 Wis. 282, 127 N.W. 998 (1910). In <u>Pierce-Arrow</u>, the defendant sought to vacate service of a summons. The defendant requested that this court exercise its "general superintending control over all inferior courts" under Article VII, Section 3 of the Wisconsin Constitution.[127]

¶521 The <u>Pierce-Arrow</u> court concluded that the legal validity of service "may well admit of different opinions by equally able legal minds."[128] The court determined that because the legal question of whether service was valid was debatable, the circuit court had not violated a plain legal duty.

¶522 The <u>Pierce-Arrow</u> court explained:

---

[127] <u>In re Petition of Pierce-Arrow Motor Car Co.</u>, 143 Wis. 282, 285, 127 N.W. 998 (1910).

At the time the <u>Pierce-Arrow</u> case was decided, Article VII, Section 3 of the Wisconsin Constitution stated in relevant part as follows: "The supreme court shall have a general superintending control over all inferior courts; it shall have the power to issue writs of . . . mandamus, injunction . . . and other original and remedial writs, and to hear and determine the same."

Since 1978, Article VII, Section 3(1) of the Wisconsin Constitution has provided that "[t]he supreme court shall have superintending and administrative authority over all courts." Section 3(2) states that "[t]he supreme court may issue all writs necessary in aid of its jurisdiction."

[128] <u>Pierce-Arrow</u>, 143 Wis. at 287.

71

One of the cardinal rules is that the duty of the court below must be <u>plain</u>. The situation must be such that hardly more than a statement of the facts is necessary to convince the legal mind as to the duty of the court. Where there is no such clear and obvious duty, based either upon common-law principles or upon express statute, but where questions of law or fact or both are involved of such difficulty that "a judge may reasonably, proceeding considerately, commit judicial error," the court will refuse to intervene under its power of superintending control, but will leave the parties to their remedy by appeal.[129]

¶523 <u>Pierce-Arrow</u> represented the court's view of the plain legal duty criterion for the issuance of a supervisory writ up to 1921.[130] Thereafter, the court's view of what constitutes a plain legal duty changed significantly.[131]

¶524 In 1921, the court decided <u>In re Inland Steel Co.</u>, 174 Wis. 140, 182 N.W. 917 (1921). In 1932, the court decided <u>State ex rel. Hustisford Light, Power & Manufacturing Co. v. Grimm</u>, 208 Wis. 366, 370-71, 243 N.W. 763 (1932). In these two cases, the court concluded that even though the question of law presented may be subject to reasonable debate, the court may exercise its original and supervisory power when an appeal would not provide an adequate remedy.

---

[129] <u>Pierce-Arrow</u>, 143 Wis. at 286 (emphasis added).

[130] See John D. Wickhem, <u>The Power of Superintending Control of the Wisconsin Supreme Court</u>, 1941 Wis. L. Rev. 153, 163 (1941). This article is generally viewed as the best explanation of the Wisconsin constitutional provision regarding superintending authority and writs.

[131] John D. Wickhem, <u>The Power of Superintending Control of the Wisconsin Supreme Court</u>, 1941 Wis. L. Rev. 153, 161 (1941).

¶525 These cases make the following point clear: "[T]he fact that the duty of the trial court in the premises can only be determined by a careful consideration of the facts and the law applicable to the situation is no barrier to the exercise of th[e supervisory writ] power."[132]

¶526 In 1941, Justice John D. Wickhem, who served on the Wisconsin Supreme Court from 1930 to 1949, explained the developing case law on the concept of plain legal duty as follows:

> The purpose of this [supervisory writ] jurisdiction is to protect the legal rights of a litigant when the ordinary processes of action, appeal and review are inadequate to meet the situation, and where there is need for such intervention to avoid grave hardship or complete denial of these rights.
>
>     . . . .
>
> The later cases hold that an exercise of the court's superintending control may be justified in spite of the fact that a determination of the duty of the inferior court and the scope of the petitioner's rights may present difficult and close questions of law.[133]

¶527 A supervisory writ has been issued in numerous cases in which a ruling of a judge or a circuit court interpreting a statute was challenged as erroneous——even though the proper interpretation of the statute was not plain or raised a novel

---

[132] See State ex rel. Hustisford Light, Power & Mfg. Co. v. Grimm, 208 Wis. 366, 371, 243 N.W. 763 (1932).

[133] John D. Wickhem, The Power of Superintending Control of the Wisconsin Supreme Court, 1941 Wis. L. Rev. 153, 161, 164 (1941).

question——and either no appeal was permitted or appellate review would have come too late for effective redress.[134]

¶528 For example, in a recent case entitled <u>Madison Metropolitan School District v. Circuit Court</u>, 2011 WI 72, 336 Wis. 2d 95, 800 N.W.2d 442, the court of appeals transformed an appeal into a supervisory writ. The issue before the court of appeals was whether the circuit court had exceeded its authority by interpreting the applicable statutes as allowing a circuit court to direct a school district to provide a child with alternative educational services.[135]

¶529 The circuit court contended in <u>Madison Metropolitan School District</u> that the supervisory writ should be denied, arguing that "its duty was not plain, because it was faced with a novel question of law requiring harmonization of several statutory provisions."[136] In contrast, the school district argued that a supervisory writ should be granted because "the circuit court did not have authority, express or implied, to order" the school district to provide the child with alternative

---

[134] <u>See, e.g.,</u> <u>State ex rel. Ampco Metal, Inc. v. O'Neill</u>, 273 Wis. 530, 535, 78 N.W.2d 921 (1956); <u>Madison Metro. Sch. Dist. v. Circuit Court</u>, 2011 WI 72, 336 Wis. 2d 95, 800 N.W.2d 442.

[135] Article VII, Section 5(3) of the Wisconsin Constitution provides: "The appeals court may issue all writs necessary in aid of its jurisdiction and shall have supervisory authority over all actions and proceedings in the courts in the district."

[136] <u>Madison Metro. Sch. Dist.</u>, 336 Wis. 2d 95, ¶84.

educational services.[137]  The court of appeals sided with the school district, granting the writ.

¶530 This court spent 34 paragraphs (13 pages in the Wisconsin Reports) analyzing and interpreting the statutes at issue in order to determine the powers of the circuit court and school district.  Obviously, the meaning of the statutes was not plain; the case presented a novel issue of law.  Nevertheless, after a lengthy statutory analysis, this court affirmed the court of appeals decision granting the writ.

¶531 In deciding that a supervisory writ was warranted, the Madison Metropolitan School District court explained that "the circuit court's duty was plain:  to keep within the scope of its statutory authority."[138]  It then continued: "Because we have concluded that the circuit court's duty to keep within the bounds of its lawful authority was plain, its violation of that duty was clear when it ordered the District to provide educational resources . . . ."[139]

¶532 Notably, Kalal was never mentioned in the majority opinion in Madison Metropolitan School District, although the court was well aware of Kalal.  Kalal was argued in the briefs and in the dissent.

¶533 Madison Metropolitan School District and numerous other cases teach that Kalal does not mean that a supervisory

---

[137] Id., ¶84.

[138] Id.

[139] Id., ¶85.

writ cannot issue when a case presents a difficult or close question of law. Rather, Kalal is best understood as demonstrating that a reviewing court has discretion whether to issue a supervisory writ, even when the trial court or judge under review violated a plain legal duty. The reviewing court considers several factors and equitable principles in deciding whether to issue a supervisory writ.[140]

¶534 Indeed, in an opinion issued just one year before Kalal (and authored by then-Justice Sykes, who wrote Kalal), this court stated in no uncertain terms that a court's decision to issue a supervisory writ "is a discretionary determination that is reviewed for an erroneous exercise of that discretion."[141]

¶535 Thus, properly understood, Kalal involved a discretionary call. Kalal does not support the majority opinion's view that a supervisory writ cannot be issued when the legal issue presented is subject to reasonable debate.

¶536 If this court's interpretation of the applicable statutes differs from that of the John Doe judge (that is, if the John Doe judge misinterpreted the law), then the John Doe

---

[140] See, for example, the following cases explaining that the issuance of a supervisory writ involves the exercise of discretion:  Madison Metro. Sch. Dist., 336 Wis. 2d 95, ¶34; Kalal, 271 Wis. 2d at 649; State ex rel. Kurkierewicz v. Cannon, 42 Wis. 2d 368, 375, 166 N.W.2d 255 (1969); State ex rel. Dressler v. Circuit Court, 163 Wis. 2d 622, 630, 472 N.W.2d 532 (Ct. App. 1991).

[141] City of Madison v. DWD, 2003 WI 76, ¶10, 262 Wis. 2d 652, 664 N.W.2d 584.  See also majority op., ¶105.

judge erroneously exercised his discretion in issuing the January 10, 2014, order, and a supervisory writ is appropriate. Two examples illustrate this point.

¶537 Example 1.  If the John Doe judge's order was based on an erroneous view of Chapter 11 or the First Amendment but is not reviewed by this court, no further review occurs and both the Special Prosecutor and the public at large are deprived of the enforcement of statutes intended to protect the integrity of Wisconsin's elections.  This result amounts to a virtual nullification of a duly enacted law and imposes a serious hardship on the people of this state.

¶538 Example 2.  If the John Doe judge had ruled in favor of the Special Prosecutor and the John Doe proceedings continued, then unless a supervisory writ were available to the Unnamed Movants, they could not challenge the John Doe judge's ruling until criminal charges were filed.  Such a situation, Unnamed Movants 6 and 7 would surely claim, would impose a serious hardship on them.

¶539 In sum, a supervisory writ is the proper procedure for correcting a John Doe judge's erroneous application of the law when an appeal is not available or would come too late for effective redress.[142]  The majority opinion errs in holding otherwise.

---

[142] Dressler, 163 Wis. 2d at 630; State ex rel. Storer Broad. Co. v. Gorenstein, 131 Wis. 2d 342, 347, 388 N.W.2d 633 (Ct. App. 1986).

¶540 For the reasons set forth, I conclude that the court should decide whether the John Doe judge's January 10, 2014, order was based on a misinterpretation of Wisconsin's campaign finance statutes. Because I conclude that it was, I further conclude that the Special Prosecutor has met the criteria for the issuance of a supervisory writ. I would grant the writ petition.

¶541 Accordingly, I dissent.

**Nos. 2013AP2504-W through 2013AP2508-W: Supervisory Writ & Review  State of Wisconsin ex rel. Three Unnamed Petitioners v. Gregory A. Peterson, John Doe Judge; Gregory Potter, Chief Judge;[143] and Francis D. Schmitz, as Special Prosecutor**

¶542 In this third case, the final case in the John Doe trilogy, Unnamed Movants 2, 6, and 7 seek review of an opinion and order of the court of appeals that denied the three Unnamed Movants' petition for supervisory writs of mandamus and prohibition.  The respondents are the John Doe judge, the chief judges of the counties in which the cases are underway, and the Special Prosecutor.

¶543 In their petition to the court of appeals seeking supervisory writs, the three Unnamed Movants alleged, in relevant part, the following errors of law in the John Doe proceedings:

(1) The multi-county nature of the John Doe investigation is contrary to Wisconsin law.

(2) The John Doe judge had no authority to appoint the Special Prosecutor without satisfying the criteria set forth in Wis. Stat. § 978.045(1r).

(3) The John Doe Judge had no authority to appoint a special prosecutor to act in multiple counties.

¶544 These allegations raise multiple overlapping questions of law regarding the procedural validity of the Special Prosecutor's appointment, the competency of the Special

---

[143] What I refer to as "the third case" comprises five cases.  One of the defendants in each case is the chief judge of the county in which the case is pending.

79

Prosecutor to conduct the John Doe investigation, and the legitimacy of a multi-county John Doe investigation under Wisconsin law.

¶545 The court of appeals rejected the arguments of the three Unnamed Movants and denied their writ petition. The majority opinion affirms the court of appeals order denying the writ petition. The petition for review in this court did not raise all the issues raised before the court of appeals or all the issues this court raised in its December 16, 2014, order (attached hereto as Exhibit A). I agree with the majority opinion that the court of appeals order should be affirmed. I reach this result, however, using significantly different reasoning than the majority opinion.

¶546 The majority opinion concludes that the John Doe judge's obligation to "correctly find facts and apply the law is not the type of plain legal duty contemplated by the supervisory writ procedure . . . ."[144] Because the majority opinion determines that the three Unnamed Movants have failed to fulfill the plain legal duty criterion, it declares that they have failed to "satisfy the stringent preconditions for a supervisory writ."[145]

¶547 The majority opinion's discussion of the plain legal duty criterion is reminiscent of its analysis in the second case

---

[144] Majority op., ¶105.

[145] Majority op., ¶13.

80

in the John Doe trilogy.[146]  For the reasons set forth in my dissent in the second case in the John Doe trilogy (see ¶¶498-521, supra), I take issue with the majority opinion's explanation and application of the plain legal duty concept.  I will not repeat that discussion here.

¶548 I conclude that the court of appeals was required to interpret and apply the applicable law to determine whether the John Doe judge had violated a plain legal duty.  The court of appeals had discretion, however, whether to grant or deny the three Unnamed Movants' writ petition.

¶549 I consider whether the court of appeals properly exercised its discretion in denying the Unnamed Movants' writ petition by correctly interpreting and applying the applicable law.[147]  I decide the underlying legal questions faced by the court of appeals independently, but benefit from the court of appeals' analysis.[148]

---

[146] See majority op., ¶¶95-99 (discussing the plain legal duty issue presented in the second case within the John Doe trilogy), ¶107-132 (discussing the plain legal duty issues presented in the third case within the John Doe trilogy).

[147] The court of appeals has discretion whether to issue a supervisory writ.  If the court of appeals misinterpreted or misapplied applicable law, it erroneously exercised its discretion.  City of Madison v. DWD, 2003 WI 76, ¶10, 262 Wis. 2d 652, 664 N.W.2d 584.  See also majority op., ¶102-106 (setting forth the standard of review applicable to the instant supervisory writ case).

[148] City of Madison v. DWD, 2003 WI 76, ¶10, 262 Wis. 2d 652, 664 N.W.2d 584.

¶550 In determining that there were no procedural defects in the John Doe proceedings and thus that a supervisory writ was not warranted, the court of appeals relied on established case law, including State v. Cummings, 199 Wis. 2d 721, 546 N.W.2d 406 (1996); State v. Carlson, 2002 WI App 44, 250 Wis. 2d 562, 641 N.W.2d 451; State ex rel. Friedrich v. Circuit Court, 192 Wis. 2d 1, 531 N.W.2d 32 (1995); and State v. Bollig, 222 Wis. 2d 558, 587 N.W.2d 908 (Ct. App 1998)). These cases are persuasive.

¶551 I conclude that the court of appeals correctly decided the questions of law presented in the three Unnamed Movants' writ petition as follows:

(1)    The initiation of multiple, parallel John Doe proceedings related to a single criminal investigation is permitted under Wisconsin law. This is an effective and efficient way of proceeding.

(2)    The John Doe judge did not rely on Wis. Stat. § 978.045(1r) to appoint the Special Prosecutor. Rather, the John Doe judge made the appointment pursuant to inherent judicial authority. The John Doe judge had such authority regardless of whether the statutory conditions set forth in Wis. Stat. § 978.045(1r) were met. Case law makes clear that a John Doe judge's powers extend beyond the powers

82

conferred by statute to include all powers necessary to conduct the John Doe investigatory proceeding.[149]

(3) The John Doe judge issued five separate orders appointing the Special Prosecutor, one for each county's John Doe proceeding. The same prosecutor may serve multiple appointments in related proceedings. Thus, a John Doe judge may lawfully appoint the same special prosecutor to proceedings underway in several counties. This is an effective and efficient way of proceeding.

---

[149] See State ex rel. Individual Subpoenaed v. Davis, 2005 WI 70, ¶¶23, 26, 281 Wis. 2d 431, 697 N.W.2d 803 ("A John Doe judge's authority stems both from the statutes and from powers inherent to a judge. . . . A John Doe judge's powers are not, however, limited to those enumerated in Wis. Stat. § 968.26 [the John Doe statute]. . . . A John Doe judge's inherent authority stems from a John Doe judge's judicial office. . . . [A] John Doe judge's inherent power encompasses all powers necessary for the John Doe judge to 'carry out his or her responsibilities with respect to the proper conduct of John Doe proceedings.'" (quoted source omitted)); In re John Doe Proceeding, 2003 WI 30, ¶54, 260 Wis. 2d 653, 660 N.W.2d 260 ("A John Doe judge is also entitled to exercise the authority inherent in his or her judicial office."); State v. Cummings, 199 Wis. 2d 721, 736, 546 N.W.2d 406 (1996) ("A grant of jurisdiction by its very nature includes those powers necessary to fulfill the jurisdictional mandate.").

Although the legislature created John Doe proceedings, the separation of powers doctrine bars the legislature from "unduly burdening," "materially impairing," or "substantially interfering" with the inherent powers of the judicial branch, including the inherent powers of the John Doe judge in the instant cases. See State v. Holmes, 106 Wis. 2d 31, 68-69, 315 N.W.2d 703 (1982). See also majority op., ¶127, and Justice Prosser's concurrence, ¶¶208-210, 216, 239, both of which improperly allow the legislature to trump the inherent judicial powers of the John Doe judge.

(4)     Even if there were procedural errors in the Special Prosecutor's appointment (and I do not believe there were), the Special Prosecutor has competency to proceed.[150]

¶552 The court of appeals was not presented with argument regarding the procedural validity of the John Doe judge's appointment and the competency of the John Doe judge to conduct the John Doe proceedings.  That argument was, however, advanced in this court.  It is without merit, as the majority opinion makes clear.[151]

¶553 Because the court of appeals properly interpreted and applied the applicable law, I conclude that it did not erroneously exercise its discretion in denying the three Unnamed Movants' writ petition.  The court of appeals decision should be affirmed.

¶554 In closing, I note that even if this court determined that the John Doe proceedings were procedurally defective and

---

[150] Whether the Special Prosecutor is deprived of competency on account of a procedural defect in his appointment turns on whether the defect was "central" to the purpose of Wis. Stat. § § 978.045(1r) (setting forth conditions for the appointment of a special prosecutor).[150]  The court of appeals determined in In re Commitment of Bollig, 222 Wis. 2d 558, 571, 587 N.W.2d 908 (Ct. App. 1998), that the purpose of § 978.045(1r) is to control costs, as the State pays an appointed special prosecutor for work that would ordinarily be performed by a district attorney. It seems implausible to suggest that the costs the State has incurred on account of a single special prosecutor's appointment are substantial enough to render the alleged defect in the Special Prosecutor's appointment central to the cost-controlling objective of § 978.045(1r).

[151] See majority op., ¶¶108-113.

that a supervisory writ is warranted, only those Unnamed Movants who raised the objection before the John Doe judge may be entitled to any relief. If not raised, these objections were waived (forfeited). See Village of Trempealeau v. Mikrut, 2004 WI 79, ¶27, 273 Wis. 2d 76, 681 N.W.2d 190 (stating that "the common-law waiver [forfeiture] rule applies to challenges to the circuit court's competency" and explaining that a competency challenge is waived as a matter of right if raised for the first time on appeal); In re Commitment of Bollig, 222 Wis. 2d 558, 564, 587 N.W.2d 908 (Ct. App. 1998) (providing that a defect in the appointment of a special prosecutor is waived (forfeited) if raised for the first time on appeal).

¶555 For the reasons set forth, I write separately.

EXHIBIT A

OFFICE OF THE CLERK



# Supreme Court of Wisconsin

110 EAST MAIN STREET, SUITE 215
P.O. BOX 1688
MADISON, WI 53701-1688

TELEPHONE (608) 266-1880
FACSIMILE (608) 267-0640
Web Site: www.wicourts.gov

December 16, 2014

**To:**

Susan K. Raimer
Columbia County Clerk of Circuit Court
P.O. Box 587
Portage, WI 53901-2157

Lia Gust
Iowa County Clerk of Circuit Court
222 N. Iowa Street
Dodgeville, WI 53533

Carlo Esqueda
Dane County Clerk of Circuit Court
215 S. Hamilton St.
Madison, WI 53703

John Barrett
Milwaukee County Clerk of Circuit Court
901 N. 9th St., Rm. G-8
Milwaukee, WI 53233

Lynn M. Hron
Dodge County Clerk of Circuit Court
210 W. Center Street
Juneau, WI 53039

*Additional Parties listed on Pages 13-14

You are hereby notified that the Court has entered the following order:

| | | |
|---|---|---|
| Nos. | 2013AP2504-2508-W | Three Unnamed Petitioners v. Peterson |
| | | L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23 |
| | 2014AP296-OA | Two Unnamed Petitioners v. Peterson |
| | | L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11 |
| | 2014AP417-421-W | Schmitz v. Peterson |
| | | L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23 |

Pending before this court are petitions in three separate proceedings relating to John Doe proceedings that have been initiated in five counties: (1) a petition for review seeking review of a court of appeals' order of January 30, 2014 (Case Nos. 2013AP2504-2508-W[1]); (2) multiple

---

[1] Because John Doe case files had been opened in each of the five counties, five separate writ proceedings with five separate case numbers (Case Nos. 2013AP2504-2508-W) were opened in the court of appeals when the Three Unnamed Petitioners filed a petition for supervisory writ in the court of appeals. For purposes of this order, these five writ proceedings will be referenced as a single writ proceeding. The same holds true for the five writ proceedings with five separate case numbers (Case Nos. 2014AP417-421-W) that were opened in the court of appeals when the Special Prosecutor, Attorney Francis A. Schmitz, filed a subsequent petition for supervisory writ

1

Page 2
December 16, 2014

| Nos. | 2013AP2504-2508-W | Three Unnamed Petitioners v. Peterson |
|------|-------------------|----------------------------------------|
| | | L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23 |
| | 2014AP296-OA | Two Unnamed Petitioners v. Peterson |
| | | L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11 |
| | 2014AP417-421-W | Schmitz v. Peterson |
| | | L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23 |

petitions for bypass of the court of appeals in a supervisory writ proceeding filed in the court of appeals by Special Prosecutor Francis A. Schmitz (Case Nos. 2014AP417-421-W); and (3) a petition for leave to commence an original action filed by Two Unnamed Petitioners (Case No. 2014AP296-OA). Responses to each of these petitions as well as statements of additional authorities also have been filed in this court. In addition to multiple motions by various parties to seal various filings in this court, the Three Unnamed Petitioners in Case Nos. 2013AP2504-2508-W have filed a motion to add five individuals as respondents in this court.

The court having considered all of the foregoing,

IT IS ORDERED that the petition for review in Case Nos. 2013AP2504-2058-W is granted; the petitions to bypass the court of appeals in Case Nos. 2014AP417-421-W are granted and this court assumes jurisdiction over that action; and the petition for leave to commence an original action in Case No. 2014AP296-OA is granted and this court assumes jurisdiction over that action. These three proceedings shall be consolidated for purposes of briefing and oral argument in this court; and

IT IS FURTHER ORDERED that the parties' briefs shall address the following issues:

1. Whether the Director of State Courts had lawful authority to appoint reserve judge, Barbara Kluka, as the John Doe judge to preside over a multi-county John Doe proceeding.

2. Whether the Chief Judge of the First Judicial District had lawful authority to appoint reserve judge, Gregory A. Peterson, as the John Doe judge to preside over a multi-county John Doe proceeding.

3. Whether Wis. Stat. § 968.26 permits a John Doe judge to convene a John Doe proceeding over multiple counties, which is then coordinated by the district attorney of one of the counties.

4. Whether Wisconsin law allows a John Doe judge to appoint a special prosecutor to perform the functions of a district attorney in multiple counties in a John Doe proceeding when (a) the district attorney in each county requests the appointment; (b) but none of the nine grounds for appointing a special prosecutor under Wis. Stat. § 978.045(1r) apply; (c) no charges have yet been issued; (d) the district attorney in each county has not refused to continue the investigation or prosecution of any

in the court of appeals. For purposes of this order, these five writ proceedings will also be referenced as a single writ proceeding.

Page 3
December 16, 2014

Nos.    2013AP2504-2508-W    Three Unnamed Petitioners v. Peterson
                            L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
        2014AP296-OA        Two Unnamed Petitioners v. Peterson
                            L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
        2014AP417-421-W     Schmitz v. Peterson
                            L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

potential charge; and (e) no certification that no other prosecutorial unit was able to do the work for which the special prosecutor was sought was made to the Department of Administration.

5.  If, arguendo, there was a defect in the appointment of the special prosecutor in the John Doe proceedings at issue in these matters, what effect, if any, would that have on the competency of the special prosecutor to conduct the investigation; or the competency of the John Doe judge to conduct these proceedings? See, e.g., State v. Bollig, 222 Wis. 2d 558, 569-70, 587 N.W.2d 908 (Ct. App. 1998).

6.  Whether, with regard to recall elections, Wis. Stat. § 11.26(13m) affects a claim that alleged illegal coordination occurred during the circulation of recall petitions and/or resulting recall elections.

7.  Whether the statutory definitions of "contributions," "disbursements," and "political purposes" in Wis. Stat. §§ 11.01(6), (7) and (16) are limited to contributions or expenditures for express advocacy or whether they encompass the conduct of coordination between a candidate or a campaign committee and an independent organization that engages in issue advocacy. If they extend to issue advocacy coordination, what constitutes prohibited "coordination?"

    a.  Whether Wis. Stat. § 11.10(4) and § 11.06(4)(d) apply to any activity other than contributions or disbursements that are made for political purposes under Wis. Stat. § 11.01(16) by
        i.  The candidate's campaign committee; or
        ii. An independent political committee.

    b.  Whether Wis. Stat. § 11.10(4) operates to transform an independent organization engaged in issue advocacy into a "subcommittee" of a candidate's campaign committee if the independent advocacy organization has coordinated its issue advocacy with the candidate or the candidate's campaign committee.

    c.  Whether the campaign finance reporting requirements in Wis. Stat. ch. 11 apply to contributions or disbursements that are not made for political purposes, as defined by Wis. Stat. § 11.01(16).

    d.  Whether Wisconsin Coalition for Voter Participation, Inc. v. State Elections Bd., 231 Wis. 2d 670, 605 N.W.2d 654 (Ct. App), pet. for rev. denied, 231

3

Page 4
December 16, 2014
Nos.   2013AP2504-2508-W          Three Unnamed Petitioners v. Peterson
                                 L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
       2014AP296-OA              Two Unnamed Petitioners v. Peterson
                                 L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
       2014AP417-421-W           Schmitz v. Peterson
                                 L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

Wis. 2d 377, 607 N.W.2d 293 (1999), has application to the proceedings pending before this court.

8. Whether fundraising that is coordinated among a candidate or a candidate's campaign committee and independent advocacy organizations violates Wis. Stat. ch. 11.

9. Whether a criminal prosecution may, consistent with due process, be founded on a theory that coordinated issue advocacy constitutes a regulated "contribution" under Wis. Stat. ch. 11.

10. Whether the records in the John Doe proceedings provide a reasonable belief that Wisconsin law was violated by a campaign committee's coordination with independent advocacy organizations that engaged in express advocacy speech. If so, which records support such a reasonable belief?

11. If Wis. Stat. ch. 11 prohibits a candidate or a candidate's campaign committee from engaging in "coordination" with an independent advocacy organization that engages solely in issue advocacy, whether such prohibition violates the free speech provisions of the First Amendment to the United States Constitution and/or Article I, Section 3 of the Wisconsin Constitution.

12. Whether pursuant to Wis. Stat. ch. 11, a criminal prosecution may, consistent with due process, be founded on an allegation that a candidate or candidate committee "coordinated" with an independent advocacy organization's issue advocacy.

13. Whether the term "for political purposes" in Wis. Stat. § 11.01(16) is unconstitutionally vague unless it is limited to express advocacy to elect or defeat a clearly identified candidate?

14. Whether the affidavits underlying the warrants issued in the John Doe proceedings provided probable cause to believe that evidence of a criminal violation of Wis. Stat. §§ 11.27, 11.26(2)(a), 11.61(1), 939.31, and 939.05 would be found in the private dwellings and offices of the two individuals whose dwellings and offices were searched and from which their property was seized.; and

IT IS FURTHER ORDERED that within 40 days after the date of this order the Three Unnamed Petitioners in Case Nos. 2013AP2504-2508-W, the Two Unnamed Petitioners in Case No. 2014AP296-OA, and the Unnamed Movants in Case Nos. 2014AP417-421-W (collectively, the Unnamed Movants) must file a brief in this court; that within 30 days of filing Special Prosecutor Francis A. Schmitz, John Doe Judge Gregory A. Peterson, and Chief Judges Gregory

Page 5
December 16, 2014
Nos.   2013AP2504-2508-W     Three Unnamed Petitioners v. Peterson
                                  L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
           2014AP296-OA          Two Unnamed Petitioners v. Peterson
                                  L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
           2014AP417-421-W       Schmitz v. Peterson
                                  L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

Potter, James Daley, James Duvall and Jeffrey Kremers, must file either a response brief or a statement that no response brief will be filed; and that if a response brief is filed by Special Prosecutor Francis A. Schmitz, John Doe Judge Gregory A. Peterson, and/or Chief Judges Gregory Potter, James Daley, James Duvall and Jeffrey Kremers, within 10 days of filing the Unnamed Movants must file either a reply brief or a statement that no reply brief will be filed; and

IT IS FURTHER ORDERED that the portions of the opening brief(s) of the Unnamed Movants that are referenced in Wis. Stat. § (Rule) 809.19(1)(d), (e), and (f) shall not exceed 100 pages if a monospaced font is used or 22,000 words if a proportional serif font is used. The portions of the response brief(s) of Special Prosecutor Francis A. Schmitz, John Doe Judge Gregory A. Peterson, and Chief Judges Gregory Potter, James Daley, James Duvall and Jeffrey Kremers that are referenced in Wis. Stat. § (Rule) 809.19(1)(d), (e), and (f) shall not exceed 150 pages if a monospaced font is used or 33,000 words if a proportional serif font is used. Any reply brief(s) filed by the Unnamed Movants shall not exceed 26 pages if a monospaced font is used or 6,000 words if a proportional serif font is used; and

IT IS FURTHER ORDERED that the parties shall file their respective original briefs and 22 copies thereof under seal and the clerk of this court shall maintain all such briefs under seal, pending further order by this court. In addition, at the time of filing the original brief, the parties shall also file 17 redacted copies of each brief, in which matters that are covered by the secrecy orders entered by the John Doe Judge or that are otherwise confidential shall be redacted. The redacted copies shall initially be maintained under seal by the clerk of this court. Two copies of each redacted brief shall be served on all other parties to these proceedings, and all other parties shall have 20 days after the filing of the redacted copies to file a written objection to the redacted copy, which objects to either insufficient redaction or excessive redaction. Each such written objection must specify which words, sentences or paragraphs the objector either wants to be redacted or unredacted, and must provide reasons for each such objection. If no objections are received within the 20-day period, the clerk of this court will place a copy of the redacted version of the brief into the public court file on the third day following the expiration of the 20-day period. If an objection is received, the redacted versions shall remain under seal until such time as the court rules on the objection and issues a written order directing the clerk of this court to place a redacted version of the brief into the public court file; and

IT IS FURTHER ORDERED that the clerk of this court shall continue to maintain as sealed all previously filed documents in these proceedings that have been maintained or treated as sealed up to the date of this order, subject to the provisions of the following paragraph; and

IT IS FURTHER ORDERED that on or before February 27, 2015, each party that has previously filed in the court of appeals or in this court any document that has been maintained

5

Page 6
December 16, 2014

Nos.  2013AP2504-2508-W    Three Unnamed Petitioners v. Peterson
                           L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
       2014AP296-OA        Two Unnamed Petitioners v. Peterson
                           L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
       2014AP417-421-W     Schmitz v. Peterson
                           L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

under seal until the date of this order shall for each such document either file a written statement that the document may be placed into the public court file or file a redacted version of the document in which matters that are covered by the secrecy orders entered by the John Doe Judge or that are otherwise confidential shall be redacted. (This requirement does not apply to documents filed in the court of appeals in Case Nos. 2013AP2504-2508-W.) Each party shall serve on all other parties a copy of the statement that the document may be placed into the public court file or two copies of the redacted version of the previously filed document. All other parties shall have 20 days after the filing of the statement or redacted copies to file a written objection to the statement or the redacted copy, which objects to either insufficient redaction or excessive redaction. Each such written objection must specify which words, sentences or paragraphs the objector either wants to be redacted or unredacted, and must provide reasons for each such objection. If no objections are received within the 20-day period, the clerk of this court will place either the original previously filed document (in the case of a statement) or a copy of the redacted version of the previously filed document into the public court file on the third day following the expiration of the 20-day period. If an objection is received, the original document and the redacted versions shall remain under seal until such time as the court rules on the objection and issues a written order directing the clerk of this court to place the original or a redacted version of the previously filed document into the public court file; and

IT IS FURTHER ORDERED that in any brief filed in this court the parties shall not incorporate by reference any portion of any document filed either in the court of appeals or in this court; instead, any material in these documents upon which there is reliance should be restated in the brief filed in this court; and

IT IS FURTHER ORDERED that the first brief filed in this court must contain, as part of the appendix, a copy of the decision of the court of appeals in Case Nos. 2013AP2504-2508-W and the relevant written decisions and orders of the John Doe Judge; and

IT IS FURTHER ORDERED that within 30 days after the date of this order, each party must provide the clerk of this court with 10 copies of the brief previously filed on behalf of that party in the court of appeals in Case Nos. 2013AP2504-2508-W; and

IT IS FURTHER ORDERED that within 15 days of the date of this order the clerk of the Milwaukee County circuit court shall assemble the record in Case No. 2012JD23, identify by number each paper, and prepare a list of the numbered papers pursuant to the directives of Wis. Stat. § (Rule) 809.15. Also within 15 days of the date of this order the clerk of the Dane County circuit court shall assemble the record in Case No. 2013JD9, identify by number each paper, and prepare a list of the numbered papers pursuant to the directives of Wis. Stat. § (Rule) 809.15. As soon as the records have been assembled and the lists of numbered papers have been prepared, the clerks of each circuit court shall submit the lists to John Doe Judge Gregory A. Peterson for

Page 7
December 16, 2014
Nos.  2013AP2504-2508-W    <u>Three Unnamed Petitioners v. Peterson</u>
                                       L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
        2014AP296-OA              <u>Two Unnamed Petitioners v. Peterson</u>
                                       L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
        2014AP417-421-W           <u>Schmitz v. Peterson</u>
                                           L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

his review of the list with respect to whether each list contains any confidential information and for his approval. Within 20 days after the date of this order, the final version of the lists of numbered papers and the assembled records shall be transmitted by each circuit court clerk to the clerk of this court. There shall not be any opportunity for any party to inspect the record prior to their transmission to this court. When the lists of numbered papers have been approved by Judge Peterson, each clerk of the circuit court shall send a copy of that clerk's list of numbered papers to the persons listed on this order. The record in Milwaukee County Case No. 2012JD23 and the record in Dane County Case No. 2013D9 shall constitute the record for purposes of these proceedings in this court. This shall not alter the status of the papers in those records with respect to their confidentiality or change the ability of the Unnamed Movants, their counsel, or any other person to view any parts of the records; and

IT IS FURTHER ORDERED that the allowance of costs, if any, in connection with the granting of the petition will abide the decision of this court on review; and

IT IS FURTHER ORDERED that the motion to add five individuals as additional respondents in Case Nos. 2013AP2504-2508-W is denied; and

IT IS FURTHER ORDERED that the parties will be notified of the date, the time, and the procedures for oral argument in these matters in due course.

ANN WALSH BRADLEY, J., did not participate. <u>See</u> attached letter to counsel setting forth reasons for recusal.

¶1     SHIRLEY S. ABRAHAMSON, C.J. *(concurring)*. I join Justice Prosser's concurrence. In addition, I offer the following comments relating not only to the parties' interests in the order but to the public's rights and interests.

¶2     Most documents filed in the three cases have been under seal, not open to the public. Some documents have been disclosed to some of the participants but not to other participants. The court has never ruled on any of the several motions to seal the documents. Instead, the clerk of the Supreme Court has kept those filings under seal on the grounds that the motions to seal remain pending before this court.

¶3     The public should, to the extent possible, be given access to documents that are the bases of the cases, as well as to the briefs (and appendices) filed in this court, to the oral arguments, and to the opinion(s) of this court. The court's order does not give adequate consideration to the public nature of the parties' arguments and the opinion(s) of this court. These issues may be down the road a piece, but now is the time to think about the road we are constructing and where it will ultimately lead.

Page 8
December 16, 2014
Nos.  2013AP2504-2508-W          Three Unnamed Petitioners v. Peterson
                                L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
       2014AP296-OA             Two Unnamed Petitioners v. Peterson
                                L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
       2014AP417-421-W          Schmitz v. Peterson
                                L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23


¶4     More particularly the order is problematic in several respects, including the following:

1.      The order groups the array of participants into two constellations:  the eight
        unnamed participants on the one side (referred to in the order as "unnamed
        movants") and the special prosecutor, John Doe judge, and five chief judges on
        the other side.  Missing from the constellations are the five district attorneys who,
        in my opinion, should be made parties as requested.  The court order denies a
        "motion to add five individuals as additional respondents in Case Nos.
        2013AP2504-2508-W."  Aren't the district attorneys more involved in the John
        Doe proceedings than the chief judges?

        Furthermore, the persons in each of these two constellations are not
        necessarily involved in all three cases and their interests may not be aligned.  On
        the unnamed participants' side, it is possible, perhaps probable, that the court will
        get eight separate briefs-in-chief, each at least 100 pages.  Each of the several
        response briefs may be 150 pages.  Then there are reply briefs.  Conceivably each
        of the parties can have a different take on each of the 14 enumerated issues (plus
        the subparts).  The array of issues that may be presented in the massive briefs
        filed is staggering.

2.      The court's order consolidates the three cases only for purposes of briefing and
        argument.  The court's order does not change the burden of proof (the burden of
        going forward with the evidence and the burden of persuasion) for each issue in
        each of the three cases.  The several cases might impose different burdens on each
        party for the same issue.  To assist the court, I would ask each party to clearly
        state the issue (and the case in which it arises) that the party is addressing and the
        standard of review and the burden of proof for that issue.

3.      Assembling and transmitting the appellate record in the three cases presents an
        especially thorny set of problems because most documents filed in this court or
        the court of appeals were accepted under seal.

        Ordinarily, briefing does not begin here until a circuit court record is
        assembled and transmitted to this court.  The circuit court record from only two of
        the five counties will come up to this court, and these records remain subject to
        the secrecy orders entered by the John Doe judge.  The John Doe judges' secrecy
        orders are themselves sealed.  Thus many of the documents in the circuit court
        record will be unavailable to the unnamed participants, their counsel, and any
        other person.

Page 9
December 16, 2014
Nos. 2013AP2504-2508-W    Three Unnamed Petitioners v. Peterson
                          L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
     2014AP296-OA         Two Unnamed Petitioners v. Peterson
                          L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
     2014AP417-421-W      Schmitz v. Peterson
                          L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

And although, according to the court's order, the appellate filings in the court of appeals and in this court must be made available to the public and the unnamed participants to the extent allowed by the John Doe secrecy orders, it is safe to assume that these filings will be heavily redacted, with many pages entirely withheld. It is also safe to assume that there will be disputes about which appellate filings should and should not remain secret.

For example, the court's order appears to assume that the same secrecy orders that applied to proceedings and filings before the John Doe judge should apply to appellate proceedings and filings in this court. Is such an assumption justified?

These kinds of informational difficulties and discrepancies may be endemic to appellate review of John Doe proceedings, but the court's order does not adequately deal with them. The order provides a briefing schedule that might end before agreement on the redaction of the sealed appellate filings is reached.

It will be difficult, for example, for the unnamed participants to discuss whether the affidavits underlying the warrants issued in the John Doe proceedings were legally sufficient when the unnamed participants are unable to see the affidavits themselves. See Order, Issue No. 14.

4.    With respect to Issue No. 14 enumerated in the order, I would ask the parties to address whether the probable cause standard is different for search warrants and subpoenas in John Doe proceedings than it is for search warrants and subpoenas in other contexts. See In re Doe Proceeding Commenced by Affidavit Dated July 25, 2001, 2004 WI 149, 277 Wis. 2d 75, 689 N.W.2d 908 (relating to the probable cause standard for subpoenas in John Doe proceedings); State v. Washington, 83 Wis. 2d 808, 843-45, 266 N.W.2d 597 (1978) (same); cf. United States v. R. Enters., Inc., 498 U.S. 292, 297-302 (1991) (relating to the probable cause standard for subpoenas in a federal grand jury proceeding).

5.    One of the three cases the court is accepting is an original action. A petition for an original action, by its nature, might not initially have a record connected with it. If a petition for an original action has no statement or stipulation of facts, this court ordinarily directs the parties (or appoints a master) to submit a stipulation of facts and a list of factual issues on which the parties cannot agree.

The inherent factual and legal complications in this case provide all the more reason for this court to follow its standard practice here regarding a

9

Page 10
December 16, 2014
Nos.   2013AP2504-2508-W       Three Unnamed Petitioners v. Peterson
                              L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
       2014AP296-OA           Two Unnamed Petitioners v. Peterson
                              L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
       2014AP417-421-W        Schmitz v. Peterson
                              L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

statement of facts. See Supreme Court Internal Operating Procedures, II.B.3. (The Supreme Court generally will not exercise its original jurisdiction in matters involving contested issues of fact.)

The court's failure to follow its standard practice regarding a statement of facts in the instant original action portends difficulties down the road.

6.    This court's role is to decide questions of law, not facts, and thus this court may not supply findings of fact that the John Doe judge did not make.

Specific facts are essential to resolve the complex legal issues presented. One set of facts needed is a description of the advocacy at issue. These facts are needed, for example, to determine whether the advocacy was issue advocacy or express advocacy.

Furthermore, this court is to decide whether, and if so, how, the unnamed participants "coordinated" with any campaign committees; whether the "coordination" violates the Wisconsin campaign finance laws; and if so, whether those campaign finance laws comply with the mandates of the federal and state constitutions. The Seventh Circuit Court of Appeals commented: "The [United States] Supreme Court has yet to determine what 'coordination' means." O'Keefe v. Chisholm, 769 F.3d 936, 941 (7th Cir. 2014).

How can this court resolve these legal issues without knowing what types and levels of "coordination" occurred? Without facts relating to what the unnamed participants and any campaign committees did, the court will be left to decide important and complex legal issues in a vacuum. The court cannot fill in the record with its own factual assumptions and hypotheticals.

The Seventh Circuit Court of Appeals commented that the "claim to constitutional protection for raising funds to engage in issue advocacy coordinated with a politician's campaign committee has not been established 'beyond debate.' To the contrary, there is a lively debate among judges and academic analysts. No opinion issued by the [United States] Supreme Court, or by any court of appeals, establishes ('clearly' or otherwise) that the First Amendment forbids regulation of coordination between campaign committees and issue-advocacy groups——let alone that the First Amendment forbids even an inquiry into that topic." O'Keefe, 769 F. 3d at 942 (emphasis in original).

10

Page 11
December 16, 2014

Nos.  2013AP2504-2508-W    Three Unnamed Petitioners v. Peterson
                          L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
      2014AP296-OA        Two Unnamed Petitioners v. Peterson
                          L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
      2014AP417-421-W     Schmitz v. Peterson
                          L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23


Here this court is being asked to decide these very complex issues with few, if any, settled facts and with the investigatory inquiry not having proceeded beyond a preliminary stage.

7. The court's order refers to independent organizations without using quotation marks around the word "independent." The Seventh Circuit Court of Appeals has cautioned that the word "independent" should be considered as being in quotation marks at all times "because the prosecutor suspected that the group's independence is ostensible rather than real." O'Keefe, 769 F.3d at 937.

8. The order directs that the record in Milwaukee and Dane counties, rather than the record in all five counties involved in the John Doe proceedings, be assembled and transmitted to this court. The court is not certain that the records filed only in these two counties contain all the documents that were filed in the other three counties. Yet the court is deeming the records of two counties to be the entire record upon which this court might base a decision.

9. The phrasing of some of the issues is not as neutral as I might prefer. Some of the issues are taken from a party's filings, and a party often writes a question in a way to stimulate a favorable response from the court. Moreover, the phrasing of some issues rests on unproven assumptions or on assumptions with which some parties agree and others do not. The parties should point out in their briefs any problems with the questions posed and any assumptions with which the party disagrees. The court intends, in my opinion, that its statement of the issues be neutral; the court does not, in my opinion, intend to accept any party's unproved assumptions.

¶5    For the reasons set forth, I join Justice Prosser's concurrence and provide these additional considerations.

¶6    DAVID T. PROSSER, J. *(concurring)*. I support the court's decision to grant the petitions in all three proceedings. I do not agree with the court's decision to "consolidate" "these three proceedings" "for purposes of briefing and oral argument."

¶7    These matters are important to the people of Wisconsin. They require the court's best effort and they require the best effort of all counsel. The present order is so complex that it makes "best effort" by anyone nearly impossible.

¶8    In my view, the court should divide the multiple issues into at least two separate cases, one relating to questions of procedure, including appointment of the John Doe special prosecutor, and one relating to the interpretation and constitutionality of campaign finance

11

Page 12
December 16, 2014
Nos.    2013AP2504-2508-W    Three Unnamed Petitioners v. Peterson
                            L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
        2014AP296-OA        Two Unnamed Petitioners v. Peterson
                            L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
        2014AP417-421-W     Schmitz v. Peterson
                            L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23


statutes.  The court should hear argument in these cases on different days, so that interested parties will have sufficient time to argue their positions and the court will have sufficient time to digest the information presented.

¶9      As I understand the order, each "Unnamed Movant" is entitled to file a separate opening brief and a separate reply brief.  The court realizes that the multiple Unnamed Movants are not indistinguishable and may not always be aligned.  Given the nature of the case, this court is in no position to compel "coordination" in terms of how many briefs will be filed, who will argue specific issues, and what the arguments will be.  Even the apportionment of time for argument may be contested.

¶10     There are significant issues involving the "facts" upon which the parties and this court may rely, i.e., the "record" and its completeness as well as the enormous problem of sealed documents.  The order contemplates that disputes relating to redaction of unsealed documents will be decided by this court without providing a blueprint of how or when the court will discharge this responsibility.

¶11     The order presumes that none of the above-stated problems will cause delay.  I do not retreat from my decision to grant the petitions, but I think the court is making a mistake in its failure to assist counsel by addressing and ameliorating some of the problems inherent in the order.

¶12     For the foregoing reasons, I respectfully concur.

¶13     I am authorized to state that CHIEF JUSTICE SHIRLEY S. ABRAHAMSON joins this concurrence.

Diane M. Fremgen
Clerk of Supreme Court

12

Page 13
December 16, 2014

| Nos. | 2013AP2504-2508-W | Three Unnamed Petitioners v. Peterson |
|---|---|---|
| | | L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23 |
| | 2014AP296-OA | Two Unnamed Petitioners v. Peterson |
| | | L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11 |
| | 2014AP417-421-W | Schmitz v. Peterson |
| | | L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23 |

*Additional Parties:

Hon. Gregory A. Peterson
Reserve Judge

Matthew W. O'Neill/ Diane Slomowitz
Fox O'Neill Shannon
622 N. Water Street, Suite 500
Milwaukee, WI 53202

David C. Rice
Asst. Attorney General
P.O. Box 7857
Madison, WI 53707-7857

Francis D. Schmitz
P.O. Box 2143
Milwaukee, WI 53201-2143

Dean A. Strang
StrangBradley, LLC
10 E. Doty Street, Suite 1002
Madison, WI 53703

J.B. Van Hollen
Wisconsin Attorney General
P.O. Box 7857
Madison, WI 53707-7857

Todd P. Graves/ Edward D. Greim
Graves Garrett LLC
1100 Main Street, Suite 2700
Kansas City, MO 64105

Michael J. Bresnick/ Edward H. Meyers
Philip J. O'Beirne/ Julie O'Sullivan
1100 Connecticut Ave., NW
Washington, DC 20036

Directors Office
Director of State Courts
P.O. Box 1688
Madison, WI 53701-1688

Dennis P. Coffey
Mawicke & Goisman, SC
1509 N. Prospect Ave.
Milwaukee, WI 53202-2323

Steven M. Biskupic
Biskupic & Jacobs, S.C.
1045 W. Glen Oaks Lane, Ste. 106
Mequon, WI 53092

Sean O'Donnell Bosack
Godfrey & Kahn, S.C.
780 N. Water St., Ste. 700
Milwaukee, WI 53202-3512

Timothy M. Hansen
Hansen Reynolds Dickinson Crueger LLC
316 N. Milwaukee St., Ste. 200
Milwaukee, WI 53202-5885

Jeffrey James Morgan
LeBell, Dobrowski & Morgan, LLP
309 N. Water St., Suite 350
Milwaukee, WI 53202

Scot Ross
One Wisconsin Now
152 W. Johnson Street, Suite 214
Madison, WI 53703

Page 14
December 16, 2014
Nos.   2013AP2504-2508-W      Three Unnamed Petitioners v. Peterson
                             L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
      2014AP296-OA            Two Unnamed Petitioners v. Peterson
                             L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
      2014AP417-421-W         Schmitz v. Peterson
                             L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23


Hon. Gregory Potter                     Hon. James Duvall
Wood County Courthouse                  Buffalo County Courthouse
P.O. Box 8095                           P.O. Box 68
Wisconsin Rapids, WI 54494              Alma, WI 54610-0068

Hon. James P. Daley                     Hon. Jeffrey Kremers
Rock County Courthouse                  Milwaukee County Courthouse
51 S. Main Street                       901 N. 9th St.
Janesville, WI 53545-3951               Milwaukee, WI 53233

Page 15
December 16, 2014

Nos.   2013AP2504-2508-W   <u>Three Unnamed Petitioners v. Peterson</u>
                           L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
       2014AP296-OA        <u>Two Unnamed Petitioners v. Peterson</u>
                           L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
       2014AP417-421-W     <u>Schmitz v. Peterson</u>
                           L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23



CHAMBERS OF
LYNN WALSH BRADLEY, JUSTICE

SUPREME COURT
STATE OF WISCONSIN
STATE CAPITOL
P. O. BOX 1688
MADISON, WISCONSIN 53701

December 15, 2014

(608) 266-1888

Dennis P. Coffey
Mawicke & Goisman, SC
1509 N. Prospect Ave.
Milwaukee, WI 53202-2323

Diane Slomowitz/ Matthew W. O'Neill
Fox, O'Neill & Shannon, S.C.
622 N. Water St., Ste. 500
Milwaukee, WI 53202-4978

Dean A. Strang
StrangBradley, LLC
10 East Doty Street, Ste. 1002
Madison, WI 53703

Steven M. Biskupic
Biskupic & Jacobs, S.C.
1045 W. Glen Oaks Lane, Ste. 106
Mequon, WI 53092

Jeffrey James Morgan
LeBell, Dobrowski & Morgan, LLP
309 N. Water St., Ste. 350
Milwaukee, WI 53202

Sean O'Donnell Bosack
Godfrey & Kahn, S.C.
780 N. Water Street, Ste. 700
Milwaukee, WI 53202-3512

Timothy M. Hansen
Hansen Reynolds Dickinson Crueger, LLC
316 N. Milwaukee St., Ste. 200
Milwaukee, WI 53202-5885

David C. Rice
Asst. Attorney General
P.O. Box 7857
Madison, WI 53707-7857

Francis D. Schmitz
P.O. Box 2143
Milwaukee, WI 53201-2143

John B. Van Hollen
Wisconsin Attorney General
P.O. Box 7857
Madison, WI 53707-7857

Directors Office
Director of State Courts
P.O. Box 1688
Madison, WI 53701-1688

Scot Ross
One Wisconsin Now
152 W. Johnson St., Ste. 214
Madison, WI 53707

Re:   Nos. 2014AP417-W – 2014AP421-W
      State of Wisconsin ex rel. Francis D. Schmitz v. The Hon. Gregory A. Peterson,
      John Doe Judge, Eight Unnamed Movants, and Interested Party

Dear Counsel:

      Unnamed movants have filed three petitions to bypass in the above-captioned case.
Listed as one of the attorneys who is representing a movant is Attorney Dean Strang. My son,

15

Page 16
December 16, 2014
Nos.   2013AP2504-2508-W     Three Unnamed Petitioners v. Peterson
                                 L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
         2014AP296-OA          Two Unnamed Petitioners v. Peterson
                                 L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
         2014AP417-421-W      Schmitz v. Peterson
                                 L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

John Bradley, practices law with Attorney Strang.

I have been advised that John has had no involvement with this petition to bypass and will not have any involvement with it. He is not acting as a lawyer in this proceeding. It is my understanding that any fee agreement is on an hourly basis and not on the basis of a contingent fee.

Under these facts and circumstances the question of recusal comes to the fore. It is not an easy decision. I am mindful that judicial impartiality is a basic premise of our jurisprudence, and it is the responsibility of a judge to protect the integrity and dignity of the judicial process from the appearance of partiality as well as from actual bias.

In response to an issue of recusal, there is a natural tendency for judges to say "I can be fair and impartial." But that is not the test. After all, the judge in the seminal recusal case of Caperton v. A.T. Massey Coal Co., 566 U.S. 868 (2009), three times proclaimed that he could be fair and impartial in response to as many motions for recusal. Nevertheless, the United States Supreme Court held that the Due Process Clause of the United States Constitution required that he not participate in the case.[1]

The Court made clear that a judge's self-proclaimed fairness does not resolve the recusal inquiry. Such a subjective response is but one step in the analysis. Due process mandates the application of an objective standard which "may also require recusal whether or not actual bias exists or can be proved." Id. at 886.

In reaching my decision on recusal, I have examined the Wisconsin Code of Judicial Conduct, Wis. Stat. § 757.19, Wisconsin Judicial Conduct Advisory Committee Opinion 00-1, other state and national ethics opinions, commentaries on judicial ethics, and relevant case law. I have also consulted with the Executive Director of the Wisconsin Judicial Commission.

Even though I subjectively believe that I could be fair and impartial in this case, I nevertheless determine that recusal is required here. Due process requires not only a consideration of fairness, but also the appearance of fairness. Siefert v. Alexander, 608 F.3d 974, 985 (7th Cir. 2010). "To perform its high function in the best way, justice must satisfy the appearance of justice." Id. (quoting In re Murchison, 349 U.S. 133, 136 (1955). In applying the objective standard mandated by due process, I conclude that under the facts and circumstances "reasonable, well-informed persons knowledgeable about judicial ethics standards and the justice

---

[1] The recusal issue in Caperton involved campaign contributions and expenditures in a judicial election. The recusal issue I address involves a lawyer relative who is a member of the firm appearing before the court. An objective standard implementing the Due Process Clause applies to both. Caperton v. A.T. Massey Coal Co., 566 U.S. 868, 883 (2009).

Caperton makes clear that not every contribution or expenditure requires recusal. Id. at 884 ("The inquiry [regarding recusal] centers on the contribution's relative size in comparison to the total amount of money contributed to the campaign, the total amount spent in the election, and the apparent effect such contribution had on the outcome of the election.")

Page 17
December 16, 2014
Nos.    2013AP2504-2508-W     Three Unnamed Petitioners v. Peterson
                             L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
        2014AP296-OA          Two Unnamed Petitioners v. Peterson
                             L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
        2014AP417-421-W       Schmitz v. Peterson
                             L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

system and aware of the facts and circumstances" could reasonably question a judge's ability to be impartial. SCR 60.04 (4).

The Wisconsin Code of Judicial Conduct takes a case-by-case approach to the question whether a judge can participate in a case when a law firm with which a family member is affiliated as an attorney appears but the relative is not involved in the case. See Comment to SCR 60.04 (4) (e).

SCR 60.04(4) specifically provides:

(4) Except as provided in sub. (6) for waiver, a judge shall recuse himself or herself in a proceeding when the facts and circumstances the judge knows or reasonably should know establish one of the following or when reasonable, well-informed persons knowledgeable about judicial ethics standards and the justice system and aware of the facts and circumstances the judge knows or reasonably should know would reasonably question the judge's ability to be impartial: . . .

(e) The judge or the judge's spouse, or a person within a third degree of kinship to either of them, or the spouse of such a person meets one of the following criteria:

1. Is a party to the proceeding or an officer, director or trustee of a party.
2. Is acting as a lawyer in the proceeding.
3. Is known by the judge to have more than a de minimus interest that could be substantially affected by the proceeding.
4. Is to the judge's knowledge likely to be a material witness in the proceeding.

The comment to the rule sheds further light on how the rule is to be interpreted and applied. It states:

Comment: The fact that a lawyer in a proceeding is affiliated with a law firm with which a relative of the judge is affiliated does not of itself require the judge's recusal. Under appropriate circumstances, the fact that the judge's impartiality may reasonably be questioned or that the relative is known by the judge to have an interest in the law firm that could be "substantially affected by the outcome of the proceeding" may require the judge's recusal.

None of the provisions that mandate recusal applies here. My son is neither a party nor a witness. Additionally, the facts indicate that he is not acting as a lawyer in the proceeding and because the fee agreement is not contingent, any interest that he may have is not "substantially affected by the outcome of the proceeding."

Nevertheless, a judge is to avoid even the appearance of partiality. Wisconsin Judicial Conduct Advisory Committee Opinion 00-1 lists factors to consider in making a recusal decision involving a lawyer relative. Those factors include: (a) the appearance to the general public of the failure to recuse; and (b) the appearance to other attorneys, judges and members of the legal system of the failure to recuse.

Page 18
December 16, 2014
Nos.  2013AP2504-2508-W    Three Unnamed Petitioners v. Peterson
                          L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
       2014AP296-OA        Two Unnamed Petitioners v. Peterson
                          L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
       2014AP417-421-W     Schmitz v. Peterson
                          L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

Other states have considered additional factors that include: The nature of the action (Tennessee Advisory Opinion 04-1); whether the relative's name appears in the firm name (Colorado Advisory Opinion 05-2); the size of the firm (Colorado Advisory Opinion 05-2, Illinois Advisory Opinion 94-18, Tennessee Advisory Opinion 04-1, Washington Advisory Opinion 88-12); whether the fee in the case is contingent or hourly (Tennessee Advisory Opinion 04-1); and whether the relative's position is as associate, partner, shareholder, or of counsel (Colorado Advisory Opinion 05-2; Illinois Advisory Opinion 94-18; Washington Advisory Opinion 88-12).

This court has been subject to extensive criticism for its recusal rules and practices. Weak recusal rules and lapses in recusal practices undermine the public trust and confidence in a fair and impartial judiciary.

We have an obligation, and the public has a right, to hold judges to high ethical standards. Judicial integrity lies at the heart of the public's respect for judicial decisions and their legitimacy.

Therefore, for the reasons set forth above, I am not participating in the petitions to bypass.

Respectfully,

Ann Walsh Bradley, Justice

EXHIBIT B



OFFICE OF THE CLERK

## Supreme Court of Wisconsin

110 EAST MAIN STREET, SUITE 215
P.O. BOX 1688
MADISON, WI 53701-1688

TELEPHONE (608) 266-1880
FACSIMILE (608) 267-0640
Web Site: www.wicourts.gov

March 27, 2015

To:

Susan K. Raimer
Columbia County Clerk of Circuit Court
P.O. Box 587
Portage, WI 53901-2157

Carlo Esqueda
Dane County Clerk of Circuit Court
215 S. Hamilton St.
Madison, WI 53703

Lynn M. Hron
Dodge County Clerk of Circuit Court
210 W. Center Street
Juneau, WI 53039

Lia Gust
Iowa County Clerk of Circuit Court
222 N. Iowa Street
Dodgeville, WI 53533

John Barrett
Milwaukee County Clerk of Circuit Court
901 N. 9th St., Rm. G-8
Milwaukee, WI 53233

*Additional Parties listed on Pages 13-14

You are hereby notified that the Court has entered the following order:

| Nos. | 2013AP2504-2508-W | Three Unnamed Petitioners v. Peterson |
| | | L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23 |
| | 2014AP296-OA | Two Unnamed Petitioners v. Peterson |
| | | L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11 |
| | 2014AP417-421-W | Schmitz v. Peterson |
| | | L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23 |

This court has before it the parties' Joint Report on Oral Argument, filed March 11, 2015. The parties filed this report consistent with this court's March 4, 2015 order, which noted the unprecedented substantive, procedural, and logistical issues that the presentation of oral argument in this case presents.

In their Joint Report, the parties disagree on a variety of points. Most fundamentally, the parties disagree as to whether this court should hold oral argument at all. The Unnamed Movants state that, "based on the clarity of the legal issues presented" and the concern that oral argument "may be unworkable in light of the potential difficulties raised by the legitimate

19

Page 2
March 27, 2015
Nos.   2013AP2504-2508-W     Three Unnamed Petitioners v. Peterson
                                         L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
          2014AP296-OA             Two Unnamed Petitioners v. Peterson
                                         L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
          2014AP417-421-W         Schmitz v. Peterson
                                         L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

privacy concerns of the parties, uncharged individuals[,] and groups subject to an ongoing investigation," the Unnamed Movants "do not object to submitting the entire case on briefs, and foregoing oral argument altogether." In contrast, the special prosecutor maintains that oral argument will not infringe on privacy concerns at this point and asserts that oral argument is required on all issues. John Doe Judge Gregory Peterson and Chief Judges Gregory Potter, James Daley, James Duvall, and Jeffrey Kremers (collectively, the "respondent judges") anticipate orally arguing the five issues regarding John Doe procedure identified by this court in its December 16, 2014 order.

The parties also disagree as to how oral argument should be conducted, if held. The Unnamed Movants suggest that the courtroom should remain open during oral argument, provided that the Unnamed Movants are referred to only as the unnamed clients of their respective attorneys or by the identifying numbers the Unnamed Movants have used throughout briefing (e.g., Unnamed Movant #1, #2, etc.), and provided that the court employs an objection procedure by which attorneys may object when a Justice or a party refers to confidential information. The special prosecutor also suggests that the courtroom should remain open during oral argument. However, the special prosecutor maintains that there is no need for anonymity "because of the widespread public disclosure of the facts of this investigation over the last year by at least one Movant in national periodicals, on the Internet and in a federal lawsuit." Alternatively, the special prosecutor argues that if anonymity is necessary, then the parties should be referenced in oral argument by a pre-arranged set of pseudonyms. If the court does not approve the use of pseudonyms, then the special prosecutor suggests that the courtroom should be closed during his recitation of the facts, with a video recording and transcript of that portion of the argument to be later released to the public with identifying information removed. The respondent judges do not state a position as to whether the courtroom should be open or closed during oral argument.

As to the broadcast of the oral argument, the Unnamed Movants state in the Joint Report that Wisconsin Eye should broadcast the oral argument on a delay that would permit the court to hear and decide any objection to the disclosure of any confidential information and would then allow Wisconsin Eye to redact any portion of the argument to which the court sustained an objection. However, the Unnamed Movants have subsequently written the court to state that, after further consultation with Wisconsin Eye, this proposal was not technologically feasible, and Wisconsin Eye would need to broadcast the oral argument without a broadcast delay. Thus, there would be no limitation on what would be broadcast. Neither the special prosecutor nor the respondent judges state a specific position regarding the broadcast of the oral argument.

Upon consideration of all of the parties' positions, and bearing in mind the very unique nature of this case, we conclude that it is neither legally nor practically possible to hold oral argument. The prospect of oral argument creates severe tension between important and

20

Page 3
March 27, 2015
Nos.  2013AP2504-2508-W    <u>Three Unnamed Petitioners v. Peterson</u>
                                   L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
             2014AP296-OA          <u>Two Unnamed Petitioners v. Peterson</u>
                                   L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
             2014AP417-421-W       <u>Schmitz v. Peterson</u>
                                     L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

conflicting priorities. On the one hand, the court is strongly adverse to the idea of closing the courtroom to the public; our long tradition is to render public decisions based on public arguments, both oral and written. On the other hand, we must uphold the John Doe secrecy orders, from which no party has appealed and which protect a vast amount of information from disclosure, including the John Doe docket and activity records, John Doe filings, process issued by the John Doe judge, and all other matters observed or heard in the John Doe proceeding. There are important reasons justifying the secrecy afforded John Doe materials, including ensuring that evidence and witnesses remain uncorrupted and preventing testimony which may be mistaken or untrue from becoming public. See <u>Wisconsin Family Counseling Services, Inc. v. State</u>, 95 Wis. 2d 670, 677, 291 N.W.2d 631 (Ct. App. 1980). Perhaps inevitably, the briefs received thus far often intertwine non-confidential information with confidential information. Although it is feasible for such confidential information to be redacted from written arguments (and we ordered the parties to do so in our December 16, 2014 order), it is much more difficult to protect the confidentiality of information covered by the secrecy orders during the give-and-take of oral argument. The parties have not provided us with a workable procedure by which to do so.

We therefore will decide this matter on briefs, without oral argument. Pursuant to the redaction process set forth in our December 16, 2014 order and further explained in a separate order issued on today's date, the parties' briefs will, in the near future, become publicly available in redacted form so as to allow as much public access to the parties' arguments as the John Doe secrecy orders permit. In this unique situation, this is the best way we can achieve transparency in the handling of these matters while the underlying John Doe investigation remains pending.

IT IS ORDERED that that this matter shall be removed from the court's April oral argument calendar and submitted to the court on the merits of the parties' written briefs.

ANN WALSH BRADLEY, J., did not participate.

¶1    SHIRLEY S. ABRAHAMSON, C.J. *(dissenting)*. Today the court takes the rare, perhaps unprecedented, step of canceling oral argument for three cases, all of which relate to a single John Doe investigation.[1]

---

[1] Alongside its order canceling oral argument, the court is releasing two other orders in the instant cases. One requires redaction of all information subject to a John Doe secrecy order. The other denies a newspaper's motion to intervene for the purpose of presenting argument on the issue of public access to these proceedings. I discuss the other two orders in my dissents to those orders. However, the issues presented in this trio of orders are interrelated and overlapping. For a full picture of the important public interests at stake, my dissents in all three orders should be read together.

Page 4
March 27, 2015
Nos.    2013AP2504-2508-W      Three Unnamed Petitioners v. Peterson
                              L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
        2014AP296-OA          Two Unnamed Petitioners v. Peterson
                              L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
        2014AP417-421-W       Schmitz v. Peterson
                              L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23


¶2    There is nothing inherently unfair or unconstitutional about deciding a case on briefs, that is, without oral argument. Here, however, the court's order canceling oral argument is not a routine decision to decide a case on briefs—it is part of a broader pattern of excluding the public from the John Doe cases under review.

¶3    The court's order is long on summarizing the parties' positions regarding oral argument but short on setting forth the court's own reasoning for canceling oral argument. The court regurgitates much of the parties' joint report on oral argument before concluding that "it is neither legally nor practically possible to hold argument. . . . The parties have not provided us with a workable procedure. . . ." (Emphasis added.) These two sentences are the entire explanation this court offers to the parties and the public. The court's failure to provide further justification for its highly unusual decision to cancel oral argument is, in my view, alarming.

¶4    The parties' joint response to the court's request for input on the manner in which oral argument should be conducted is admittedly complex and, unfortunately, not very helpful. The unnamed movants express concern that oral argument "may be unworkable in light of the potential difficulties raised by the legitimate privacy concerns of the parties, uncharged individuals[,] and groups subject to an ongoing investigation." The report includes requests for the court to hold oral argument and not to hold oral argument; to open the courtroom and to close the courtroom; and to refer to the parties by their names, by their attorneys' names, by numbers, and by pseudonyms.

¶5    This snarl of competing and conflicting requests is the result of the court's decision to review (prematurely, in my opinion) an ongoing secret John Doe investigation and to consolidate diverse cases with different parties for oral argument and briefing.

¶6    Nevertheless, if federal courts can manage to maintain public oral argument and access to briefs in cases implicating serious national security concerns,[2] then surely this court can manage oral argument in the three John Doe cases before us. "Briefs in the Pentagon Papers case and the hydrogen bomb plans case were [made] available to the press, although sealed appendices discussed in detail the documents for which protection was sought. The court denied a motion to close part of the oral argument in the Pentagon Papers case."[3]

¶7    Although it would not be free from difficulty, oral argument is legally and practically possible in the instant cases. Accordingly, I would hold oral argument as scheduled.

---

[2] See Krynicki v. Falk, 983 F.2d 74, 76 (7th Cir. 1992).

[3] Krynicki v. Falk, 983 F.2d 74, 76 (7th Cir. 1992).

Page 5
March 27, 2015
Nos.   2013AP2504-2508-W          Three Unnamed Petitioners v. Peterson
                                                       L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
          2014AP296-OA                    Two Unnamed Petitioners v. Peterson
                                                       L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
          2014AP417-421-W              Schmitz v. Peterson
                                                       L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23


¶8       To put the order canceling oral argument in perspective, I begin by examining the practice of public oral argument in this court and the necessity of providing compelling reasons for a departure from that practice. I then recount the scheduling of oral argument in the instant cases. Finally, I consider and debunk potential justifications for the court's decision to cancel oral argument.

I

¶9       This court's practice is to grant oral argument in all cases.[4]

¶10      We have ample time to do so. From September 2013 through August 2014 we issued written opinions in 66 cases. We expect to issue fewer than 55 between September 2014 and August 2015.

¶11      We also have ample reason to do so, as the significance of oral argument is hard to overstate.

¶12      Oral argument is a critical element of courts' information-gathering and decision-making processes. It enables courts to seek clarification from counsel about the issues presented and the parties' arguments.

¶13      Chief Justice Rehnquist summarized the function and importance of oral argument as follows:

> The intangible value of oral argument is, to my mind, considerable. It is and should be valuable to counsel, to judges and to the public. . . . [O]ral argument offers an opportunity for a direct interchange of ideas between court and counsel . . . . Counsel can play a significant role in responding to the concerns of the judges, concerns that counsel won't always be able to anticipate in preparing the briefs.[5]

---

[4] In lawyer discipline cases, this court grants oral argument only when the parties request it. In all other cases, this court grants oral argument as a matter of course, regardless of whether the parties request it.

[5] William H. Rehnquist, Oral Advocacy: A Disappearing Art, 35 Mercer L. Rev. 1015, 1021 (1984).

Page 6
March 27, 2015
Nos.   2013AP2504-2508-W   <u>Three Unnamed Petitioners v. Peterson</u>
                           L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
       2014AP296-OA        <u>Two Unnamed Petitioners v. Peterson</u>
                           L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
       2014AP417-421-W     <u>Schmitz v. Peterson</u>
                           L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

¶14     Because our oral arguments are open to the public,[6] oral argument helps ensure that the public's firmly established right to open court proceedings is a reality.[7] Oral argument gives the public an opportunity to hear discussion of cases, subjecting the justices of this court to vital public scrutiny.[8]

¶15     Open court proceedings gives "assurance that the proceedings [are] conducted fairly to all concerned, and . . . discourage perjury, the misconduct of participants, and decision based on secret bias or partiality."[9]

¶16     Open court proceedings encourage confidence in the judiciary because "[p]eople in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing."[10]

¶17     The court's surprising order canceling all oral argument in the instant cases requires further explanation.  "Any step that withdraws an element of the judicial process from public view makes the ensuing decision look more like fiat; this requires rigorous justification."[11]  The court order's conclusory statement that oral argument would not be legally and practically possible in the instant cases falls far short of providing the rigorous justification required.

_____

[6] Not only may the public attend oral argument in this court, but audio transmissions of oral argument are available on the court's website and audio-visual recordings of oral argument can be viewed on Wisconsin Eye's website and television channel.

[7] It is a basic tenet of the democratic system that "people have the right to know about operations of their government, including the judicial branch . . . ." <u>State ex rel. Bilder v. Delavan Tp.</u>, 112 Wis. 2d 539, 553, 334 N.W.2d 252 (1983).  This court has previously stated that "the closure of a courtroom should ensue only when not to do so would defeat the very purpose of the court proceedings or would otherwise substantially impinge on widely held public values . . . ." <u>State ex rel. La Crosse Tribune v. Circuit Court</u>, 115 Wis. 2d 220, 235, 340 N.W.2d 460 (1983).  For additional discussion of the public's right of access to judicial records and proceedings, see my dissent to the court's order denying Journal Sentinel, Inc.'s motion to intervene in the instant cases, which is also being released today.

    The dissent in the order denying the Journal Sentinel's motion to intervene discusses the right to open judicial proceedings in greater detail.

[8] See <u>Krynicki v. Falk</u>, 983 F.2d 74, 75 (7th Cir. 1992).

[9] <u>Richmond Newspapers, Inc. v. Virginia</u>, 448 U.S. 555, 569 (1980).

[10] <u>Richmond Newspapers, Inc. v. Virginia</u>, 448 U.S. 555, 572 (1980).

[11] <u>Krynicki v. Falk</u>, 983 F.2d 74, 75 (7th Cir. 1992).

Page 7
March 27, 2015
Nos.   2013AP2504-2508-W     <u>Three Unnamed Petitioners v. Peterson</u>
                                     L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
           2014AP296-OA              <u>Two Unnamed Petitioners v. Peterson</u>
                                     L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
           2014AP417-421-W           <u>Schmitz v. Peterson</u>
                                       L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

## II

¶18    The court initially planned to hold oral argument in these cases.

¶19    In an order dated December 16, 2014, after the cases had been pending for about a year, the court acted on various petitions that had been filed with regard to several outstanding John Doe proceedings. The court granted: (1) a petition for review of an order of the court of appeals; (2) petitions to bypass the court of appeals in a supervisory writ proceeding filed in the court of appeals; and (3) a petition for leave to commence an original action in this court. The court advised the parties and the public that the three proceedings would be consolidated for purposes of briefing and oral argument.

¶20    On December 19, 2014, the court issued an order advising the parties to keep April 17, 2015, and the afternoon of April 20, 2015, available for oral argument.

¶21    On February 11, 2015, the court issued an order advising the parties that oral argument was indeed scheduled for April 17 and 20.

¶22    The parties' briefs generally agreed that oral argument should be held.

¶23    On March 4, 2015, the court asked the parties to file a joint report providing input on the manner in which oral argument should be conducted.

¶24    In an about-face, the unnamed movants responded to the court's request for input by stating that they would not object to the instant cases being decided on briefs. The unnamed movants nevertheless provided the court with recommendations for how oral argument could be conducted.

¶25    In contrast, the special prosecutor, the John Doe judge, and the four chief circuit court judges continued to request oral argument on all five issues regarding John Doe procedure that were identified by the court in its December 16, 2014 order. The special prosecutor also insisted that oral argument is warranted on all other issues presented.

¶26    The court now cancels oral argument altogether. The order denying oral argument constitutes a surprising departure both from the court's usual practice of hearing oral argument and from its stated intention to hear oral argument in the present cases.

## III

¶27    I would stay the course and hold oral argument as scheduled.

25

Page 8
March 27, 2015
Nos.    2013AP2504-2508-W    Three Unnamed Petitioners v. Peterson
                             L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
        2014AP296-OA        Two Unnamed Petitioners v. Peterson
                             L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
        2014AP417-421-W     Schmitz v. Peterson
                             L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

¶28    The importance of oral argument to the public's right to open judicial proceedings, which I discussed above, weighs in favor of holding oral argument in the instant cases.[12]

¶29    The complexity and significance of the legal issues presented also weigh in favor of holding oral argument. The parties and the court would benefit from "a direct interchange of ideas."[13]

¶30    Fourteen issues were identified in the court's December 16, 2014 order, and multiple sub-issues. At least 733 pages of briefs have been filed in the instant cases (along with numerous motions), and additional briefs are expected. If any case demands oral argument to help clarify the issues, the parties' positions, and the law, then these cases do.

¶31    A brief description of the substantive legal issues presented illustrates my point.

¶32    The unnamed movants are challenging the constitutionality of the Wisconsin statutes governing campaign finance and campaign conduct and the application of the First Amendment to the Wisconsin statutes and to the conduct of the unnamed movants. The unnamed movants challenge the ability of the State to even inquire into coordination between campaign committees and issue-advocacy groups. The claims presented raise difficult constitutional questions being debated by scholars and courts across the country.

¶33    The Seventh Circuit Court of Appeals recognized the complexity of the issues presented in this litigation when it stated as follows:

> Plaintiffs' claim to constitutional protection for raising funds to engage in issue advocacy coordinated with a politician's campaign committee has not been established "beyond debate." To the contrary, there is a lively debate among judges and academic analysts. ... No opinion issued by the [United States] Supreme Court, or by any court of appeals, establishes ("clearly" or otherwise) that the First Amendment forbids regulation of coordination between campaign committees and issue-advocacy groups—let alone that the First Amendment forbids even an inquiry into that topic.[14]

---

[12] As I explained in note 7, I discuss the public's right to access judicial proceedings at length in my dissent to the court's order denying a motion to intervene filed by Journal Sentinel, Inc., which is also being released today. That discussion applies here and supports my conclusion that oral argument is warranted in the present cases.

[13] William H. Rehnquist, Oral Advocacy: A Disappearing Art, 35 Mercer L. Rev. 1015, 1021 (1984).

[14] O'Keefe v. Chisholm, 769 F.3d 936, 942 (7th Cir. 2014).

26

Page 9
March 27, 2015
Nos.  2013AP2504-2508-W    <u>Three Unnamed Petitioners v. Peterson</u>
                                     L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
         2014AP296-OA                  <u>Two Unnamed Petitioners v. Peterson</u>
                                     L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
         2014AP417-421-W        <u>Schmitz v. Peterson</u>
                                     L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

¶34    Beyond their complexity, the issues presented in the instant cases are the subject of acute public concern. The public's interest in this litigation is evidenced by the extensive state and national media coverage that the underlying John Doe investigation has garnered and by the large number of entities seeking to file amicus briefs to aid this court's decision-making. Those entities include the Wisconsin Government Accountability Board, the Center for Competitive Politics, Wisconsin Family Action, Citizens for Responsible Government, the Ethics and Public Policy Center, the League of Women Voters of Wisconsin, four former Federal Election Commissioners, and the Wyoming Liberty Group.

¶35    The unnamed movants in the present cases implausibly suggest that oral argument may not be necessary due to "the clarity of the legal issues presented." This claim cannot be made with a straight face, and the court wisely opts not to adopt it. Indeed, the court's redaction order acknowledges that the cases do not present "simple issues with easy answers."

¶36    Rather, it appears the court's rationale for canceling oral argument is its determination that this court is bound by a secrecy order issued by the John Doe judge early on in the John Doe investigation underlying this litigation.

¶37    A John Doe secrecy order does not automatically apply to proceedings in an appellate court. I conclude, for the reasons set forth below, that the specific John Doe secrecy order at issue in the instant cases should not be enforced by this court.

¶38    In my dissent to a separate order this court is simultaneously releasing, requiring extensive redaction of the parties' briefs, I explain that this court has the power and responsibility to determine for itself what parts of the briefs and record before us should be open or closed. I set forth four reasons for my conclusion that this court is not bound by the John Doe secrecy order:

¶39    First, the public has a constitutional, statutory and common law right of access to judicial proceedings and judicial records. This right is largely negated by the court's orders issued today.

¶40    Second, Wis. Stat. § 968.26 and the case law do not support the proposition that this court must comply with the John Doe secrecy order. The three John Doe cases are sui generis. They are not governed by prior case law.

¶41    Third, this court has the inherent power to determine the level of secrecy needed to decide the John Doe cases before it. Indeed, the order on redaction issued today admits to violating the John Doe secrecy order by revealing a confidential portion of the secrecy order. Why does the court breach the John Doe secrecy order? According to the redaction order, the

Page 10
March 27, 2015
Nos. 2013AP2504-2508-W    Three Unnamed Petitioners v. Peterson
                          L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
      2014AP296-OA        Two Unnamed Petitioners v. Peterson
                          L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
      2014AP417-421-W     Schmitz v. Peterson
                          L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

court is "forced" to do so "so that we can decide the redaction objections raised by the parties and establish the proper secrecy rules that will apply to filings in this court."[15] That is precisely my point. This court must decide the level of secrecy that applies to the instant cases based on the public's rights and this court's needs in deciding the cases.

¶42    Fourth, the justification for secrecy in John Doe proceedings does not support secrecy at this stage in the instant litigation. The cat may already be out of the bag. The special prosecutor asserts that various "secrets" have already been made public.

¶43    Even if the court decides to observe some level of secrecy, dispensing with oral argument altogether is unnecessary. Less restrictive measures than cancelation of oral argument are available to maintain confidentiality.

¶44    There are two distinct sets of issues in the instant litigation; the first pertains to state statutes governing the creation of John Doe proceedings and the second pertains to Wisconsin campaign finance law and related constitutional issues. These two sets of issues present different problems regarding public disclosure. One option the court could consider is separating oral argument on the two sets of issues and imposing partial closures of oral argument for each to the extent necessary. Such bifurcation is not unusual.[16]

¶45    This court's redaction order states that the public will be able to see, in the briefs, "the legal arguments being made by the parties." Why, then, can the public not hear the parties' legal arguments being tested by this court in open oral argument?

¶46    Alternatively, but probably not needed in the present cases, oral argument could be closed to the public but recorded for subsequent transcription. A redacted version of the transcript or video recording could be released to the public as promptly as feasible.[17]

---

[15] Footnote 2 of the court's redaction order explains its violation of the John Doe secrecy order as follows:

The secrecy orders themselves were part of the record in the John Doe proceedings and therefore were maintained as confidential. Notwithstanding this fact, we are forced to include a portion of the text of one of the secrecy orders in this order so that we can decide the redaction objections raised by the parties and establish the proper secrecy rules that will apply to filings in this court.

[16] See, e.g., United States v. Sterling, unpublished disp., No. 11-5028 (4th Cir. 2012); United State v. Abu Ali, 528 F.3d 210, 244, n.13 (4th Cir. 2008); United States v. Moussaoui, unpublished disp., 65 F. App'x 881, 890-91 (4th Cir. 2003).

[17] See United States v. Pelton, 696 F. Supp. 156, 159 (D. Md. 1986).

Page 11
March 27, 2015
Nos. 2013AP2504-2508-W     <u>Three Unnamed Petitioners v. Peterson</u>
                     L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
       2014AP296-OA     <u>Two Unnamed Petitioners v. Peterson</u>
                     L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
       2014AP417-421-W     <u>Schmitz v. Peterson</u>
                     L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

¶47     My point is this: Just because holding oral argument in the instant cases without breaching confidentiality would present logistical challenges does not mean oral argument should be eliminated.

¶48     In summary: If the court's rationale for canceling oral argument is that the legal issues presented are so clear that oral argument would be pointless, then some may view the court's order as outlandish on its face. If the court's rationale for canceling oral argument is that public oral argument would be logistically complicated on account of the John Doe secrecy order, then the order cannot withstand scrutiny. Public access to oral argument can surely be managed.

¶49     There is, in my view, no legitimate reason supporting the court's decision to cancel oral argument entirely. I conclude that oral argument is warranted in the present cases.

¶50     For the reasons set forth, I dissent.

¶51     DAVID T. PROSSER, J. *(dissenting).* On December 16, 2014, I disagreed with the court's decision to "consolidate" "these three proceedings" "for purposes of briefing and oral argument." Now, because of the unusual complexity of the proceedings and the secrecy inherent in a pending John Doe investigation, the court decides to dispense with oral argument altogether. This is a mistake.

¶52     Although I originally voted with the majority because of the impracticability, if not impossibility, of having oral argument open to the public, I believe upon reflection that my vote was wrong. We should not dispense with oral argument simply because the hearing room would have to be closed. The court could have promptly released a redacted transcript, a redacted recording, and a redacted video of oral argument after reviewing the argument and ensuring that information protected by the secrecy order was not disclosed.

¶53     Oral argument could have been limited to the most critical issues before the court—not all 14 issues set out in our December 16 order. It could have been reasonably limited in duration. Counsel could have been directed not to make any argument and not to respond to any question from the court that would disclose confidential information.

¶54     Closing the hearing room to the public would not have been popular, but the court indisputably has the authority to do so when it has a legitimate and substantial reason. As we said in <u>State ex rel. La Crosse Tribune v. Circuit Court for La Crosse County</u>, 115 Wis. 2d 220, 235, 340 N.W.2d 460 (1983):

> [T]he closure of a courtroom should ensue only when not to do so would defeat
> the very purpose of the court proceedings or would otherwise substantially

29

Page 12
March 27, 2015
Nos.  2013AP2504-2508-W   <u>Three Unnamed Petitioners v. Peterson</u>
                                L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
          2014AP296-OA            <u>Two Unnamed Petitioners v. Peterson</u>
                                  L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
          2014AP417-421-W     <u>Schmitz v. Peterson</u>
                                  L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

impinge upon widely held public values which have been declared by the legislature in particular circumstances to supersede the general public policy of the open courtroom.

¶55    In that same case, the court also said that the reason for closure must be "substantial," "compelling," and that failing to close the courtroom would jeopardize "cherished and legislatively recognized values." <u>Id.</u> at 235, 236.

¶56    Here, the compelling reason for closing the hearing room would be the protection of the secrecy of the John Doe proceeding. The legislature has explicitly recognized the need to maintain secrecy in a John Doe proceeding.

¶57    The John Doe statute specifically authorizes the John Doe judge to issue a secrecy order to protect testimony given and documents collected during a John Doe proceeding. Wis. Stat. § 968.26(3) (2013-14) ("The examination may be adjourned and may be secret."). This court has that authority as well.

¶58    As members of this court, our job is to do the right thing, as each of us understands the right thing, regardless of the inconvenience, or the controversy, or the consequences.

¶59    For these reasons, I respectfully dissent.

---

Diane M. Fremgen
Clerk of Supreme Court

30

Page 13
March 27, 2015
Nos.  2013AP2504-2508-W    Three Unnamed Petitioners v. Peterson
                           L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
      2014AP296-OA         Two Unnamed Petitioners v. Peterson
                           L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
      2014AP417-421-W      Schmitz v. Peterson
                           L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23


*Additional Parties:

Hon. Gregory A. Peterson
Reserve Judge

Matthew W. O'Neill/ Diane Slomowitz
Fox O'Neill Shannon
622 N. Water Street, Suite 500
Milwaukee, WI 53202

David C. Rice
Asst. Attorney General
P.O. Box 7857
Madison, WI 53707-7857

Francis D. Schmitz
P.O. Box 2143
Milwaukee, WI 53201-2143

Dean A. Strang
StrangBradley, LLC
10 E. Doty Street, Suite 621
Madison, WI 53703

Brad D. Schimel
Wisconsin Attorney General
P.O. Box 7857
Madison, WI 53707-7857

Todd P. Graves/ Edward D. Greim
Graves Garrett LLC
1100 Main Street, Suite 2700
Kansas City, MO 64105

Michael J. Bresnick/ Edward H. Meyers
Philip J. O'Beirne/ Julie O'Sullivan
Stein Mitchell Muse & Cippollone
1100 Connecticut Ave., NW, Suite 1100
Washington, DC 20036

Directors Office
Director of State Courts
P.O. Box 1688
Madison, WI 53701-1688

Dennis P. Coffey
Mawicke & Goisman, SC
1509 N. Prospect Ave.
Milwaukee, WI 53202-2323

Steven M. Biskupic/ Michelle L. Jacobs
Biskupic & Jacobs, S.C.
1045 W. Glen Oaks Lane, Ste. 106
Mequon, WI 53092

Sean O'Donnell Bosack
Godfrey & Kahn, S.C.
780 N. Water St., Ste. 700
Milwaukee, WI 53202-3512

Eric J. Wilson
Godfrey & Kahn, S.C.
P.O. Box 2719
Madison, WI 53701-2719

Timothy M. Hansen/ James B. Barton
John P. Shanahan
Hansen Reynolds Dickinson Crueger LLC
316 N. Milwaukee St., Ste. 200
Milwaukee, WI 53202-5885

H.E. Cummins
1818 N. Taylor St., Ste. 301
Little Rock, AR 72207

31

Page 14
March 27, 2015
Nos.   2013AP2504-2508-W   <u>Three Unnamed Petitioners v. Peterson</u>
                                    L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
            2014AP296-OA              <u>Two Unnamed Petitioners v. Peterson</u>
                                      L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
            2014AP417-421-W          <u>Schmitz v. Peterson</u>
                                      L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

Jeffrey James Morgan
LeBell, Dobrowski & Morgan, LLP
309 N. Water St., Suite 350
Milwaukee, WI 53202

Hon. Gregory J. Potter
Wood County Courthouse
P.O. Box 8095
Wisconsin Rapids, WI 54494

Hon. James P. Daley
Rock County Courthouse
51 S. Main Street
Janesville, WI 53545-3951

Hon. James J. Duvall
Buffalo County Courthouse
P.O. Box 68
Alma, WI 54610-0068

Hon. Jeffrey A. Kremers
Milwaukee County Courthouse
901 N. 9th St.
Milwaukee, WI 53233

EXHIBIT C



OFFICE OF THE CLERK

# Supreme Court of Wisconsin

110 EAST MAIN STREET, SUITE 215
P.O. BOX 1688
MADISON, WI 53701-1688

TELEPHONE (608) 266-1880
FACSIMILE (608) 267-0640
Web Site: www.wicourts.gov

March 27, 2015

**To:**

Susan K. Raimer
Columbia County Clerk of Circuit Court
P.O. Box 587
Portage, WI 53901-2157

Carlo Esqueda
Dane County Clerk of Circuit Court
215 S. Hamilton St.
Madison, WI 53703

Lynn M. Hron
Dodge County Clerk of Circuit Court
210 W. Center Street
Juneau, WI 53039

Lia Gust
Iowa County Clerk of Circuit Court
222 N. Iowa Street
Dodgeville, WI 53533

John Barrett
Milwaukee County Clerk of Circuit Court
901 N. 9th St., Rm. G-8
Milwaukee, WI 53233

*Additional Parties listed on Pages 23-24

You are hereby notified that the Court has entered the following order:

Nos. 2013AP2504-2508-W    <u>Three Unnamed Petitioners v. Peterson</u>
                                 L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
     2014AP296-OA           <u>Two Unnamed Petitioners v. Peterson</u>
                                 L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
     2014AP417-421-W       <u>Schmitz v. Peterson</u>
                                 L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

The John Doe proceedings in this court, which are taking place in the context of an ongoing John Doe investigation, have presented the court with unprecedented issues, including questions regarding the secrecy of evidence gathered in the John Doe investigation and the confidentiality of the identity of individuals connected in some way with the investigation. The John Doe judge presiding over the investigation issued secrecy orders early on in those investigatory proceedings.[1]

---

[1] The John Doe judge issued five nearly identical secrecy orders—one for each of the five counties in which John Doe proceedings were initiated. To the extent that there were variations in the language used in some of

33

Page 2
March 27, 2015
Nos.   2013AP2504-2508-W    <u>Three Unnamed Petitioners v. Peterson</u>
                             L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
        2014AP296-OA              <u>Two Unnamed Petitioners v. Peterson</u>
                             L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
        2014AP417-421-W        <u>Schmitz v. Peterson</u>
                             L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

The secrecy order provides in pertinent part:

> IT IS HEREBY ORDERED that the John Doe proceeding, commenced by order of the court rendered this day and pending before me, shall be secret. All persons having access to these proceedings are hereby ordered not to disclose to anyone the court docket and activity records, court filings, process issued by the court, information concerning the questions asked and the answers given during a John Doe hearing, transcripts of the proceedings, exhibits and other papers produced during the proceedings, as well as all other matters they may observe or hear in the John Doe proceeding. This order is made:

> 1) To prevent persons from collecting perjured testimony for any future trial.

> 2) To prevent those interested in thwarting the inquiry from tampering with prospective testimony or secreting evidence.

> 3) To render witnesses more free in their disclosures.

> 4) To prevent testimony which may be mistaken, untrue, insubstantial or irrelevant from becoming public.

>    .   .   .   .

> IT IS FURTHER ORDERED that secrecy shall be maintained during this John Doe proceeding as to court docket and activity records, court filings, process issued by the court, information concerning the questions asked and the answers given during a John Doe hearing, transcripts of the proceedings, exhibits and other papers produced during the proceedings, as well as to all other matters observed or heard in the John Doe proceeding. <u>See, generally, In re John Doe Proceeding</u>, 2003 WI 30 at ¶62.[2]

In this court's December 16, 2014 order granting review in these proceedings, the court established procedures whereby documents or portions of documents that had been or would be

---

the orders, the variations were minor and do not affect the substance of the orders. For ease of reference, therefore, we will treat those five orders as if they were a single secrecy order.

   [2] The secrecy orders themselves were part of the record in the John Doe proceedings and therefore were maintained as confidential. Notwithstanding this fact, we are forced to include a portion of the text of one of the secrecy orders in this order so that we can decide the redaction objections raised by the parties and establish the proper secrecy rules that will apply to filings in this court.

Page 3
March 27, 2015
Nos.   2013AP2504-2508-W        Three Unnamed Petitioners v. Peterson
                               L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
       2014AP296-OA            Two Unnamed Petitioners v. Peterson
                               L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
       2014AP417-421-W         Schmitz v. Peterson
                               L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

filed under seal could be placed into the open court file and be made available to the public. Those procedures (one for briefs and one for other documents that were filed under seal) directed the parties, by certain deadlines, to file (1) either a statement that the previously sealed document could be placed into the open court file or (2) a proposed redacted version of the brief or other document that could be placed into the open court file (while the original, unredacted version of the brief or document would remain under seal). The purpose of these procedures was to strike a balance between the need to protect the secrecy of information covered by the secrecy order issued by the John Doe judge and the public interest in understanding what is transpiring in its judicial system, and particularly, in this court.

Recognizing that there might be disagreements among the parties as to what should or should not be redacted and what should or should not be placed into the open court file, the court's procedures provided an opportunity for other parties to object to certain proposed redactions or to the lack of certain redactions. If such an objection was made, the objection would be submitted to the court for a ruling, with the redacted versions at issue being maintained under seal until the court had issued an order disposing of the objection.

Consistent with these procedures, a number of objections have been filed to proposed redactions. This decision and order will address and resolve those objections.

On February 2, 2015, Unnamed Movant #2[3] filed an unredacted and a redacted version of its brief-in-chief, but its redacted version contained only a couple of redactions. The redacted version did not contain any redactions in the brief's statement of the case and statement of facts. The redacted version did not redact the name of Unnamed Movant #2 on the cover page.

On February 2, 2015, Unnamed Movant #3 filed an unredacted and a redacted version of its brief-in-chief. Its redacted version generally redacted mentions of its own name. The redacted version, however, failed to redact the identity of one of the other Unnamed Movants on page 2 of the brief.

On February 2, 2015, Unnamed Movants ##4 and 5 filed a joint unredacted brief-in-chief, but did not file a redacted version of that brief.[4] In the cover letter accompanying their brief,

---

[3] As we have done in prior orders in these proceedings, we use the term "Unnamed Movants" to refer collectively to the Three Unnamed Petitioners in Case Nos. 2013AP2504-2508-W, the Two Unnamed Petitioners in Case No. 2014AP296-OA, and the Unnamed Movants in Case Nos. 2014AP417-421-W. When referring to one of the Unnamed Movants individually, we utilize the number that has been attached to that individual or entity in Case Nos. 2014AP417-421-W.

[4] Unnamed Movants ##4 and 5 did file a redacted version of their appendix at the same time that they filed their brief-in-chief.

35

Page 4
March 27, 2015
Nos.  2013AP2504-2508-W   Three Unnamed Petitioners v. Peterson
                          L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
      2014AP296-OA        Two Unnamed Petitioners v. Peterson
                          L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
      2014AP417-421-W     Schmitz v. Peterson
                          L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23


they indicated that they were not filing a redacted brief because their preference was to make their briefs (and presumably other filings) in these proceedings a matter of public record without redactions. The cover letter acknowledged, however, that portions of the brief would arguably be subject to the provisions of the secrecy orders issued by the John Doe judge. Subsequent to the filing of their brief-in-chief, one or more other Unnamed Movants expressed objections to Unnamed Movants ##4 and 5 regarding the lack of certain redactions in the brief-in-chief. Rather than file a redacted version of their brief that redacted the portions identified by the objecting parties, on February 24, 2015, Unnamed Movants ##4 and 5 filed a letter motion asking to file a "superseding" brief, which contained some changes in the text of the original brief-in-chief to replace the language the other Unnamed Movant(s) believed should be redacted.

On January 30, 2015, Unnamed Movant #6 filed both an unredacted and a redacted brief-in-chief. While the redacted version did redact the identities of individuals connected with the underlying John Doe investigation, it did not redact the portion of the brief that described the contents of the search warrants that were served on Unnamed Movant #6 and the items that were seized during the execution of the search warrant.

On February 24, 2015, an objection was filed by the special prosecutor, Francis D. Schmitz, to certain of the redactions contained within the briefs-in-chief filed by the Unnamed Movants. On February 25, 2015, this court ordered that any response to the special prosecutor's objection be filed by March 4, 2015. Responses were filed by Unnamed Movants ##1, 2, 3, 6, and 7.

On February 12, 2015, the special prosecutor, Francis D. Schmitz, filed an original, unredacted version and a redacted version of a motion for recusal of certain justices. On February 20, 2015, Unnamed Movant #1 filed a response to the recusal motion, which included an objection to the lack of redactions of certain portions of the recusal motion. Unnamed Movant #1 also attached a proposed redacted version of the special prosecutor's recusal motion, containing all of the redactions Unnamed Movant #1 believed necessary. On February 23, 2015, Unnamed Movants ##6 and 7 also filed an objection to the lack of redactions in the special prosecutor's proposed redacted version of his recusal motion.

On March 5, 2015, the special prosecutor filed both an unredacted and a redacted version of his brief-in-chief. The redacted version did not redact the identities of the Unnamed Movants or of other individuals who received subpoenas and search warrants issued by the John Doe judge or who were otherwise connected with the John Doe investigation in some way. While the redacted version of the brief did redact actual images of documents collected either in connection with the underlying John Doe investigation or with a previous John Doe investigation, the special prosecutor did not redact any of the many portions of the text that described (often in

Page 5
March 27, 2015
Nos. 2013AP2504-2508-W  <u>Three Unnamed Petitioners v. Peterson</u>
           L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
   2014AP296-OA    <u>Two Unnamed Petitioners v. Peterson</u>
           L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
   2014AP417-421-W   <u>Schmitz v. Peterson</u>
           L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

great detail) the contents of such documents or the actions of individuals that were disclosed as a result of the underlying John Doe investigation or of a previous John Doe investigation.

The special prosecutor essentially takes the position that while the John Doe judge did issue a secrecy order that required most documents and identities connected with the John Doe investigation to be maintained as confidential, that secrecy order no longer governs whether documents and identities need to remain secret. He contends that the actions of one of the Unnamed Movants and a director of that organization have improperly disclosed a considerable amount of information regarding the John Doe investigation, in violation of the secrecy order, and therefore waived or forfeited confidentiality regarding the information that had been disclosed.[5]

The special prosecutor argues that since these documents and this information has been publicly disclosed by one of the Unnamed Movants, albeit in violation of the John Doe secrecy order, no real purpose would be served by maintaining as confidential any documents or information connected to the John Doe proceedings that has been previously disclosed. Thus, he contends that the identity of the Unnamed Movants, the identity of other individuals who have had some connection with the John Doe proceedings, the identity of individuals mentioned in documents that have been collected as part of the John Doe investigation, and other information about the nature of the John Doe investigation and the underlying actions that are being investigated should be fully disclosed to the public.

On the other hand, most, but not all, of the Unnamed Movants argue that all of the information covered by the John Doe secrecy order, including their identities and the identities of all individuals/entities connected with the John Doe investigation or mentioned in documents collected as part of the John Doe investigation, should be maintained as confidential pursuant to that secrecy order.

Having reviewed all of the parties' filings regarding the confidentiality of documents and the impact of the John Doe secrecy order on proceedings in this court and recognizing the strong interest of the public in observing what transpires in this court, we conclude that the secrecy order issued by the John Doe judge should be respected and that all documents and information covered by that secrecy order must remain sealed in this court.

Under the John Doe statute, Wis. Stat. § 968.26, the John Doe judge is authorized to determine whether the proceedings in the John Doe, including the testimony taken and the documents collected, should remain secret. <u>See</u> Wis. Stat. § 968.26(3) ("The examination may

---

[5] It should be noted, however, that the special prosecutor has acknowledged that certain documents and information obtained in connection with the John Doe investigation have not been publicly disclosed.

Page 6
March 27, 2015
Nos.   2013AP2504-2508-W         Three Unnamed Petitioners v. Peterson
                                 L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
       2014AP296-OA             Two Unnamed Petitioners v. Peterson
                                 L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
       2014AP417-421-W          Schmitz v. Peterson
                                 L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

be adjourned and may be secret.")  The statute further provides that once the decision has been made to keep a John Doe proceeding secret, all John Doe materials and testimony must remain secret, with only three exceptions where public use or disclosure is allowed:  (1) use by the prosecution at a preliminary examination, (2) use by the prosecution at a criminal trial, and (3) required disclosure pursuant to the criminal discovery statute, Wis. Stat. § 971.23.  See Wis. Stat. § 968.26(3) ("Subject to s. 971.23, if the proceeding is secret, the record of the proceeding and the testimony taken shall not be open to inspection by anyone except the district attorney unless it is used by the prosecution at the preliminary hearing or the trial of the accused and then only to the extent that it is so used."); see also, State v. O'Connor, 77 Wis. 2d 261, 279-80, 252 N.W.2d 671 (1977) ("The legislative history of sec. 968.26 indicates that the primary purpose of the provision specifically limiting inspection of the record is to prevent public access to John Doe records at any time, and to preclude criminal defendants from asserting a right to discovery of John Doe testimony except as provided in the statute.").

We have previously addressed the ramifications of a John Doe secrecy order in the context of a potential disclosure by a John Doe judge.  See State ex rel. Niedziejko v. Coffey, 22 Wis. 2d 392, 126 N.W.2d 96 (1964).  In that case, the John Doe judge had ordered that the proceedings be kept secret.  When certain police officers who had been ordered to appear before him a second time refused to answer questions, the John Doe judge threatened to disclose their prior John Doe testimony to their police supervisors.  We held that even the John Doe judge, once the decision to keep proceedings secret has been made, is bound by the secrecy order and is prohibited from revealing portions or summaries of material in the John Doe record.  We expressly and clearly stated that once a secrecy order has been entered, the only occasions when John Doe documents or testimony may be disclosed are the three exceptions noted in the statute:

> The statute clearly contemplates that a secrecy order, if issued by the magistrate, shall be binding on him as well as the witnesses.  We conclude that if the magistrate, in the proper exercise of his discretion, orders that a John Doe proceeding should be secret, it must remain so for all purposes (until closed), subject to the statutory exceptions for trials and preliminary examinations.

22 Wis. 2d at 398.

We have also previously determined that the fact that a John Doe proceeding becomes the subject of review in an appellate court (regardless of the type of legal vehicle used to obtain such review, such as a supervisory writ) does not eliminate the secrecy of documents and other information that are covered by a secrecy order issued by a John Doe judge.  In re John Doe Proceeding Commenced by Affidavit Dated July 25, 2001, 2003 WI 30, ¶67, 260 Wis. 2d 653, 660 N.W.2d 260 ("It is critical that when a John Doe judge issues a secrecy order pursuant to Wis. Stat. § 968.26, the judge must be assured that secrecy will be preserved when and if the

Page 7
March 27, 2015
Nos.  2013AP2504-2508-W    <u>Three Unnamed Petitioners v. Peterson</u>
                                  L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
          2014AP296-OA                 <u>Two Unnamed Petitioners v. Peterson</u>
                                    L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
          2014AP417-421-W              <u>Schmitz v. Peterson</u>
                                    L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

matter reaches an appellate court. Seeking review in the court of appeals must not become a vehicle to undermine the secrecy or integrity of a John Doe proceeding."). The appellate court may seal such information in filings made in the appellate court, and the failure to do so would compromise the John Doe investigation. <u>Id.</u>, ¶68. Thus, we directed any party seeking review of a John Doe judge's decision to file with its appellate petition a motion seeking leave to file under seal any portions of the petition or record that fall within the scope of an existing secrecy order. <u>Id.</u>, ¶71. While the appellate court is to review the sealed documents to determine if they should be unsealed, we have expressly stated that if the documents "fall within the scope of a permissible secrecy order, they shall remain sealed." <u>Id.</u>, ¶73. The procedure we have utilized in these matters to date, including the procedure outlined in this order, has tracked the procedure we previously adopted for such situations.

Thus, contrary to the special prosecutor's argument, the fact that one individual or entity may have disclosed certain documents and information subject to a John Doe secrecy order does not mean that the secrecy order becomes a nullity and the entirety of the John Doe proceeding or an appellate review of the John Doe proceeding is opened to public view. While such a disclosure of John Doe material may well constitute a violation of the secrecy order and may subject the individual/entity making the disclosure to sanctions, it does not change the duty of the John Doe judge and the participants in the John Doe investigation to continue to honor their obligation to obey the secrecy order.

Consequently, we see no reason why the rules we have established for a John Doe judge and participants in a John Doe proceeding should not apply in this instance, when that proceeding has become the subject of appeal, writ proceeding or original action in this court. The John Doe investigation that is the subject of the several proceedings this court is reviewing remains an open investigation. While that may complicate how this court normally conducts its appellate review functions, the convenience of this court and the parties/counsel appearing before it does not provide a sufficient basis on which to ignore the statutory commands to maintain secrecy or the rules we have already established for maintaining the secrecy of John Doe materials.

Our conclusion that the secrecy of an ongoing John Doe investigation must be maintained does not mean that this court has no concern for the interest of the public in knowing what is transpiring in the highest court of this state. We have taken and continue to take measures to provide the public with redacted copies of the filings in this court so that the public can understand the issues this court is being asked to decide and the arguments of the parties on those issues. As this order demonstrates, these are not simple issues with easy answers nor are there simple procedures that can accomplish these goals. We asked the parties to submit redacted versions of their briefs and other filings in the hope that we could get those redacted documents into the public domain as quickly as practicable. The parties, however, have taken different

Page 8
March 27, 2015
Nos.    2013AP2504-2508-W        Three Unnamed Petitioners v. Peterson
                                 L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
        2014AP296-OA             Two Unnamed Petitioners v. Peterson
                                 L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
        2014AP417-421-W          Schmitz v. Peterson
                                 L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

approaches to what should be redacted, which has delayed the release of redacted briefs/documents and required us to issue this order. It also will require the parties to redo the redacted versions of their briefs and other filings to conform to this order. That will require some additional time, but it will still result in the public being able to see the legal arguments being made by the parties.

Accordingly, we will deny the special prosecutor's objection to the redactions in the Unnamed Movants' briefs-in-chief and grant the objections filed by Unnamed Movants ##1, 6 and 7 to the special prosecutor's recusal motion. Our ruling, however, is not limited to just those filings. Rather, we direct all of the parties to redact all information that is subject to the secrecy orders issued by the John Doe judge. This is a broad universe of documents and information, including the John Doe court dockets and activity records, court filings, process issued by the John Doe judge, information concerning the questions asked and answers given during a John Doe hearing, transcripts of any proceedings before the John Doe judge, all exhibits and other papers produced during the John Doe proceedings, and all other matters observed or heard in the John Doe proceedings. See State ex rel. Individual Subpoenaed to Appear at Waukesha County v. Davis, 2005 WI 70, ¶21, 281 Wis. 2d 431, 697 N.W.2d 803 (approving similar language). Further, it is not sufficient merely to redact the image of a document, but then to leave unredacted a textual discussion of the contents of that document. The secrecy order requires redaction of the contents as well as the image of the document. We also agree that the secrecy order extends to the identity of the individuals and entities to whom subpoenas or search warrants are issued or who are questioned by the John Doe judge, the prosecutor, or individuals working at their direction.

This will mean that the parties will need to review the redacted versions of their briefs and other filings to ensure that they comply with the directions we are providing in this order. If any previously submitted redacted version of any brief or other filing does not comply with the secrecy order and this order, the party responsible for that brief or filing must file a new redacted version consistent with the secrecy order and this order. If a previously filed redacted version meets the requirements we have established, the party must submit a statement to that effect and indicate that it will not be submitting a revised redacted version. We will again utilize an objection period to identify and resolve any disputes that arise from this second round of redactions, but the time periods to comply with this order and to file any objection will be substantially compressed.

IT IS ORDERED that the objection of the special prosecutor to the redacted versions of the briefs-in-chief filed by the Unnamed Movants is denied; and

IT IS FURTHER ORDERED that the objection of Unnamed Movants ##1, 6, and 7 to the redacted version of the special prosecutor's recusal motion is granted; and

40

Page 9
March 27, 2015
Nos.    2013AP2504-2508-W    Three Unnamed Petitioners v. Peterson
                            L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
        2014AP296-OA        Two Unnamed Petitioners v. Peterson
                            L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
        2014AP417-421-W     Schmitz v. Peterson
                            L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23


IT IS FURTHER ORDERED that the motion of Unnamed Movants ##4 and 5 to file a superseding brief is denied, and Unnamed Movants ##4 and 5 shall file a redacted version of their brief-in-chief that complies with the provisions of this order and the secrecy orders issued by the John Doe judge in the underlying John Doe proceedings; and

IT IS FURTHER ORDERED that for all briefs and other filings in this court that are filed under seal or maintained under seal, the parties must file a redacted version that redacts all information subject to the secrecy orders issued by the John Doe judge in the underlying John Doe proceedings; and

IT IS FURTHER ORDERED that, on or before April 6, 2015, each party that has previously filed a redacted version of a brief or other document that has been maintained under seal until the date of this order shall for each such brief or document either file a written statement that the previously filed redacted version complies with the secrecy orders issued by the John Doe judge in the underlying John Doe proceedings and may be placed into the open court file or file a revised redacted version of the document in which all matters covered by the secrecy orders issued by the John Doe judge in the underlying John Doe proceedings or that are otherwise confidential shall be redacted. (This requirement does not apply to documents filed in the court of appeals in Case Nos. 2013AP2504-2508-W.) Each party shall serve on all other parties a copy of the statement that the previously filed redacted version may be placed into the open court file or two copies of the revised redacted version. All other parties shall have 10 calendar days after the filing of the statement or the revised redacted versions to file a written objection to the statement or the revised redacted version, which objects to either insufficient redaction or excessive redaction. Each such written objection must specify which words, sentences or paragraphs the objector either wants to be redacted or unredacted, and must provide reasons for each such objection. If no objections are received within the 10-day period, the clerk of this court will place either the original document or the previously filed redacted version (in the case of a statement) or a copy of the revised redacted version of the previously filed document into the public court file on the seventh calendar day following the expiration of the 10-day objection period. If an objection is received, the original document and the revised redacted versions shall remain under seal until such time as the court rules on the objection and issues a written order directing the clerk of this court to place the original or a revised redacted version of the brief or previously filed document into the public court file; and

IT IS FURTHER ORDERED that for any redacted version of a document for which a revised redacted version is filed, the clerk of this court shall maintain the first redacted version under seal pending further order of this court.

41

Page 10
March 27, 2015
Nos.  2013AP2504-2508-W    <u>Three Unnamed Petitioners v. Peterson</u>
                                 L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
        2014AP296-OA         <u>Two Unnamed Petitioners v. Peterson</u>
                                 L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
        2014AP417-421-W     <u>Schmitz v. Peterson</u>
                                 L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

IT IS FURTHR ORDERED that for all future briefs and other documents that are filed in this proceeding, the filing party shall comply with the provisions of the December 16, 2014 order regarding the filing of a statement that the brief or other document may be placed into the open court file or the filing of a redacted version of the brief or other document, which shall be subject to the 20-day objection procedure set forth in that order. The extent of the redactions shall comply with the provisions of this order.

ANN WALSH BRADLEY, J., did not participate.

¶1     SHIRLEY S. ABRAHAMSON, C.J. *(dissenting).* In September of 2012 and August 2013, a John Doe judge signed multiple, substantially similar secrecy orders with regard to a single multi-county John Doe investigation.[1] Over one and a half years later, the public still has not been given access to the parties' filings or briefs or to the records in the three John Doe cases before it arising from that investigation. Rather, this court has accepted under seal virtually all the John Doe material requested to be filed under seal. In other words, if a party has requested that a document be filed under seal, the court has automatically complied with the request.

¶2     The court's treatment of the John Doe material runs directly counter to the public's longstanding and firmly established right to access judicial records.[2]

¶3     The unnamed movants and the special prosecutor take varying positions on whether the John Doe judge's expansive secrecy order applies to this court in the instant cases. The special prosecutor favors fuller public disclosure than the John Doe secrecy order or this court's order on redaction allow.[3] The majority of the unnamed movants, in contrast, favor this court's full observance of the John Doe secrecy order.[4]

---

[1] We refer to these secrecy orders collectively as "the John Doe judge's secrecy order" or "the John Doe secrecy order."

[2] See, for example, <u>State v. Cummings,</u> 199 Wis. 2d 721, 738, 546 N.W.2d 406 (1996), in which this court stated that "at least two sets of rights [] are involved when court documents are kept from public scrutiny: (1) those rights guaranteed under the First Amendment and (2) the common law right of public access." See also <u>Nixon v. Warner Communications, Inc.,</u> 435 U.S 589, 597-98 (1978) (stating that "the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents").

[3] The court's redaction order summarizes the prosecutor's position as follows:

The special prosecutor essentially takes the position that while the John Doe Judge did issue a secrecy order . . . that secrecy order no longer governs whether documents and identities need to remain secret. He contends that the actions of one of the Unnamed Movants and a director of that organization have improperly disclosed a considerable amount of information regarding the John Doe investigation, in violation of the secrecy order, and therefore waived or forfeited confidentiality . . . .

42

Page 11
March 27, 2015
Nos.    2013AP2504-2508-W    Three Unnamed Petitioners v. Peterson
                                              L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
          2014AP296-OA          Two Unnamed Petitioners v. Peterson
                                              L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
          2014AP417-421-W      Schmitz v. Peterson
                                              L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

¶4      The court's order on redaction sides with the unnamed movants and mandates continued observance of the entirety of the John Doe secrecy order. The order directs the parties to review the redacted briefs they have filed in this court to ensure that "all information that is subject to the secrecy order issued by the John Doe Judge" has been redacted.

¶5      Apparently, the parties' redacted briefs will eventually be open to the public. Perhaps not soon. The parties on both sides of the "v." are still arguing about specific redactions. Still, the question remains whether the extensive redactions ordered by the court—or any redactions at all—are justified at this stage in the litigation.

¶6      Like the court's order canceling oral argument in the instant cases,[5] the court's redaction order is long on stating the parties' positions but short on explaining the court's rationale. The court's redaction order regurgitates the history and content of the parties' filings regarding redaction. It then asserts that "the secrecy order issued by the John Doe judge should be respected and [] all documents and information covered by the secrecy order must remain sealed in this court."

¶7      I agree that the John Doe secrecy order should be respected. However, respect does not mean the secrecy order must be fully embraced.

¶8      The court's redaction order examines the John Doe statute, Wis. Stat. § 968.26 (2011-12),[6] and three prior John Doe cases—none of which is directly on point, as the John Doe cases before the court are sui generis, the first and only ones of their kind in the annals of our John Doe jurisprudence. The redaction order then weakly concludes: "Consequently, we see no reason why the rules we have established for a John Doe judge and participants in a John Doe

---

[4] The court's redaction order explains that most, but not all, of the unnamed movants urge that all of the information covered by the John Doe secrecy order, including the identities of the unnamed movants and the identities of all individuals/entities connected with the John Doe investigation or mentioned in documents collected as part of the John Doe investigation, should remain confidential.

[5] The court's order on redaction is one of three orders issued today in the John Doe cases that the court has consolidated for purposes of briefing and oral argument in this court. These three orders present interrelated and overlapping issues. I discuss the other two—an order denying a motion to intervene filed by Journal Sentinel, Inc. and an order canceling oral argument in the John Doe cases—in my dissents to those orders. For a full picture of the important public interests at stake in the three orders the court issues today, my dissents in all three orders should be read together.

[6] All subsequent references to the Wisconsin Statutes are to the 2011-12 version unless otherwise indicated.

Page 12
March 27, 2015
Nos.  2013AP2504-2508-W     Three Unnamed Petitioners v. Peterson
                                    L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
         2014AP296-OA             Two Unnamed Petitioners v. Peterson
                                      L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
         2014AP417-421-W       Schmitz v. Peterson
                                      L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

proceeding should not apply in this instance, when that proceeding has become the subject of appeal, writ proceeding or original action in this court."

¶9     There are many reasons why rules established for a John Doe judge or for the participants in a John Doe proceeding should not apply to this court. Unlike a John Doe judge, the supreme court is a court. The John Doe judge exercises judicial and quasi-executive powers;[7] it ultimately decides whether there is probable cause to believe a crime has been committed.[8] The supreme court has much broader powers; it decides procedural and substantive issues presented.

¶10    I do not dispute that this court may need to order redaction of the parties' briefs. Redaction may provide the best available means of balancing the public's right to access judicial documents against the interests of the parties and the court in keeping certain information confidential.

¶11    But in ordering redaction, the court must exercise discretion "in light of the relevant facts and circumstances."[9] Because redaction withdraws elements of the parties' briefs and the appellate record from public view, it "requires rigorous justification."[10]

¶12    The only justification the court's redaction order provides for the extensive redaction it requires is the John Doe secrecy order. By automatically adopting the John Doe secrecy order wholesale, this court overlooks the legal principle that it should continue to impose secrecy only if secrecy is warranted. This court should not blindly adopt a secrecy order issued by a John Doe judge in John Doe proceedings more than a year and a half ago.

¶13    Because this court has failed to consider carefully whether continued concealment of all information subject to the John Doe secrecy order is justified, and because the record falls far

---

[7] State v. Washington, 83 Wis. 2d 808, 828, 266 N.W.2d 597 (1978).

[8] In re John Doe Proceeding, 2003 WI 30, ¶22, 260 Wis. 2d 653, 660 N.W.2d 260.

[9] The United States Supreme Court has stated that "the right to inspect and copy judicial records is not absolute." Nixon v. Warner Communications, Inc., 435 U.S. 589, 598 (1978). Courts have "supervisory power over [court] records and files, and access [to court records] has been denied where court files might have become a vehicle for improper purposes." Nixon, 435 U.S. at 598. While the Nixon Court declined to enumerate "all the factors to be weighed" in determining whether public access to particular information is appropriate, the Court made clear that courts must exercise discretion "in light of the relevant facts and circumstances" when deciding whether the interest in access or the interest in secrecy should prevail.

[10] Krynicki v. Falk, 983 F.2d 74, 75 (7th Cir. 1992) (explaining that withdrawal of an element of judicial proceedings from public view "requires rigorous justification").

Page 13
March 27, 2015
Nos.   2013AP2504-2508-W      Three Unnamed Petitioners v. Peterson
                             L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
       2014AP296-OA         Two Unnamed Petitioners v. Peterson
                             L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
       2014AP417-421-W      Schmitz v. Peterson
                             L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

short of demonstrating that full observance of the secrecy order remains appropriate, I dissent from the court's redaction order.

¶14    There are several reasons the court should not enforce the John Doe judge's sweeping secrecy order at this stage of the litigation.

¶15    First, the public has a constitutional, statutory, and common-law right to access judicial proceedings and judicial records. This right is negated by the court's broad redaction order.

¶16    Second, Wis. Stat. § 968.26 and the case law do not support the proposition that this court must comply with the John Doe secrecy order. The three John Doe cases are sui generis; they are not governed by prior case law.

¶17    Third, this court has the inherent power to determine the level of secrecy necessary to decide the John Doe cases before it. Indeed, the court's redaction order admits to violating the John Doe secrecy order by revealing a confidential portion of the secrecy order. Why does the court breach the John Doe secrecy order? According to the redaction order, the court is "forced" to do so "so that we can decide the redaction objections raised by the parties and establish the proper secrecy rules that will apply to filings in this court."[11] That is precisely my point. Thus, this court must decide the level of secrecy that applies based on the public's rights and this court's needs to decide the John Doe cases before it.

¶18    Fourth, the justifications for secrecy in John Doe proceedings no longer support secrecy at this stage in the instant litigation. The cat may be out of the bag.

¶19    Thus, I conclude that this court's sweeping redaction order, which simply adopts the John Doe secrecy order, impermissibly violates the public's constitutional, statutory, and common-law right to access judicial proceedings and records.

---

[11] Footnote 2 of the court's redaction order explains its violation of the John Doe secrecy order as follows:

> The secrecy orders themselves were part of the record in the John Doe proceedings and therefore were maintained as confidential. Notwithstanding this fact, we are forced to include a portion of the text of one of the secrecy orders in this order so that we can decide the redaction objections raised by the parties and establish the proper secrecy rules that will apply to filings in this court.

Page 14
March 27, 2015
Nos.   2013AP2504-2508-W     <u>Three Unnamed Petitioners v. Peterson</u>
                                         L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

          2014AP296-OA            <u>Two Unnamed Petitioners v. Peterson</u>
                                         L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11

          2014AP417-421-W       <u>Schmitz v. Peterson</u>
                                           L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

I

¶20     I begin by examining the public's right of access to court records. This right is negated by the court's broad redaction order.

¶21     I discuss the public's right to open judicial proceedings under the federal and state constitutions, under state statutes,[12] and under the common law more fully in my dissent to another order issued by the court today denying a newspaper's motion to intervene.

¶22     Here, it suffices to cite <u>Krynicki v. Falk</u>, 983 F.2d 74, 75 (7th Cir. 1992), in which Judge Easterbrook explains how he decides motions to seal records. Judge Easterbrook describes the presumption of public access to judicial proceedings and the purposes that presumption serves, making clear that the presumption of public access is fundamental to our system of government[13] and can be overcome only by the weightiest interests.[14] Judge Easterbrook writes:

> Judicial proceedings in the United States are open to the public—in criminal cases by constitutional command, and in civil cases by force of tradition. What happens in the halls of government is presumptively open to public scrutiny. Judges deliberate in private but issue public decisions after public arguments based on public records. The political branches of government claim legitimacy by election, judges by reason. Any step that withdraws an element of the judicial process from public view makes the ensuing decision look more like fiat; this requires rigorous justification.[15]

¶23     Applying these principles to the instant cases, I conclude that to support a redaction order that "withdraws an element of the judicial process from public view," the court must provide truly compelling reasons.[16]

---

[12] In addition to the John Doe statute (Wis. Stat. § 968.26), the court has explained that Wisconsin's public records law (Wis. Stat. § 19.35) applies to the court of appeals' sealing records filed in a case seeking review of a John Doe judge's actions. <u>In re John Doe Proceeding</u>, 2003 WI 30, ¶66, 260 Wis. 2d 653, 660 N.W.2d 260.

[13] <u>See also</u> Wis. Stat. § 19.31 ("In recognition of the fact that a representative government is dependent upon an informed electorate, it is declared to be the public policy of this state that all persons are entitled to the greatest possible information regarding the affairs of government . . . .").

[14] <u>See also</u> <u>State ex rel. La Crosse Tribune v. Circuit Court</u>, 115 Wis. 2d 220, 241, 340 N.W.2d 460 (1983) (holding that the public should not be "denied the right of access to the court for other than the most weighty and overwhelming reasons").

[15] <u>Krynicki v. Falk</u>, 983 F.2d 74, 75 (7th Cir. 1992).

[16] <u>Krynicki v. Falk</u>, 983 F.2d 74, 75 (7th Cir. 1992).

46

Page 15
March 27, 2015
Nos.  2013AP2504-2508-W     Three Unnamed Petitioners v. Peterson
                             L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
      2014AP296-OA           Two Unnamed Petitioners v. Peterson
                             L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
      2014AP417-421-W        Schmitz v. Peterson
                             L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

¶24   The order issued today provides just one reason for requiring far-reaching redactions in documents filed in this court: The John Doe secrecy order is binding on this court and, for this reason alone, the parties must redact all information subject to that secrecy order.

¶25   To determine whether this explanation constitutes the "rigorous justification" required to support redaction, I turn first to the statutes and case law governing secrecy in John Doe cases.

II

¶26   The question is whether Wis. Stat. § 968.26 and related case law compel this court to comply with the John Doe secrecy order. I conclude they do not.

¶27   The rules governing John Doe proceedings are set forth at Wis. Stat. § 968.26. Wisconsin Stat. § 968.26(3) authorizes a John Doe judge to issue secrecy orders binding on those involved in a John Doe proceeding. The statute lists three circumstances under which the record of the John Doe proceeding and the testimony taken shall be open to inspection. It cannot be assumed, however, that all aspects of John Doe proceedings are encapsulated within the four corners of the statute. Courts have "filled in" the statute and recognized other instances when the record of a John Doe proceeding or the testimony taken at a John Doe proceeding shall be open.[17]

¶28   The statutory language of Wis. Stat. § 968.26(3) is as follows:

> The extent to which the judge may proceed in an examination under sub. (1) or (2) is within the judge's discretion. The examination may be adjourned and may be secret. Any witness examined under this section may have counsel present at the examination but the counsel shall not be allowed to examine his or her client, cross-examine other witnesses, or argue before the judge. Subject to s. 971.23, if the proceeding is secret, the record of the proceeding and the testimony taken shall not be open to inspection by anyone except the district attorney unless it is used by the prosecution at the preliminary hearing or the trial of the accused and then only to the extent that it is so used.[18]

---

[17] For example, in State v. Rindfleisch, unpublished disp. No. 2013AP362-CR, at 4 (Wis. Ct. App.), the court of appeals stated that it has "supervisory authority to unseal documents in our record . . . regardless of whether a prior circuit court order or trial judge order sealed the documents," and the court of appeals exercised this authority in the case before it to unseal records that were subject to a John Doe secrecy order.

[18] Wis. Stat. § 968.26(3).

4 /

Page 16
March 27, 2015
Nos.   2013AP2504-2508-W   <u>Three Unnamed Petitioners v. Peterson</u>
                                       L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
            2014AP296-OA            <u>Two Unnamed Petitioners v. Peterson</u>
                                         L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
            2014AP417-421-W         <u>Schmitz v. Peterson</u>
                                         L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

¶29     Furthermore, Wis. Stat. § 968.26 alone cannot justify sealing documents in this court. This court must make its own decision. In <u>United States v. Moussaoui</u>, unpublished disp., 65 Fed. App'x 881, 887 (4th Cir. 2003), a federal court of appeals concluded that the federal Classified Information Procedure Act could not on its own justify closing oral argument or sealing documents. The <u>Moussaoui</u> court declared that a court must independently conduct a constitutional inquiry to determine whether and to what extent judicial proceedings should be closed. The court may not simply assume that the legislature has struck the correct constitutional balance in the statute.

¶30     Beyond its discussion of the John Doe statute, the court's redaction order also refers briefly to three cases involving John Doe proceedings: <u>State v. O'Connor</u>, 77 Wis. 2d 261, 279-80, 252 N.W.2d 671 (1977); <u>State ex rel. Niedziejko v. Coffey</u>, 22 Wis. 2d 392, 398, 126 N.W.2d 96 (1964); and <u>In re John Doe Proceeding</u>, 2003 WI 30, ¶¶67-68, 71, 260 Wis. 2d 653, 660 N.W.2d 260.

¶31     The cases are largely unhelpful. This court's prior John Doe cases examined questions of John Doe procedure but did not delve into the ultimate merits of the investigation. In the instant cases, the court is reviewing both procedural matters and substantive legal questions related to the subject matter of the John Doe investigation. The three cases now before the court, as I stated previously, are sui generis.

¶32     With that in mind, I review the cases cited by the court's redaction order.

¶33     This court quotes the <u>O'Connor</u> reference to legislative history that supposedly demonstrates that the John Doe statute is intended to "prevent public access to John Doe records at any time, and to preclude criminal defendants from asserting a right to discovery of John Doe testimony except as provided in the statute."

¶34     The legislative history referred to by <u>O'Connor</u> and by this court's redaction order discusses limits upon the rights of the public and of criminal defendants to demand disclosure of documents protected by a John Doe secrecy order. It does not address, explicitly or implicitly, the right of an appellate court to order disclosure of documents when the appellate court determines such disclosure is warranted at the appellate level.

¶35     Furthermore, <u>O'Connor</u> makes clear that secrecy in John Doe proceedings "is not maintained for its own sake."[19] Rather, "[t]he policy underlying secrecy is directed to promoting

---

[19] <u>State v. O'Connor</u>, 77 Wis. 2d 261, 283, 252 N.W.2d 671 (1977).

Page 17
March 27, 2015
Nos.  2013AP2504-2508-W  Three Unnamed Petitioners v. Peterson
L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
2014AP296-OA  Two Unnamed Petitioners v. Peterson
L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
2014AP417-421-W  Schmitz v. Peterson
L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

[the] effectiveness of the investigation . . . ."[20] It follows from O'Connor that when secrecy does not promote the effectiveness of the investigation, it should not be imposed.

¶36  In sum, the court's reliance on O'Connor is misplaced.

¶37  The reliance on Niedziejko in the court's redaction order is similarly unpersuasive.

¶38  In Niedziejko, the court considered a John Doe judge's attempt to coerce a witness to testify by threatening disclosure of incriminating information contained in a secret John Doe record. The court concluded that the John Doe judge's conduct constituted an erroneous exercise of discretion. The Niedziejko court explained: "The [John Doe] statute clearly contemplates that a secrecy order, if issued by the magistrate, shall be binding on him as well as the witnesses."[21]

¶39  If the court interprets this language from Niedziejko as mandating the continued secrecy of a John Doe proceeding in an appellate court, then the court is taking the language out of context.

¶40  Again, the Niedziejko court considered whether a John Doe judge erroneously exercised his discretion by threatening to disclose information protected by a John Doe secrecy order for the purpose of coercing a witness to testify. The Niedziejko court did not address whether an appellate court has discretion to disclose information protected by a John Doe secrecy order for a legitimate purpose.

¶41  Finally, the court's redaction order cites In re John Doe Proceeding.

¶42  One of the issues presented in In re John Doe Proceeding was whether the court of appeals had authority to seal John Doe records within the court of appeals when a petition for a supervisory writ was filed in the court of appeals. The supreme court acknowledged that "Wisconsin statutes and case law do not specifically address this issue."[22]

¶43  In In re John Doe Proceeding, the supreme court admonished that "[s]eeking review in the court of appeals must not become a vehicle to undermine the secrecy or integrity of a John Doe proceeding."[23] I agree.

---

[20] State v. O'Connor, 77 Wis. 2d 261, 281, 252 N.W.2d 671 (1977).

[21] State ex rel. Niedziejko v. Coffey, 22 Wis. 2d 392, 398, 126 N.W.2d 96 (1964).

[22] In re John Doe Proceeding, 2003 WI 30, ¶64, 260 Wis. 2d 653, 660 N.W.2d 260.

[23] In re John Doe Proceeding, 2003 WI 30, ¶¶67, 71, 260 Wis. 2d 653, 660 N.W.2d 260.

49

Page 18
March 27, 2015
Nos.   2013AP2504-2508-W     <u>Three Unnamed Petitioners v. Peterson</u>
                            L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
           2014AP296-OA          <u>Two Unnamed Petitioners v. Peterson</u>
                            L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
           2014AP417-421-W     <u>Schmitz v. Peterson</u>
                            L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

¶44    The supreme court went on to say, however, that the court of appeals "<u>may</u> seal parts of a [John Doe] record."[24] The supreme court used the word "may"; it did not say the court of appeals "shall" seal the record. The supreme court carefully counseled that secrecy "is not maintained for its own sake" but rather "is directed to promoting the effectiveness of the investigation."[25]

¶45    <u>In re John Doe Proceeding</u> is not easy to read or to understand. On the one hand, it gives the court of appeals discretion to seal records. On the other hand, it seems to state that if an in camera inspection of the records by the court of appeals shows that the records are encompassed by a "permissible secrecy order," then the documents must remain sealed.

¶46    The better reading of <u>In re John Doe Proceeding</u>, in my view, permits this court to consider the extent to which the John Doe secrecy order at issue in the instant cases is still a permissible secrecy order. To decide this question, this court must determine whether the secrecy order at issue remains, at this stage of the litigation, reasonably tailored to further the purposes that secrecy in John Doe proceedings are designed to serve. If it is not, then the order should be enforced only partially, or not at all.

### III

¶47    My interpretation of the statutes and case law is supported by the doctrine of inherent powers.

¶48    In addition to powers expressly granted to courts under the state and federal constitutions, courts have inherent, implied, and incidental powers that enable them to accomplish their constitutionally and legislatively mandated functions.[26] "A grant of jurisdiction by its very nature includes those powers necessary to fulfill the jurisdictional mandate."[27]

¶49    "A court is understood to retain inherent powers when those powers are needed to 'maintain [the courts'] dignity, transact their business, and accomplish the purposes of their

---

[24] <u>In re John Doe Proceeding</u>, 2003 WI 30, ¶¶68, 71, 260 Wis. 2d 653, 660 N.W.2d 260 (emphasis added).

[25] <u>In re John Doe Proceeding</u>, 2003 WI 30, ¶¶61, 71, 260 Wis. 2d 653, 660 N.W.2d 260.

[26] <u>State ex rel. Friedrich v. Circuit Court</u>, 192 Wis. 2d 1, 16-17, 531 N.W.2d 32 (1995).

[27] <u>State v. Cummings</u>, 199 Wis. 2d 721, 736, 546 N.W.2d 406 (1996) (recognizing that the John Doe judge has inherent powers).

Page 19
March 27, 2015
Nos.   2013AP2504-2508-W      <u>Three Unnamed Petitioners v. Peterson</u>
                                      L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
           2014AP296-OA           <u>Two Unnamed Petitioners v. Peterson</u>
                                        L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
           2014AP417-421-W       <u>Schmitz v. Peterson</u>
                                          L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

existence."[28]  In Wisconsin, courts have been recognized as possessing inherent authority to manage their internal operations,[29] to regulate the bench and bar,[30] and to ensure that the courts themselves function "efficiently and effectively to provide the fair administration of justice."[31]

¶50   A court has the inherent power "to preserve and protect the exercise of its judicial function . . . [by] limit[ing] public access to judicial records when the administration of justice requires it."[32]  In other words, courts have the inherent power to exclude the public from judicial proceedings in the interests of justice.

¶51   Surely a necessary corollary of a court's inherent power to exclude the public from its proceedings is a court's inherent power to give the public access to its proceedings, even in the face of a John Doe secrecy order.  Depending on the circumstances, either exclusion or access may be necessary "to preserve and protect the exercise of [a court's] judicial function."[33]  Without the inherent power to determine whether exclusion or access is appropriate in a given case, an appellate court would be unable to balance the interest in confidentiality against the interest in openness and thus could protect neither interest.  An appellate court would be unable, in other words, to do its job.

¶52   In sum, although the court's redaction order apparently determines that the John Doe secrecy order governs the instant cases, I conclude that this court should reassess the extent to which the extensive secrecy ordered by the John Doe judge is needed at this stage in the litigation.  In my opinion, the court should enforce the secrecy order only to the extent secrecy remains warranted.

¶53   Because the propriety of this court's enforcing the John Doe judge's secrecy order turns on whether the justifications for secrecy still apply, I examine those justifications now.

---

[28] <u>State v. Henley</u>, 2010 WI 97, ¶73, 328 Wis. 2d 544, 787 N.W.2d 350.

[29] <u>City of Sun Prairie v. Davis</u>, 226 Wis. 2d 738, 749, 595 N.W.2d 635 (1999).

[30] <u>City of Sun Prairie v. Davis</u>, 226 Wis. 2d 738, 749, 595 N.W.2d 635 (1999).

[31] <u>City of Sun Prairie v. Davis</u>, 226 Wis. 2d 738, 749-50, 595 N.W.2d 635 (1999).

[32] <u>State ex rel. Bilder v. Delavan Tp.</u>, 112 Wis. 2d 539, 556, 334 N.W.2d 252 (1983).

[33] <u>State ex rel. Bilder v. Delavan Tp.</u>, 112 Wis. 2d 539, 556, 334 N.W.2d 252 (1983).

Page 20
March 27, 2015
Nos.   2013AP2504-2508-W    <u>Three Unnamed Petitioners v. Peterson</u>
                                  L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
          2014AP296-OA              <u>Two Unnamed Petitioners v. Peterson</u>
                                    L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
         2014AP417-421-W         <u>Schmitz v. Peterson</u>
                                    L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

### IV

¶54    The oft-stated and accepted rationale for secrecy in John Doe proceedings does not support maintaining the secrecy of the John Doe cases in this court.

¶55    This court has repeatedly set forth the following reasons as justifying secrecy in a John Doe proceeding:

1.    Keeping knowledge from an unarrested defendant that could encourage escape;
2.    Preventing the defendant from collecting perjured testimony for trial;
3.    Preventing those interested in thwarting the inquiry from tampering with prosecutive testimony or secreting evidence;
4.    Rendering witnesses more free in their disclosures; and
5.    Preventing testimony that may be mistaken or untrue or irrelevant from becoming public.[34]

¶56    It is obvious that none of these reasons for secrecy applies to the three John Doe cases currently before this court.

¶57    It is also obvious from these justifications that secrecy is imposed to further the efforts of the prosecution. Indeed, the court has repeatedly recognized that secrecy is justified only insofar as it "promot[es] the effectiveness of the investigation."[35]

¶58    As the court's redaction order acknowledges, the special prosecutor in the instant cases now favors less, not more, secrecy.

¶59    Under these circumstances, the court's decision to require extensive redaction of the parties' briefs cannot withstand scrutiny.

¶60    A John Doe judge may amend its secrecy order as "subsequent developments require."[36] If a John Doe judge may amend the secrecy order if "subsequent developments [so] require," then surely this court may for purposes of its decision-making "amend" the John Doe secrecy order as well.

---

[34] <u>In re John Doe Proceeding</u>, 2003 WI 30, ¶60, 260 Wis. 2d 653, 660 N.W.2d 260; <u>State v. O'Connor</u>, 77 Wis. 2d 261, 279, 252 N.W.2d 671 (1977).

[35] <u>In re John Doe Proceeding</u>, 2003 WI 30, ¶61, 260 Wis. 2d 653, 660 N.W.2d 260; <u>State v. O'Connor</u>, 77 Wis. 2d 261, 283, 252 N.W.2d 671 (1977).

[36] <u>State v. O'Connor</u>, 77 Wis. 2d 261, 286, 252 N.W.2d 671 (1977).

Page 21
March 27, 2015
Nos.    2013AP2504-2508-W    Three Unnamed Petitioners v. Peterson
                             L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
        2014AP296-OA         Two Unnamed Petitioners v. Peterson
                             L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
        2014AP417-421-W      Schmitz v. Peterson
                             L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

¶61    Developments subsequent to the issuance of the John Doe secrecy order at issue in the instant cases weigh in favor of amending that secrecy order. The John Doe secrecy order at issue has allegedly failed to achieve its objective of secrecy.

¶62    The special prosecutor claims that much of the information the secrecy order intended to conceal has been divulged through media leaks, through extensive media coverage of the underlying John Doe investigation and the instant litigation, and within unsealed filings in federal court in related litigation. The special prosecutor argues compellingly that because information subject to the John Doe judge's secrecy order has already been publicly released, public discussion of that information is appropriate.[37]

¶63    Indeed, on March 19, 2015, the special prosecutor filed a letter directed to this court regarding an "Apparent Violation of Supreme Court Order and John Doe Secrecy Order." (The unsealed part of the letter explains that it pertains to an "apparent violation of Supreme Court order and John Doe secrecy order.")

¶64    Records should be unsealed when they can be.[38] Once the overriding interest initially necessitating closure has passed, the restriction must be lifted.[39]

¶65    In the instant cases, continued adherence to the John Doe secrecy order will not serve the objectives of secrecy when secrecy has not in fact been preserved. When the objectives of secrecy are not furthered by continued observance of a secrecy order, disclosure is appropriate.[40]

_____

[37] In the parties' joint report on oral argument, the special prosecutor takes the position that oral argument should be held and that the courtroom should be open to the public. The special prosecutor's explanation of his position on oral argument applies with equal force to the issue of whether redaction is warranted:

[B]ecause of the widespread public disclosure of the facts of this investigation over the last year by at least one Movant in national periodicals, on the Internet, and in a federal lawsuit . . . the secrecy of these proceedings has been undermined, intentionally and in disregard of Judge Peterson's orders. Indeed, most—if not all—of the facts of consequence have already been released publicly. This fundamentally affects the need to continue non-public proceedings before the Supreme Court of the State of Wisconsin.

[38] Robert Timothy Reagan, Sealing Court Records and Proceedings: A Pocket Guide at 22 (Federal Judicial Center 2010).

[39] United States v. Antar, 38 F.3d 1348, 1362 (3d Cir. 1994); Phoenix Newspapers, Inc. v. U.S. District Court, 156 F.3d 940, 948 (9th Cir. 1998).

[40] Robert Timothy Reagan, Fed'l Jud. Ctr., Sealing Court Records and Proceedings: A Pocket Guide 22 (2010).

53

Page 22
March 27, 2015
Nos.   2013AP2504-2508-W     <u>Three Unnamed Petitioners v. Peterson</u>
                            L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
       2014AP296-OA          <u>Two Unnamed Petitioners v. Peterson</u>
                            L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
       2014AP417-421-W       <u>Schmitz v. Peterson</u>
                            L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

"We simply do not have the power, even were we of the mind to use it if we had, to make what has become public private again . . . . The genie is out of the bottle . . . . We have not the means to put the genie back."[41]

¶66    It would be anomalous for this court to adhere to a sweeping John Doe secrecy order without any analysis when——as in the instant cases——observance of the order runs counter to the public's right of access to judicial proceedings, observance of the order is not required by statute or case law, the prosecutor whom the order was designed to serve does not seek its enforcement, and confidentiality has already been breached.

¶67    I conclude that enforcement of the sweeping John Doe secrecy order is neither necessary nor appropriate at this stage in the litigation. Because the court's order merely echoes the broad terms of the underlying secrecy order without providing "rigorous justification" for the extensive redaction it requires, I cannot join it. This court must independently determine the need for secrecy for each document.

* * * *

¶68    A few short years ago, I wrote that "[i]f Wisconsin were not known as the Dairy State it could be known, and rightfully so, as the Sunshine State. All branches of Wisconsin government have, over many years, kept a strong commitment to transparent government."[42]

¶69    The trio of orders the court issues today collectively and without full explanation deny the public its right of access to judicial proceedings in three cases of immense public interest and importance. The public will no doubt wonder, as do I, what has become of this court's commitment to transparency.

¶70    For the reasons set forth, I dissent.

---

Diane M. Fremgen
Clerk of Supreme Court

---

[41] <u>Gambale v. Deutsche Bank AG</u>, 377 F.3d 133, 144 (2d Cir. 2004)(citing cases in support of this proposition and also a case upholding an injunction against media dissemination of material released by accident). <u>See also Estate of Martin Luther King, Jr. v. CBS, Inc.</u>, 184 F. Supp. 2d 1353, 1363-64 (N.D. Ga. 2002).

[42] <u>Schill v. Wisconsin Rapids School Dis.</u>, 2010 WI 86, ¶1, 327 Wis. 2d 572, 786 N.W.2d 177.

Page 23
March 27, 2015
Nos.   2013AP2504-2508-W     <u>Three Unnamed Petitioners v. Peterson</u>
                             L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
       2014AP296-OA          <u>Two Unnamed Petitioners v. Peterson</u>
                             L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
       2014AP417-421-W       <u>Schmitz v. Peterson</u>
                             L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23


<u>*Additional Parties:</u>

Hon. Gregory A. Peterson
Reserve Judge

Matthew W. O'Neill/ Diane Slomowitz
Fox O'Neill Shannon
622 N. Water Street, Suite 500
Milwaukee, WI 53202

David C. Rice
Asst. Attorney General
P.O. Box 7857
Madison, WI 53707-7857

Francis D. Schmitz
P.O. Box 2143
Milwaukee, WI 53201-2143

Dean A. Strang
StrangBradley, LLC
10 E. Doty Street, Suite 621
Madison, WI 53703

Brad D. Schimel
Wisconsin Attorney General
P.O. Box 7857
Madison, WI 53707-7857

Todd P. Graves/ Edward D. Greim
Graves Garrett LLC
1100 Main Street, Suite 2700
Kansas City, MO 64105

Michael J. Bresnick/ Edward H. Meyers
Philip J. O'Beirne/ Julie O'Sullivan
Stein Mitchell Muse & Cippollone
1100 Connecticut Ave., NW, Suite 1100
Washington, DC 20036

Directors Office
Director of State Courts
P.O. Box 1688
Madison, WI 53701-1688

Dennis P. Coffey
Mawicke & Goisman, SC
1509 N. Prospect Ave.
Milwaukee, WI 53202-2323

Steven M. Biskupic/ Michelle L. Jacobs
Biskupic & Jacobs, S.C.
1045 W. Glen Oaks Lane, Ste. 106
Mequon, WI 53092

Sean O'Donnell Bosack
Godfrey & Kahn, S.C.
780 N. Water St., Ste. 700
Milwaukee, WI 53202-3512

Eric J. Wilson
Godfrey & Kahn, S.C.
P.O. Box 2719
Madison, WI 53701-2719

Timothy M. Hansen/ James B. Barton
John P. Shanahan
Hansen Reynolds Dickinson Crueger LLC
316 N. Milwaukee St., Ste. 200
Milwaukee, WI 53202-5885

H.E. Cummins
1818 N. Taylor St., Ste. 301
Little Rock, AR 72207

Page 24
March 27, 2015
Nos.   2013AP2504-2508-W      Three Unnamed Petitioners v. Peterson
                             L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
       2014AP296-OA          Two Unnamed Petitioners v. Peterson
                             L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
       2014AP417-421-W       Schmitz v. Peterson
                             L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23


Jeffrey James Morgan                        Hon. James J. Duvall
LeBell, Dobrowski & Morgan, LLP             Buffalo County Courthouse
309 N. Water St., Suite 350                 P.O. Box 68
Milwaukee, WI 53202                         Alma, WI 54610-0068

Hon. Gregory J. Potter                      Hon. Jeffrey A. Kremers
Wood County Courthouse                      Milwaukee County Courthouse
P.O. Box 8095                               901 N. 9th St.
Wisconsin Rapids, WI 54494                  Milwaukee, WI 53233

Hon. James P. Daley
Rock County Courthouse
51 S. Main Street
Janesville, WI 53545-3951

EXHIBIT D



CHAMBERS OF
ANN WALSH BRADLEY, JUSTICE

SUPREME COURT
STATE OF WISCONSIN
STATE CAPITOL
P. O. BOX 1688
MADISON, WISCONSIN 53701

(608) 266-1888

March 19, 2014

Matthew W. O'Neill
Fox O'Neill Shannon
622 N. Water Street, Suite 500
Milwaukee, WI 53202

David C. Rice
Asst. Attorney General
P.O. Box 7857
Madison, WI 53707-7857

Francis D. Schmitz
P.O. Box 2143
Milwaukee, WI 53201-2143

Dean A. Strang
StrangBradley, LLC
10 East Doty Street, Suite 1002
Madison, WI 53703

J.B. Van Hollen
Wisconsin Attorney General
P.O. Box 7857
Madison, WI 53707-7857

Michael J. Bresnick
Stein Mitchell Muse & Cippollone
1100 Connecticut Avenue, NW
Washington, DC 20036

Todd P. Graves
Graves Garrett LLC
1100 Main Street, Suite 2700
Kansas City, MO 64105

Edward D. Greim
Graves Garrett LLC
1100 Main Street, Suite 2700
Kansas City, MO 64105

Edward H. Meyers
Stein Mitchell Muse & Cippollone
1100 Connecticut Avenue, NW
Washington, DC 20036

Philip J. O'Beirne
Stein Mitchell Muse & Cippollone
1100 Connecticut Avenue, NW
Washington, DC 20036

Michael O'Grady
P.O. Box 2
Portage, WI 53901

A. John Voelker
Director of State Courts
P.O. Box 1688
Madison, WI 53701-1688

Re:    No. 2013AP2504 – 2013AP2508
       State of Wisconsin ex rel. Three Unnamed Petitioners v. The Hon. Gregory A.
       Peterson, John Doe Judge

Dear Counsel:

Proposed Intervenor Michael O'Grady has submitted an unsealed Motion to Intervene in a Petition for Review. Three unnamed petitioners seek review of the court of appeals denial of a petition for supervisory writ. Listed as one of the attorneys who is representing an unnamed petitioner is Attorney Dean Strang. My son, John Bradley, practices law with Attorney Strang.

57

I have been advised that John has had no involvement with this petition for review. He is not acting as a lawyer in this proceeding. It is my understanding that any fee agreement is on an hourly basis and not on the basis of a contingent fee.

Under these facts and circumstances the question of recusal comes to the fore. It is not an easy decision. I am mindful that judicial impartiality is a basic premise of our jurisprudence, and it is the responsibility of a judge to protect the integrity and dignity of the judicial process from the appearance of partiality as well as from actual bias.

In response to an issue of recusal, there is a natural tendency for judges to say "I can be fair and impartial." But that is not the test. After all, the judge in the seminal recusal case of Caperton v. A.T. Massey Coal Co., 566 U.S. 868 (2009), three times proclaimed that he could be fair and impartial in response to as many motions for recusal. Nevertheless, the United States Supreme Court held that the Due Process Clause of the United States Constitution required that he not participate in the case. [1]

The Court made clear that a judge's self-proclaimed fairness does not resolve the recusal inquiry. Such a subjective response is but one step in the analysis. Due process mandates the application of an objective standard which "may also require recusal whether or not actual bias exists or can be proved." Id. at 886.

In reaching my decision on recusal, I have examined the Wisconsin Code of Judicial Conduct, Wis. Stat. § 757.19, Wisconsin Judicial Conduct Advisory Committee Opinion 00-1, other state and national ethics opinions, commentaries on judicial ethics, and relevant case law. I have also consulted with the Executive Director of the Wisconsin Judicial Commission.

Even though I subjectively believe that I could be fair and impartial in this case, and that the specific rules set forth in the Wisconsin Code of Judicial Conduct do not mandate recusal, I nevertheless determine that recusal is required here. In applying the objective standard mandated by due process, I conclude that under the facts and circumstances "reasonable, well-informed persons knowledgeable about judicial ethics standards and the justice system and aware of the facts and circumstances" could reasonably question a judge's ability to be impartial. SCR 60.04 (4).

---

[1] The recusal issue in Caperton involved campaign contributions and expenditures in a judicial election. The recusal issue I address involves a lawyer relative who is a member of the firm appearing before the court. An objective standard implementing the Due Process Clause applies to both. Caperton v. A.T. Massey Coal Co., 566 U.S. 868, 883 (2009).

Caperton makes clear that not every contribution or expenditure requires recusal. Id. at 884 ("The inquiry [regarding recusal] centers on the contribution's relative size in comparison to the total amount of money contributed to the campaign, the total amount spent in the election, and the apparent effect such contribution had on the outcome of the election.")

The Wisconsin Code of Judicial Conduct takes a case-by-case approach to the question whether a judge can participate in a case when a law firm with which a family member is affiliated as an attorney appears but the relative is not involved in the case. See Comment to SCR 60.04 (4) (e).

SCR 60.04(4) specifically provides:

(4) Except as provided in sub. (6) for waiver, a judge shall recuse himself or herself in a proceeding when the facts and circumstances the judge knows or reasonably should know establish one of the following or when reasonable, well-informed persons knowledgeable about judicial ethics standards and the justice system and aware of the facts and circumstances the judge knows or reasonably should know would reasonably question the judge's ability to be impartial: . . .

(e) The judge or the judge's spouse, or a person within a third degree of kinship to either of them, or the spouse of such a person meets one of the following criteria:

1. Is a party to the proceeding or an officer, director or trustee of a party.
2. Is acting as a lawyer in the proceeding.
3. Is known by the judge to have more than a de minimus interest that could be substantially affected by the proceeding.
4. Is to the judge's knowledge likely to be a material witness in the proceeding.

The comment to the rule sheds further light on how the rule is to be interpreted and applied. It states:

Comment: The fact that a lawyer in a proceeding is affiliated with a law firm with which a relative of the judge is affiliated does not of itself require the judge's recusal. Under appropriate circumstances, the fact that the judge's impartiality may reasonably be questioned or that the relative is known by the judge to have an interest in the law firm that could be "substantially affected by the outcome of the proceeding" may require the judge's recusal.

None of the provisions that mandate recusal applies here. My son is neither a party nor a witness. Additionally, the facts indicate that he is not acting as a lawyer in the proceeding and because the fee agreement is not contingent, any interest that he may have is not "substantially affected by the outcome of the proceeding." As noted above, I subjectively believe that I could be fair and impartial in this action.

Nevertheless, a judge is to avoid even the appearance of partiality. Wisconsin Judicial Conduct Advisory Committee Opinion 00-1 lists factors to consider in making a recusal decision involving a lawyer relative. Those factors include: (a) the appearance to the general public of the failure to recuse; and (b) the appearance to other attorneys, judges and members of the legal system of the failure to recuse.

59

Other states have considered additional factors that include: The nature of the action (Tennessee Advisory Opinion 04-1); whether the relative's name appears in the firm name (Colorado Advisory Opinion 05-2); the size of the firm (Colorado Advisory Opinion 05-2, Illinois Advisory Opinion 94-18, Tennessee Advisory Opinion 04-1, Washington Advisory Opinion 88-12); whether the fee in the case is contingent or hourly (Tennessee Advisory Opinion 04-1); and whether the relative's position is as associate, partner, shareholder, or of counsel (Colorado Advisory Opinion 05-2; Illinois Advisory Opinion 94-18; Washington Advisory Opinion 88-12).

This court has been subject to extensive criticism for its recusal rules and practices. Weak recusal rules and lapses in recusal practices undermine the public trust and confidence in a fair and impartial judiciary.

We have an obligation, and the public has a right, to hold judges to high ethical standards. Judicial integrity lies at the heart of the public's respect for judicial decisions and their legitimacy.

Therefore, for the reasons set forth above, I am not participating in the motion for intervention or the underlying petition for review.

Respectfully,

Ann Walsh Bradley

cc: Diane Fremgen, Clerk of Supreme Court
Chief Justice Shirley S. Abrahamson
Justice N. Patrick Crooks
Justice David T. Prosser, Jr.
Justice Patience Drake Roggensack
Justice Annette Kingsland Ziegler
Justice Michael J. Gableman

Page 24
March 27, 2015
Nos.  2013AP2504-2508-W    Three Unnamed Petitioners v. Peterson
                           L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
      2014AP296-OA          Two Unnamed Petitioners v. Peterson
                           L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
      2014AP417-421-W       Schmitz v. Peterson
                           L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23


Jeffrey James Morgan              Hon. James J. Duvall
LeBell, Dobrowski & Morgan, LLP   Buffalo County Courthouse
309 N. Water St., Suite 350       P.O. Box 68
Milwaukee, WI 53202               Alma, WI 54610-0068

Hon. Gregory J. Potter            Hon. Jeffrey A. Kremers
Wood County Courthouse            Milwaukee County Courthouse
P.O. Box 8095                     901 N. 9th St.
Wisconsin Rapids, WI 54494        Milwaukee, WI 53233

Hon. James P. Daley
Rock County Courthouse
51 S. Main Street
Janesville, WI 53545-3951

EXHIBIT E



OFFICE OF THE CLERK

# Supreme Court of Wisconsin

110 EAST MAIN STREET, SUITE 215
P.O. BOX 1688
MADISON, WI 53701-1688

TELEPHONE (608) 266-1880
FACSIMILE (608) 267-0640
Web Site: www.wicourts.gov

March 27, 2015

**To:**

Susan K. Raimer
Columbia County Clerk of Circuit Court
P.O. Box 587
Portage, WI 53901-2157

Carlo Esqueda
Dane County Clerk of Circuit Court
215 S. Hamilton St.
Madison, WI 53703

Lynn M. Hron
Dodge County Clerk of Circuit Court
210 W. Center Street
Juneau, WI 53039

Lia Gust
Iowa County Clerk of Circuit Court
222 N. Iowa Street
Dodgeville, WI 53533

John Barrett
Milwaukee County Clerk of Circuit Court
901 N. 9th St., Rm. G-8
Milwaukee, WI 53233

*Additional Parties listed on Pages 23-24

You are hereby notified that the Court has entered the following order:

Nos. 2013AP2504-2508-W    Three Unnamed Petitioners v. Peterson
                                L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
      2014AP296-OA                 Two Unnamed Petitioners v. Peterson
                                  L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
      2014AP417-421-W            Schmitz v. Peterson
                                  L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

      More than one year after the three John Doe-related proceedings (Three Unnamed Petitioners v. Peterson, Nos. 2013AP2504-2508-W; Two Unnamed Petitioners v. Peterson, No. 2014AP296-OA; and Schmitz v. Peterson, Nos. 2014AP417-421-W; collectively, the John Doe cases) were initiated in the court of appeals and in this court, and months after this court had already put into place a procedure for providing public access to redacted versions of **all** previously sealed documents, Journal Sentinel, Inc., the publisher of the Milwaukee Journal Sentinel, moved to intervene for the stated purpose of asserting its purported right to gain access to the "proceedings" and "records" in this court. We conclude that the motion is untimely, and that it must be denied.

62

Page 2
March 27, 2015

Nos.  2013AP2504-2508-W    <u>Three Unnamed Petitioners v. Peterson</u>
                               L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

        2014AP296-OA           <u>Two Unnamed Petitioners v. Peterson</u>
                               L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11

        2014AP417-421-W       <u>Schmitz v. Peterson</u>
                               L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

        Proceedings in the appellate courts arising out of the pending, five-county John Doe investigation have been ongoing since November 2013, when three unnamed petitioners filed a petition for a supervisory writ in the court of appeals (Case Nos. 2013AP2504-2508-W). In a public order dated November 22, 2013, the court of appeals directed that the writ petition and supporting memorandum be held under seal while the underlying John Doe investigations remained pending and the relevant secrecy orders issued by the John Doe judge remained in effect, or until further order of the court of appeals. With the release of this order, it was plain for all to see that certain documents regarding the John Doe investigation filed in the appellate courts would be maintained under seal, at least temporarily. Indeed, multiple articles and postings on the Milwaukee Journal Sentinel's website, jsonline.com,[1] from November and December 2013 explicitly stated that the filings in the court of appeals were under seal and not available for public inspection.

        The court of appeals' final order issued on January 30, 2014, made clear that certain documents in the appellate record would be permanently sealed. The order stated that certain documents needed to remain sealed because they "would identify subjects of one or more of the John Doe proceedings, specific information that has been gathered or is being sought by a subpoena or search warrant, or other details of the investigation." The court unsealed certain documents the parties agreed could be unsealed because they did not disclose any such information. Indeed, with respect to a motion to stay filed in the court of appeals, the court concluded that the motion could be unsealed because it did not "reveal[] any information that would violate a secrecy order," which it concluded was the proper standard for determining whether or not a particular document should remain sealed.

        Despite knowing that the court of appeals had initially ordered all documents in the writ proceeding to be sealed and then had kept under seal all documents that contained information covered by the secrecy order issued by the John Doe judge, Journal Sentinel, Inc. never sought to intervene in the court of appeals to argue that the court of appeals was failing to provide adequate public access to the documents filed in that court.

        The various proceedings in this court began shortly after the court of appeals issued its January 30, 2014 final order in Case Nos. 2013AP2504-2508-W. First, on February 7, 2014, two unnamed petitioners filed a petition for leave to commence an original action in this court (Case

---

[1] <u>See</u> "Court filings seek to stop Doe probe into recall elections," dated November 19, 2013, located at http://www.jsonline.com/news/statepolitics/court-filings-target-judge-overseeing-probe-into-conservative-groups-b99145927z1-232536631.html; "Appeals court won't stop secret probe into campaign fundraising, spending," dated November 22, 2013, located at http://www.jsonline.com/news/statepolitics/appeals-court-declines-to-stop-secret-probe-into-campaign-fundraising-spending-b99148909z1-233086001.html; and "Prosecutor and judges file briefs in John Doe case," dated December 26, 2013, located at http://www.jsonline.com/blogs/news/237328331.html, all of which were last visited on March 25, 2015.

Page 3
March 27, 2015

Nos.  2013AP2504-2508-W     Three Unnamed Petitioners v. Peterson
                           L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
     2014AP296-OA          Two Unnamed Petitioners v. Peterson
                           L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
     2014AP417-421-W       Schmitz v. Peterson
                           L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23


No. 2014AP296-OA).  Less than two weeks later, the three unnamed petitioners in Case Nos. 2013AP2504-2508-W filed a petition for review of the court of appeals' January 30, 2014 order.  Within a couple of days of the filing of the petition for review, the special prosecutor filed his own petition for a supervisory writ in the court of appeals (Case Nos. 2014AP417-421-W). That writ petition soon became the subject of three bypass petitions filed in this court, all of which were filed within a five-day span in April 2014.  It was evident from this court's public docket database on its website, www.wicourts.gov, that all of these filings in this court were accompanied by motions to seal and that the filings were indeed being maintained under seal. Once again, Journal Sentinel, Inc. never moved to intervene in this court on the ground that its views on whether filings should be unsealed needed to be heard or public access would be lost.

When this court subsequently granted review in all three John Doe cases in a December 16, 2014 order, the court explicitly addressed the fact that most documents in the three cases had been sealed.  The court created a procedure under which original versions or redacted versions of all documents that had been maintained under seal would be filed and ultimately be placed into the court's public case file for viewing by all members of the news media and the public.  The court established a similar redaction procedure for all of the briefs that the parties would be filing in the coming months.  Yet again, Journal Sentinel, Inc. failed to move to intervene to argue that the court's redaction procedures were insufficient in providing public access.

Only after the court asked the parties to submit a report on how oral argument might be handled in these John Doe cases (and on the date the parties' report was due) did Journal Sentinel, Inc. move to intervene to express its views on how this court should provide public access to its proceedings and record.  Moreover, by the time Journal Sentinel, Inc. filed its intervention motion, the parties had already filed their proposed redactions of their briefs-in-chief and their previous filings, and the parties were close to completing the written objection process for each others' proposed redactions.[2]  Even then, with only slightly more than a month before the scheduled dates for oral argument, Journal Sentinel, Inc. did not provide the court with its arguments on public access.  Indeed, its memorandum in support of the intervention motion specifically stated that it was not asking the court to make any decisions on access at that point because, if its intervention motion would be granted, it would make those arguments in the days and weeks to come.  Although it failed to recognize this fact, Journal Sentinel, Inc.'s request for the ability to brief public access issues in the coming weeks would have also meant that the court would have been required to provide the parties to these cases with a chance to respond.

---

[2] The briefing on the merits of the parties was also very close to completion by the time the intervention motion was filed.  Indeed, briefing by the parties has now been completed, and the case is ready for decision.

Page 4
March 27, 2015
Nos.   2013AP2504-2508-W     Three Unnamed Petitioners v. Peterson
                                    L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
            2014AP296-OA             Two Unnamed Petitioners v. Peterson
                                    L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
            2014AP417-421-W       Schmitz v. Peterson
                                    L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

The import of Journal Sentinel, Inc.'s request for additional time to submit its arguments on public access at this late stage in the case is that this court would have been precluded from making decisions on whether to hold oral argument, and if oral argument would be granted, what procedures would be used for the oral argument, until Journal Sentinel, Inc. and the parties had submitted their additional memoranda on these issues. In any event, as set forth in another order being issued today, the court has determined that it will not hold oral argument in these cases. Thus, to the extent Journal Sentinel, Inc. seeks to submit its views on whether oral argument should be open, that decision has, of necessity, already been made, rendering that portion of the intervention motion moot.

To the extent that Journal Sentinel, Inc. seeks to submit its view on access to filings in this court, it is also too late. As noted above, the court already in December of last year created procedures to provide public access to redacted copies of briefs and other filings. It is today issuing another order that rules on the various objections to the redactions, or lack thereof, in the proposed redacted versions of documents already filed by the parties. That order once again requires the parties to submit revised redacted versions of their filings in compliance with the John Doe secrecy orders so that the portions of the filings that do not disclose confidential information can be placed into the public file. Importantly, while Journal Sentinel, Inc. professes that it wants to submit arguments regarding the public's access to documents, its motion never indicates that it objects to the court's redaction procedures. Most importantly, if the court were to grant Journal Sentinel, Inc.'s motion to intervene, the process of receiving its memoranda and the responsive memoranda of the parties would delay by weeks or months the completion of the already ongoing redaction process and the placing of the redacted documents into the public court file, which is the type of public access apparently sought by Journal Sentinel, Inc.

Journal Sentinel, Inc. cites four cases as evidence that Wisconsin courts have "repeatedly" allowed media organizations to intervene on issues of public access. None of those cases, however, involved the time conditions present here, where Journal Sentinel, Inc. seeks to intervene after an appellate court has already created a procedure for providing public access and just weeks before the court will be holding a decision conference on the merits of the case. It first cites In re John Doe Proceeding Commenced by Affidavit Dated July 25, 2001, 2003 WI 30, 260 Wis. 2d 653, 660 N.W.2d 260, but in that case the intervention motion was filed and already decided at the time this court accepted certification at the beginning of the appeal. It also cites State ex rel. Bilder v. Township of Delevan, 112 Wis. 2d 539, 334 N.W.2d 252 (1983), but there the motions to intervene by newspapers were made in the circuit court within weeks of the case being commenced and at the same time a stipulation to seal the circuit court record was being filed in the circuit court. Journal Sentinel, Inc. further cites an unpublished order of the court of appeals allowing it to intervene and ultimately unsealing certain documents in an appellate record in a criminal case arising out of an earlier John Doe proceeding. See State v. Rindfleisch, No. 2013AP362-CR (Wis. Ct. App. Feb. 10, 2014). The intervention motion in that appeal,

Nos.   2013AP2504-2508-W     Three Unnamed Petitioners v. Peterson
                              L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
          2014AP296-OA         Two Unnamed Petitioners v. Peterson
                              L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
         2014AP417-421-W       Schmitz v. Peterson
                              L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

however, was filed when the briefing was at an early stage and more than a year before oral argument was held, not just a few weeks prior to the scheduled oral argument dates as was the case here. Finally, Journal Sentinel, Inc. points to the decision of a John Doe judge (not an appellate court) in an earlier John Doe proceeding, who allowed Journal Sentinel, Inc. to intervene. In that situation, however, the John Doe proceeding had already been completed; it was not still pending as is the situation here. Moreover, the issue there was not whether the John Doe judge should unseal documents gathered in an ongoing John Doe proceeding, but whether the judge should order that documents obtained from the county should be returned to the county after the completion of the John Doe proceeding. That is an entirely different issue with entirely different time considerations than presented by the intervention motion filed here.

The dissent criticizes this order as violating the public's right to open judicial proceedings in an unjustified and unprecedented manner. This is simply not correct. It is true that John Doe proceedings, like most other court proceedings, are presumptively open, but this court has clearly recognized that a John Doe judge may exercise discretion to close a John Doe proceeding to the public when there is a compelling reason to do so. See, e.g., State v. Unnamed Defendant, 150 Wis. 2d 352, 359, 441 N.W.2d 696 (1989). Indeed, this court has already recognized that the legislature has made a clear statement of public policy that John Doe proceedings are exceptions from the usual requirement that court records and court proceedings must be open to the public in all respects. See In re John Doe Proceeding, 260 Wis. 2d 653, ¶67 ("The John Doe statute, Wis. Stat. § 968.26, which authorizes secrecy in John Doe proceedings, is a clear statement of legislative policy and constitutes a specific exception to the public records law [Wis. Stat. § 19.35(1)].") This clear statement of public policy is set forth in the John Doe statute itself, which states that "[t]he examination [in a John Doe proceeding] may be adjourned and may be secret." Wis. Stat. § 968.26(3). The factors a John Doe judge should consider in exercising the discretion to keep a proceeding secret include whether making the John Doe proceeding secret would keep the target of the proceeding or an arrested defendant from fleeing; whether it would prevent targets of the proceeding or other individuals from collecting perjured testimony, tampering with evidence, or otherwise preventing inquiry into the subject matter of the proceeding; whether it would free witnesses from the threat of retaliation for their John Doe evidence or testimony and render them more free in their testimony; and whether it would protect targets and witnesses in the John Doe proceeding by preventing evidence or testimony that may be mistaken, untrue or irrelevant from becoming public. See In re John Doe Proceeding, 260 Wis. 2d 653, ¶60; State ex rel. Newspapers, Inc. v. Cir. Ct., 124 Wis. 2d 499, 508, 370 N.W.2d 209 (1985) (recognizing that there is a public policy interest in protecting a potential defendant's privacy and reputation, which could be jeopardized by opening a pre-charging proceeding (there under Wis. Stat. § 968.02(3)) if no criminal charges result); Wisconsin Family Counseling Services v. State, 95 Wis. 2d 670, 677, 291 N.W.2d 631 (Ct. App. 1980).

Page 6
March 27, 2015
Nos.   2013AP2504-2508-W     Three Unnamed Petitioners v. Peterson
                              L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
        2014AP296-OA          Two Unnamed Petitioners v. Peterson
                              L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
        2014AP417-421-W       Schmitz v. Peterson
                              L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

If a John Doe judge, in the exercise of that judge's discretion, determines that a John Doe proceeding should be kept secret, some form of appellate review should ordinarily not lead to the disclosure of information that has been ordered by the John Doe judge to be secret. In re John Doe Proceeding, 260 Wis. 2d 653, ¶67 ("It is critical that when a John Doe judge issues a secrecy order pursuant to Wis. Stat. § 968.26, the judge must be assured that secrecy will be preserved when and if the matter reaches an appellate court. Seeking review in the court of appeals must not become a vehicle to undermine the secrecy or integrity of a John Doe proceeding."). When a writ petition, petition for review, or original action is filed either in the court of appeals or in this court, the appellate court should review the materials filed in the appellate court (including potentially materials that originated in the John Doe proceeding) to determine whether they should be maintained under seal in the appellate court. Id., ¶71. While an appellate court is not obligated to seal all documents that include information covered by a John Doe secrecy order, the appellate court should generally lean toward protecting information already ordered to be kept secret. As we noted, "failure [by an appellate court] to protect this information on review would compromise John Doe investigations and encourage frivolous requests for review by disgruntled individuals seeking to expose the details of the underlying proceeding." Id., ¶68. Absent a compelling reason for overturning a John Doe judge's secrecy order, in whole or in part, appellate courts seal those portions of the appellate record that "appear to fall legitimately within the scope of a permissible secrecy order." Id., ¶71.

In summary, it is clear from the writings of its own employees that Journal Sentinel, Inc. knew for more than a year of the sealed nature of filings arising out of the pending John Doe investigation in both this court of appeals and this court, but that Journal Sentinel, Inc. took no action until after the court had already created a redaction procedure to place documents into the public court file and until just weeks before the scheduled oral argument dates. At this late date, granting the intervention motion would unfairly and unjustly delay the court's ability to make needed decisions. Indeed, granting the intervention motion would delay the redaction process and the placing of redacted documents and briefs into the publicly-accessible court file, in clear contradiction to the apparent purpose of the intervention motion. Journal Sentinel, Inc. has simply waited too long to claim that it needs to be heard on issues of public access, which have already been decided by this court. Accordingly,

IT IS ORDERED that the motion to intervene is denied.

ANN WALSH BRADLEY, J., did not participate.

¶1     SHIRLEY S. ABRAHAMSON, C.J. (dissenting). Journal Sentinel, Inc., publisher of the Milwaukee Journal Sentinel, seeks to intervene in the three John Doe cases currently under review in this court. Journal Sentinel requests "an opportunity to be heard on important issues of access to [the] documents" on which the parties' numerous petitions to this court are based, to

Page 7
March 27, 2015
Nos.    2013AP2504-2508-W        Three Unnamed Petitioners v. Peterson
                                L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
        2014AP296-OA            Two Unnamed Petitioners v. Peterson
                                L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
        2014AP417-421-W          Schmitz v. Peterson
                                L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23


"oral arguments before the Court," and to "the Court's ultimate opinion(s)" in these cases. The court denies Journal Sentinel's requests on the sole basis of timeliness.[1]

¶2      As members of the public, newspapers have standing to challenge a court's decision to close its records or proceedings.[2] This standing is rooted in the shared right of the news media and the public to access court records and proceedings, which the First Amendment guarantees.[3]

¶3      When a newspaper advocates for openness in a judicial proceeding, it represents both itself and the public at large.[4] In the instant cases, Journal Sentinel therefore acts in part as a surrogate for the public.

¶4      Wisconsin courts have repeatedly allowed newspapers to intervene in cases that are subject to secrecy orders and in cases in which the public's right to attend court proceedings or view public records is at stake.[5] Indeed, this court has previously allowed newspapers to intervene in John Doe cases for the specific and limited purpose of presenting argument on the issue of openness.[6]

---

[1] The court's order denying Journal Sentinel's motion to intervene is one of three the court issues today in the John Doe cases. I discuss the other two—one canceling oral argument and one requiring extensive redaction of the parties' briefs—in my dissents to those orders. However, the issues presented in this trio of orders are interrelated and overlapping. For a full picture of the important public interests at stake, my dissents in all three orders should be read together.

[2] State ex rel. Newspapers, Inc. v. Circuit Court, 65 Wis. 2d 66, 69, 73, 221 N.W.2d 894 (1974) (explaining that newspapers, newspaper reporters, and "any citizen and member of the public" have standing to raise the issue of openness).

[3] State v. Pinno, 2014 WI 74, ¶70, 356 Wis. 2d 106, 149, 850 N.W.2d 207.

[4] See State ex rel. Newspapers, Inc. v. Showers, 135 Wis. 2d 77, 81, 398 N.W.2d 154 (1987). See also State ex rel. La Crosse Tribune v. Circuit Court, 115 Wis. 2d 220, 241, 340 N.W.2d 460 (1983) (explaining that the news media's right to open judicial proceedings "transcends the right of a newspaper or its reporter to have access to a courtroom," furthering "the right of the people to an open and responsible government").

[5] See, e.g., Zellner v. Cedarburg School Dist., 2007 WI 53, 300 Wis. 2d 290, 731 N.W.2d 240; In re John Doe Proceeding, 2003 WI 30, 260 Wis. 2d 653, 660 N.W.2d 260; State ex rel. Bilder v. Delavan Tp., 112 Wis. 2d 539, 334 N.W.2d 252 (1983).

[6] See, e.g., In re John Doe Proceeding, 2003 WI 30, 260 Wis. 2d 653, 660 N.W.2d 260 (newspaper's motion to intervene with respect to the issue of secrecy of the appellate record in a John Doe proceeding was granted by this court); State ex rel. Newspapers, Inc. v. Circuit Court, 65 Wis. 2d 66, 73, 221 N.W.2d 894 (1974) (holding that newspapers have standing to challenge secret immunity hearings in a John Doe proceeding).

Page 8
March 27, 2015
Nos.  2013AP2504-2508-W    <u>Three Unnamed Petitioners v. Peterson</u>
                                        L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
          2014AP296-OA                 <u>Two Unnamed Petitioners v. Peterson</u>
                                          L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
          2014AP417-421-W            <u>Schmitz v. Peterson</u>
                                          L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

¶5     In contrast to its past practice, today the court proclaims that it will not hear argument from the media or the public on the important issue of openness in the John Doe cases before it. The court unceremoniously slams its doors (and ears) shut, saying Journal Sentinel "has simply waited too long."

¶6     Timeliness is not "a tool of retribution which can be used to punish a would-be intervenor for allowing time to pass before moving to intervene. . . . [T]he traditional attitude of the [] courts is to allow intervention 'where no one would be hurt and greater justice would be attained.'"[7]

¶7     The court's response to Journal Sentinel's motion endangers the public's perception of the judicial system as fair. "Fairness is essential to our system of justice. . . . It is hard to demonstrate fairness if the courtroom is closed—if citizens who have done nothing wrong are shooed away."[8] Yet the court in the instant cases shoos the public away.

¶8     The court's swift disposal of Journal Sentinel's motion—in conjunction with its concurrent decisions to cancel oral argument and require extensive redaction of the parties' briefs—may, unfortunately, signify the court's intention to dispose of the John Doe cases as a whole in a similarly swift and secretive manner. I cannot join the court in concealing this important litigation from public view.

¶9     I discuss Journal Sentinel's motion and the court's order denying it in four parts.

¶10     First, I find little merit in the order's narrow discussion of timeliness and disagree with the court's determination that Journal Sentinel's motion is untimely. "There is no precise formula to determine whether a motion to intervene is timely."[9] Rather, a court considering the timeliness of a motion to intervention considers "whether in view of all the circumstances the proposed intervenor acted promptly."[10] In my opinion, Journal Sentinel acted promptly under the circumstances presented.

¶11     Second, I conclude that by refusing to give Journal Sentinel an opportunity to be heard on the issue of openness in these proceedings, the order violates the substantive rights of the news

---

[7] <u>McDonald v. Lavino</u>, 430 F.2d 1065, 1074 (5th Cir. 1970).

[8] <u>State v. Pinno</u>, 2014 WI 74, ¶78, 356 Wis. 2d 106, 850 N.W.2d 207.

[9] <u>State ex rel. Bilder v. Delavan Tp.</u>, 112 Wis. 2d 539, 550, 334 N.W.2d 252 (1983).

[10] <u>State ex rel. Bilder v. Delavan Tp.</u>, 112 Wis. 2d 539, 550, 334 N.W.2d 252 (1983).

Page 9
March 27, 2015
Nos.   2013AP2504-2508-W     <u>Three Unnamed Petitioners v. Peterson</u>
                                 L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
       2014AP296-OA                 <u>Two Unnamed Petitioners v. Peterson</u>
                                 L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
       2014AP417-421-W            <u>Schmitz v. Peterson</u>
                                   L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

media and of the public as a whole to open judicial proceedings—a right protected by the constitutions of the United States and Wisconsin, by the Wisconsin Statutes, and by the common law.

¶12    Third, I conclude that by denying Journal Sentinel a chance to be heard on its motion and on the issue of openness without first providing Journal Sentinel with a hearing and an explanation of the court's decision, the court breaches the procedure it has established for ruling on a request to keep court proceedings open.

¶13    Fourth, I disagree with the notion that this court must adopt wholesale the secrecy order issued by the John Doe judge. Regardless of what level of secrecy the John Doe judge saw fit to impose on the John Doe records and proceedings, this court must independently determine the appropriate level of secrecy to impose on this court's records and proceedings. In making this determination, this court would benefit from Journal Sentinel's perspective.

¶14    I would grant Journal Sentinel's motion to intervene. I would listen to what Journal Sentinel has to say about the importance of public access to this court's records and proceedings and about the level of access appropriate in the instant cases. The parties' debate about redaction and oral argument continues. The court should hear from the public.

I

¶15    I begin by addressing the order's one and only basis for denying Journal Sentinel's motion: timeliness.

¶16    Whether a motion to intervene was timely filed is a discretionary determination.[11]

¶17    First, "[i]n exercising its discretion, the court necessarily will consider the time element itself . . . ."[12] However, the time element "should not be judged in a vacuum."[13] The court must decide "whether in view of all the circumstances the proposed intervenor acted promptly."[14]

---

[11] <u>State ex rel. Bilder v. Delavan Tp.</u>, 112 Wis. 2d 539, 550, 334 N.W.2d 252 (1983).

[12] 7C Charles Alan Wright et al., Fed. Prac. & Proc. Civ. § 1916 (3d ed. 2007).

[13] 7C Charles Alan Wright et al., Fed. Prac. & Proc. Civ. § 1916 (3d ed. 2007).

[14] <u>State ex rel. Bilder v. Delavan Tp.</u>, 112 Wis. 2d 539, 550, 334 N.W.2d 252 (1983).

Page 10
March 27, 2015
Nos.  2013AP2504-2508-W    <u>Three Unnamed Petitioners v. Peterson</u>
                           L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

      2014AP296-OA         <u>Two Unnamed Petitioners v. Peterson</u>
                           L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11

      2014AP417-421-W      <u>Schmitz v. Peterson</u>
                           L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23


¶18    Second, the court must determine "whether the intervention will prejudice the original parties to the lawsuit."[15]  Courts have traditionally allowed intervention "where no one would be hurt and greater justice would be attained."[16]

¶19    Third, in exercising its discretion, the court should explore "[t]he existence of unusual circumstances militating either for or against a determination that the [motion to intervene] is timely."[17]

¶20    Because determining the timeliness of Journal Sentinel's motion requires consideration of "all the circumstances,"[18] I begin by setting forth the relevant chronology and background of the instant litigation:

   •   After the three John Doe cases had been pending before this court for months and months, this court granted review of the cases on December 16, 2014 (about three months ago).  Prior to that date, it was unclear whether there would even be John Doe cases in this court into which Journal Sentinel might intervene.

   •   Although this court issued preliminary redaction instructions to the parties in its December 16, 2014 order, in which the court agreed to hear all three John Doe cases, the parties have continued to dispute the appropriate level of redaction in this court.  The parties were filing redaction-related objections when Journal Sentinel moved to intervene and they are still filing motions related to redaction.  The issue of redaction was therefore far from settled when Journal Sentinel filed its motion to intervene.  It is far from settled even today.

   •   This court issued an order requesting input from the parties on the manner in which oral argument should be conducted on March 4, 2015.  This was the first indication the court had given that it was considering closing all or part of oral argument, and the court had still given no indication that it might cancel oral argument altogether.  In response to the court's request, the parties have offered varied and conflicting suggestions about whether and how to hold oral argument and what access to give the public to such argument.  This debate is ongoing.

---

[15] <u>State ex rel. Bilder v. Delavan Tp.</u>, 112 Wis. 2d 539, 550, 334 N.W.2d 252 (1983).

[16] <u>McDonald v. Lavino</u>, 430 F.2d 1065, 1074 (5th Cir. 1970) (internal quotation marks omitted).

[17] <u>Stallworth v. Monsanto Co.</u>, 558 F.2d 257, 266 (5th Cir. 1977).

[18] <u>State ex rel. Bilder v. Delavan Tp.</u>, 112 Wis. 2d 539, 550, 334 N.W.2d 252 (1983).

71

Page 11
March 27, 2015
Nos.  2013AP2504-2508-W   Three Unnamed Petitioners v. Peterson
                          L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
      2014AP296-OA        Two Unnamed Petitioners v. Peterson
                          L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
      2014AP417-421-W     Schmitz v. Peterson
                          L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

> Thus, like the issue of redaction, the issue of oral argument was far from settled when Journal Sentinel moved to intervene and it is far from settled even today.[19]
>
> - Journal Sentinel's motion to intervene was filed on March 11, 2015—less than three months after the court granted review of these cases, just one week after the court indicated that it might be taking the highly unusual step of closing oral argument, and over a month before oral argument was scheduled to take place.
>
> - Alongside the court's order denying Journal Sentinel's motion to intervene, the court is issuing two additional orders. One requires extensive redaction of the parties' briefs, and one cancels oral argument in the John Doe cases. Together, these three orders effectively exclude the public altogether from these John Doe proceedings. The level of secrecy the court is imposing in the present cases and the manner in which it is imposing it are extraordinary indeed.

¶21     With this chronology and background in mind, I explore the three criteria for determining the timeliness of Journal Sentinel's motion to intervene and conclude that the motion is timely.

¶22     First, under the circumstances presented, Journal Sentinel's motion was filed promptly.

¶23     Journal Sentinel moved to intervene just seven days after the court issued an order requesting input from the parties on the manner in which oral argument should be conducted and the extent of public access that should be granted—topics implicating the fundamental First Amendment right of the public and the news media to access judicial proceedings.[20] Prior to the court's March 4, 2015 order, Journal Sentinel had received no indication from the court that it might close oral argument.

¶24     A motion to intervene filed just seven days after the court notified the parties and the public that it was considering this extraordinary step cannot reasonably be deemed tardy. Indeed, Journal Sentinel's motion to intervene for the purpose of presenting argument on the issue of public access to oral argument in these cases could hardly have been prompter.

¶25     The court's order stresses the fact that Journal Sentinel did not intervene two years ago, when the John Doe cases were being litigated in the court of appeals. So what? Journal Sentinel has the right to challenge this court's closure of this court's records and proceedings independent

---

[19] For a timeline of this court's orders concerning oral argument in the present cases, see ¶¶19-26 of my dissent to the court's order eliminating oral argument (also issued today).

[20] See State v. Pinno, 2014 WI 74, ¶70, 356 Wis. 2d 106, 149, 850 N.W.2d 207.

Page 12
March 27, 2015
Nos.    2013AP2504-2508-W    <u>Three Unnamed Petitioners v. Peterson</u>
                            L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
        2014AP296-OA        <u>Two Unnamed Petitioners v. Peterson</u>
                            L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
        2014AP417-421-W     <u>Schmitz v. Peterson</u>
                            L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

of its right to challenge the court of appeals' closure of the court of appeals' records and proceedings. Moreover, one of the John Doe cases before the court is an original action—it was never before the court of appeals, and it was therefore impossible for Journal Sentinel to intervene in that case in the court of appeals.

¶26    Second, the parties would not be prejudiced by Journal Sentinel's intervention. Journal Sentinel can be heard promptly and a decision on public access to the instant cases can be made promptly if the court has the will to do so.

¶27    The parties dispute the appropriate level of openness in these proceedings. Journal Sentinel's presenting argument on the issue of openness would contribute to this ongoing debate. It would also ensure that the court decides the level of secrecy to impose in the John Doe cases with the public's right to access firmly in mind.

¶28    Third, the instant cases present extraordinary circumstances that weigh strongly in favor of a finding of timeliness.

¶29    As previously explained, this court is issuing an order today that cancels oral argument in the instant cases. This is an unusual, if not unprecedented, step. As I discuss here and in my dissent to the court's order canceling oral argument, it is also a step that undermines the public's firmly established right of access to judicial proceedings.

¶30    Courts have previously granted motions to intervene after the parties had submitted a settlement agreement to the circuit court[21] and even after judgment has been entered.[22] Such cases recognize that "'[t]imeliness' is not a word of exactitude or of precisely measurable dimensions."[23] Rather, "[t]he requirement of timeliness must have accommodating flexibility toward both the court and the litigants if it is to be successfully employed to regulate intervention in the interest of justice."[24]

¶31    The importance of taking a flexible approach to timeliness is especially acute in the present cases in light of the significance of the public's right to access, which is at stake.

_____

[21] See <u>State ex rel. Bilder v. Delavan Tp.</u>, 112 Wis. 2d 539, 550-51, 334 N.W.2d 252 (1983).

[22] See <u>McDonald v. Lavino</u>, 430 F.2d 1065, 1074 (5th Cir. 1970).

[23] <u>McDonald v. Lavino</u>, 430 F.2d 1065, 1074 (5th Cir. 1970). <u>See also</u> 7C Charles Alan Wright et al., Fed. Prac. & Proc. Civ. § 1916 (3d ed. 2007).

[24] <u>McDonald v. Lavino</u>, 430 F.2d 1065, 1074 (5th Cir. 1970). <u>See also</u> 7C Charles Alan Wright et al., Fed. Prac. & Proc. Civ. § 1916 (3d ed. 2007).

Page 13
March 27, 2015
Nos.   2013AP2504-2508-W        Three Unnamed Petitioners v. Peterson
                                L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
       2014AP296-OA             Two Unnamed Petitioners v. Peterson
                                L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
       2014AP417-421-W          Schmitz v. Peterson
                                L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

¶32     The court's failure to provide authority to support its conclusion is particularly telling. Although the case law dictates an accommodating approach, the court takes a rigid approach. The court's long recitation of the procedural history of the instant litigation cannot overcome the paltry support in the case law for the court's position on timeliness.

¶33     In sum, I conclude that Journal Sentinel's motion to intervene was timely filed in the instant cases. The court's one and only basis for rejecting Journal Sentinel's motion is not cogent.

II

¶34     I now examine the substantive right to open judicial proceedings, which Journal Sentinel seeks in vain to enforce.

¶35     The right to open judicial proceedings, that is, the right of the public and the news media to attend court proceedings and view court records, is longstanding.[25] It is rooted in the First Amendment to the United States Constitution[26] and is buttressed by the Wisconsin Constitution.[27]

¶36     The First Amendment right to open court proceedings applies to appellate proceedings.[28]

¶37     The presumption under the First Amendment of public access to judicial proceedings can be overcome only if closure serves a compelling interest; there is a substantial probability that this compelling interest would be harmed in the absence of closure; and there are no alternatives to closure that would adequately protect the compelling interest.[29]

---

[25] State v. Pinno, 2014 WI 74, ¶70, 356 Wis. 2d 106, 850 N.W.2d 207.

[26] State v. Cummings, 199 Wis. 2d 721, 738, 546 N.W.2d 406 (1996). See also Presley v. Georgia, 558 U.S. 209, 212 (2010); Press-Enterprise Co. v. Superior Court, 464 U.S. 501, 516-17 (1984) (Stevens, J., concurring).

[27] State v. Pinno, 2014 WI 74, ¶70, 356 Wis. 2d 106, 850 N.W.2d 207.

[28] United States v. Moussaoui, unpublished disp., 65 Fed. App'x 881, 890 (4th Cir. 2003) (explaining that the First Amendment right to open court proceedings applies to appellate proceedings).

[29] Washington Post v. Robinson, 935 F.2d 282, 290 (D.C. Cir. 1991).

Page 14
March 27, 2015
Nos.   2013AP2504-2508-W      Three Unnamed Petitioners v. Peterson
                              L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
       2014AP296-OA          Two Unnamed Petitioners v. Peterson
                              L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
       2014AP417-421-W       Schmitz v. Peterson
                              L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23


¶38    The constitutional right to open judicial proceedings is reinforced by Wis. Stat. § 757.14 (2013-14), which dates back to 1849.[30] This statute provides that "[t]he sittings of every court shall be public and every citizen may freely attend the same . . . ."[31]

¶39    The text of Wis. Stat. § 757.14 makes clear that the statute governs the sittings of every court. Every court means every court, including, of course, this court.

¶40    The concept of open judicial proceedings embraced by the federal and state constitutions and by Wis. Stat. § 757.14 is further reinforced by the common law.[32] Judicial proceedings in the United States are open to the public not just based on constitutional and statutory law, but also by force of tradition.[33] "Judges deliberate in private but issue public decisions after public arguments based on public records."[34]

¶41    Underpinning the constitutional, statutory, and common law right to open judicial proceedings is a collective recognition of the critical role that public scrutiny plays in our form of government and in the proper functioning of Wisconsin's legal system.[35]

---

[30] State v. Pinno, 2014 WI 74, ¶70, 356 Wis. 2d 106, 850 N.W.2d 207. See also State ex rel. Newspapers, Inc. v. Circuit Court, 65 Wis. 2d 66, 73, 221 N.W.2d 894 (1974) ("Where such right of attendance is denied, any citizen . . . has a right to bring an action to enforce the right which [Wis. Stat. § 757.14] so clearly gives."). All subsequent references to the Wisconsin Statutes are to the 2013-14 version unless otherwise indicated.

[31] Wis. Stat. § 757.14.

[32] State v. Pinno, 2014 WI 74, ¶70, 356 Wis. 2d 106, 850 N.W.2d 207; State v. Cummings, 199 Wis. 2d 721, 738, 546 N.W.2d 406 (1996). See also United States v. Moussaoui, unpublished disp., 65 Fed. App'x 881, 885 (4th Cir. 2003).

[33] Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 7-8 (1986); Nixon v. Warner Communications, Inc., 435 U.S. 589, 597-99 (1978); Krynicki v. Falk, 983 F.2d 74, 75 (7th Cir. 1992); In re Reporters Committee for Freedom of the Press, 773 F.2d 1325, 1330-33 (D.C. Cir. 1985).

[34] Krynicki v. Falk, 983 F.2d 74, 75 (7th Cir. 1992).

[35] See, for example, Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 606 (1982), in which the United States Supreme Court stated as follows:

> Public scrutiny . . . enhances the quality and safeguards the integrity of the factfinding process, with benefits to the defendant and to society as a whole. Moreover, public access . . . heighten[s] public respect for the judicial process . . . [and] permits the public to participate in and serve as a check upon the judicial process—an essential component in our structure of self-government.

Page 15
March 27, 2015
Nos.    2013AP2504-2508-W    <u>Three Unnamed Petitioners v. Peterson</u>
                             L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
        2014AP296-OA         <u>Two Unnamed Petitioners v. Peterson</u>
                             L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
        2014AP417-421-W      <u>Schmitz v. Peterson</u>
                             L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

¶42    "The value of openness in judicial proceedings can hardly be overestimated."[36] "An open courtroom 'is an effective restraint on possible abuse of judicial power' and a deterrent to arbitrary decision-making."[37] It is also a means of protecting the public's broader right "to an open and responsible government."[38] Indeed, the presumption of openness in judicial proceedings "reflects the basic principle that the people must be informed about the workings of their government, and that openness in government is essential to maintain the strength of our democratic society."[39]

¶43    This court has explained that "the great virtue in our Anglo-American court system is that it is open to the public so that all will know that the courts, as instruments of government, are defending the rights of the people and are not suppressing them."[40]

¶44    Thus, the public's right to open judicial proceedings is firmly established and of the utmost importance to both the efficacy and the legitimacy of Wisconsin's judicial system.

¶45    The right is not, however, absolute.[41] Exceptional circumstances may in certain cases justify closed trials, sealed records, secrecy orders, and the like.

¶46    When the public disagrees with a court about whether exceptional circumstances warrant confidentiality in a particular case, the news media may seek to persuade the court that public

---

[36] <u>United States v. Moussaoui</u>, unpublished disp., 65 Fed. App'x 881, 885 (4th Cir. 2003).

[37] <u>State v. Pinno</u>, 2014 WI 74, ¶41, 356 Wis. 2d 106, 850 N.W.2d 207 (citing <u>In re Oliver</u>, 333 U.S. 257, 270 (1948)).

[38] <u>State ex rel. La Crosse Tribune v. Circuit Court</u>, 115 Wis. 2d 220, 241, 340 N.W.2d 460 (1983).

[39] <u>In re John Doe Proceeding</u>, 2003 WI 30, ¶66, 260 Wis. 2d 653, 660 N.W.2d 260.

[40] <u>State ex rel. La Crosse Tribune v. Circuit Court</u>, 115 Wis. 2d 220, 242, 340 N.W.2d 460 (1983).

[41] <u>In re John Doe Proceeding</u>, 2003 WI 30, ¶66, 260 Wis. 2d 653, 660 N.W.2d 260. <u>See also</u> <u>Nixon v. Warner Communications, Inc.</u>, 435 U.S. 589, 598 (1978).

Page 16
March 27, 2015
Nos.   2013AP2504-2508-W      Three Unnamed Petitioners v. Peterson
                             L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
       2014AP296-OA          Two Unnamed Petitioners v. Peterson
                             L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
       2014AP417-421-W       Schmitz v. Peterson
                             L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23


access is in fact appropriate. Accordingly, courts "routinely permit non-parties to intervene for the purposes of challenging motions to seal" and other closure matters.[42]

¶47    As previously explained, newspapers advocating for openness in judicial records or court proceedings represent both themselves and the public at large.[43] Allowing newspapers to intervene on behalf of the public makes sense, as newspapers are often the entities best able to articulate the public's interest in openness and to ensure that courts are apprised of the significance of that interest.

¶48    Moreover, newspapers are in many cases the only available source of advocacy for openness. "Practical realities dictate that very few of our citizens have the ability to be personally present during the conduct of government business. If we are to have an informed public, the media must serve as the eyes and ears of that public."[44]

¶49    Because of the profound importance of the public's right to access judicial proceedings, and because withdrawing any aspect of the judicial process from public view "makes the ensuing decision look more like fiat,"[45] secrecy at any level "requires rigorous justification" by the court imposing it.[46]

---

[42] Robert Timothy Reagan, Fed'l Jud. Ctr., Sealing Court Records and Proceedings: A Pocket Guide 20 (2010) (citing Washington Post v. Robinson, 935 F.2d 282, 289, 292 (D.C. Cir. 1991); In re Globe Newspaper Co., 729 F.2d 47, 56 (1st Cir. 1984); United States v. Aref, 533 F.3d 72, 81 (3rd Cir. 1987); In re Knight Publishing Co., 743 F.2d 231, 234 (4th Cir. 1984); Ford v. City of Huntsville, 242 F.3d 235, 241 (5th Cir. 2001); In re. Knoxville News-Sentinel Co., 723 F.2d 470, 475-76 (6th Cir. 1983); In re Associated Press, 162 F.3d 503, 507 (7th Cir. 1998); Phoenix Newspapers, Inc. v. U.S. Dist. Court, 156 F.3d 940, 949 (9th Cir. 1998); In re Tribune Co., 784 F.2d 1518, 1521 (11th Cir. 1986)).

See also United States v. Moussaoui, unpublished disp., 65 Fed. App'x 881, 884 (4th Cir. 2003) (involving a motion to intervene filed by a consortium of media companies seeking to obtain access to certain portions of the record and oral argument on appeal).

[43] "The public has a right to be present [at a judicial proceeding] whether or not any party has asserted the right." Presley v. Georgia, 558 U.S. 209, 214 (2010).

See also Robert Timothy Reagan, Fed'l Jud. Ctr., Sealing Court Records and Proceedings: A Pocket Guide 1 (2010) (citing Nixon v. Warner Communications, Inc., 435 U.S. 589, 596-97 (1978)) (explaining that the public and the news media have a qualified common-law right of access to court proceedings and judicial records).

[44] State ex rel. Newspapers, Inc. v. Showers, 135 Wis. 2d 77, 81, 398 N.W.2d 154 (1987).

[45] Krynicki v. Falk, 983 F.2d 74, 75 (7th Cir. 1992).

[46] Krynicki v. Falk, 983 F.2d 74, 75 (7th Cir. 1992).

Page 17
March 27, 2015
Nos.  2013AP2504-2508-W     <u>Three Unnamed Petitioners v. Peterson</u>
                                 L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
           2014AP296-OA           <u>Two Unnamed Petitioners v. Peterson</u>
                                 L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
           2014AP417-421-W     <u>Schmitz v. Peterson</u>
                                   L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

¶50    A court seeking to exclude the public from its proceedings has a heavy burden. To justify the closure of a courtroom or the sealing of records under the federal and state constitutions, under Wis. Stat. § 757.14, and under the common law, a court must provide compelling reasons for excluding the public, must seek alternatives to closure,[47] and must tailor its closure order as narrowly as possible.[48] The public should not be "denied the right of access to the court for other than the most weighty and overwhelming reasons."[49]

¶51    Today the court ignores its obligation to justify the secrecy it imposes. The court's failure to adequately explain itself renders its denial of the public's right to open judicial proceedings not just substantively problematic but also procedurally defective. I explore the court's procedural errors next.

### III

¶52    I turn to the court's breach of the established procedure for ruling on a request to keep court proceedings open.

¶53    This court has set forth a specific procedure to be followed when a court is considering whether to close court proceedings or records to the public.[50] The court has expressed no compunction about imposing this procedure on other courts in this state. Yet the court refuses to follow this procedure in the instant cases. Do as I say, declares this court, not as I do.

¶54    The procedure this court has prescribed for court closings is as follows.

¶55    First, a court is to exercise discretion regarding closure or sealing.

¶56    The act of excluding the public from John Doe proceedings at the appellate level, like the act of closing any court proceeding, requires the careful exercise of a court's discretion. Because

---

[47] <u>Presley v. Georgia</u>, 558 U.S. 209, 214-15 (2010).

[48] <u>Press-Enterprise Co. v. Superior Court</u>, 464 U.S. 501, 510 (1984) ("The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.").

[49] <u>State ex rel. La Crosse Tribune v. Circuit Court</u>, 115 Wis. 2d 220, 241, 340 N.W.2d 460 (1983).

[50] The procedure is set forth in <u>State ex rel. La Crosse Tribune v. Circuit Court</u>, 115 Wis. 2d 220, 236-37, 340 N.W.2d 460 (1983), and <u>State v. Pinno</u>, 2014 WI 74, ¶¶69-80, 356 Wis. 2d 106, 149, 850 N.W.2d 207.

Page 18
March 27, 2015
Nos.   2013AP2504-2508-W        Three Unnamed Petitioners v. Peterson
                               L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
       2014AP296-OA            Two Unnamed Petitioners v. Peterson
                               L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
       2014AP417-421-W         Schmitz v. Peterson
                               L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

the public's right to access should not be taken away lightly,[51] an appellate case should be closed to the public only after careful deliberation. "A balance must be struck between the public's right to be informed about the workings of its government and the legitimate need to maintain the secrecy of certain John Doe proceedings."[52]

¶57     The court should exercise its discretion only after holding a hearing.[53] "The hearing may be a brief one or it may be extensive."[54] The failure to hold any hearing at all, however, is evidence that a court has not exercised discretion and therefore constitutes an erroneous exercise of discretion.[55]

¶58     Second, a court that decides to close its doors to the public must make findings of fact and state them with sufficient specificity to enable a reviewing court to "determine whether the closure order was properly entered."[56] "The failure to expressly exercise discretion on the basis of findings of fact will be deemed an [erroneous exercise] of discretion."[57]

¶59     Third, a court must take care that the record demonstrates that discretion was in fact exercised and that a reasonable court could have reached the same conclusion as the court in question.[58] The record must show that the process by which the court chose to exclude the public was a rational one and should reveal the factors that in the court's view override the presumption of openness in the case at hand.[59] In other words, a court deciding to impose

---

[51] State v. Unnamed Defendant, 150 Wis. 2d 352, 359, 441 N.W.2d 696 (1989) ("[John Doe] proceedings are presumptively open, although the John Doe judge may in the exercise of discretion close the proceeding to the public for compelling reasons.").

[52] In re John Doe Proceeding, 2003 WI 30, ¶66, 260 Wis. 2d 653, 660 N.W.2d 260.

[53] State ex rel. La Crosse Tribune v. Circuit Court, 115 Wis. 2d 220, 242, 340 N.W.2d 460 (1983).

[54] State ex rel. La Crosse Tribune v. Circuit Court, 115 Wis. 2d 220, 242, 340 N.W.2d 460 (1983).

[55] State ex rel. La Crosse Tribune v. Circuit Court, 115 Wis. 2d 220, 237, 340 N.W.2d 460 (1983).

[56] Press-Enterprise Co. v. Superior Court, 464 U.S. 501, 510 (1984).

[57] State ex rel. La Crosse Tribune v. Circuit Court, 115 Wis. 2d 220, 242, 340 N.W.2d 460 (1983).

[58] State ex rel. La Crosse Tribune v. Circuit Court, 115 Wis. 2d 220, 236-37, 340 N.W.2d 460 (1983).

[59] State ex rel. La Crosse Tribune v. Circuit Court, 115 Wis. 2d 220, 242, 340 N.W.2d 460 (1983).

Page 19
March 27, 2015
Nos.   2013AP2504-2508-W    Three Unnamed Petitioners v. Peterson
                           L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
       2014AP296-OA        Two Unnamed Petitioners v. Peterson
                           L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
       2014AP417-421-W     Schmitz v. Peterson
                           L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

secrecy should set forth its decision on closure in a manner that enables review of the propriety of the court's exercise of discretion.[60]

¶60    Other courts have imposed similar procedural requirements. The federal court of appeals for the ninth circuit, for example, has stated as follows: "[I]f a court contemplates sealing a document or transcript, it must provide sufficient notice to the public and press to afford them the opportunity to object or offer alternatives. If objections are made, a hearing on the objections must be held as soon as possible."[61] The federal court of appeals for the fourth circuit has cited the ninth circuit's position with approval, adding: "If the [] court believes it is necessary to close the courtroom after hearing objections, it must state its reasons on the record, supported by specific findings."[62]

¶61    In the instant cases, this court ignores the procedure it has established, a procedure recognized and followed by courts across the country. This court fails to provide Journal Sentinel with a hearing, fails to make any findings of facts, and fails to explain why the interest in secrecy outweighs the public's right to access. The court simply turns Journal Sentinel away.

¶62    As this court stated just last year in State v. Pinno, 2014 WI 74, ¶71, 356 Wis. 2d 106, 850 N.W.2d 207, "[w]hat is troublesome here is the [trial] court's failure to appreciate that it could not act alone in addressing [the public's] concerns" about closing the courtroom. So, too, this court cannot act alone in these John Doe cases. This court should listen to what Journal Sentinel and the public have to say.

IV

¶63    Finally, I turn to the discussion in this court's order of this court's supposed obligation to enforce the John Doe secrecy order.

¶64    Responding to my dissent, this court's order asserts that "John Doe proceedings are exceptions from the usual requirement that court records and court proceedings must be open to the public in all respects." The order goes on to explain that "while an appellate court is not obligated to seal all documents that include information covered by a John Doe secrecy order, the appellate court should generally lean toward protecting information already ordered to be

---

[60] State ex rel. La Crosse Tribune v. Circuit Court, 115 Wis. 2d 220, 236-37, 340 N.W.2d 460 (1983).

[61] Phoenix Newspapers, Inc. v. District Court, 156 F.3d 940, 949 (9th Cir. 1998).

[62] In re Knight Publishing Co., 743 F.2d 231, 234 (4th Cir. 1984).

Page 20
March 27, 2015
Nos.    2013AP2504-2508-W      Three Unnamed Petitioners v. Peterson
                               L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
        2014AP296-OA           Two Unnamed Petitioners v. Peterson
                               L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
        2014AP417-421-W        Schmitz v. Peterson
                               L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

kept secret. . . ." The order concludes that "[a]bsent a compelling reason for overturning [the] John Doe judge's secrecy order," the secrecy order should be enforced in its entirety.

¶65    I note at the outset that if the court gave Journal Sentinel the opportunity to present argument on the issue of openness, Journal Sentinel might assert "compelling reasons for overturning [the] John Doe judge's secrecy order" in the present cases. By denying Journal Sentinel's motion to intervene, the court denies itself the opportunity to be apprised of any extenuating circumstances that weigh in favor of openness in this litigation.

¶66    Setting aside this hole in the court's analysis, I conclude that there are two primary problems with the discussion in this court's order of this court's supposed obligation to enforce the John Doe secrecy order.

¶67    First, this court's order incorrectly states the presumption: The presumption in John Doe proceedings, as in most court proceedings, is openness.[63] Secrecy in John Doe proceedings "is not maintained for its own sake."[64] Rather, "[t]he policy underlying secrecy is directed to promoting [the] effectiveness of the investigation . . . ."[65] When secrecy does not promote the effectiveness of the investigation, it should not be imposed. In other words, this court should 'generally lean toward" giving the public access to its records and proceedings, even in John Doe cases.

¶68    Second, this court's order sets forth the factors that may warrant secrecy in a John Doe proceeding without considering the continued applicability of those factors at this stage in the instant litigation.[66] This court must independently determine whether the justifications for secrecy in John Doe proceedings apply to these cases in this court. This obligation is rooted in the presumption of openness discussed above and in this court's inherent power and

---

[63] See In re John Doe Proceeding, 2003 WI 30, ¶66, 260 Wis. 2d 653, 660 N.W.2d 260 (recognizing that the presumption of openness applies in John Doe proceedings but explaining that the public's right to be informed must be balanced against "the legitimate need to maintain the secrecy of certain John Doe proceedings"); State ex rel. Newspapers, Inc. v. Circuit Court, 124 Wis. 2d 499, 505, 370 N.W.2d 209 (1985) (holding that a John Doe proceeding is subject to "the same presumption of openness that applies to most judicial proceedings in Wisconsin").

[64] State v. O'Connor, 77 Wis. 2d 261, 283, 252 N.W.2d 671 (1977).

[65] State v. O'Connor, 77 Wis. 2d 261, 281, 252 N.W.2d 671 (1977).

[66] I consider the continued applicability in the instant cases of the justifications for secrecy in John Doe proceedings in my dissent to the court's order requiring extensive redaction of the parties' briefs. For a fuller discussion of the relationship between a John Doe secrecy order and this court's decision to require secrecy in this court's records and proceedings, these dissents should be read together.

81

Page 21
March 27, 2015
Nos.  2013AP2504-2508-W      Three Unnamed Petitioners v. Peterson
                            L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
      2014AP296-OA          Two Unnamed Petitioners v. Peterson
                            L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
      2014AP417-421-W       Schmitz v. Peterson
                            L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

responsibility to determine the level of secrecy to be imposed in its own records and proceedings—a power this court's order itself acknowledges. In sum, the court should continue to conceal these John Doe cases from the public only if, and only to the extent that, concealment is still warranted.

¶69  I conclude that the justifications for secrecy in John Doe proceedings do not support enforcement of the sweeping John Doe secrecy order in this court. Thus, I conclude that the presumption of openness prevails. In my opinion, this court should listen to what Journal Sentinel and the public have to say about the level of secrecy—if any—that this court should impose. Journal Sentinel's perspective would inform the court's decision whether and to what extent to conceal each document and record filed in these cases.

¶70  I briefly explain my position.

¶71  This court has explained that secrecy may be warranted in a John Doe proceeding because it serves the purposes of:

  1.    Keeping knowledge from an unarrested defendant that could encourage escape;

  2.    Preventing the defendant from collecting perjured testimony for trial;

  3.    Preventing those interested in thwarting the inquiry from tampering with prosecutive testimony or secreting evidence;

  4.    Rendering witnesses more free in their disclosures; and

  5.    Preventing testimony that may be mistaken or untrue or irrelevant from becoming public.[67]

¶72  It is obvious from this list of justifications that secrecy is imposed in John Doe proceedings to further the efforts of the prosecution. Indeed, as previously explained, secrecy is justified in John Doe proceedings only insofar as it "promot[es] the effectiveness of the investigation."[68]

---

[67] In re John Doe Proceeding, 2003 WI 30, ¶60, 260 Wis. 2d 653, 660 N.W.2d 260; State ex rel. Newspapers, Inc. v. Cir. Ct., 124 Wis. 2d 499, 508, 370 N.W.2d 209 (1985); State v. O'Connor, 77 Wis. 2d 261, 279, 252 N.W.2d 671 (1977).

[68] In re John Doe Proceeding, 2003 WI 30, ¶61, 260 Wis. 2d 653, 660 N.W.2d 260; State v. O'Connor, 77 Wis. 2d 261, 283, 252 N.W.2d 671 (1977).

Page 22
March 27, 2015
Nos.   2013AP2504-2508-W      Three Unnamed Petitioners v. Peterson
                             L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
       2014AP296-OA          Two Unnamed Petitioners v. Peterson
                             L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
       2014AP417-421-W       Schmitz v. Peterson
                             L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

¶73   The special prosecutor in the instant cases now favors less, not more, secrecy. Under these circumstances, the court's decision to impose secrecy must be carefully scrutinized.

¶74   It is also obvious that none of the enumerated justifications for secrecy applies to the three John Doe cases currently before this court.

¶75   The objectives of secrecy can only be furthered if secrecy is in fact preserved. The special prosecutor claims that much of the information the secrecy order intended to conceal has been divulged through media leaks, through extensive media coverage of the underlying John Doe investigation and the instant litigation, and within unsealed filings in federal court in related litigation. The special prosecutor argues compellingly that because information subject to the John Doe judge's secrecy order has already been publicly released, public discussion of that information in this court is appropriate. The secrecy genie is, according to the special prosecutor, out of the bottle.

¶76   When the objectives of secrecy are not furthered by continued observance of a secrecy order, this court must respect the presumption of openness and grant the public access to its records and proceedings.[69]

¶77   In sum, the discussion in this court's order of the justifications underlying secrecy in John Doe proceedings and the order's contention that this court should err on the side of following John Doe secrecy orders are unconvincing. In my view, enforcement of the sweeping John Doe secrecy at issue in the instant cases is not warranted in this court.

* * * *

¶78   The court in the instant cases denies the public its right to be heard on the issue of openness without providing the requisite rigorous justification and without following the procedures that this court has itself prescribed for imposing secrecy. The court bases its decision solely on timeliness, coming to the unsupported conclusion that Journal Sentinel "has simply waited too long . . . ."

¶79   In light of the significant constitutional, statutory, and common law rights at stake and in light of the established procedure for determining whether judicial proceedings should be closed, I would grant Journal Sentinel's motion to intervene for the limited purpose of presenting argument on the issue of openness in the John Doe cases pending in this court.

---

[69] Robert Timothy Reagan, Fed'l Jud. Ctr., Sealing Court Records and Proceedings: A Pocket Guide 22 (2010).

83

Page 23
March 27, 2015
Nos.  2013AP2504-2508-W       Three Unnamed Petitioners v. Peterson
                              L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
      2014AP296-OA            Two Unnamed Petitioners v. Peterson
                              L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
      2014AP417-421-W         Schmitz v. Peterson
                              L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23

¶80     For the reasons set forth, I dissent.

---

                                        Diane M. Fremgen
                                        Clerk of Supreme Court

*Additional Parties:

Hon. Gregory A. Peterson
Reserve Judge                           Michael J. Bresnick/ Edward H. Meyers
                                        Philip J. O'Beirne/ Julie O'Sullivan
Matthew W. O'Neill/ Diane Slomowitz     Stein Mitchell Muse & Cippollone
Fox O'Neill Shannon                     1100 Connecticut Ave., NW, Suite 1100
622 N. Water Street, Suite 500          Washington, DC 20036
Milwaukee, WI 53202
                                        Directors Office
David C. Rice                           Director of State Courts
Asst. Attorney General                  P.O. Box 1688
P.O. Box 7857                           Madison, WI 53701-1688
Madison, WI 53707-7857
                                        Dennis P. Coffey
Francis D. Schmitz                      Mawicke & Goisman, SC
P.O. Box 2143                           1509 N. Prospect Ave.
Milwaukee, WI 53201-2143                Milwaukee, WI 53202-2323

Dean A. Strang                          Steven M. Biskupic/ Michelle L. Jacobs
StrangBradley, LLC                      Biskupic & Jacobs, S.C.
10 E. Doty Street, Suite 621            1045 W. Glen Oaks Lane, Ste. 106
Madison, WI 53703                       Mequon, WI 53092

Brad D. Schimel                         Sean O'Donnell Bosack
Wisconsin Attorney General              Godfrey & Kahn, S.C.
P.O. Box 7857                           780 N. Water St., Ste. 700
Madison, WI 53707-7857                  Milwaukee, WI 53202-3512

Todd P. Graves/ Edward D. Greim         Eric J. Wilson
Graves Garrett LLC                      Godfrey & Kahn, S.C.
1100 Main Street, Suite 2700            P.O. Box 2719
Kansas City, MO 64105                   Madison, WI 53701-2719

84

Page 24
March 27, 2015
Nos.    2013AP2504-2508-W     Three Unnamed Petitioners v. Peterson
                             L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23
        2014AP296-OA          Two Unnamed Petitioners v. Peterson
                             L.C.#s2012JC23, 2013JD1, 2013JD6, 2013JD9 & 2013JD11
        2014AP417-421-W       Schmitz v. Peterson
                             L.C.#s2013JD11, 2013JD9, 2013JD6, 2013JD1 & 2012JD23


Timothy M. Hansen/ James B. Barton
John P. Shanahan
Hansen Reynolds Dickinson Crueger LLC
316 N. Milwaukee St., Ste. 200
Milwaukee, WI 53202-5885

H.E. Cummins
1818 N. Taylor St., Ste. 301
Little Rock, AR 72207

Jeffrey James Morgan
LeBell, Dobrowski & Morgan, LLP
309 N. Water St., Suite 350
Milwaukee, WI 53202

Hon. Gregory J. Potter
Wood County Courthouse
P.O. Box 8095
Wisconsin Rapids, WI 54494

Hon. James P. Daley
Rock County Courthouse
51 S. Main Street
Janesville, WI 53545-3951

Hon. James J. Duvall
Buffalo County Courthouse
P.O. Box 68
Alma, WI 54610-0068

Hon. Jeffrey A. Kremers
Milwaukee County Courthouse
901 N. 9th St.
Milwaukee, WI 53233

Steven P. Mandell/ Natalie A. Harris
Mandell Menkes LLC
1 N. Franklin St., Ste. 3600
Chicago, IL 60606

¶556 N. PATRICK CROOKS, J. *(concurring in part, dissenting in part).* The United States Supreme Court has recently acknowledged that "Judges are not politicians, even when they come to the bench by way of the ballot." Williams-Yulee v. Florida Bar, 135 S. Ct. 1656, 1662 (2015). Williams-Yulee involved whether a judicial conduct rule prohibiting judicial candidates from personally soliciting campaign funds violated the First Amendment to the United States Constitution. Id. In concluding that the First Amendment permits the particular regulation of speech at issue, the Supreme Court stressed:

> In deciding cases, a judge is not to follow the preferences of his supporters, or provide any special consideration to his campaign donors. A judge instead must "observe the utmost fairness," striving to be "perfectly and completely independent, with nothing to influence or controul him but God and his conscience."

Id. at 1667 (citing Address of John Marshall, in Proceedings and Debates of the Virginia State Convention of 1829-1830, p. 616 (1830)).

¶557 These principles must serve as guideposts for all of us as judges in the courts of Wisconsin, whether or not the case or cases at issue involve significant political overtones, as these John Doe cases do.

¶558 It is with these important tenets in mind that I write separately.

¶559 By erroneously concluding that campaign committees do not have a duty under Wisconsin's campaign-finance law, Wis.

1

Stat. ch. 11 (2011-12),[1] to report receipt of in-kind contributions in the form of coordinated spending on issue advocacy,[2] the majority rejects the special prosecutor's primary argument regarding criminal activity. Although the special prosecutor advances a secondary argument of criminal activity concerning coordinated express advocacy, the majority inexplicably ignores that argument. These mistakes lead the majority to terminate a valid John Doe[3] investigation in an unprecedented fashion.

¶560 With respect to the special prosecutor's primary argument, which is the focus of my writing, the majority misapplies the related doctrines of overbreadth and vagueness. Unlike the majority, I conclude that Wis. Stat. § 11.06(1) is neither overbroad nor vague in its requirement that campaign committees report receipt of in-kind contributions. The majority also makes the troubling pronouncement that an act is

---

[1] All subsequent references to the Wisconsin Statutes are to the 2011-12 version unless otherwise indicated.

[2] In campaign-finance terminology, "issue advocacy" is generally understood to mean speech about public issues, whereas "express advocacy" refers to campaign or election-related speech. Fed. Election Comm'n v. Wis. Right to Life, Inc., 551 U.S. 449, 456 (2007).

[3] "A John Doe proceeding is intended as an independent, investigatory tool used to ascertain whether a crime has been committed and if so, by whom." In re John Doe Proceeding, 2003 WI 30, ¶22, 260 Wis. 2d 653, 660 N.W.2d 260. A John Doe proceeding, by virtue of its secrecy, serves as an essential investigative device that protects "'innocent citizens from frivolous and groundless prosecutions.'" Id. (citation omitted).

not a regulable disbursement or contribution under Chapter 11 unless it involves express advocacy or its functional equivalent. This is an erosion of Chapter 11 that will profoundly affect the integrity of our electoral process. I cannot agree with this result.

¶561 It is also imperative to note that the majority conveniently overlooks the special prosecutor's secondary argument of criminal activity in its effort to end this John Doe investigation. Specifically, the special prosecutor seeks to investigate whether particular express advocacy groups coordinated their spending with candidates or candidate committees in violation of their sworn statement of independence under Wis. Stat. § 11.06(7). Despite the fact that the special prosecutor utilizes a significant portion of his brief to present evidence of such illegal coordination, the majority determines, without explanation, that the John Doe investigation is over.

¶562 Has the majority abused its power in reaching this conclusion? The majority's rush to terminate this investigation is reminiscent of the action taken by the United States District Court for the Eastern District of Wisconsin in O'Keefe v. Schmitz, 19 F. Supp. 3d 861 (E.D. Wis.) order clarified, No. 14-C-139, 2014 WL 2446316 (E.D. Wis. May 30, 2014) (O'Keefe v. Schmitz), an action that was both criticized and reversed by the United States Court of Appeals for the Seventh Circuit in O'Keefe v. Chisholm, 769 F.3d 936 (7th Cir. 2014) cert. denied, No. 14-872, 2015 WL 260296 (U.S. May 18, 2015). Although the

3

focus of my writing lies elsewhere, the majority's error in this regard cannot be overlooked.

¶563 For these reasons, I respectfully dissent in State ex. rel. Two Unnamed Petitioners v. Peterson (Two Unnamed Petitioners).

¶564 However, like the majority, I conclude that the special prosecutor and certain Unnamed Movants have failed to meet their heavy burden of establishing that the John Doe judge violated a plain legal duty in either initiating these proceedings or quashing various subpoenas and search warrants related to the investigation. Accordingly, I concur with the majority in State ex. rel. Schmitz v. Peterson (Schmitz v. Peterson) and State ex. rel. Three Unnamed Petitioners v. Peterson (Three Unnamed Petitioners). In concurring in Schmitz v. Peterson, it is significant for me that when an appellate court decides to issue a supervisory writ, it is a rare, discretionary decision. Madison Metro. Sch. Dist. v. Circuit Ct. for Dane Cnty., 2011 WI 72, ¶¶33-34, 336 Wis. 2d 95, 800 N.W.2d 442. Here, the John Doe judge also made a discretionary decision in deciding a complex legal issue. Deference should be given where there is such discretion.

¶565 The John Doe investigation should not be terminated because the special prosecutor's primary argument regarding criminal activity is supported by Chapter 11, and the United States Supreme Court has not concluded that the First Amendment to the United States Constitution prohibits the type of regulation underlying that argument. See O'Keefe, 769 F.3d at

4

942.[4] The special prosecutor seeks to investigate whether certain campaign committees failed to comply with their statutory obligation to report receipt of in-kind contributions (in the form of coordinated spending on issue advocacy) in connection with various recall elections. A campaign committee's duty to report such in-kind contributions is prescribed by Wis. Stat. § 11.06(1).[5]

¶566 In Two Unnamed Petitioners, the majority holds that the special prosecutor fails to advance a valid argument under Wisconsin criminal law and rashly closes the John Doe investigation. In reaching its conclusion, the majority does not confront the plain language of Wis. Stat. § 11.06(1). Instead, it focuses more generally on Chapter 11's definition of

---

[4] It is noteworthy that the United States Supreme Court denied certiorari review in O'Keefe v. Chisholm, 769 F.3d 936 (7th Cir. 2014) cert. denied, No. 14-872, 2015 WL 260296 (U.S. May 18, 2015), a case in which the United States Court of Appeals for the Seventh Circuit determined that the Supreme Court has not decided whether the First Amendment prohibits the regulation of coordinated issue advocacy between a candidate or campaign committee and an issue advocacy group. If the Supreme Court eventually determines that the First Amendment allows that type of regulation, the decision would validate the special prosecutor's in-kind contribution argument. As discussed below, it can be argued that Williams-Yulee v. Florida Bar, 135 S. Ct. 1656 (2015), supports the special prosecutor's position, but that decision, while helpful, is certainly not definitive on the issue.

[5] Wisconsin Stat. § 11.06(1) provides, in relevant part: "Except as provided in subs. (2), (3) and (3m) and ss. 11.05(2r) and 11.19(2), each registrant under s. 11.05 shall make full reports . . . of all contributions received, contributions or disbursements made, and obligations incurred." (emphasis added).

"political purposes," because in its view, "If an act is not done for political purposes, then it is not a disbursement or a contribution, and it therefore is not subject to regulation under Ch. 11."[6]

¶567 The majority determines that the definition of "political purposes" in Wis. Stat. § 11.01(16) is unconstitutionally overbroad and vague regardless of the context in which it applies to regulate political speech under Chapter 11.[7] This is so, the majority reasons, primarily because the definition encompasses an act done "for the purpose of influencing" an election.[8] To support the notion that the phrase "for the purpose of influencing" an election is hopelessly overbroad and vague, even where it operates to regulate campaign contributions, the majority purports to borrow pages from Buckley v. Valeo, 424 U.S. 1 (1976), and Wis. Right to Life, Inc. v. Barland, 751 F.3d 804 (7th Cir. 2014) (Barland II). It then applies a narrowing construction to § 11.01(16) to confine the definition of "political purposes" to express advocacy or its functional equivalent, because that construction is "'readily available' due to the Seventh Circuit's decision in Barland II."[9] The upshot, according to the majority, is that an

---

[6] Majority op., ¶62.

[7] Majority op., ¶67.

[8] Majority op., ¶66.

[9] Majority op., ¶67.

act is not a regulable disbursement or contribution under Chapter 11 unless it involves express advocacy or its functional equivalent.[10]

¶568 Turning to the special prosecutor's arguments regarding criminal activity, the majority summarily concludes: "The limiting construction that we apply makes clear that the special prosecutor's theories are unsupportable in law given that the theories rely on overbroad and vague statutes."[11] The majority must therefore dismiss the special prosecutor's in-kind contribution argument on the basis that Wis. Stat. § 11.06(1) contains the terms "contribution" and "disbursement," thereby triggering the definition of "political purposes." It follows, according to the majority's logic, that § 11.06(1) is unconstitutionally overbroad and vague unless its reach is limited to express advocacy or its functional equivalent. Since the special prosecutor's in-kind contribution argument relies on coordinated issue advocacy, not express advocacy, the majority swiftly rejects that argument.[12]

---

[10] See majority op., ¶¶62, 67.

[11] Majority op., ¶69.

[12] While I disagree with the majority's dismissal of the special prosecutor's in-kind contribution argument, I do agree with the majority's criticism of some of the purported tactics used in gathering evidence in this particular John Doe investigation. As the majority identifies, some of these methods certainly appear to be improper and open to severe disagreement. See majority op., ¶¶28-29. At this point, the actual facts concerning the tactics used have not been fully established, but the allegations are very troubling.

7

¶569 As previously mentioned, I conclude that Wis. Stat. § 11.06(1) is neither overbroad nor vague in its requirement that campaign committees report receipt of in-kind contributions.  I recognize that under the special prosecutor's argument a reportable in-kind contribution requires a "political purpose," thus implicating the phrase "for the purpose of influencing" an election that the majority finds so troubling.  However, in Buckley, the United States Supreme Court indicated that this phrase is hardly problematic "in connection with the definition of a contribution because of the limiting connotation created by the general understanding of what constitutes a political contribution."  Buckley, 424 U.S. at 23 n.24.  In other words, it is common sense——not the retention of a campaign-finance attorney——that tells people of ordinary intelligence what is and is not a campaign contribution.

¶570 The majority disregards this important language in Buckley, opting instead to justify its overbreadth and vagueness determination with the Supreme Court's discussion of the phrase "for the purpose of influencing" an election in a completely different context:  the regulation of independent political expenditures.  The majority's failure to perform a context specific analysis of the subject phrase in reaching its blanket conclusion that Chapter 11's definition of "political purposes" is overbroad and vague represents a fundamental misunderstanding of Buckley and its progeny, including Barland II.  It further ignores the principle that "The First Amendment vagueness and overbreadth calculus must be calibrated to the kind and degree

8

of the burdens imposed on those who must comply with the regulatory scheme. The greater the burden on the regulated class, the more acute the need for clarity and precision." Barland II, 751 F.3d at 837.

¶571 The majority's errors in Two Unnamed Petitioners (including its failure to address Wis. Stat. § 11.06(1) in rejecting the special prosecutor's in-kind contribution argument) serve to terminate a valid John Doe investigation. They also work to limit the reach of Wisconsin's campaign-finance law in a manner that will undermine the integrity of our electoral process. I disagree with these consequences.

## I. TWO UNNAMED PETITIONERS (ORIGINAL ACTION)

¶572 To support my position that the John Doe investigation should move forward because the special prosecutor advances a valid argument under Wisconsin criminal law, I begin by identifying the relevant portions of Chapter 11 that support that argument. Next, I discuss some important principles pertaining to the related doctrines of overbreadth and vagueness, as well as significant campaign-finance law decisions embodying those principles. These general principles and decisions lead me to determine that there are no overbreadth and vagueness concerns with respect to the statute that supports the special prosecutor's primary argument regarding criminal activity. Finally, I discuss the question of whether the First Amendment to the United States Constitution forbids regulation of coordinated issue advocacy between a candidate or a campaign committee and an issue advocacy group. I conclude that the

9

absence of Supreme Court precedent regarding an issue that has sparked "lively debate among judges and academic analysts"[13] is an important factor as to why this John Doe investigation should not be terminated.

A. Under Chapter 11, a Campaign Committee Must Report its Receipt of In-Kind Contributions in the Form of Coordinated Spending on Issue Advocacy.

¶573 In the special prosecutor's own words, the "non-disclosure of reportable campaign contributions is at the heart of this [John Doe] investigation."  The following illustrates the special prosecutor's in-kind contribution argument:

> X is a nonprofit corporation that engages in political speech on issues of public importance.  Y is a campaign committee[14] regulated under Ch. 11.  When X spends money on issue advocacy, it does not operate independently of Y.  Rather, X coordinates its spending with Y, such that Y may be involved in the timing, content, or placement of issue advocacy that

---

[13] O'Keefe, 769 F.3d at 942.

[14] Wis. Stat. § 11.01(15) defines a "personal campaign committee" as:

> A committee which is formed or operating for the purpose of influencing the election or reelection of a candidate, which acts with the cooperation of or upon consultation with the candidate or the candidate's agent or which is operating in concert with or pursuant to the authorization, request or suggestion of the candidate or the candidate's agent.

is made for its benefit. Y has received an in-kind contribution that must be reported under Chapter 11.[15]

¶574 The special prosecutor's in-kind contribution argument is rooted in Wis. Stat. § 11.06. That section, entitled "Financial report information; application; funding procedure," generally requires Chapter 11 registrants[16] to "make full reports . . . of all <u>contributions received</u>, contributions or disbursements made, and obligations incurred." Wis. Stat. § 11.06(1) (emphasis added). Candidates and their campaign committees have an absolute duty to register with the Government Accountability Board (GAB) under Wis. Stat. § 11.05(2g), so there appears to be no question that the general reporting obligations prescribed by § 11.06(1) apply to those entities.

¶575 The term "contribution" is defined by Wis. Stat. § 11.01(6)(a). It includes "A gift, subscription, loan, advance, or deposit of money or anything of value . . . made for political purposes." Wis. Stat. § 11.01(6)(a)1. The definition encompasses contributions that are received in cash, i.e., a

---

[15] To be clear, the special prosecutor's main focus in this investigation is on certain campaign committees' failure to report receipt of in-kind contributions (in the form of coordinated spending on issue advocacy), <u>not</u> on certain issue advocacy groups' failure to report making such in-kind contributions. So what the majority mistakenly refers to as "illegal campaign coordination" is in reality a campaign committee's failure to report its receipt of an in-kind contribution.

[16] Chapter 11 imposes registration requirements on political speakers such as candidates, their campaign committees, political committees, independent groups, and individuals. <u>See</u> Wis. Stat. § 11.05.

"gift . . . of money," and those that are received "in kind," i.e., "anything of value." See Wis. Coal. for Voter Participation, Inc. v. State Elections Bd., 231 Wis. 2d 670, 680, 605 N.W.2d 654 (Ct. App. 1999) (WCVP). Wisconsin Admin. Code § GAB 1.20(1)(e) defines an "in-kind contribution" as "a disbursement by a contributor to procure a thing of value or service for the benefit of a registrant who authorized the disbursement." To constitute a cash or in-kind contribution, money must be given or spent for "political purposes," which is defined by Wis. Stat. § 11.01(16) to include an act done "for the purpose of influencing" an election.

¶576 Reading the above definitions in conjunction with Wis. Stat. § 11.06(1), it is clear that a campaign committee has a duty to report its receipt of cash as contributions. It is equally clear that a campaign committee has a duty to report its receipt of services as contributions if it authorizes a third party to pay for those services for the benefit of the campaign.

¶577 But what if a campaign committee does not necessarily authorize or control a third party's spending on services for the campaign's benefit, but instead prearranges that spending with the third party? Chapter 11 instructs that under these circumstances a candidate committee has received a reportable contribution as well. See Wis. Stat. § 11.06(4)(d) ("A . . . disbursement . . . made . . . for the benefit of a candidate is reportable by the candidate or the candidate's personal campaign committee if it is made or incurred with the authorization,

12

direction or control of or <u>otherwise by prearrangement</u> with the candidate or the candidate's agent.") (emphasis added).

¶578 As the foregoing discussion demonstrates, under Chapter 11, "contributions to a candidate's campaign must be reported <u>whether or not</u> they constitute express advocacy." <u>WCVP</u>, 231 Wis. 2d at 679 (emphasis in original). There is nothing in the plain language of Wis. Stat. § 11.06(1), § 11.01(6)(a)1, § 11.06(4)(d), or Wis. Admin. Code § GAB 1.20(1)(e) that limits receipt of reportable contributions to express advocacy or its functional equivalent.

¶579 Returning to the illustration of the special prosecutor's in-kind contribution argument, it is evident that Chapter 11 supports that argument in one of two ways. First, Y, the campaign committee, may have received a reportable in-kind contribution if the nature of its coordination with X is such that Y authorized or controlled X's spending on issue advocacy. Second, Y may have received a reportable in-kind contribution if the nature of its coordination with X is such that the two entities prearranged X's spending on issue advocacy.

¶580 Thus, absent the majority's limiting construction that confines the term "contribution" to express advocacy or its function equivalent, the special prosecutor makes a valid argument under Wisconsin criminal law.[17]

---

[17] The intentional failure to disclose contributions received is a violation of criminal law. <u>See</u> Wis. Stat. §§ 11.27(1) and 11.61(1)(b).

B. The Key Inquiry in First Amendment Overbreadth and Vagueness Analysis is Whether the Statute at Issue Reaches a Substantial Amount of Constitutionally Protected Activity.

¶581 Having identified the portions of Chapter 11 that support the special prosecutor's in-kind contribution argument, I turn to the related doctrines of overbreadth and vagueness to highlight some important principles that the majority opinion overlooks.  I also examine relevant campaign-finance decisions that embody those principles.

i. Overbreadth and Vagueness

¶582 "According to our First Amendment overbreadth doctrine, a statute is facially invalid if it prohibits a substantial amount of protected speech."  United States v. Williams, 553 U.S. 285, 292 (2008) (emphasis added).  The Supreme Court in Williams explained:

> The doctrine seeks to strike a balance between competing social costs.  On the one hand, the threat of enforcement of an overbroad law deters people from engaging in constitutionally protected speech, inhibiting the free exchange of ideas.  On the other hand, invalidating a law that in some of its applications is perfectly constitutional—particularly a law directed at conduct so antisocial that it has been made criminal—has obvious harmful effects.  In order to maintain an appropriate balance, we have vigorously enforced the requirement that a statute's overbreadth be substantial, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep.  Invalidation for overbreadth is strong medicine that is not to be casually employed.

Id. (emphasis added) (internal citations and quotations omitted).  When engaging in overbreadth analysis, a court's first step "is to construe the challenged statute; it is

14

impossible to determine whether a statute reaches too far without first knowing what the statute covers." Id. at 293 (emphasis added). Once a court interprets the statute at issue, the second step is to determine whether it "criminalizes a substantial amount of protected expressive activity." Id. at 297.

¶583 "Like the overbreadth doctrine, the void-for-vagueness doctrine protects against the ills of a law that 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" Ctr. for Individual Freedom v. Madigan, 697 F.3d 464, 478-79 (7th Cir. 2012) (quoted source and citation omitted). Where the statute at issue implicates First Amendment rights, a greater degree of precision and guidance is required. Id. at 479; see also Buckley, 424 U.S. at 77 ("Where First Amendment rights are involved, an even 'greater degree of specificity' is required.") (quoted source and citation omitted). That said, "'perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.'" Williams, 553 U.S. at 304 (quoted source and citation omitted). Similar to overbreadth analysis, a court engaging in First Amendment vagueness analysis must interpret the statute at issue and determine whether it restricts a substantial amount of constitutionally protected activity. Madigan, 697 F.3d at 479. If it does not, a facial challenge to the statute must fail. Id.

¶584 The takeaway is that "The First Amendment vagueness and overbreadth calculus must be calibrated to the kind and degree of the burdens imposed on those who must comply with the regulatory scheme. The greater the burden on the regulated class, the more acute the need for clarity and precision." Barland II, 751 F.3d at 837.

ii. Relevant Campaign-Finance Decisions

¶585 That First Amendment overbreadth and vagueness analysis is context specific is best exemplified by Buckley, the case in which the United States Supreme Court created the express-advocacy limitation that is at the heart of this case. In Buckley, the Supreme Court considered various challenges to the Federal Election Campaign Act of 1971's (FECA) restrictions on contributions and independent expenditures. The main provisions under review involved: (1) limitations on individual and group political contributions; (2) limitations on independent expenditures; and (3) disclosure requirements for individual and group political contributions and independent expenditures. Buckley, 424 U.S. at 7.

¶586 Prior to addressing the subject enactments, Buckley discussed the kind and degree of burdens imposed on political speakers through limitations on the giving and spending of money in political campaigns. Regarding limitations on contributions, the Supreme Court explained:

> a limitation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restriction upon the contributor's ability to engage in free communication. A contribution serves as a general expression of

16

> support for the candidate and his views, but does not communicate the underlying basis for the support . . . . A limitation on the amount of money a person may give to a candidate or campaign organization thus involves little direct restraint on his political communication, for it permits the symbolic expression of support evidenced by a contribution but does not in any way infringe the contributor's freedom to discuss candidates and issues.

Id. at 20-21 (emphasis added).  In comparison, limitations on independent expenditures "represent substantial rather than merely theoretical restraints on the quantity and diversity of political speech."  Id. at 19.  This is because "A restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached."  Id.

¶587 Bearing in mind the relative burdens on political speech imposed by limitations on contributions and independent expenditures, the Supreme Court turned to address constitutional challenges to FECA's $1,000 limitation on individual and group political contributions to any single candidate per election. Under FECA, the term "contribution" was defined to include "a gift, subscription, loan, advance, or deposit of money or anything of value . . . made for the purpose of influencing" an election.  Id. at 182.  The appellants did not challenge the subject enactment as unconstitutionally overbroad and vague on the basis that it incorporated the phrase "for the purpose of influencing" an election.  However, in a footnote, Buckley all

17

but assured that the phrase poses little overbreadth and vagueness concerns in the context of regulating contributions:

> The Act does not define the phrase "for the purpose of influencing" an election that determines when a gift, loan, or advance constitutes a contribution. Other courts have given that phrase a narrow meaning to alleviate various problems in other contexts. . . . The use of the phrase presents fewer problems in connection with the definition of a contribution because of the limiting connotation created by the general understanding of what constitutes a political contribution.

Id. at 23 n.24 (internal citations omitted).

¶588 Given the Supreme Court's recognition that limitations on contributions impose marginal burdens on free speech, its decision not to require a more precise definition of the term "contribution" is entirely consistent with the context specific inquiry that must take place when engaging in overbreadth and vagueness analysis. Ultimately, Buckley upheld FECA's limitation on individual and group political contributions, finding a "sufficiently important interest" in preventing quid pro quo corruption or the appearance thereof. Id. at 25-28.

¶589 The Supreme Court then considered FECA's $1,000 limitation on independent expenditures "relative to a clearly identified candidate." Id. at 39. In that context, the appellants successfully asserted a vagueness challenge to the subject enactment's use of the above quoted phrase. Significant to the Supreme Court's determination was the fact that the limitation on independent expenditures posed a substantial burden on political speech. See id. at 39-44. It reasoned that the indefiniteness of the phrase "relative to a clearly

18

identified candidate" "fails to clearly mark the boundary between permissible and impermissible speech . . . ." Id. at 41. Thus, it searched for a narrowing construction to save the statute from unconstitutionality.

¶590 The Supreme Court found that narrowing construction in the text of the subject enactment itself:

> The section prohibits any expenditure . . . relative to a clearly identified candidate during a calendar year which, when added to all other expenditures . . . advocating the election or defeat of such candidate, exceeds, $1,000. This context clearly permits, if indeed it does not require, the phrase "relative to" a candidate to be read to mean "advocating the election or defeat of" a candidate.

Id. at 42 (internal quotations omitted). It then determined that the readily apparent limiting construction simply "refocuse[d] the vagueness question," Id., "[f]or the distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application." Id. As a result, the Supreme Court further narrowed FECA's limitation on independent expenditures to "expenditures for communications that in express terms advocate the election or defeat of a clearly identified candidate for federal office." Id. at 44.

¶591 The express advocacy limitation created in Buckley was therefore "an endpoint of statutory interpretation, not a first principle of constitutional law." McConnell v. Fed. Election Comm'n, 540 U.S. 93, 190 (2003), overruled on other grounds by Citizens United v. Fed. Election Comm'n, 558 U.S. 310 (2010). Ultimately, the Supreme Court determined that FECA's limitation

19

on independent expenditures, even as narrowly construed, impermissibly burdened the constitutional right of free expression. Buckley, 424 U.S. at 47-51.

¶592 Perhaps most significant for purposes of the instant action is Buckley's discussion of FECA's disclosure requirements for contributions and independent expenditures. The enactment at issue imposed reporting obligations on individuals and groups that made contributions or independent expenditures aggregating over $100 in a calendar year "other than by contribution to a political committee or candidate." Id. at 74-75.

¶593 FECA defined the terms "contribution" and "expenditure" to include anything of value made "for the purpose of influencing" an election. Id. at 77. This time Buckley took issue with that phrase, but only as it operated to regulate independent expenditures. Id. at 77-80.[18] To avoid overbreadth and vagueness concerns, the Supreme Court construed "expenditure" for purposes of the subject enactment "to reach only funds that expressly advocate the election or defeat of a clearly identified candidate." Id. at 80. So construed, the enactment withstood constitutional scrutiny, as Buckley found disclosure to be "a reasonable and minimally restrictive method of furthering First Amendment values by opening the basic

---

[18] It is worth noting that Buckley found no overbreadth or vagueness concerns with respect to FECA's definition of "contribution" even though that definition included "expenditures placed in cooperation with or with the consent of a candidate, his agents, or an authorized committee of the candidate." Buckley v. Valeo, 424 U.S. 1, 78 (1976).

processes of our federal election system to public view."  Id. at 82.

¶594 The foregoing discussion reveals that the majority misconstrues Buckley.  Buckley's conclusion is that the phrase "for the purpose of influencing" an election poses First Amendment overbreadth and vagueness concerns in regard to independent expenditures, not contributions received.[19]

¶595 In the aftermath of Buckley, the Supreme Court has continued to utilize the express advocacy limitation to curb FECA restrictions on independent expenditures.  For example, in Fed. Election Comm'n v. Mass. Citizens for Life, Inc., 479 U.S. 238, 245-49 (1986) (MCFL), the Supreme Court applied Buckley's

---

[19] This court previously examined Buckley for the purpose of clarifying the meaning of the term "express advocacy" as used in Wis. Stat. § 11.01(16).  See Elections Bd. of State of Wis. v. Wis. Mfrs. & Commerce, 227 Wis. 2d 650, 597 N.W.2d 721 (1999) (WMC).  In WMC, a Wisconsin corporation sought and received assurance from the Elections Board of the State of Wisconsin (the Board) that certain advertisements it wanted to broadcast prior to a general election did not qualify as express advocacy.  Id. at 653, 677 n.24.  The Board later determined that the ads that were broadcast constituted express advocacy under a context-based approach toward defining the term.  Id. at 678-79.

We turned to Buckley to decide whether the corporation had fair warning that its ads constituted express advocacy, ultimately concluding that it did not.  Id. at 662-81.  As part of our discussion, we recognized that the United States Supreme Court created the express advocacy limitation in Buckley to avoid overbreadth and vagueness concerns with respect to FECA's regulation of independent expenditures.  See id. at 664-66.  So it would be a mistake to rely on WMC for the proposition that the express advocacy limitation is necessary to cure constitutional infirmities with respect to Chapter 11's regulation of campaign contributions received.  See majority op., ¶68 n. 23.

21

express advocacy limitation to FECA's prohibition on corporations using treasury funds to make independent expenditures in connection with any federal election. Tracking Buckley's overbreadth and vagueness analysis with respect to FECA's disclosure requirements on independent expenditures, the Supreme Court in MCFL determined that FECA's broad definition of the term "expenditure," i.e., anything of value made "for the purposes of influencing" an election, posed overbreadth concerns in the context of the "more intrusive provision that directly regulate[d] independent spending." Id. at 246-49. Accordingly, it held that the term "expenditure" in the subject provision was limited to communications for express advocacy. Id. at 249.

¶596 That Buckley's express advocacy limitation was the product of statutory interpretation designed to avoid overbreadth and vagueness concerns solely with respect to the statutory language at issue is confirmed by McConnell, 540 U.S. at 191-93. There, the Supreme Court considered challenges to the Bipartisan Campaign Reform Act of 2002 (BCRA). Id. at 189. BCRA created a new term, "electioneering communication,"[20] which placed restrictions on communications for express advocacy as well as issue advocacy. Id. The plaintiffs asserted

---

[20] The term "electioneering communication" was defined to encompass "any broadcast, cable, or satellite communication" that "refers to a clearly identified candidate for Federal office" and appears within 60 days of a federal general election or 30 days of a federal primary election. McConnell v. Fed. Election Comm'n, 540 U.S. 93, 189 (2003) overruled on other grounds by Citizens United v. Fed. Election Comm'n, 558 U.S. 310 (2010).

22

constitutional challenges to the new term as it applied to both the expenditure and disclosure contexts. Id. at 190. In essence, they argued that the term "electioneering communication" must be limited to communications for express advocacy because "Buckley drew a constitutionally mandated line between express advocacy and so-called issue advocacy, and that speakers possess an inviolable First Amendment right to engage in the latter category of speech." Id.

¶597 McConnell patently rejected that contention, reasoning:

> a plain reading of Buckley makes clear that the express advocacy limitation, in both the expenditure and the disclosure contexts, was the product of statutory interpretation rather than a constitutional command. In narrowly reading the FECA provisions in Buckley to avoid problems of vagueness and overbreadth, we nowhere suggested that a statute that was neither vague nor overbroad would be required to toe the same express advocacy line. Nor did we suggest as much in MCFL . . . in which we addressed the scope of another FECA expenditure limitation and confirmed the understanding that Buckley's express advocacy category was a product of statutory construction.
>
> In short, the concept of express advocacy and the concomitant class of magic words were born of an effort to avoid constitutional infirmities. . . . We have long rigidly adhered to the tenet never to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied, . . . for [t]he nature of judicial review constrains us to consider the case that is actually before us, . . . Consistent with that principle, our decisions in Buckley and MCFL were specific to the statutory language before us; they in no way drew a constitutional boundary that forever fixed the permissible scope of provisions regulating campaign-related speech.

23

Id. at 191-93 (emphasis added) (internal citations and quotations omitted). Thus, it would be error for a court to rely on Buckley to narrow a statute's reach to express advocacy where it does not pose the same overbreadth and vagueness concerns that drove the Supreme Court's analysis in Buckley. See id. at 194.

¶598 The Seventh Circuit's decision in Barland II is entirely consistent with the notion that Buckley's express advocacy limitation is context specific. There, Wisconsin Right to Life (WRTL), a nonprofit tax-exempt corporation, "sued to block enforcement of many state statutes and rules against groups that spend money for political speech independently of candidates and parties." Barland II, 751 F.3d at 807 (emphasis added). Specifically, the complaint alleged "that the challenged laws are vague and overbroad and unjustifiably burden the free-speech rights of independent political speakers in violation of the First Amendment." Id. (emphasis added). Lest there be any confusion, the Seventh Circuit specified: "Neither [WRTL] nor its state PAC contributes to candidates or other political committees, nor are they connected with candidates, their campaign committees, or political parties. That is to say, they operate independently of candidates and their campaign committees." Id. at 809.

¶599 So when the Seventh Circuit considered WRTL's overbreadth and vagueness challenge to Chapter 11's definition of "political purposes," it did so in the context of that term's restrictions on independent expenditures, not contributions

24

received.   Any other reading contravenes the principle that courts should not "formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied . . . ."  McConnell, 540 U.S. at 193 (citation and quotations omitted).   To be clear, the GAB's concession in Barland II was that Chapter 11's definition of "political purposes" was overbroad and vague "in the sense meant by Buckley . . . ."  Barland II, 751 F.3d at 832.  As demonstrated, Buckley was concerned with the phrase "for the purpose of influencing" an election where it operated to regulate independent expenditures, not contributions.  Thus, it is incorrect to rely on Barland II to support the notion that the subject phrase poses overbreadth and vagueness concerns in the context of Chapter 11's regulation of contributions received.[21]

¶600 In sum, the key inquiry in First Amendment overbreadth and vagueness analysis is whether the statute at issue reaches a substantial amount of constitutionally protected speech.  As a result, a court's analysis in this regard must be context specific——"the greater the burden on the regulated class, the more acute the need for clarity and precision."  Id. at 837.

---

[21] The majority states that "Although Barland II did not involve an allegation of coordination, that distinction is meaningless in determining whether the definition of 'political purposes' is vague or overbroad."  Majority op., ¶67 n.22. Actually, it makes all the difference.  Under Chapter 11, coordinated disbursements are treated as contributions.

Buckley embodies that principle in its disparate treatment of contributions and independent expenditures under FECA.[22]

C. There are No Overbreadth and Vagueness Concerns with Respect to Wis. Stat. § 11.06(1).

¶601  Wisconsin Stat. § 11.06(1) is neither overbroad nor vague in its requirement that campaign committees report receipt of in-kind contributions in the form of coordinated spending on issue advocacy.

¶602 As noted, the primary inquiry is whether Wis. Stat. § 11.06(1) reaches a substantial amount of constitutionally protected speech.  Madigan, 697 F.3d at 479.  Of course, in order to answer that question, it is necessary to examine the plain language of the statute.  Williams, 553 U.S. at 293.

¶603 Generally speaking, Wis. Stat. § 11.06(1) requires registrants to "make full reports . . . of all contributions received, contributions or disbursements made, and obligations incurred."  Registrants must file frequent and detailed reports under § 11.06; Barland II summarized a variety of those reporting obligations as follows:

> For contributions received in excess of $20, the report must include the date of the contribution, the name and address of the contributor, and the cumulative total contributions made by that contributor for the calendar year.  For contributions

---

[22] For a thorough discussion that supports my interpretation of Buckley's distinction between contributions and independent expenditures, see generally Brent Ferguson, Beyond Coordination: Defining Indirect Campaign Contributions for the Super PAC Era, 42 Hastings Const. L.Q. 471 (2015).

received in excess of $100, the registrant must obtain and report the name and address of the donor's place of employment.  All other income in excess of $20—including transfers of funds, interest, returns on investments, rebates, and refunds received—must be listed and described.

Registrants must report all disbursements. For every disbursement in excess of $20, the registrant must include the name and address of the recipient, the date of the disbursement, and a statement of its purpose. Individuals and committees not primarily organized for political purposes need only report disbursements made for the purpose of expressly advocat[ing] the election or defeat of a clearly identified candidate. In other words, committees in this category need not report general operating expenses; for all other committees, administrative and overhead expenses must be reported as disbursements. All disbursements that count as contributions to candidates or other committees must be reported.

Barland II, 751 F.3d at 814 (internal citations and quotations omitted).  "No person may prepare or submit a false report or statement to a filing officer under [Chapter 11]."  Wis. Stat. § 11.27(1).  A registrant that intentionally violates § 11.27(1) is subject to criminal penalty.  See Wis. Stat. § 11.61(1)(b).

¶604 To understand Wis. Stat. § 11.06(1)'s full reach on constitutionally protected speech, the terms "contribution" and "disbursement" must be construed.[23]  As previously noted, a "contribution" includes a "gift . . . of money . . . or anything

---

[23] Wisconsin Stat. § 11.06(1) includes the term "obligation" as well.  Under Chapter 11, "incurred obligation" is defined as "every express obligation to make any contribution or disbursement . . . for political purposes."  Wis. Stat. § 11.01(11).  Since that term relies on a promise to make a "contribution" or "disbursement," it is unnecessary to separately analyze it.

27

of value . . . made for political purposes." Wis. Stat. § 11.01(6)(a)1. The definition encompasses a "disbursement by a contributor to procure a thing of value or service for the benefit of a registrant who authorized the disbursement." Wis. Admin. Code § GAB 1.20(1)(e). A disbursement made for the benefit of a candidate that is prearranged with the candidate or the candidate's agent is treated as a contribution to the candidate or the campaign committee that must be reported as a contribution received. Wis. Stat. § 11.06(4)(d).

¶605 A "disbursement" includes "A purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value . . . made for political purposes." Wis. Stat. § 11.01(7)(a)1.

¶606 A "contribution" and a "disbursement" must be made for "political purposes." "Political purposes" is defined to include an act done "for the purpose of influencing" an election. Wis. Stat. § 11.01(16).

¶607 To reiterate, the phrase "for the purpose of influencing" an election has caused overbreadth and vagueness problems in the context of campaign-finance regulation where it serves to restrict independent expenditures. See Buckley, 424 U.S. at 77-80; MCFL, 479 U.S. at 249; Barland II, 751 F.3d at 833. That is because restraints on independent expenditures have the potential to encumber a substantial amount of protected speech. Buckley, 424 U.S. at 19. At first blush, then, Wis. Stat. § 11.06(1)'s reporting requirement for "disbursements" raises the specter of unconstitutionality as far as independent

28

spending is concerned. But Wis. Stat. § 11.06(2) solves that dilemma, exempting from § 11.06(1)'s reporting requirement independent disbursements that do not "expressly advocate the election or defeat of a clearly identified candidate . . . ." Thus, with respect to § 11.06(1)'s regulation of independent disbursements, there are no overbreadth and vagueness concerns in the sense meant by Buckley.

¶608 That leaves the question of whether the phrase "for the purpose of influencing" an election, incorporated in Wis. Stat. § 11.06(1) through the definition of "contribution," raises constitutional concerns in the sense meant by Buckley. Clearly, the answer is "no."

¶609 For starters, restrictions on contributions pose marginal as opposed to substantial burdens on speech. Id. at 20-21; see also Fed. Election Comm'n v. Colo. Republican Fed. Campaign Comm., 533 U.S. 431, 440 (2001) (Colorado II) ("Restraints on expenditures generally curb more expressive and associational activity than limits on contributions do."). The main rationale is that restraints on contributions have little direct impact on political communication, as they permit the symbolic expression of support and leave the contributor free to discuss candidates and issues. Buckley, 424 U.S. at 21. Arguably, that justification might not apply with equal force to contributions that take the form of coordinated issue advocacy, since such contributions do "communicate the underlying basis for the [contributor's] support." Id. But there is a simple solution to that problem: stop coordinating. In the absence of

29

coordination, the contributor is free to discuss candidates and issues.

¶610 That restrictions on contributions impose marginal burdens on free speech is especially true where the restriction at issue involves disclosure rather than a ceiling on the amount of money a person can give to a campaign. See Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 369 (2010) ("The Court has explained that disclosure is a less restrictive alternative to more comprehensive regulations of speech."). Even the majority is forced to acknowledge the fact that disclosure requirements pose less significant burdens on the exercise of free speech.[24] So it is important to keep in mind that Wis. Stat. § 11.06(1) requires disclosure of contributions made and received.

¶611 In light of the more modest burdens that Wis. Stat. § 11.06(1) imposes on the free speech rights of those that make and receive contributions, it is clear that less precision and clarity is required with respect to what is regulated. See Barland II, 751 F.3d at 837 ("The greater the burden on the regulated class, the more acute the need for clarity and precision."). That leads me to conclude that the phrase "for the purpose of influencing" an election is not problematic where it operates to regulate contributions under § 11.06(1). Indeed, Buckley supports my position. See Buckley, 424 U.S. at 23 n.24 ("The use of the phrase presents fewer problems in connection

---

[24] Majority op., ¶48.

with the definition of a contribution because of the limiting connotation created by the general understanding of what constitutes a political contribution.").

¶612 It is common sense that a gift of money to a candidate or a campaign committee constitutes an act made for the purpose of influencing an election. It is also common sense that money spent on services for the benefit of a candidate or a campaign committee that authorized the spending is an act done for the purpose of influencing an election. Similarly, where a candidate or a candidate's agent and a third party prearrange the third party's spending for the benefit of the candidate, common sense says the spending is done for the purpose of influencing an election. The point is that the aforementioned actions <u>are connected with a candidate or his or her campaign</u>.

¶613 Therefore, I conclude that Wis. Stat. § 11.06(1) is neither overbroad nor vague in its requirement that candidate committees report receipt of in-kind contributions in the form of coordinated spending on issue advocacy.

¶614 The majority disagrees, <u>although it does not address Wis. Stat. § 11.06(1)</u> in reaching its conclusion that the special prosecutor fails to advance a valid argument under Wisconsin criminal law. Rather, the majority dismisses the special prosecutor's primary argument by analyzing the GAB's definition of the term "in-kind contribution."[25] That approach is inconsistent with First Amendment overbreadth and vagueness

---

[25] <u>See</u> majority op., ¶74.

31

analysis. See Williams, 553 U.S. at 293 ("The first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers."); Madigan, 697 F.3d at 479 ("'In a facial challenge to the overbreadth and vagueness of a law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct.'") (quoted source and citation omitted). Wisconsin Admin. Code § GAB 1.20(1)(e), standing alone, does not regulate protected speech——it is a definition.

¶615 Had the majority performed a context specific First Amendment overbreadth and vagueness analysis, it presumably would have concluded that Wis. Stat. § 11.06(1) is unconstitutionally overbroad and vague in the sense meant by Buckley because it contains the terms "contribution" and "disbursement," thereby triggering "political purposes" and the phrase "for the purpose of influencing" an election.[26] But a correct reading of Buckley and its progeny leads to a conclusion that there are no constitutional infirmities with respect to § 11.06(1).

¶616 The majority's contrary conclusion ignores the legislature's intent in enacting Chapter 11. When searching for a limiting construction to cure an overly broad or vague statute, "we examine the language of the statute as well as its legislative history to determine whether the legislature

---

[26] See majority op., ¶¶66-67.

intended the statute to be applied in its newly-construed form." State v. Janssen, 219 Wis. 2d 362, 380, 580 N.W.2d 260 (1998). By rejecting the special prosecutor's in-kind contribution argument and holding that contributions received need not be reported under Wis. Stat. § 11.06(1) unless they involve express advocacy or its functional equivalent, the majority disregards the legislature's declaration of policy in creating Chapter 11: ensuring that the public is fully informed of the true source of financial support to candidates for public office. Wis. Stat. § 11.001.

¶617 The majority's errors will have a detrimental effect on the integrity of Wisconsin's electoral process, particularly in the context of campaign contributions. Under the majority's holding, an act is not a campaign contribution unless it involves express advocacy or its functional equivalent.[27] The majority claims that its limiting construction is necessary to place issue advocacy beyond Chapter 11's reach,[28] but at what cost? Surely gifts of money to a campaign trigger the same quid pro quo corruption concerns that justify the regulation of communications for express advocacy or its functional equivalent, and yet gifts of money would not constitute contributions under the majority's holding. Since Buckley, the United States Supreme Court has consistently upheld restraints on such campaign contributions. See O'Keefe, 769 F.3d at 941.

---

[27] Majority op., ¶67.

[28] Majority op., ¶¶66-67.

33

Thus, I question the propriety of the majority's decision to tear down those restraints.

¶618 In sum, I conclude that Chapter 11 supports the special prosecutor's in-kind contribution argument. The majority's contrary determination is the product of a fundamental misunderstanding and misapplication of Buckley and its progeny, including Barland II, as well as the First Amendment overbreadth and vagueness principles that those decisions embody.

D. The Question of Whether the First Amendment Prohibits Regulation of Coordinated Issue Advocacy Should Not Prevent the John Doe Investigation From Moving Forward.

¶619 Having concluded that the special prosecutor makes a valid argument under Wisconsin criminal law, the question remains whether the First Amendment to the United States Constitution prohibits regulation of coordinated issue advocacy.[29] This question should be addressed by the United States Supreme Court because it has sparked "lively debate among judges and academic analysts." Id. at 942.

---

[29] Speech that is protected under the First Amendment is not necessarily immune to governmental regulation. See Williams-Yulee, 135 S. Ct. at 1667 ("[N]obody argues that solicitation of campaign funds by judicial candidates is a category of unprotected speech. As explained above, the First Amendment fully applies to Yulee's speech. The question is instead whether that Amendment permits the particular regulation of speech at issue here."). This point appears lost on the majority. See, e.g., majority op., ¶¶66-67.

34

¶620 In O'Keefe, the plaintiffs filed suit seeking an injunction that would halt this John Doe investigation permanently, regardless of whether the special prosecutor could demonstrate a violation of Wisconsin law. Id. at 938. In addition, the complaint sought damages against five defendants, including the special prosecutor and the Milwaukee County District Attorney. Id. The United States District Court for the Eastern District of Wisconsin "held that the First Amendment to the Constitution (as applied to the states through the Fourteenth) forbids not only penalties for coordination between political committees and groups that engage in issue advocacy, but also any attempt by the state to learn just what kind of coordination has occurred." Id. As a result, the district court rejected the defendants' argument that they enjoyed qualified immunity. Id. at 939.

¶621 In reversing the district court's order that rejected the defendants' qualified immunity defense, the Seventh Circuit, in an opinion authored by Judge Easterbrook, reasoned:

> No opinion issued by the Supreme Court, or by any court of appeals, establishes ("clearly" or otherwise) that the First Amendment forbids regulation of coordination between campaign committees and issue-advocacy groups—let alone that the First Amendment forbids even an inquiry into that topic. The district court broke new ground. Its views may be vindicated, but until that day public officials enjoy the benefit of qualified immunity from liability in damages.

Id. at 942.

¶622 It is important to note that the United States Supreme Court has endorsed FECA's treatment of coordinated expenditures

35

as contributions. As previously mentioned, in Buckley, the Supreme Court upheld FECA's limitations on individual and group political contributions notwithstanding the fact that "contribution" was defined to include coordinated expenditures. Buckley, 424 U.S. at 23-59. It also upheld FECA's disclosure requirements on contributions so defined. Id. at 78. In Colorado II, the Supreme Court upheld FECA's limitations on coordinated expenditures between political parties and candidates. Colorado II, 533 U.S. at 465. Also, in McConnell, it upheld BCRA's treatment of coordinated disbursements for electioneering communications as contributions, even though the term "electioneering communication" was defined to include issue advocacy. McConnell, 540 U.S. at 203.

¶623 The basic rationale underlying the Supreme Court's endorsement of such restrictions is that coordinated expenditures "are as useful to the candidate as cash . . . ." Colorado II, 533 U.S. at 446. Thus, they are "disguised contributions" that "might be given 'as a quid pro quo for improper commitments from the candidate' (in contrast to independent expenditures, which are poor sources of leverage for a spender because they might be duplicative or counterproductive from a candidate's point of view." Id. (citing Buckley, 424 U.S. at 47). Since the prevention of quid pro quo corruption or its appearance remains a permissible goal justifying regulations on political speech, McCutcheon v. Fed. Election Comm'n, 134 S. Ct. 1434, 1441 (2014), it is certainly likely that the

36

regulation of coordinated issue advocacy will withstand First Amendment scrutiny.

¶624 Moreover, as noted previously, the Supreme Court recently determined that the First Amendment permits the regulation of judicial candidates' speech.  Williams-Yulee, 135 S. Ct. at 1662.  The Supreme Court reasoned that states have a compelling interest in preserving public confidence in their judges by preventing quid pro quo corruption or its appearance. Id. at 1667-68.  Thus, an argument can be made that Williams-Yulee bolsters the special prosecutor's contention that the First Amendment permits the regulation of coordinated issue advocacy, since that is an area where corruption or its appearance is a significant concern as well.

¶625 Because the special prosecutor makes a valid argument under Wisconsin criminal law, and because the United States Supreme Court has not concluded that the First Amendment prohibits the regulation of coordinated issue advocacy, the John Doe investigation should not be terminated.  Not only do the majority's errors serve to end a valid John Doe investigation, they work to limit the reach of Wisconsin's campaign-finance law in a manner that will undermine the integrity of our electoral process.  I disagree with these consequences and therefore respectfully dissent in Two Unnamed Petitioners.

II. SCHMITZ v. PETERSON AND THREE UNNAMED PETITIONERS

¶626 The questions presented in Schmitz v. Peterson and Three Unnamed Petitioners boil down to whether the John Doe judge violated a plain legal duty in either initiating these

37

proceedings or quashing various subpoenas and search warrants related to the investigation. Both the special prosecutor in Schmitz v. Peterson and the Unnamed Movants in Three Unnamed Petitioners carry a heavy burden in this regard, as a supervisory writ is an "extraordinary and drastic remedy that is to be issued only upon some grievous exigency." State ex. rel. Kalal v. Circuit Ct. for Dane Cnty., 2004 WI 58, ¶17, 271 Wis. 2d 633, 681 N.W.2d 110. I agree with the majority that neither the special prosecutor nor the Unnamed Movants have established the prerequisites for a writ to issue.[30]

¶627 However, I wish to clarify that the majority's decision in Schmitz v. Peterson should not be construed as holding that the evidence gathered in the John Doe proceedings fails to provide a reasonable belief that Wisconsin's campaign-finance law was violated. The majority's decision to deny the writ rests solely on the fact that Reserve Judge Gregory Peterson made a discretionary decision to quash the subpoenas and search warrants at issue. By the very nature of the supervisory writ standard, the majority's conclusion takes no position on the propriety of Reserve Judge Peterson's decision in this regard.

### III. CONCLUSION

¶628 By erroneously concluding that campaign committees do not have a duty under Wisconsin's campaign-finance law to report receipt of in-kind contributions in the form of coordinated

---

[30] See majority op., ¶¶78, 101.

spending on issue advocacy, the majority rejects the special prosecutor's primary argument regarding criminal activity. Although the special prosecutor advances a secondary argument of criminal activity concerning coordinated express advocacy, the majority inexplicably ignores that argument.  These mistakes lead the majority to terminate a valid John Doe investigation in an unprecedented fashion.

¶629 With respect to the special prosecutor's primary argument, which is the focus of my writing, the majority misapplies the related doctrines of overbreadth and vagueness. Unlike the majority, I conclude that Wis. Stat. § 11.06(1) is neither overbroad nor vague in its requirement that campaign committees report receipt of in-kind contributions.  The majority also makes the troubling pronouncement that an act is not a regulable disbursement or contribution under Ch. 11 unless it involves express advocacy or its functional equivalent.  This is an erosion of Ch. 11 that will profoundly affect the integrity of our electoral process.  I cannot agree with this result.

¶630 It is also imperative to note that the majority conveniently overlooks the special prosecutor's secondary argument of criminal activity in its effort to end this John Doe investigation.  Specifically, the special prosecutor seeks to investigate whether particular express advocacy groups coordinated their spending with candidates or candidate committees in violation of their sworn statement of independence under Wis. Stat. § 11.06(7).  Despite the fact that the special

39

prosecutor utilizes a significant portion of his brief to present evidence of such illegal coordination, the majority determines, without explanation, that the John Doe investigation is over.

¶631 Has the majority abused its power in reaching this conclusion? The majority's rush to terminate this investigation is reminiscent of the action taken by the United States District Court for the Eastern District of Wisconsin in O'Keefe v. Schmitz, 19 F. Supp. 3d at 875, an action that was both criticized and reversed by the United States Court of Appeals for the Seventh Circuit in O'Keefe, 769 F.3d at 942. Although the focus of my writing lies elsewhere, the majority's error in this regard cannot be overlooked.

¶632 For these reasons, I respectfully dissent in State ex. rel. Two Unnamed Petitioners v. Peterson (Two Unnamed Petitioners).

¶633 However, because I agree that the special prosecutor and certain Unnamed Movants have failed to meet their heavy burden of establishing that the John Doe judge violated a plain legal duty in either initiating these proceedings or quashing various subpoenas and search warrants related to the investigation, I respectfully concur with the majority in State ex. rel. Schmitz v. Peterson (Schmitz v. Peterson) and State ex. rel. Three Unnamed Petitioners v. Peterson (Three Unnamed Petitioners). In concurring in Schmitz v. Peterson, it is significant for me that when an appellate court decides to issue a supervisory writ, it is a rare, discretionary decision.

<u>Madison Metro. Sch. Dist.</u>, 336 Wis. 2d 95, ¶¶33-34. Here, the John Doe judge also made a discretionary decision in deciding a complex legal issue. Deference should be given where there is such discretion.

¶634 For the foregoing reasons, I concur in part and dissent in part. To be clear, I agree with the majority's decision to deny the petition for supervisory writ and affirm Reserve Judge Gregory Peterson's order in <u>Schmitz v. Peterson</u>. I also agree with the majority's decision to deny the petition for supervisory writ and affirm the court of appeals' decision in <u>Three Unnamed Petitioners</u>. However, contrary to the majority, I would deny the relief sought in <u>Two Unnamed Petitioners</u> and allow the John Doe investigation to continue.